## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| ) | Civil Action No. <u>12-cv-8791 (CM)</u> |
| **UNITED STATES COMMODITY FUTURES** ) | <u>(GWG)</u> |
| **TRADING COMMISSION,** ) |  |
| **Plaintiff,** ) | **(PROPOSED) ORDER OF DEFAULT** |
| ) | **JUDGMENT, PERMANENT** |
| **v.** ) | **INJUNCTION, CIVIL MONETARY** |
| ) | **PENALTIES AND OTHER** |
| **ERIC MONCADA; BES CAPITAL LLC; and** ) | **EQUITABLE RELIEF AGAINST** |
| **SERDIKA LLC.** ) | **DEFENDANTS BES CAPITAL LLC** |
| **Defendant(s).** ) | **AND SERDIKA LLC** |
| ) |  |

On December 3, 2012, the Commodity Futures Trading Commission ("CFTC" or "Commission") filed a Complaint against Defendants Eric Moncada ("Moncada"), BES Capital LLC ("BES"), and Serdika LLC ("Serdika"). (Dkt. No. 1). The Complaint alleged violations by Defendants of Sections 4c(a), 6(c), 6(d) and 9(a)(2) of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 6c(a), 9, 13b and 13(a)(2) (2006), as well as Commission Regulation ("Regulation") 1.38(a), 17 C.F.R. § 1.38(a) (2012). Neither BES nor Serdika have filed Answers to the Commission's Complaint and are in default. However, Moncada was served and has filed an answer and is not in default; therefore, the findings of fact and conclusions of law in this Order of Default Judgment, Permanent Injunction, Civil Monetary Penalties and Other Equitable Relief Against Defendants BES Capital LLC and Serdika LLC ("Default Order") are binding only on Defendants BES and Serdika.

Pursuant to FED. R. CIV. P. 55(b)(2), this matter now comes before the Court on the Commission's Motion For Default Judgment, Permanent Injunction, Civil Monetary Penalties And Other Equitable Relief Pursuant To Federal Rule Of Civil Procedure 55(b) And Memorandum In Support Against Defendants BES Capital LLC And Serdika LLC ("Motion") for BES's and Serdika's failure to answer or otherwise respond to the Complaint. This Court has considered the

entire record in this matter, including the Commission's Motion, and finds that good cause exists for entry of the relief requested.  Accordingly, the Commission's Motion is **GRANTED**, as detailed below.

**THE COURT HEREBY FINDS:**

## I.   PROCEDURAL HISTORY

1.      On December 3, 2012, the Commission filed a ten-count Complaint against Defendants, alleging violations of Sections 4c(a), 6(c), 6(d) and 9(a)(2) of the Act 7 U.S.C. §§ 6c(a), 9, 13b and 13(a)(2) (2006) and Regulation 1.38(a), 17 C.F.R. § 1.38(a) (2012).

2.      More than 21 days have elapsed since the filing of the Commission's Complaint on December 3, 2012, and all Defendants were served on or before January 16, 2013.  Neither BES nor Serdika has filed any responsive pleadings to the Commission's Complaint.  (*See generally*, Dkt.).

3.      On May 30, 2013, the Commission filed an Application for Certificate of Default Under F.R.C.P. 55(a) and S.D.N.Y. Local Rule 55.1 Against Defendants Serdika LLC and BES Capital LLC.  (Dkt. No. 19).

4.      On July 17, 2013, the Clerk of Court entered a Certificate of Default against Defendants Serdika and BES.  (Dkt. No. 24).

## II.   FINDINGS OF FACT

5.      The allegations of the Complaint are well-pleaded and hereby taken as true.  This Default Order is supported by the findings of fact detailed in this Default Order which are only applicable for purposes of this Default Order and only against BES and Serdika.  Further, the findings of fact contained in this Default Order are specifically not binding on any other defendant in this action.

## A.    Parties

6.    The **U.S. Commodity Futures Trading Commission** is an independent federal regulatory agency that is charged by Congress with the responsibility for administering and enforcing the provisions of the Act, 7 U.S.C. §§ 1 *et seq*., and the Regulations promulgated thereunder, 17 C.F.R. §§ 1 *et seq*. (2012).  One of its core responsibilities is to protect the public interest by deterring and preventing price manipulations of the commodity markets or futures markets, or other disruptions to market integrity.  *See* Section 3(b) of the Act, 7 U.S.C. § 5(b) (2012).

7.    **BES Capital LLC** was a Delaware limited liability company with its principal place of business in New York, New York.  BES shared offices, common ownership and management with Serdika.  BES began operations in December 2008, and ceased trading in December 2009.  BES has never been registered with the Commission.

8.    **Serdika LLC** was a Delaware limited liability company with a principal place of business in New York, New York.  Serdika shared offices, common ownership and management with BES.  Serdika began operations in November 2007, and ceased trading in June 2011.  Serdika has never been registered with the Commission.

9.    **Eric Moncada** at all relevant times resided in New York City, and was a futures trader employed by Serdika and a member of BES during the relevant dates.  Moncada was responsible for trades on behalf of BES and Serdika during the relevant dates.  Moncada is a floor broker registered with the Commission.

## B.    The Manipulative Scheme

10.    On the trading days of October 6, 12, 14, 19, 26, 27, 29, and 30, 2009, Moncada engaged in a strategy of repeated and persistent trading activity in an attempt to manipulate the price of the Chicago Board of Trade ("CBOT") December 2009 #2 Soft Red Winter Wheat Futures

Contract ("December 2009 Wheat Futures Contract").  Moncada's manipulative scheme employed the following trading tactics: 1) manually placing and immediately canceling numerous orders of 200 lots or more (hereinafter "large-lot orders") without the intent to have the large-lot orders filled, but instead with the intent to create the misleading impression of increasing liquidity in the market;  2) placing these large-lot orders at or near the best bid or offer price in a manner to avoid being filled by the market; and 3) placing small-lot orders on the opposite side of the market from these large-lot orders with the intent of taking advantage of any price movements that might result from the misleading impression of increasing liquidity that his large-lot orders created.  These trading tactics illustrate Moncada's intent to repeatedly affect the prices of the December 2009 Wheat Futures Contract both upward and downward.

11.    Moncada used the first trading tactic by placing and immediately canceling orders in excess of 200 lots to buy December 2009 Wheat Futures Contracts (hereinafter "large-lot buy order") and by placing and immediately canceling orders in excess of 200 lots to sell December 2009 Wheat Futures Contracts (hereinafter "large-lot sell order").

12.    Moncada used the second trading tactic by placing many of his large-lot buy orders or large-lot sell orders at or near the market's best bid price or best offer price, respectively.  By doing so, Moncada ensured that his large-lot orders (buy or sell) would appear in the "best of book" orders that Globex, the electronic trading platform on which Moncada was trading the December 2009 Wheat Futures Contract, displayed to other market participants.  However, Moncada entered his large-lot orders in a manner that minimized the risk that his large-lot orders would be hit or lifted by other market participants.

13.    Moncada used the first and second trading tactics with the intent to create the misleading impression of increasing liquidity in the market to other market participants.

4

14.     Moncada also used the third trading tactic of placing small-lot orders on the opposite side of the market from these large-lot (buy or sell) orders (hereinafter "potentially benefitting orders") to capture any financial benefit that may have resulted from any price movements in the market from the misleading impression of increasing liquidity created by the use of his first and second trading tactics.  Moncada would place his potentially benefitting orders into the market immediately *before* or immediately *after* he placed his large-lot orders.

15.     Moncada's manipulative scheme was intended to capture immediate gains over a short period of time, and was distinct from his other trading activity throughout the day.

16.     On the relevant dates, Moncada manually entered a total of 710 large-lot orders.  Moncada manually canceled at least 98 percent of the total volume of these orders.

17.     Over the relevant dates, Moncada's large-lot orders were manually canceled on average within approximately 2.06 seconds of entry, and as quickly as 0.226 seconds.  This short time between entry and cancelation of the large-lot orders and the use of the other trading tactics in his manipulative scheme evidences that Moncada did not intend to fill these large-lot orders and did not have a rational economic business purpose for placing them other than to attempt to influence prices of the December 2009 Wheat Futures Contract.

18.     Moncada placed significantly more large-lot orders in the December 2009 Wheat Futures Contract than all other market participants combined on the relevant dates.  Further, Moncada canceled a significantly higher percentage of his large-lot orders by volume in the December 2009 Wheat Futures Contract than all other market participants combined on the relevant dates.

**1.    *Moncada's Use of the Manipulative Trading Strategy***

19.     The following examples illustrate Moncada's manipulative trading strategy of repeating and persistently using his trading tactics in his attempt to manipulate the December 2009

Wheat Futures Contract price.  Moncada repeated, in one form or another, each of his trading tactics on each and every one of the relevant dates.

### a.    Example of Activity Intended to Push the Market Price Up

20.    On October 29, 2009, between 10:33:19 a.m. and 10:39:31 a.m., Moncada engaged in a pattern of manual trading activity in an attempt to manipulate upward the price of the December 2009 Wheat Futures Contract while trading in the Serdika account.

21.    As described more fully below, Moncada bought 25 lots of the December 2009 Wheat Futures Contract at prices of 506.5 and 506.75, in order to build a long position.  Moncada then used all three of his trading tactics in an attempt to gain a financial benefit.  First, he placed large-lot orders and then immediately cancelled them.  Second, when he placed the large-lot orders, he did so at the best bid price when there were already several orders at that best bid price. By placing and then cancelling large lot orders at the best bid price, Moncada's large-lot orders had little chance of being filled.  In doing so, Moncada intended to create the misleading impression of increasing liquidity (on the buy side) in the market with the intent to move the market price upward.  During this period, the market price rose as high as 508.75.  Moncada also used his third trading tactic of placing potentially benefiting sell orders (small-lot short positions) to offset his previous long position at the higher prices that may have resulted from these trading tactics.

22.    Specifically, between 10:33:19 a.m. and 10:33:21 a.m., Moncada accumulated 25 lots of a long position at prices of 506.5 and 506.75 (*i.e.* bought low).  Sometime after 10:38:25 a.m. Moncada offset these long positions at prices of up to 508.75 (*i.e.* sold high).

6

23.     As detailed in the chart below, Moncada, after 10:33:21 a.m., entered a series of six large-lot buy orders, of 402 lots and 500 lots, over a period of five minutes.  Moncada canceled these six large-lot orders within 0.575 to 2.696 seconds of entry (Trading Tactic 1).

| Order Time | Lot Size | Price | Distance From Best Bid (Ticks) | Filled Lots | Time to Cancel |
|---|---|---|---|---|---|
| 10:33:25.251 a.m. | 500 | 506.5 | 0 | 0 | 1.283 seconds |
| 10:34:40.764 a.m. | 402 | 506.5 | 0 | 0 | 0.983 seconds |
| 10:35:41.260 a.m. | 402 | 506.75 | 0 | 0 | 0.575 seconds |
| 10:36:42.715 a.m. | 500 | 507.75 | 0 | 4 | 2.696 seconds |
| 10:37:40.395 a.m. | 500 | 508.5 | 0 | 1 | 0.746 seconds |
| 10:38:24.755 a.m. | 402 | 508.5 | 0 | 1 | 0.737 seconds |

24.     Of the 2,706 lots comprising these six large-lot buy orders, only six lots were filled, with the remaining 2,700 lots canceled.  These large-lot buy orders were entered in a manner consistently at the best bid price, when there were already several orders ahead of Moncada's at the best bid price (Trading Tactic 2).  This allowed Moncada's large-lot orders to appear in the best of book on Globex, while minimizing the risk that the large-lot orders would be filled.   The prices of the large-lot buy orders that Moncada placed rose with the market price; the first large-lot buy order was at 506.5, the last at 508.5.

25.     Beginning one second after canceling his first large-lot buy order and continuing one minute after canceling his sixth large-lot buy order, Moncada entered a series of potentially benefiting sell orders at prices ranging from 507 to 508.75 (Trading Tactic 3).  Moncada entered these potentially benefitting orders with the intent to take advantage of any possible market price movement resulting from the misleading impression of increasing liquidity on the buy side his large-lot orders may have created.

26.     A total of 66 lots of the potentially benefitting sell orders were ultimately filled, with prices ranging from 507 to 508.75.  These prices were between one and eight ticks higher than the

prices Moncada received when he filled his buy orders before the large-lot orders.  Therefore, Moncada bought multiple contracts at 506.5 and 506.75 and sold them for 507 and 508.75.

### b.  Example of Activity Intending to Push the Market Price Down

27.    On October 27, 2009, between 9:36:00 a.m. and 9:38:01 a.m., Moncada engaged in a pattern of manual trading activity in an attempt to manipulate downward the price of the December 2009 Wheat Futures Contract while trading in the BES account.

28.    As discussed more fully below, Moncada sold 25 lots of the December 2009 Wheat Futures Contract at prices of 523.5 and 523.75, in order to build a short position.  Moncada then used all three of his trading tactics in an attempt to gain a financial benefit.  First, he placed large-lot orders and then immediately cancelled them.  Second, when he placed the large-lot orders, he did so at the best offer price when there were already several orders at that best offer price.  By placing and then cancelling large-lot orders at the best offer price, Moncada's large-lot orders had little chance of being filled.  In doing so, Moncada intended to create the misleading impression of increasing liquidity (on the sell side) in the market with the intent to move the market price downward.  During this period, the market price dropped as low as 522.  Moncada also used his third trading tactic of placing potentially benefiting buy orders (small lot long positions) to offset his previous short position at the lower prices that may have resulted from these trading tactics.

29.    Specifically, beginning at 9:36:00 a.m., and continuing throughout the next two minutes, Moncada placed a series of potentially benefitting orders at prices of 523, 522.75, 522.5, 522.25, and 521.75, which were several ticks below the best bid price at the time Moncada entered them (Trading Tactic 3).  These potentially benefiting orders rested unfilled in the market.

30.     As detailed below, Moncada then manually entered a series of five large-lot sell orders of 302 and 402 lots, over a period of less than two minutes.  Moncada manually canceled these five large-lot orders within 0.9 seconds of entry (Trading Tactic 1).

| Time | Size | Price | Distance From Best Bid (Ticks) | Filled Lots | Time to Cancel |
|------|------|-------|-------------------------------|-------------|----------------|
| 9:36:16.765 a.m. | 302 | 524 | 0 | 0 | 0.797 |
| 9:36:26.751 a.m. | 402 | 523.75 | 0 | 0 | 0.827 |
| 9:37:00.130 a.m. | 402 | 523.5 | 0 | 0 | 0.649 |
| 9:37:30.523 a.m. | 402 | 522.75 | 0 | 0 | 0.729 |
| 9:37:59.620 a.m. | 402 | 522 | 0 | 0 | 0.712 |

31.     Of the 1,910 lots comprising these five large-lot sell orders, none were filled, and all of the 1,910 lots canceled.  These large-lot sell orders were entered in a manner consistently at the best offer price, when there were already several orders ahead of Moncada's at the best offer price (Trading Tactic 2).  This allowed Moncada to place large-lot orders that would appear in the best of book on Globex, while minimizing the risk that the large-lot orders would be filled.  The prices of the large-lot sell orders Moncada placed in these seconds fell with the market price; the first large-lot sell order was at 524, the last at 522.

32.     Between 9:37:21 a.m. and 9:38:01 a.m., a series of Moncada's earlier potentially benefiting orders were filled at prices of two to eight ticks lower than his previously acquired short positions.  Moncada entered these potentially benefitting orders with the intent to take advantage of any possible market price movement resulting from the misleading impression of increasing liquidity on the sell side which he had caused by placing and immediately canceling his large-lot orders.

33.     Over the period of less than two minutes described above, Moncada accumulated a short position of 55 lots at prices of 523.5 and 523.75.  Moncada then closed out 42 lots of that

position with buy trades at prices of 521.75 to 523, representing a price movement in favor of his short position by two to eight ticks.  Therefore, Moncada sold multiple contracts at 523.5 to 506.75 and bought them for 521.75 to 523.

### c.    Moncada Repeatedly Employed the Manipulative Trading Strategy on Each of the Relevant Dates

34.    The examples above illustrate how Moncada attempted to manipulate the price of the December 2009 Wheat Futures Contract by using his three trading tactics in his manipulative trading strategy.  Moncada repeated this trading strategy multiple times on each of the relevant dates in his attempt to manipulate the price of the December 2009 Wheat Futures Contract in the BES account and in the Serdika account.  Specifically, on each of the relevant dates - with the intent to avoid being hit or lifted by other market participants - he placed and immediately canceled between 37 and 118 large-lot orders (Trading Tactic 1), at or near the best bid or offer price (Trading Tactic 2).  Further, on each of the relevant dates, Moncada placed small-lot potentially benefiting orders on the opposite side of the market from his large-lot orders with the intent of taking advantage of any price movements that might result from the misleading impression of increasing liquidity that his large-lot orders created (Trading Tactic 3).

### 2.    Moncada's Large-Lot Trading Activity Was Significantly Different from the Rest of the Market

35.    During the relevant dates, Moncada's large-lot manual trading activity in the December 2009 Wheat Futures Contract was significantly different than the large-lot trading activity by the other market participants in terms of volume and the speed at which he consistently canceled his large-lot orders.

36.    As shown in the chart below, during the relevant dates, Moncada entered and immediately canceled the following volumes of large-lot orders with overall high cancelation rates. By contrast, the rest of the market entered significantly less volume, and canceled significantly less

of the volume of its large-lot orders.  Contrary to Moncada's large-lot trading activity, most of the other market participant's large-lot orders were filled completely or partially, and remained on the market for extended periods of time.

| | MONCADA | | MARKET | | CANCELLATION RATE | |
|---|---|---|---|---|---|---|
| Relevant Dates | Total Volume of Large-Lot Orders | Total Canceled Volume of Large-Lot Orders | Total Volume of Large-Lot Orders | Total Canceled Volume Of Large-Lot Orders | Moncada's by Volume | Market's by Volume |
| October 6 | 18,924 | 18,711 | 4,580 | 477 | 98.87% | 10.41% |
| October 12 | 15,766 | 15,546 | 14,323 | 4,493 | 98.60% | 31.37% |
| October 14 | 29,216 | 28,860 | 12,730 | 2,673 | 98.78% | 21.00% |
| October 19 | 35,551 | 35,201 | 18,958 | 7,689 | 99.02% | 40.56% |
| October 26 | 42,878 | 41,986 | 20,549 | 1,096 | 97.71% | 5.33% |
| October 27 | 34,161 | 33,659 | 9,207 | 1,736 | 98.53% | 19.23% |
| October 29 | 49,088 | 48,293 | 18,138 | 5,995 | 99.66% | 33.00% |
| October 30 | 16,438 | 16,433 | 10,248 | 3200 | 99.97% | 31.23% |

37.     For example, on October 29, 2009, Moncada entered 118 large-lot orders for a total volume of 49,088 lots.  Moncada canceled, either completely or partially, all of his large-lot orders, and was partially filled for only 165 lots on this day.  The remaining 48,923 lots were canceled, representing 99.66 percent of the total volume of his large-lot orders.

38.     To the contrary, on the same day, the rest of the market only placed 51 large-lot orders for a total volume of 18,138 lots.  The rest of the market canceled, either completely or partially, only 16 of those large-lot orders for a total volume of 5,995 lots.  As such, the market

only canceled 33 percent of the total volume of its large-lot orders on October 29, 2009, as compared to Moncada's cancellation rate of 99.66 percent.

39.     Moncada's trading activity was also significantly different from the rest of the market with respect to the duration that his large-lot orders stayed open in the market.  On the relevant dates, Moncada's large-lot orders were in the market for an average of 2.06 seconds, with some canceled within 226 milliseconds.  To the contrary, the average amount of time that a large-lot order placed by another market participant remained open in the market was 9 hours 16 minutes and 35 seconds, during the relevant dates.  Based on the speed and immediacy in which Moncada canceled his large-lot orders, especially as compared to rest of the market, he did not intend for each of his large-lot orders to be filled.

### 3. *Moncada's Use of "Iceberg" Orders*

40.     Globex allows traders to enter "iceberg" orders, which are orders for a large number of lots that only display a small number of the lots to the market at any one time as predetermined by the trader.  If the initial visible quantity of lots in the "iceberg" is filled, then additional lots will automatically be shown to the market.  This type of order entry allows traders to execute large-lot trades without signaling to the market their intention to fill a large quantity of lots.  Therefore, traders who want to fill orders for large-lot quantities may use this order entry method to avoid the natural price movements that could potentially occur in reaction when orders, particularly large-lot orders, suddenly are placed in the market.  This order entry method assists a trader in trying to get the best possible price for all of the lots the trader desires to fill.

41.     Moncada's lack of use of "iceberg" orders further illustrates that he had no intent to fill the vast majority of the large-lot orders he placed on the relevant dates.  During the relevant dates, Moncada entered only four large-lot orders with the "iceberg" function, all of which were on October 27, 2009.  By contrast, Moncada entered 710 large-lot orders showing the entire quantity

to the market.  However, Moncada frequently used "iceberg" orders to fill his orders ranging in size from 20 to 100 lots.

42.     Had Moncada intended for his large-lot orders to be filled, he could have used the "iceberg" function to fill each of those large-lot orders.  The "iceberg" function would have avoided causing any sudden price movement by the market.  Rather than engage in this legitimate trading strategy, Moncada used Trading Tactics 1, 2 and 3 to create a misleading impression of increasing liquidity in the market so he could attempt to benefit financially from price movements.

43.     By engaging in the trading tactics described in the above paragraphs, with the requisite intent to affect prices, BES and Serdika, through Moncada, attempted to manipulate the prices of the December 2009 Wheat Futures Contracts on October 6, 12, 14, 19, 26, 27, 29, and 30, 2009.

**B.     Fictitious Sales and Non-Competitive Transactions**

44.     On the trading dates of October 6, 12, 15, and 29, 2009, Moncada, while trading in the BES and Serdika accounts, entered four separate opposing buy and sell orders in the December 2009 Wheat Futures Contracts into Globex for the purpose of transferring positions between an account in the name of BES and an account in the name of Serdika with the knowledge and intent that the orders would match opposite one another in these accounts with common ownership.

45.     For example, at 10:20:54 a.m. on October 6, 2009, Moncada entered an order in the Serdika account to sell 40 lots of the December 2009 Wheat Futures Contract at a price of 466. Less than five seconds later, Moncada entered an order in the BES account to buy 40 lots of the December 2009 Wheat Futures Contract at 466.25.  Two seconds later, Moncada moved the price of the Serdika order to match the BES order so that both orders were completely filled at 466.25, with 40 lots of the BES sell order filled by the Serdika buy order.  These transactions were

intended to transfer positions from the BES account to the Serdika account by having the opposite orders find and match each other on Globex without the intent to take a genuine *bona fide* position in the market.

46.     Moncada placed other near-simultaneous buy and sell orders at the same price in the Serdika account and BES account on October 6, 12, 15 and 29, 2009.  CBOT Rules 534 and 539 do not allow Moncada to execute trades in the manner described herein.  By his own account, Moncada admitted that he simultaneously placed offsetting orders in the BES and Serdika accounts in an effort to "transfer" or move the positions from the BES account to the Serdika account.  BES and Serdika, through their agents and employees, including Moncada, intended for the offsetting transactions to negate risk and price competition, and the transactions did in fact negate risk and price competition.  BES and Serdika, through their agents and employees, including Moncada, knew at the time BES and Serdika entered into the offsetting transactions that the transactions resulted in a position and financial nullity.

### III.   <u>CONCLUSIONS OF LAW</u>

The conclusions of law detailed in this Default Order are only applicable for purposes of this Default Order and only against BES and Serdika.  Further, the conclusions of law contained in this Default Order are specifically not binding on any other defendant in this action.

47.     This Court has jurisdiction over this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), which authorizes the Commission to seek injunctive relief against any person, or to enforce compliance with the Act, whenever it shall appear to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder.

48.     Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e) (2012), in that Defendants are found in this District, transact business in this District, and

the acts and practices in violation of the Act have occurred, are occurring, or are about to occur within this District.

**A.      BES's and Serdika's Failure to Answer Warrants Entry of Default Judgment**

49.      When a party against whom a default judgment is sought has failed to plead or otherwise assert a defense, and that fact has been documented, the clerk shall enter the party's default.  Fed. R. Civ. P. 55(a).  As indicated *supra*, BES and Serdika were properly served on or before January 16, 2013.  Neither BES nor Serdika has filed any responsive pleadings to the Commission's Complaint.  (*See generally*, Dkt.).  The Commission requested a Clerk's Entry of Default, which was entered on July 17, 2013.  (Dkt. Nos. 19, 24).

50.      Once the Clerk has entered a default, the party seeking the default shall then apply to the court for a default judgment. Fed. R. Civ. P. 55(b).  A party may move for a default judgment against an adversary who fails to answer or appear. Fed. R. Civ. P. 55(b). "Where, as here, 'the court determines that defendant is in default, the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true.'" *Mendez v. Nooch, Inc*., 07 Civ. 11174 (LLS)(RLE), 2009 U.S. Dist. LEXIS 25114, 2009 WL 666771, at * 1 (S.D.N.Y. Mar. 6, 2009) (quoting *Lin v. Hayashi Ya II, Inc*., No. 08 Civ. 6071 (SAS)(AJP), 2009 U.S. Dist. LEXIS 12963, 2009 WL 289653, at *1 (S.D.N.Y. Jan. 30, 2009)).   A factual allegation will be deemed not well-pleaded only in "very narrow, exceptional circumstances." *Verizon Directories Corp. v. AMCAR Transp. Corp*., 05 Civ. 8867 (GBD)(RLE), 2008 U.S. Dist. LEXIS 92037, 2008 WL 4891244, at *2 (S.D.N.Y. Nov. 12, 2008) (citing *TMS Entm't Ltd. v. Madison Green Entm't Sales, Inc*., 03 Civ. 0517 (GBD) (RLE), 2005 U.S. Dist. LEXIS 18256, 2005 WL 2063786, at *2 (S.D.N.Y. Aug. 16, 2005)).  BES and Serdika have not responded to the Complaint and have not attempted to dispute or

defend against the allegations in the Complaint.  In light of the facts established above, the the entry of default judgment against BES and Serdika is warranted as a matter of law.

**B.**      **BES and Serdika Violated Certain Provisions of the Act and Regulations**

      *1.  BES and Serdika Violated Sections 6(c), 6(d), and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13(b) and  13(a)(2) (2006)*

51.      Sections 6(c), 6(d), and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b, and 13(a)(2) (2006), make it illegal for any person to attempt to manipulate the price of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, including any contract market.

52.      On October 6, 12, 14, 19, 26, 27, 29, and 30, 2009, BES and Serdika, through Moncada, their agent for purposes of this default order judgment against BES and Serdika, intended to affect the prices of the December 2009 Wheat Futures Contract, and engaged in repeated overt acts in furtherance of that intent.  Accordingly, BES and Serdika, through Moncada, their agent for purposes of this default order judgment against BES and Serdika, violated Sections 6(c), 6(d), and 9(a)(2) of the Act, 7 U.S.C. § 9, 13b and 13(a)(2)(2006).

53.      Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2006), provides that the act, omission or failure of any official, agent, or other person acting for any corporation within the scope of his employment shall be deemed the act of the corporation.  Because the actions of the officers, employees and agents of BES and Serdika, including, but not limited to Moncada, that violated Sections 6(c), 6(d), and 9(a)(2) of the Act, 7 U.S.C §§ 9, 13b and 13(a)(2) (2006), were within the scope of their employment, BES and Serdika are liable for those acts constituting violations pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2006).

54.      Specifically, Moncada's actions resulted in violations of the Act by BES on October 6, 12, 14 and 19, 2009.  Moncada's actions resulted in additional violations of the Act by both BES

and Serdika on October 26 and 27, 2009.  Moncada's actions further resulted in additional

violations of the Act by Serdika on October 29 and 30, 2009.  Therefore, Moncada's actions

resulted in violations of Sections 6(c), 6(d), and 9(a)(2) of the Act by BES on six separate days and

violations of Sections 6(c), 6(d), and 9(a)(2) of the Act by Serdika on four separate days.

### 2.   *BES and Serdika Violated Section 4c(a) of the Act, 7 U.S.C. § 6c(a)*

55.     Section 4c(a)(1) of the Act,  7 U.S.C. § 6c(a)(1), provides, in relevant part, "It shall

be unlawful for any person to offer to enter into, enter into, or confirm the execution of a

transaction described in paragraph (2) involving the purchase or sale of any commodity for future

delivery . . .  if the transaction is or may be used to (A) hedge any transaction in interstate

commerce in the commodity or the product or byproduct of the commodity," or "(C) deliver any

such commodity sold, shipped or received in interstate commerce for the execution of the

transaction."  7 U.S.C. § 6c(a)(1).

56.     Paragraph (2) of Section 4c(a), in turn, provides, "[a] transaction referred to in

paragraph (1) is a transaction that . . . is, is of the character of, or is commonly known to the trade

as, a 'wash sale' or 'accommodation trade' . . . or is a fictitious sale or is used to cause any price to

be reported, registered or recorded that is not a true and *bona fide* price."  7 U.S.C. § 6c(a)(2).

57.     On October 6, 12, 15, and 29, 2009, BES and Serdika, through Moncada, their agent

for purposes of a default order judgment against BES and Serdika, knowingly offered to enter into

and entered into four separate transactions that were fictitious sales in violation of Section 4c(a) of

the Act, 7 U.S.C. § 6c(a), by simultaneously buying and selling the same number of lots of the

December 2009 Wheat Futures Contract for the same delivery month at the same price, with the

expectation that both parties to the trades would offset against each other.

58.     BES and Serdika, through Moncada, their agent for purposes of this default order

judgment against BES and Serdika, intended to negate the risk and price competition normally

attendant to futures transactions at the time Moncada entered into these offsetting trades.

Moncada, for purposes of this default order judgment against BES and Serdika, as an agent and

employee of both BES and Serdika, knew at the time he entered into the transactions that they

negated risk and price competition.

59.    Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2006), provides that the act,

omission or failure of any official, agent, or other person acting for any corporation within the

scope of his employment shall be deemed the act of the corporation.  Because the acts, omissions,

and failures of the officers, employees and agents of BES and Serdika, including, but not limited to

Moncada, that violated the Act were within the scope of their employment, BES and Serdika are

liable for those acts constituting violations pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. §

2(a)(1)(B) (2006), and Regulation 1.2, 17 C.F.R. § 1.2 (2012).

### 3.  *BES and Serdika Violated Commission Regulation 1.38(a), 17 C.F.R. § 1.38(a)*

Commission Regulation 1.38(a), 17 C.F.R. § 1.38(a) (2012), provides, in relevant part:

*Competitive execution required; exceptions.*  All purchases and sales of any
commodity for future delivery  . . .  on or subject to the rules of a contract market
shall be executed openly or competitively by open outcry or posting of bids and
offers or by other equally open and competitive methods, in the trading pit or ring
or similar place provided by the contract market, during the regular hours
prescribed by the contract market for trading in such commodity. . . . *Provided
however*, That this requirement shall not apply to transactions which are executed
noncompetitively in accordance with the written rules of the contract market
which have been submitted to and approved by the Commission, specifically
providing for the noncompetitive execution of such transactions.

60.    BES and Serdika, through Moncada, their agent for purposes of a default order

judgment against BES and Serdika,  knowingly entered into four separate futures transactions on

October 6, 12, 15, and 29, 2009, in the December 2009 Wheat Futures Contract that were not

executed openly and competitively, in violation of Regulation 1.38(a), 17 C.F.R. § 1.38(a) (2012).

61.     Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2006), provides that the act, omission or failure of any official, agent, or other person acting for any corporation within the scope of his employment shall be deemed the act of the corporation.  Because the acts, omissions, and failures of the officers, employees and agents of BES and Serdika, including, but not limited to Moncada, that violated the Act were within the scope of their employment, BES and Serdika are liable for those acts constituting violations pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2006), and Regulation 1.2, 17 C.F.R. § 1.2 (2012).

62.     Section 6c(b) of the Act, 7 U.S.C. § 13a-1(b), provides in pertinent part that "[u]pon a proper showing, a permanent . . . injunction . . . shall be granted without bond."  Unlike private actions for equitable relief, a Commission action for injunctive relief is a creature of statute.  "In actions for a statutory injunction, the agency need not prove irreparable injury or the inadequacy of other remedies as required in private injunctive suits.  A *prima facie* case of illegality is sufficient." *CFTC v. Muller*, 570 F.2d 1296, 1300 (5thCir, 1978). *See also SEC v. Prater*, 289 F. Supp. 2d 39, 49 (D. Conn. 2003) (citing *SEC v. Unifund SAL*, 910 F.2d 1028, 1036 (2d Cir. 1990)); *SEC v. Princeton Econ. Int'l.*, 73 F. Supp. 2d 420, 422 (S.D.N.Y. 1999) (applying a less restrictive injunctive standard to actions brought in courts by SEC and CFTC); *CFTC v. IBS, Inc*., 113 F. Supp. 2d 830, 848 (W.D.N.C. 2000), *aff'd, CFTC v. Kimberlynn Creek Ranch, Inc.*, 276 F.3d 187 (4th Cir. 2002); *CFTC v. Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979).

63.     In order to obtain a permanent injunction, "the CFTC must show that 'there is a likelihood that, unless enjoined, the violations will continue.'" *CFTC v. Kelly*, 736 F. Supp. 2d 801, 804 (S.D.N.Y. 2010) (quoting *CFTC v. Am. Bd. of Trade, Inc*., 803 F.2d 1242, 1250-51 (2d Cir. 1986)); *accord SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 808 (2d Cir. 1975) ("SEC suits for injunctions are creatures of statute. Proof of irreparable injury or inadequacy of other remedies as in

the usual suit for injunction is not required."). A court may infer a reasonable likelihood of future violations based on prior violations. *CFTC v. Premium Income Corp.*, 2007 U.S. Dist. LEXIS 94878, at *18 (N.D. Tex. Dec. 28, 2007). Further, "past illegal conduct is highly suggestive of the likelihood of future violations." *SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 807 (2d Cir. 1975); *see also Hunt*, 591 F.2d at 1220. A district court may infer a likelihood of future violations from defendant's past unlawful conduct. *CFTC v. Crown Colony Commodity Options, Ltd.*, 434 F. Supp. 911, 919 (S.D.N.Y. 1977).

## IV.    ORDER FOR PERMANENT INJUNCTION, CIVIL MONETARY PENALTY, AND OTHER ANCILLARY RELIEF

64.    A permanent injunction against BES and Serdika is warranted in this case because of the egregious violations of the Act committed by the Defendants. The Commission has presented a *prima facie* case that BES and Serdika have violated Sections 4c(a), 6(c), 6(d) and 9(a)(2) of the Act, 7 U.S.C. §§ 6c(a), 9, 13b and 13(a)(2) (2006), as well as Commission Regulation 1.38(a), 17 C.F.R. § 1.38(a) (2012), and that, unless restrained and enjoined by this Court, there is a reasonable likelihood that BES and Serdika will continue to engage in the acts and practices alleged in the Complaint and in similar acts and practices in violation of the Act and the Regulations.

**IT IS HEREBY ORDERED THAT:**

65.    Pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), the Commission has made a showing that BES and Serdika have engaged in acts and practices which violated Sections 4c(a), 6(c), 6(d) and 9(a)(2) of the Act, 7 U.S.C. §§ 6c(a), 9, 13b and 13(a)(2) (2006), as well as Commission Regulation 1.38(a), 17 C.F.R. § 1.38(a) (2012). Unless restrained and enjoined by this Court, there is a reasonable likelihood that BES and Serdika will continue to engage in the acts and practices alleged in the Complaint and in similar acts and practices in violation of the Act and

Regulations.  Therefore, judgment shall be and hereby is entered in favor of the Commission and against Defendants as follows:

**A.     Prohibition Against Violations of Sections 4c(a), 6(c), 6(d), and 9(a)(2) of the Act, 7 U.S.C. §§ 6c(a), 9, 13b, and 13(a)(2) (2012), and Commission Regulation 1.38(a), 17 C.F.R. § 1.38(a) (2013)**

66.     BES and Serdika, all persons and entities insofar as they are acting in the capacity of agents, servants, employees, successors, assigns, or attorneys of BES or Serdika, and all persons and entities insofar as they are acting in concert or participation with BES or Serdika who receive actual notice of this order by personal service or otherwise, are hereby permanently prohibited, enjoined and restrained from directly or indirectly engaging in any conduct in violation of Sections 4c(a), 6(c), 6(d) and 9(a)(2) of the Act, 7 U.S.C. §§ 6c(a), 9, 13b and 13(a)(2) (2012), as well as Commission Regulation 1.38(a), 17 C.F.R. § 1.38(a) (2013).

**B.     Trading, Solicitation and Registration Prohibitions**

67.     BES and Serdika, all persons and entities insofar as they are acting in the capacity of agents, servants, employees, successors, assigns, or attorneys of BES or Serdika, and all persons and entities insofar as they are acting in concert or participation with BES or Serdika who receive actual notice of this order by personal service or otherwise, are hereby permanently prohibited, enjoined and restrained from directly or indirectly:

a.     Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a of the Act, 7 U.S.C. § 1a (2012));

b.     Entering into any transactions involving commodity futures, options on commodity futures, commodity options (as that term is defined in Regulation 1.3 (hh), 17 C.F.R. § 1.3(hh) (2013)) ("commodity options"), security futures products, foreign currency (as described in Sections 2(c)(2)(B) and 2(c)(2)(C)(i) of the Act, 7 U.S.C. §§

2(c)(2)(B) and 2(c)(2)(C)(i) (2012)) ("forex contracts"), and/or swaps (as that term is defined in Section 1a(47) of the Act,  7 U.S.C. § 1a(47) (2012), and as further defined by Regulation 1.3(xxx), 17 C.F.R. § 1.3(xxx) (2013)) for his own personal account or for any account in which he has a direct or indirect interest;

c.     Having any commodity futures, options on commodity futures, commodity options, security futures products, forex contracts, and/or swaps traded on his behalf;

d.     Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity futures, options on commodity futures, commodity options, security futures products, forex contracts and/or swaps;

e.     Soliciting, receiving or accepting any funds from any person for the purpose of purchasing or selling any commodity futures, options on commodity futures, commodity options, security futures products, forex contracts, and/or swaps;

f.     Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2013); and

g.     Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2013)), agent or any other officer or employee of any person (as that term is defined in Section 1a of the Act, 7 U.S.C. § 1a (2012)) registered, exempted from registration or required to be registered with the Commission except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2013).

**C.     Civil Monetary Penalty**

68.     For Counts 1 through 8, Section 6c(d)(1)(B) of the Act provides that each violation of Section 9(a)(2) is punishable up to $1,000,000.  7 U.S.C. § 13a-1(d)(1)(B) (Supp. II 2009).   As such, the maximum civil monetary penalty against BES and Serdika for more than 700 overt acts could legally be in the hundreds of millions.  The penalty shall be $3,000,000 for each day of multiple overt acts charged, for each entity.  There are six charge days for BES, totaling $18,000,000, and four charge days for Serdika, totaling $12,000,000.

69.     For Counts 9 and 10, Section 6c(d)(1) of the Act provides that "the Commission may seek and the Court shall have jurisdiction to impose . . . on any person found in the action to have committed any violation, a civil penalty in the amount of not more than the higher of $100,000 or triple the monetary gain to the person for each violation." 7 U.S.C. §13a-1(d)(1). The Commission Regulations adjust the statutory civil monetary penalty of $100,000 for inflation. *See* 17 C.F.R. § 143.8.  For the period at issue, the statutory civil monetary penalty was $140,000 per violation.  *Id.* Both BES and Serdika were each charged with four violations for claims under Counts 9 and 10, totaling eight violations for each entity, which totals $1,120,000 for each entity, which shall be the penalty amount.

70.     Therefore, BES and Serdika are liable for civil monetary penalties as part of the default judgment, in the amount of $19,120,000 for BES and $13,120,000 for Serdika.

71.     Post-judgment interest shall accrue beginning on the date of entry of this Default Order and shall be determined by using the Treasury Bill rate prevailing on that day, pursuant to 28 U.S.C. § 1961(a).

## V.     <u>MISCELLANEOUS PROVISIONS</u>

**IT IS FURTHER ORDERED THAT:**

72.      All pleadings, correspondence, notices or other materials required by this Default

Order shall be sent to Andrew Ridenour, Trial Attorney, Division of Enforcement, Commodity

Futures Trading Commission, Three Lafayette Centre, 1155 21st Street N.W., Washington, D.C.

20581.

73.      This Court shall retain jurisdiction of this cause to assure compliance with this

Default Order and for all other purposes related to this action.

**SO ORDERED**, at the Southern District of New York on this ___day of ____ 2014.


_____

**THE HONORABLE COLLEEN MCMAHON**
**U.S. DISTRICT COURT JUDGE**