## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **UNITED STATES COMMODITY FUTURES TRADING COMMISSION,** | ) )  ) |
| **Plaintiff,** | ) |
|  | )    Civil Action No. 12-cv-8791 (CM) |
| **v.** | )    (GWG) |
|  | ) |
| **ERIC MONCADA; BES CAPITAL LLC; and SERDIKA LLC.** | ) ) |
| **Defendant(s).** | ) ) |

## JOINT PRE-TRIAL ORDER

The parties having conferred among themselves and with the Court pursuant to

Fed.R.Civ.P. 16, the following statements, directions and agreements are adopted as the Pre-Trial

Order herein.

### I.        NATURE OF THE CASE

As more fully detailed in the pleadings, the Commodity Futures Trading Commission

("Commission" or "CFTC") filed a ten count complaint alleging that BES Capital LLC

("BES") and Serdika LLC ("Serdika"), by and through their officers, employees and agents,

including but not limited to, Eric Moncada ("Moncada"), and Moncada directly (collectively

"Defendants"), attempted to manipulate the price of the December 2009 #2 Soft Red Winter

Wheat commodity futures contract traded on the Chicago Board of Trade ("CBOT")

(hereinafter "CBOT Wheat Futures Contract") on the trading days of October 6, 12, 14, 19, 26,

27, 29, and 30, 2009 (collectively the "alleged attempted manipulation dates").  On the alleged

attempted manipulation dates, Moncada, while trading accounts in the name of BES and/or

Serdika, allegedly employed a strategy utilizing multiple trading tactics in the CBOT Wheat

Futures Contract market on the electronic trading platform, Globex, with the intent to affect the price of the December 2009 Wheat Futures Contract.  These acts and practices constitute violations of the Commodity Exchange Act, as amended ("Act" or "CEA"), 7 U.S.C. §§ 1 *et seq.* (2006) and the Commission's  Regulations ("Regulations").

Additionally, BES and Serdika, by and through their officers, employees and agents, including but not limited to, Moncada, and Moncada  individually, engaged in several fictitious sales of the December 2009 CBOT Wheat Futures Contract between BES and Serdika on October 6, 12, 15, and 29, 2009 (collectively the "alleged fictitious sales dates").  Moncada traded in accounts in the name of BES and in the name of Serdika.  On the alleged fictitious sales date, Moncada placed virtually simultaneous orders to buy in the BES account and orders to sell in the Serdika account, or, conversely, placed virtually simultaneously orders to buy in the Serdika account and orders to sell in the BES account.  By simultaneously buying and selling the same number of lots of the December 2009 Wheat Futures Contract for the same delivery month at the same price on the alleged fictitious sales date, Moncada intended for the trades to offset each other.  Defendants' transactions were fictitious sales, and therefore violated Section 4c(a) of the Act, 7 U.S.C. § 6c(a) (2006).  Defendants' transactions were also non-competitive and therefore violated Regulation 1.38(a), 17 C.F.R. § 1.38(a) (2012).

Moncada committed the acts described in the pleadings within the course and scope of his employment at, or agency with, BES and Serdika.  Therefore, BES and Serdika are each liable under Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2006), and Regulation 1.2, 17 C.F.R. § 1.2 (2012), as a principal for its agents' acts, omissions or failures.

Plaintiff Commodity Futures Trading CFTC seeks to enjoin Defendants' violative acts and practices and to compel Defendants' compliance with the Act and Regulations.  In addition,

the CFTC seeks civil monetary penalties, permanent trading bans, permanent registration restrictions and such other equitable relief as this Court deems necessary or appropriate.

Defendant Eric Moncada asserts that he did not attempt to manipulate the price of December 2009 Wheat Futures on the eight days charged or at any other time; that his large-lot orders and cancellations were part of legitimate trading strategies; and that he did almost no trading in the time window when his large lot activity allegedly affected the market price. Moncada also asserts that, in the event of a ruling adverse to him on the merits, the CFCT is not entitled to an injunction, and any monetary penalty should be nominal.

## II.      JURY/NON-JURY

No jury demand has been made by either party.

The estimated length of trial is seven days.

## III.      STIPULATED FACTS

### A.      Relevant Dates and Time Periods

1.      The CFTC has alleged that Moncada attempted to manipulate the market price of the December 2009 CBOT Wheat Futures Contract on the following eight days:  October 6, 12, 14, 19, 26, 27, 29 and 30, 2009, alleged attempted manipulation dates.

2.      The CFTC has alleged that Moncada engaged in fictitious sales and non-competitive transactions on the following four days:  October 6, 12, 15, and 29, 2009, the alleged fictitious sales dates.  (The alleged attempted manipulation dates and alleged fictitious sales dates will collectively be referred to as "relevant trading dates").

3.      The "relevant time period" as used in this Joint Pre-trial Order is the time period from August 13, 2009 to November 30, 2009.

**B.     Jurisdiction and Venue**

4.     This Court has jurisdiction over this action pursuant to Section 6c of the Act, 7

U.S.C. § 13a-1 (2006), which authorizes the CFTC to seek injunctive relief against any person,

or to enforce compliance with the Act, whenever it shall appear to the CFTC that such person has

engaged, is engaging, or is about to engage in any act or practice constituting a violation of any

provision of the Act or any rule, regulation, or order thereunder.

5.     Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C.

§ 13a-1(e) (2006), in that Defendants are found in this District, transact business in this District,

and the acts and practices in violation of the Act have occurred, are occurring, or are about to

occur within this District.

**C.     Parties**

6.     The **U.S. Commodity Futures Trading Commission** is an independent federal

regulatory agency that is charged by Congress with the responsibility for administering and

enforcing the provisions of the Act, 7 U.S.C. §§ 1 *et seq*., and the Regulations promulgated

thereunder, 17 C.F.R. §§ 1 *et seq*. (2012).  One of its core responsibilities is to protect the public

interest by deterring and preventing price manipulations of the commodity markets or futures

markets, or other disruptions to market integrity.  *See* 7 U.S.C. § 5(b) (2006).

7.     During the relevant time period, **BES Capital LLC** was a Delaware limited

liability company with its principal place of business in New York, New York.  BES shared

offices, common ownership and management with Serdika.  BES began operations in December

2008, and ceased trading in December 2009.  BES has never been registered with the CFTC.

8.     During the relevant time period, **Serdika LLC** was a Delaware limited liability

company with a principal place of business in New York, New York.  Serdika shared offices,

common ownership and management with BES.  Serdika began operations in November 2007, and ceased trading in June 2011.  Serdika has never been registered with the CFTC.

9.      During the relevant time period, **Eric Moncada** resided in New York City, and was a futures trader authorized to trade certain accounts in the names of BES and Serdika during the relevant time period.  Moncada is a floor broker registered with the CFTC.

10.      Moncada was an employee and agent of Serdika during the relevant time period.

11.      Moncada was a member of Serdika during the relevant time period.

12.      Moncada was an employee and agent of BES during the relevant time period.

13.      Moncada was a member of BES during the relevant time period.

**D.      Other Individuals and Entities**

   **1.      _Emil Dontchev_**

14.      **Emil Dontchev** ("Dontchev") was a member of Serdika during the relevant period.

15.      Dontchev granted Moncada authorization to trade futures on behalf of Serdika and BES.

16.      Dontchev had to approve the products and strategies that Moncada used to trade futures on behalf of Serdika or BES.

   **2.      _James Moriarty_**

17.      **James Patrick Moriarty** was an employee of Serdika during the relevant period.

18.      During the relevant time period, Moriarty was a personal friend of Moncada, and is currently a personal friend of Moncada.

19.      Moriarty and Moncada exchanged instant messages ("IMs") at various times during the relevant period.

20.     Moriarty traded in the CBOT Wheat Futures Contract market during the relevant time period.

### 3.     *Advantage Futures, LLC*

21.     During the relevant time period, **Advantage Futures LLC** ("Advantage") was a registered futures commission merchant ("FCM") with the CFTC.

22.     Advantage held various futures trading accounts for the benefit of Serdika and BES during the relevant period.

### 4.     *Registered Exchanges*

23.     During the relevant time period and continuing to the present, **Chicago Board of Trade** is a designated contract market registered with the CFTC.

24.     The **CME Group, Inc.** ("CME Group") is one of the largest options and futures exchanges in the world and is registered with the CFTC as an exchange.  During the relevant time period and continuing to the present, CME Group owns the CBOT.

### E.     **Background and Definitions**

25.     A futures contract is an agreement to purchase or sell a commodity for delivery or cash settlement in the future at a price determined at initiation of the contract that obligates each party to the contract to fulfill the contract at the specified price.  Futures contracts are used to assume or shift price risk, and may be satisfied by cash settlement, delivery, or offset.  Futures contracts are commonly used to hedge risks or to speculate on the price of commodities.

26.     Open interest represents the total number of futures contracts in a market that remain "open" at the end of a trading session across all available contract months.  In other words, open interest refers to those contracts not yet liquidated either by an offsetting futures market transaction or delivery.  For each open contract there is a "short" and a "long" position.

For example, if open interest is one hundred contracts, then there are outstanding one hundred short contracts and one hundred long contracts.

27.    Volume is the number of purchases or sales of futures contracts made during a specified period of time.

>    1.    ***CBOT Wheat Futures Market Fundamentals***

28.    The CBOT Wheat Futures Contract is regularly traded on the CBOT in five contract months (March, May, July, September, and December) that have identical contract specifications except for the delivery date. The December 2009 CBOT Wheat Futures Contract had a delivery date of December 1, 2009 and was traded during October 2009.  One delivery contract is equal to 5,000 bushels of CBOT #2 Soft Red Winter Wheat.

29.    On the relevant trading dates, the CBOT Wheat Futures Contract carried an average open interest of approximately 183,000 contracts per day, with an average trading volume of approximately 50,000 contracts per day.

30.    Prices of the CBOT Wheat Futures Contract are quoted in cents per bushel. During the relevant time period, the CBOT Wheat Futures Contract traded between approximately 450 and 500 cents per bushel, which equates to a price of $22,500 to $25,000 per contract.

31.    Prices of the CBOT Wheat Futures Contract move in increments of one quarter cent per bushel, known as a "tick."  The movement in price of one "tick" results in a change in the value of the contract by $12.50.  Therefore, an increase of one "tick" in the price of CBOT Wheat Futures Contract would increase the value of a "long" position by $12.50 and decrease the value of a "short" position by the same amount.

32.    A long position in the CBOT Wheat Futures Contract is a *purchase* not yet closed with an offsetting sale or delivery.  Accordingly, the holder of a long position is obligated to

offset prior to the delivery period during the contract month, or to accept physical delivery of wheat.  The holder of a long position profits from a rise in the price of the futures contract.

33.     A short position in CBOT Wheat Futures Contract is a *sale* not yet closed with an offsetting purchase or delivery.  Accordingly, the holder of a short position is obligated to offset prior to the delivery period, or else physically deliver wheat to the holder of a long position.  The holder of a short position profits from a fall in the price of the contract.

34.     During the relevant time period, the CME Group had "price limits" in place in the CBOT Wheat Futures Contract market that prevent trading at prices more than 60 cents (or 240 ticks) above or below the prior day's settlement price.

35.     A "limit up" market exists when the market price is at the top of the price limit, 60 cents above the prior day's settlement price; likewise, a "limit down" market is when the market price is at the bottom of the price limit, 60 cents below the prior day's settlement price.

36.     The December 2009 CBOT Wheat Futures Contract market was never trading "limit up" or "limit down" on any of the eight alleged attempted manipulation dates.

### 2.     *Globex*

37.     During the relevant trading dates, the trading day began on the electronic trading platform, or "Globex," at 6:00 p.m. and continued to 7:15 a.m. the next day.  Trading closed from 7:15 a.m. until 9:30 a.m.  Trading reopened at 9:30 a.m. on both Globex and open outcry in the CBOT trading pit and closed at 1:15 p.m.  All times are Central time.

38.     The vast majority of trading in the CBOT Wheat Futures Contract market is conducted electronically via Globex.  In electronic trading, traders have the ability to enter, modify and cancel bids and offers in a matter of milliseconds through a computer portal to the Globex platform.

39.     When a "buy" or "sell" order is placed on Globex, the order becomes part of the order book, which is all resting orders in the marketplace.  Globex displays to market participants the total order volume of the ten best prices closest to the last executed trade price on both the buy side and the sell side, commonly known as "best of book."

40.     The highest priced buy order in the order book is called the "best bid." The lowest priced sell order in the order book is called the "best offer." The "bid-ask spread" is the difference between the best bid and best offer.

41.      For the CBOT Wheat Futures Contract, Globex functions such that the best available bid or offer price must be taken, "hit" or "lifted," by the market for a trade to occur before the next available best bid or offer price can be taken.

42.     Globex displays the number of individual orders at each price point in the best of book and the total order volume.  For example, if Globex showed bids of 500 lots at a price in the best of book, a market participant would not know if there were 500 orders at one lot apiece or a single order for 500 lots.

43.     "Aggressor orders" are orders that will accept prices offered by resting orders on the other side of the market already in the order book and are, therefore, immediately filled against those resting orders.

44.     The Globex matching algorithm determines the priority in which resting orders of the same price are filled when an order on the opposite side of the market is placed at that price.

45.     During the relevant period, the Globex matching algorithm employed a "split FIFO/pro rata" method for CBOT Wheat Futures Contract contracts, which allocated the first 40 percent of fills on a first in/first out ("FIFO") basis, giving priority to resting orders placed the

earliest, the remaining 60 percent of the aggressor order being allocated on a pro rata basis, giving priority to larger orders.

46.     As an explanation of how the split FIFO/pro rata matching algorithm functioned in the CBOT Wheat Futures Contract market in October 2009, assume there are three buy orders of 4, 10, and 20 lots resting in the market at the best bid price, with the 4 lot buy order entered first, then the 10, then the 20.  An aggressive sell order is then entered at the best bid price for 10 lots. The matching algorithm would assign the first 4 lots (40% of 10 lots) of the sell order to the resting 4 lot buy order under the FIFO portion.  The matching algorithm would then allocate the remaining 6 lots (60% of 10 lots) of the sell order among the remaining 10 lot and 20 lot buy orders on a pro-rata basis, resulting in the 10 lot buy order having two lots filled, and the 20 lot buy order having four lots filled, thereby satisfying the entire offer entered at the best bid price for 10 lots.

47.     The CME Group, which operates the CBOT futures market, maintains records of all orders placed, modified, canceled, and matched for execution on the Globex system.  Every order is given a unique "order ID."  Every order is also associated with an account number and a unique trader identification (called a "Tag 50"), which is assigned by the clearing member through which the trader trades.

48.     Moncada's Tag 50 when trading the BES and Serdika accounts was "EM4", as assigned by Advantage, which held the accounts.

F.     **Moncada's Relationship to Serdika and BES**

1.     *The Serdika Account*

49.     Moncada had authority during the relevant time period to trade futures in account A4858 in the name of Serdika held at Advantage (hereinafter the "Serdika account").

50.     During the relevant time period, Moncada was entitled to receive 40 percent of profits generated from trading in the Serdika account.

51.     From July 1, 2009 to December 23, 2009, Moncada contributed at least $350,000 in capital to Serdika.

52.     From October 10, 2008 to May 12, 2009, Moncada received at least $1,695,860.41 in profits from Serdika.

## 2.     *The BES Account*

53.     During the relevant time period, Moncada had authority to trade futures in account A5187 in the name of BES held at Advantage (hereinafter the "BES account").

54.     During the relevant time period, Moncada and another trader, William Brindise, were collectively entitled to receive 80 percent of profits generated from trading in the BES account.

55.     Moncada contributed $175,000 in capital to BES in early 2009.

56.     From May 5, 2009 to October 9, 2009, Moncada received at least $612,371.46 in profits from BES.

## G.     Net Liquidating Value, Positions Held, and Trading in Serdika and BES Accounts

### 1.     *The Serdika Account*

57.     During the relevant time period, Advantage issued account statements for the Serdika account on a daily basis (the "Serdika daily statements") and on a monthly basis (the "Serdika monthly statements").

58.     During the relevant time period, Moncada received both the Serdika daily statements and the Serdika monthly statements.

59.     During the relevant time period, the Serdika daily account statements identify all trades executed in the Serdika account on a given day, the open futures positions held in the Serdika account, as well as the net liquidating value of the Serdika account on that date.

60.     On the eight alleged attempted manipulation dates the Serdika account had a net liquidating value at the close of trading (i.e. 1:15 pm Central time) that ranged from a margin deficit of $454,618.42 to an excess equity $458,805.11.  The Serdika account had a negative end of day equity on five of the eight alleged attempted manipulation dates.

61.     On the eight alleged attempted manipulation dates, the Serdika account was short overnight with open positions ranging from 212 lots to 716 lots.

62.     On the eight alleged attempted manipulation dates, Moncada never executed more than 606 lots on the buy side in the Serdika account.

63.     On the eight alleged attempted manipulation dates, the Moncada never executed more than 691 lots on the sell side on the Serdika account.

2.     ***The BES Account***

64.     During the relevant time period, Advantage issued account statements for the BES account on a daily basis (the "BES daily statements") and on a monthly basis (the "BES monthly statements").

65.     During the relevant time period, Moncada received both the BES daily statements and the BES monthly statements.

66.     During the relevant time period, the BES daily account statements identify all trades executed in the BES account on a given day, the open futures positions held in the BES account, as well as the net liquidating value of the BES account on that date.

67.     On the eight alleged attempted manipulation dates, the BES account had net liquidating value at the close of trading (i.e. 1:15 pm Central time) that ranged from a margin

deficit $1,082,191.99 to an excess equity of $1,082,191.99. The BES account had a negative end of day equity on seven of the eight alleged attempted manipulation dates.

68.     On the eight alleged attempted manipulation dates, the BES account held overnight positions, with the largest net short position being 286 lots short, and the largest net long position being 300 lots.

69.     On the eight alleged attempted manipulation dates, Moncada never executed more than 1,351 lots on the buy side in the BES account.

70.     On the eight alleged attempted manipulation dates, Moncada never executed more than 1,139 lots on the sell side on the BES account.

71.     The following charts contain the end of day net liquidating value, end of day net position, total volume of sell trades, and total volume of buy trades for the Serdika and BES accounts, as well as the combined figures for the accounts, on the eight alleged attempted manipulation dates.

| Date | Oct. 6 | Oct. 12 | Oct. 14 | Oct. 19 |
|---|---|---|---|---|
| **Serdika Account** | | | | |
| Excess Equity/Margin Deficit | -$320,234.51 | $87,702.23 | -$40,590.98 | $458,805.11 |
| Position | -468 | -548 | -493 | -212 |
| Buy Trades | 120 | 219 | 137 | 132 |
| Sell Trades | 554 | 73 | 240 | 275 |
| **BES Account** | | | | |
| Excess Equity/Margin Deficit | -$583,543.68 | -$327,207.94 | -$297,076.35 | -$706,735.56 |
| Position | -120 | 300 | 198 | -141 |
| Buy Trades | 706 | 1083 | 1351 | 880 |
| Sell Trades | 584 | 1108 | 1126 | 1139 |
| **Combined Accounts** | | | | |
| Excess Equity/Margin Deficit | | | | |
| Position | -588 | -248 | -295 | -353 |
| Buy Trades | 826 | 1302 | 1488 | 1012 |
| Sell Trades | 1138 | 1181 | 1366 | 1414 |

| Date | Oct. 26 | Oct. 27 | Oct. 29 | Oct. 30 |
|---|---|---|---|---|
| **Serdika Account** | | | | |
| Excess Equity/Margin Deficit | $31,062.06 | -$60,864.56 | -$454,618.42 | -$299,448.25 |
| Position | -531 | -716 | -616 | -621 |
| Trades | 600 | 28 | 606 | 470 |
| Trades | 691 | 213 | 636 | 475 |
| **BES Account** | | | | |
| Excess Equity/Margin Deficit | -$1,082,191.99 | -$1,168,171.00 | -$697,095.63 | -$758,593.60 |
| Position | -286 | -40 | 0 | 8 |
| Trades | 910 | 1151 | 154 | 47 |
| Trades | 808 | 905 | 0 | 39 |
| **Combined Accounts** | | | | |
| Excess Equity/Margin Deficit | | | | |
| Position | -637 | -756 | -616 | -613 |
| Buy Trades | 1510 | 1179 | 760 | 517 |
| Sell Trades | 1499 | 1118 | 636 | 514 |

**H.      Margin Requirements**

72.      To hold a futures position, an account holder must satisfy an initial margin requirement.  Margin posted with an FCM acts as a performance bond on a futures contract.  The exchange, such as the CME Group, sets margin requirements, although an FCM can require margin in excess of the exchange's margin requirements.  The "initial margin" is the amount required to be posted upon entering a position.  The "maintenance margin" is the amount of account value (net liquidating value or "NLV") which must be maintained in order to hold a position without additional funding.  Should the account's NLV decline below the maintenance margin level, new funds must be deposited sufficient to bring the account's NLV back above the initial margin requirement or the futures position(s) must be liquidated in order to bring the initial margin requirement below the level of the account's NLV.

73.     Prior to October 27, 2009, the initial margin requirement in October 2009 for one lot of a CBOT Wheat Futures Contract, either a long position or a short position, was $2,700 per lot.  After October 27, 2009, the initial requirement was $2,362.50.  The maintenance margin requirement for a December 2009 CBOT Wheat Futures Contract from October 1, 2009 to October 27, 2009 was $2,000 per lot.  From October 27, 2009 to October 30, 2009, the maintenance margin requirement was $1,750 per lot.

74.     The FCM holding Serdika's and BES's accounts, Advantage, calculated margin requirements at the end of each trading day.  Advantage calculated margin requirements for a position in the CBOT Wheat Futures Contract based on the net position held at 1:15 pm, which is the close of pit trading hours in the CBOT Wheat Futures Contract market.

75.     If an account did not have sufficient NLV to cover the initial margin requirement, the account is considered to be "margin deficient."  If the NLV is less than the maintenance margin requirement for all futures positions it held, the account would be subject to a margin call, which is a demand by the FCM for the customer to cover potential losses.  To satisfy a margin call, the account holder would either have to put more funds into the account to meet its margin requirements, or reduce its open futures positions to the point where the net liquidating value in the account was able to cover the initial margin requirement on the positions.  Advantage, the FCM, expected Serdika and BES to be margin compliant at the close of each business day.  If a margin call was generated, Serdika and BES were expected to resolve the call on the first day.  Advantage could have, at its discretion, allowed additional time to meet a margin call, subject to a risk assessment of market conditions, etc.

76.     If an account did not have sufficient NLV to cover its margin requirements, the daily account statements that Advantage sent to the account holder would include the dollar

amount of the "Margin Deficit" on the last page of the statement.  If the account did have

sufficient equity, the daily account statement would include the dollar amount of the "Excess

Equity" on the last page.

      I.      **Moncada's Large-Lot Orders and Related Trading Activity**

      77.      On the eight alleged attempted manipulation dates, Moncada placed over 700

orders for 200 lots or greater of the December 2009 Wheat Futures Contract on the Globex

trading platform (hereinafter the "large-lot orders").

      78.      While utilizing computerized trading on Globex, Moncada manually placed the

large-lot orders through his trading software.

      79.      While engaging in electronic trading, Moncada manually canceled the large-lot

orders.

      80.      Moncada could have cancelled his large lot orders in microseconds by using

algorithm trading.  However, Moncada was not using an algorithmic trading program to place or

cancel his large-lot orders.

      81.      The placing and cancelling of large-lot orders by Moncada put his orders at risk of

being filled.

      82.      On the eight alleged attempted manipulation dates, Moncada canceled 99.6

percent of the large-lot orders.

      83.      Focusing first on the equation for CBOT price changes on the charge dates in

Panel C, the estimated coefficient on new Moncada orders is 0.049.   Further, the estimated

coefficients on the first and second ten second lags of new Moncada orders are 0.036 and 0.011,

respectively. (The estimated coefficient for the third lag is not statistically significant; the p-

value of .101 indicates a reasonable likelihood that the true coefficient is zero at three lags.)  The

sum of the contemporaneous and lagged coefficients is 0.096.   Prices are measured in cents per

bushel, while Moncada large lot orders are in thousands of contracts.   The interpretation is that for each one thousand net (buy – sell) contracts entered by Moncada in large lot orders, the CBOT midpoint increases by an average of 0.096 cents over the thirty second interval after order entry.

84.     On the eight alleged attempted manipulation dates, all market participants combined entered over 470,000 orders for the December 2009 CBOT wheat futures contract.  Of that total, only 853 (0.18 percent of total) were for a quantity of large-lot orders.  Moncada placed 710 of the large-lot orders, while all other market participants combined entered only 143 large-lot orders.

85.     On the eight alleged attempted manipulation dates, other market participants canceled 28.7 percent of their large lot-orders.

86.     On the eight alleged attempted manipulation dates, Moncada canceled his large-lot orders an average of 2.1 seconds after entry, and 92.5 percent of his large-lot order cancelations occurred within five seconds of entry.

87.     On the eight alleged attempted manipulation dates, other market participants who entered and canceled large-lot orders on the charge dates did so after an average of 127 minutes, and 3.6 percent were canceled within five seconds.

88.     On the eight alleged attempted manipulation dates, of the 102 of Moncada's large-lot orders that resulted in any trading, an average of only 1.1 percent of the total volume was executed.

89.     On the eight alleged attempted manipulation dates, of the other market participant's large-lot orders that resulted in any trading, 45.2 percent of the total volume was executed.

90.     On the eight alleged attempted manipulation dates, Moncada's large-lot orders in the CBOT Wheat Futures Contract matched the best bid or best offer price 77.1 percent of the time.  Moncada's large-lot orders were an average of 0.2 ticks from the best bid/best offer price, and all of them were within 10 ticks of the best bid/best offer price.

91.     On the eight alleged attempted manipulation dates, other market participant's large-lot orders were on average 18.0 ticks from the best bid/best offer price.

92.     Moncada's trading accounted for more than six percent of the total volume of executed trades of large-lot orders in the marketplace of December 2009 Wheat Futures Contracts during the time period of August 13, 2009 to November 30, 209.  During that time period, Moncada accounted for 74.5 percent of the total; volume of large-lot orders.

93.     On the eight alleged attempted manipulation dates, Moncada placed 710 Large-Lot orders totaling 274626 contracts.  Moncada executed 2,136 contracts as a result of his large lot orders.

94.     On the eight alleged attempted manipulation dates, Moncada canceled 51.5 percent of his orders of less than 200 lots of the December 2009 Wheat Futures Contract (hereinafter "small-lot orders").  Those small-lot orders that were canceled were in the market an average of 10 minutes before canceling.

95.     On the eight alleged attempted manipulation dates, 51.6 percent of Moncada's small-lot orders resulted in trades.

96.     On the eight alleged attempted manipulation dates, 45.5 percent of the volume of Moncada's small-lot orders was executed.

97.     On the eight alleged attempted manipulation dates, Moncada's small-lot orders were an average of 6.6 ticks from the best bid/best offer price.

18

98. On the eight alleged attempted manipulation dates, and for trades for which the relevant data is available, Moncada used the "iceberg" function with 0.6 percent of his large-lot orders.

99. Moncada used the "iceberg" function with 5.2 percent of his small-lot orders.

100. A computer trading program could respond to Moncada's large-lot orders in 2-3 milliseconds.

## J.     ALLEGED FICTITIOUS SALES AND NON-COMPETITIVE TRANSACTIONS

### 1.     *October 6, 2009 Transaction*

101. On October 6, 2009, at 10:20:09.476 am, Moncada placed a buy order in the Serdika account for 80 lots of December 2009 CBOT Wheat Futures Contracts at a price of 466 cents. At 10:20:10.943 am, approximately 1.5 seconds later, Moncada placed an offsetting sell order in the BES account for 80 lots of December 2009 CBOT Wheat Futures Contracts also at a price of 466 cents. The entire BES sell order filled at the price of 466 cents within 0.001 seconds. The majority of the Serdika buy order, 58 lots, was filled at the price of 466 cents.

102. Moncada placed the 80 lot buy order of December 2009 CBOT Wheat Futures Contracts in the Serdika account knowing that it would execute against the 80 lot sell order in the BES account.

### 2.     *October 12, 2009 Transaction*

103. On October 12, 2009, at 11:27:56.161 am, Moncada placed a sell order in the BES account for 116 lots at a price of 483 ½ cents. At 11:27:57.793, approximately 1.6 seconds later, Moncada placed an offsetting buy order in the Serdika account for 116 lots at a price of 483 ½ cents. Both orders immediately filled at the price of 483 ½ cents.

104.    Moncada placed the 116 lot buy order in the Serdika account knowing that it would execute against the 116 lot sell order in the BES account.

### 3.    *October 15, 2009 Transaction*

105.    On October 15, 2009, at 10:34:54.801 am, Moncada placed an order in the BES account to sell 271 lots at a price of 499.  At 10:34:55.516, approximately 0.7 seconds later, Moncada placed an offsetting buy order in the Serdika account for 271 lots at a price of 499 cents.  Both orders were completely filled at a price of 499 cents.

106.    Moncada placed the 271 lot buy order in the Serdika account knowing that it would execute against the 271 lot sell order in the BES account.

### 4.    *October 29, 2009 Transaction*

107.    On October 29, 2009, at 12:08:59.899, Moncada placed an order in the Serdika account to sell 154 lots at a price of 508 cents.  At 12:09:17.266, approximately 17.3 seconds later, Moncada placed an offsetting buy order in the BES account for 154 lots at a price of 508 ¼ cents.  Both orders were immediately and completely filled at a price of 508 cents.

108.    The offsetting trade on October 29 was the only transaction that Moncada made in the BES account on that day.

109.    Moncada placed the 154 lot sell order in the Serdika account knowing that it would execute against the 154 lot buy order in the BES account.

## IV.    PARTIES' CONTENTIONS[1]

The parties intend to prove the following facts and law:

### A.    Plaintiff's Contentions

#### 1.    *Proposed Findings of Fact Supporting the CFTC's Complaint*

The CFTC provides this summary of the relevant facts that it intends to prove in its case

in chief.[2]  Specifically, the CFTC will show that BES and Serdika, by and through Moncada as

their officer, employee or agent, and Moncada directly, attempted to manipulate the price of the

December 2009 CBOT Wheat Futures Contract on the trading days of October 6, 12, 14, 19, 26,

27, 29, and 30, 2009 through the following trading tactics:  1) manually placing and immediately

canceling numerous large-lot orders without the intent to have the large-lot orders filled, but

---

[1] Plaintiff Commission is an independent federal regulatory agency charged with the responsibility for administering and enforcing the provisions of the Commodity Exchange Act, as amended, 7 U.S.C. §§ 1 *et seq.* (2006), and the Regulations promulgated thereunder, 17 C.F.R. §§ 1 *et seq.* (2012).  It is composed of and governed by five Commissioners appointed by the President, by and with the advice of the Senate 7 U.S.C. § 4a(a)(2).  Although the Commission prosecutes actions through its Division of Enforcement ("Division"), the Division does not possess independent authority to alter pleadings or complaints, as requested in Your Honor's Form for the Pre-Trial Order (*See* "Parties Contentions: The pleadings are deemed amended to embrace the following, and only the following, contentions of the parties.")  Rather, the Division presents specific recommendations to the Commission for a vote by the sitting Commissioners.  In the case of federal litigation, recommendations can include granting the Division the authority to file or amend pleadings.  The plaintiff requests that it be allowed to work within this administrative framework and that written statements in this Joint Pre-Trial Order not alter the Complaint and current filed pleadings.  Moreover, all issues in the Complaint remain, thus there is no need to amend.

[2] Moncada intends to call Steven E. Wollack as an expert witness and submitted a report by Mr. Wollack (the "Wollack Report") to the CFTC.  Wollack testified that he has never conducted any analysis of trade data.  (Deposition of Steven Wollack ("Wollack Dep."), at 16:5-13, 106:9-107:19, 129:14-17).  Wollack admitted that he only "eyeballed" a limited set of data as a basis for the conclusions in his report.  (Wollack Dep. 121:3-15, 109:1-7).  Further, Wollack testified that he does not dispute the analysis of Moncada's trading contained in the Bessembinder Report, only the conclusions that Moncada intended to manipulate the market.  (Wollack Dep. 109:1-13, 120:10-12).  The Commission intends, if Moncada submits the Wollack Report as an exhibit to any motion or as a trial exhibit, to move to strike the Wollack Report and the testimony of Wollack on a variety of grounds.

instead with the intent to create the misleading impression of increasing liquidity in the market; 2) placing these large-lot orders at or near the best bid or offer price in a manner to avoid being filled by the market; and 3) placing small-lot orders on the opposite side of the market from these large-lot orders with the intent of taking advantage of any price movements that might result from the misleading impression of increasing liquidity that his large-lot orders created.

### a)   Moncada's Trading in the BES and Serdika Accounts

During October 2009 (the "relevant time period"), Moncada was a member of and/or trader for BES and Serdika, two proprietary trading firms that traded commodity futures ("futures") using their own capital.  (Deposition of Eric Moncada, "Moncada Dep." 38:8-25, 44:10-15, 45:1-11).  Moncada contributed a total of $525,000 to BES and Serdika between early 2009 and December 2009, for the purpose of posting margin in futures trading accounts and to cover trading losses.  (Moncada Dep. 41:25-42:16, 49:8-14; Affidavit of Jessica Harris ("Harris Aff."), at ¶ 30).

During the relevant time period, Moncada was authorized to trade one account in the name of BES (account ending in187, the "BES account") and one account in the name of Serdika (account ending in 858, the "Serdika account").  (Affidavit of William Steele, ("Steele Aff.") ¶ 8).  During the relevant time period, Moncada was entitled to at least 40 percent of profits from his trading for Serdika and, along with another trader at BES, 80 percent of BES's trading profits.  (Moncada Dep. 47:10-48:14; Plaintiff's First Set of Requests for Admissions, ¶¶ 15, 18; Response to Request for Admissions, ¶¶ 15, 18).  From October 2008 through the end of October 2009, Moncada withdrew $2,308,231.87 in profits from BES and Serdika.  (Harris Aff. ¶ 30).

The BES and Serdika accounts had to maintain funds to cover margin requirements before Moncada could trade futures in those accounts.  (Steele Aff. ¶¶ 11-12).  If either the BES or Serdika account carried an open futures position at the close of regular trading hours,

Moncada was required to post margin on that position.  (Moncada Dep. 103:16-104:13; Steele Aff. ¶ 14).  The end-of-day equity for the two accounts, which is the difference between the cash value of the account and the margin requirements for positions held in the account, ranged from a margin deficit of over $1.1 million to a positive equity of just over $458,000 on the eight attempted manipulation days.  (Steele Aff., ¶¶ 15, 16; Harris Aff. ¶ 9).  The BES account had a margin deficit on each of the eight attempted manipulation dates, meaning that it was unable to meet the initial margin requirement for the positions it held.  (Harris Aff. ¶¶ 9, 11; Steele Aff. ¶¶ 15-16).  Similarly, the Serdika account had a margin deficit on five of the days.  (Harris Aff. ¶¶ 9, 11; Steele Aff. ¶¶ 15-16).

Moncada placed large-lot orders in the final minutes of trading on at least one day.  For example, in the last fifteen minutes of trading on October 14, Moncada placed and immediately canceled 10 large-lot buy orders, totaling 4,410 lots, in the BES account.  (Harris Aff. ¶ 20).  If any of these orders were filled, it would have increased Moncada's existing long position in the BES account, which stood at 198 lots at the end of trading on October 14.  (Harris Aff. ¶ 20).  Moncada would have had to either liquidate the position before the market closed (and be subject to any losses had the market price moved against his position) or post sufficient margin to carry the position overnight.  (Moncada Dep. 103:16-104:13; Steele Aff. ¶¶ 12, 14).  Moncada testified that the initial margin requirement for a 500-lot position would be approximately $1 million (Moncada Dep. 217:10-218:4); if so, the initial margin requirement for a 4,410-lot position would be nearly $9 million.  At the end of the trading day on October 14, 2009, the BES account already had a margin deficit of over $297,000.  (Harris Aff. ¶ 9).

**b)**     **Summary of Moncada's Trading Activity Related to the CFTC's Claims of Attempted Manipulation**

On the eight attempted manipulation dates, Moncada entered over 700 large-lot orders in the December 2009 Wheat Futures Contract at or near the best bid or offer price in the market. (Bessembinder Report, ¶¶ 7, 24).[3]  Moncada canceled virtually all of these large-lot orders after entering them.  (Bessembinder Report, ¶ 11).  Moncada manually placed and canceled these large-lot orders in the Globex electronic trading platform.  (Wollack Dep. 97:2-4; Bessembinder Report, ¶ 6; Affidavit of James Moran "Moran Aff." ¶¶ 5-7)

**(1)**     *Moncada Entered and Canceled Hundreds of Large-Lot Orders Before They Were Filled*

On the eight attempted manipulation dates, Moncada placed a total of over 700 large-lot orders, ranging from 200 to 500 lots, in the December 2009 Wheat Futures Contract as follows: (a) 46 large-lot orders on October 6, 2009; (b) 71 large-lot orders on October 12, 2009; (c) 115 large-lot orders on October 14, 2009; (d) 116 large-lot orders on October 19, 2009; (e) 107 large-lot orders on October 26, 2009; (f) 98 large-lot orders on October 27, 2009; (g) 118 large-lot orders on October 29, 2009; and (h) 37 large-lot orders on October 30, 2009.  (Bessembinder Report, ¶ 7, Table 1).  Moncada placed large-lot orders in the BES account on six of the attempted manipulation dates – October 6, 12, 14, 19, 26, and 27 – and in the Serdika account on four of the attempted manipulation dates – October 26, 27, 29, and 30.  (Harris Aff. ¶¶ 34-43).

Moncada accounted for the vast majority of large-lot orders in the December 2009 Wheat Futures Contract market across the eight attempted manipulation dates.  Of the 470,000 total orders entered in the December 2009 Wheat Futures Contract market on the eight attempted

---

[3] The Bessembinder Report also includes statistical analysis of the effect of Moncada's large-lot orders over the broader time frame of August 13, 2009 to November 30, 2009, finding virtually identical statistics regarding the effect over the broader time frame as on the eight attempted manipulation dates.  (See, generally, Bessembinder Report).

manipulation dates, only 853 were large-lot orders – of which Moncada accounted for 710. (Bessembinder Report, ¶ 4(i)).  As a point of comparison, the average order size across the entire market in the December 2009 Wheat Futures Contract from August 13, 2009 to November 30, 2009 was approximately 3 lots.  (Harris Aff. ¶ 32).  Excluding his large-lot orders, Moncada's average order size from August 13 to November 30, 2009 was approximately 7 lots (his "small-lot orders").  (Harris Aff. ¶ 33).

Moncada placed large-lot orders on both the buy and sell sides of the market. (Bessembinder Report, ¶ 9).  In some instances, he placed and canceled large-lot orders on both sides of the market within minutes of each other.  For instance, on October 27, 2009 between 11:45:41 am and 11:55:45 am, Moncada placed and canceled (a) one large-lot *buy* order, followed by (b) one large-lot *sell* order, followed by (c) three large-lot *buy* orders, followed by (d) four large-lot *sell* orders, followed by (e) two large-lot *buy* orders.  (Harris Aff. ¶¶ 26-27).

Moncada's large-lot orders resulted in very little trading, particularly when compared to those entered by other traders.  Moncada canceled 99.6 percent of his large-lot orders on the eight attempted manipulation dates.  (Bessembinder Report, ¶ 11).  By comparison, of the 143 large-lot orders placed by all other traders combined, only 28.7 percent were canceled. (Bessembinder Report, ¶¶ 7, 15).  Only 0.78 percent of the total volume of Moncada's large-lot orders was actually filled.  (Bessembinder Report, ¶ 7-8).  Also by comparison, other traders filled over 45 percent of the total volume of their large-lot orders.  (Bessembinder Report, ¶ 19).

In contrast to the low percentage of his large-lot orders filled, Moncada filled a high percentage of his small-lot orders, even when compared to the small-lot orders entered by other traders.  Moncada filled over 45 percent of the volume of his own small-lot orders, while other

traders filled on average only 28.2 percent of the volume of their small-lot orders.

(Bessembinder Report, ¶¶ 19, 22).

Moncada also canceled his large-lot orders quickly compared to other traders' large-lot order cancellations.  Moncada canceled his large-lot orders an average of 2.1 seconds after placing them, which included 72.1 percent of those canceled in less than one second.  (Bessembinder Report, ¶ 11; Table 3).  By comparison, other traders canceled large-lot orders only after an average of 127 minutes, with none canceled in less than one second.  (Bessembinder Report, ¶ 15, Table 3).  Additionally, Moncada did not cancel his small-lot orders until leaving them in the market for an average of 10 minutes.  (Bessembinder Report, ¶ 16).

Even though Moncada canceled nearly all of his large-lot orders, he placed them in the market in a manner that ensured that other traders would see his large-lot orders.  All of Moncada's large-lot orders on the eight attempted manipulation dates were within ten ticks of the best bid/best offer prices, meaning that all of his large-lot orders would be displayed to the rest of the market on the Globex order book.  (Bessembinder Report, ¶ 24; Benbrook Aff. ¶ 17).  Moreover, Moncada placed 77.1 percent of his large-lot orders **at the same price as** the best bid (for buy orders) or best offer (for sell orders).  (Bessembinder Report, ¶ 24).  By comparison, other traders' large-lot orders were on average 18 ticks away from the best bid/best offer price.  (Bessembinder Report, ¶ 24).  Also by comparison, Moncada placed his small-lot orders on average 6.6 ticks from the best bid/best offer price.  (Bessembinder Report, ¶ 24).

In over 99 percent of instances for which the data is available, Moncada chose not to enter his large-lot orders as iceberg orders.  (Bessembinder Report, ¶ 25).  Iceberg orders allow traders to enter orders but only show a portion of that order in the market.  (Benbrook Aff. ¶ 20).  Traders tend to use iceberg orders to execute trades "without moving the price unduly" and

"without moving the market as much as you would if you exposed your orders."  (Deposition of Hendrik Bessembinder ("Bessembinder Dep."), 18:23-19:4, 19:20-20:7; *See also*, Bessembinder Dep. 110:17-111:7; Bessembinder Report, ¶ 52).  Moncada said that traders might use iceberg orders because, if the full size of an order were showing, other traders could "lean on your order" or "use your order as a crutch[.]"  (Moncada Dep. 153:21-154:6).  When asked if he ever used iceberg orders while trading for BES and Serdika during October 2009, Moncada testified he would use them whenever he felt he might have a better chance of getting filled.  (Moncada Dep. 152:2-14).

(2)   *Moncada's Large-Lot Orders Affected the Market Price* [4]

Moncada's large-lot orders on the eight attempted manipulation dates affected the market price of the December 2009 Wheat Futures Contract.  Moncada's large-lot orders on average pushed the market price in the twenty seconds following their entry, meaning that his large-lot **buy** orders pushed the price **up** while his large-lot **sell** orders pushed the price **down**. (Bessembinder Report, ¶¶ 62, 76, 77(vi)).

As a result, when Moncada placed and canceled a large-lot buy (or sell) order, the market price increased (or decreased), and other traders were induced to place additional buy (or sell) orders, respectively.  (Bessembinder Report, ¶¶ 73, 76).  While the effect of an individual large-lot order was relatively small, Moncada placed between 37 and 118 large-lot orders per day. (Bessembinder Report, ¶ 62, Table 1).

---

[4] As discussed in the Proposed Conclusions of Law, Section IV. A.2, below, the CFTC does not need to establish that Moncada actually caused an effect on the market price of the December 2009 Wheat Futures Contract to prove attempted manipulation.  The market impact of Moncada's large-lot orders simply provides indicia of his intent to manipulate the December 2009 Wheat Futures Contract market.

Moncada admitted that large-lot orders could have an effect on the market even if only in the market for a fraction of a second. (Moncada Dep. 318:25-319:14). Academic literature in the stock market shows that computerized algorithms often responded to events, such as the arrival of a new order in the market, within two to three milliseconds. (Bessembinder Report, ¶ 27). Moncada knew that any order has an effect on the market. (Moncada Dep. 155:15-19). Moncada also knew that large-lot orders would have more of an effect on the market than smaller lot orders. (Moncada Dep. 154:7-155:19).

### (3)    *Moncada Consistently Traded on the Opposite Side of the Market Following His Large-Lot Orders*

Following a large-lot order on one side of the market, Moncada consistently traded on the opposite side of the market in the minutes afterwards, starting in the first ten seconds after a large-lot order. (Bessembinder Report, ¶ 39). Five minutes after placing a large-lot order on one side of the market, Moncada on average executed 19.3 contracts on the opposite side of the market for every 1,000 contracts of large-lot order. (Bessembinder Report, ¶ 42). By way of explanation, this would mean that if Moncada placed a 500 lot *buy* order (which did not get filled), he would on average actually *sell* orders of nearly 10 lots (which did get filled) in the five minutes following that large-lot buy order. One sequence of Moncada's trading on October 27, 2009 illustrates his trading on the opposite side of the market from his large-lot orders. First, one of Moncada's large-lot (202 lots) buy orders was fully filled. (Bessembinder Report, ¶ 51). This was one of only eight times between August and November 2009 when Moncada's large-lot orders were actually filled. (Bessembinder Report, ¶¶ 47-55). Second, during the following 45 minutes, Moncada placed 25 large-lot *buy* orders and one large-lot *sell* order, none of which resulted in a single executed trade. (Harris Aff. ¶ 24). Third, in that same 45 minute period, Moncada placed a series of four 100 lot iceberg *sell* orders. (Bessembinder Report, ¶ 51, Table

10).  This was one of the few instances where Moncada placed iceberg orders for 100 lots or

greater.  (Bessembinder Report, ¶50-52).  Through this 45 minute stretch, Moncada sold a net

total of 163 lots.  (Harris Aff., ¶ 24; Bessembinder Report, Figure 4).

On each of the eight attempted manipulate dates, Moncada placed and filled small-lot

orders on the opposite side of the market from his large-lot orders in the same time period that he

placed at least one large-lot order.  (Harris Aff. ¶¶ 34-43).

**(4)**     ***Moncada's Testimony on His Rationale for Entering and Canceling Large-Lot Orders***

**i.     Moncada Did Not Recall Why He Entered or Canceled his Large-Lot Orders**

When presented with exhibits showing his large-lot orders and cancelations, Moncada

repeatedly testified that he did not recall his reasons for placing and canceling any one of the

hundreds of individual large-lot orders in the December 2009 Wheat Futures Contract in October

2009.  (Moncada Dep. 166:24-167:7, 173:4-8, 190:3-8, 202:5-15, 210:21-24, 221:6-16, 222:16-

223:3, 228:6-10, 229:12-15, 231:23-232:17, 234:20-23, and 235:12-15).  His testimony included

responses such as "I don't know," "I'm not sure," "I don't know what I was trying to do," or "I

don't know what the situation was in the market here."  (Moncada Dep. 213:11, 216:2, 229:15

and 229:10-11).  Moncada testified that he had not reviewed any of the trading data from

October 2009 provided him by the CFTC or refreshed his recollection with "any documents of

any kind" prior to his testimony to the CFTC.  (Moncada Dep. 316:12-23).

Moncada was asked repeatedly whether he intended to fill his large-lot orders.  When

asked, "Were there any times where you did not intend to fully fill a large-lot order?"  Moncada

responded, "I would have to – I would have to look at the situation."  (Moncada Dep. 135:18-

21).  Additionally, when asked, "Do you recall ever placing a large lot order that you did not

intend to fully fill?" he replied, "I would have to look at each time I placed one and the situation.

29

I don't recall." (Moncada Dep. 136:7-8, 136:13-14).  When asked if he hoped his large-lot orders would be filled, Moncada testified, "I don't recall what I was hoping for, but I do recall that there was always risks and chances, and if the order got filled, I would- I would have to make a decision on what I wanted to do then." (Moncada Dep. 148:9-16).

**ii.      Moncada's Three Purported Rationales for Placing the Large-Lot Orders**

While unable to recall reasons for individual large-lot orders he placed in the December 2009 Wheat Futures Contract, Moncada testified that there were only three rationales he might have used when placing large-lot orders.  (Moncada Dep. 100:25-101:18).  Moncada's first purported rationale was to send a signal to the market as "a way of asking for liquidity." (Moncada Dep. 99:5-25 and 129:13-130:8).  He testified "I don't – I don't remember if I did in that – in October or not, but I know it's a – it's a – it's a method that's used." (Moncada Dep. 129:24-130:2).  Moncada could not state whether he actually used this rationale when placing large-lot orders in October 2009, or at any time.  (Moncada Dep. 130:3-8).

Moncada's second purported rationale was to get "size priority" from the matching algorithm used by the Globex trading platform.  (Moncada Dep. 96:23-98:18).  Moncada testified that he understood that "[i]f you are one of the bigger bids or offers in the [Globex matching] engine, whether you're first or last, you could potentially get a partial fill."  (Moncada Dep. 138:11-17).  Moncada was not sure if he ever placed large-lot orders with the intent of getting size priority in October 2009 in the CBOT Wheat Futures market.  (Moncada Dep. 98:8-18, 144:24-145:9).  Moncada testified that he could have used this rationale because he was having difficulty filling his small-lot orders.  (Moncada Dep. 145:10-20).  When asked under what market conditions he would place large-lot orders to get size priority, Moncada responded "[i]t's very situational.  I mean, it's just depending on what, you know, what was going on the

30

market, depending on, you know, how I felt about, you know, trading a big position." (Moncada Dep. 144:15-23).

Moncada's third purported rationale was that he intended to actually take a position (*i.e*., actually fill his order) based on his "view of the market." (Moncada Dep. 100:25-101:6). Moncada testified that his "view of the market" would be based on "weather, news, outside markets, meaning most of the global commodity markets, equity markets, what the other grains are doing." (Moncada Dep. 81:21-25). Moncada testified that "[i]t would have to be more than just something like gold going up. I would to be [*sic*] looking at several other factors." (Moncada Dep. 84:12-16).

### iii.      Moncada's Only Purported Rationale for Canceling the Large-Lot Orders Before They Were Filled

While Moncada had three purported rationales for ***placing*** his large-lot orders, he testified that the only reason he could think of for ***canceling*** his large-lot orders before they filled was that he was "constantly re-evaluating and adjusting to market conditions." (Moncada Dep. at 114:12-21). Moncada testified that he was "prepared to make a decision on the market at that moment and then change my mind, cancel and reevaluate." (Moncada Dep. 324:16-325:4). When asked why he would cancel an order before it was filled Moncada further testified:

> If that's not going to get filled I'm not going to leave my order out there so somebody could take their time and decide what they want to do. I choose to trade at that moment at that price. If I don't get filled I'm going to cancel my order and look for another spot to trade.

(Moncada Dep. 332:3-16).

When asked about a series of large-lot orders that he canceled within 0.7 seconds after entry, Moncada testified that he might cancel a large-lot order because he was "reacting to something in the market, changing my mind, changing my opinion, changing the feeling that I --

you know, maybe I just didn't want to hold a -- maybe I changed my mind on taking a position at that time, you know, not wanting to expose myself to the market running through me and decided not to."  (Moncada Dep. 115:6-16).  When asked what he meant by "run through," Moncada responded, "I don't even know what that means." (Moncada Dep. 203:23-206:5).

Moncada testified that he "re-evaluated" his large-lot orders based on a review of "all of the markets that have any relation to the grain trade and that includes currencies, that includes macro markets like gold, that includes U.S. equity indexes, that includes specifically the grains." (Moncada Dep. 197:21-198:9).  Moncada testified that he was able to evaluate all of those markets looking at the "momentum and gyrations of those markets" and decide, in under a second, to cancel his large-lot orders based on that evaluation.  (Moncada Dep. 198:14-200:10).

### (5)     *Testimony of Moncada's Colleague at Serdika*

At least one other trader at Serdika was aware that Moncada was placing and canceling large-lot orders.  James Moriarty ("Moriarty"), who was Moncada's friend and a fellow trader at Serdika in the CBOT Wheat Futures market, frequently exchanged instant messages ("IMs") with Moncada.  (Moncada Dep. 246:14-247:24; Deposition of James Moriarty ("Moriarty Dep."), 25:25-26:17, 33:25-34:11, 72:9-14).  During one such IM conversation on September 30, 2009, Moncada said to Moriarty, "Oh yeah, watch wheat dump Cada on the close."  (Instant Message dated September 30, 2009 (the "September 30 IM")).  "Cada" was Moncada's nickname, and "dump Cada" meant that Moncada thought the wheat market was going to go lower.  (Moriarty Dep. 82:1-22).  Two minutes later, Moncada placed and canceled two 500 lot sell orders and one 402 lot sell order in the December 2009 Wheat Futures Contract.  (Harris Aff. ¶ 15).  Moriarty then asked Moncada "is that you fucking around with the 500 lot?" (September 30 IM).  Moncada responded "of course ont [sic] not," eliciting Moriarty to respond "lol," meaning "laugh out loud."  (September 30 IM; Moriarty Dep. 77:8-22, 83:14-84:8).

When asked what he meant by "fucking around," Moriarty characterized the phrase to mean Moncada's "…putting that kind of size in on the market…" (Moriarty Dep. 95:8-14). Moriarty said he used the phrase "[b]ecause, I think it's a crazy thing to do[,]" and "[b]ecause there's too much leverage there." (Moriarty Dep. 94:11-19). Moriarty assumed that Moncada had placed the 500 lot orders, testifying, "I don't know why I thought it was him, it was just on my mind and to be in the market for that much size to me is crazy and I would say why you effing around like this." (Moriarty Dep. 106:11-21).

> **c)**   **Summary of Moncada's Trading Activity Related to the CFTC's Claims of Fictitious Sales and Non-Competitive Transactions**

Separate and apart from his large-lot order activity, Moncada executed a series of offsetting trades between the BES and Serdika accounts on October 6, 12, 15, and 29, 2009. On those four days in October 2009, Moncada placed sizeable orders on opposite sides of the market for the same quantity and price within seconds of each other in the BES and Serdika accounts. (Harris Aff. ¶¶ 16, 18, 22, 28). Moncada admitted that he placed buy orders in the December 2009 Wheat Futures Contract market for one account and sell orders in the market for the other account for the same price and quantity on at least ten occasions, with knowledge and intent that they would hit each other. (Moncada Dep. 254:14-256:21).

> **(1)**   ***Moncada's Trading and Testimony on the October 6, 2009 Transactions***

On October 6, 2009, at 10:20:09.476 am, Moncada placed a buy order in the Serdika account for 80 lots at a price of 466 cents. (Harris Aff. ¶ 16). At 10:20:10.943 am, approximately 1.5 seconds later, Moncada placed an offsetting sell order in the BES account for 80 lots also at a price of 466 cents. (Harris Aff. ¶ 16). The entire BES sell order filled at the price of 466 cents within 0.001 seconds. The majority of the Serdika buy order, 58 lots, was

filled at the price of 466 cents.  (Harris Aff. ¶ 16).  The majority of the BES sell order and

Serdika buy order filled against each other.  (Moncada Dep. 263:4-10).

Moncada was shown the Moncada's trading for the October 6 orders and asked if he was

trying to have the order in the BES account match against the order in the Serdika account.

Moncada agreed that he was trying to match the two orders against each other.  (Moncada

Dep. 262:23-263:3).

**(2)**   ***Moncada's Trading and Testimony on the October 12,
2009 Transactions***

On October 12, 2009, at 11:27:56.161 am, Moncada placed a sell order in the BES

account for 116 lots at a price of 483 ½ cents.  (Harris Aff. ¶ 18).  At 11:27:57.793,

approximately 1.6 seconds later, Moncada placed an offsetting buy order in the Serdika account

for 116 lots at a price of 483 ½ cents.  (Harris Aff. ¶ 18).  Both orders immediately filled at the

price of 483 ½ cents.  (Harris Aff. ¶ 18).  The majority of the BES sell orders and Serdika buy

orders filled against each other.  (Moncada Dep. 268:10-20).

Moncada was shown the trade data for the October 12 orders at his deposition.  He

testified again that he was trying to have the order in the BES account match against the order in

the Serdika account.  (Moncada Dep. 265:6-19).

**(3)**   ***Moncada's Trading and Testimony on the October 15,
2009 Transactions***

On October 15, 2009, at 10:34:54.801 am, Moncada placed an order in the BES account

to sell 271 lots at a price of 499 cents.  (Harris Aff. ¶ 22).  At 10:34:55.516, approximately 0.7

seconds later, Moncada placed an offsetting buy order in the Serdika account for 271 lots at a

price of 499 cents.  (Harris Aff. ¶ 22).  Both orders were completely filled at a price of 499 cents.

(Harris Aff. ¶ 22).  The majority of the BES sell orders and Serdika buy orders filled against each

other.  (Moncada Dep. 260:6-16).

34

Moncada was shown the trade data for the October 15 orders at his deposition. He testified again that he was trying to have the order in the BES account match against the order in the Serdika account. (Moncada Dep. 259:16-261:9).

### (4)   *Moncada's Trading and Testimony on the October 29, 2009 Transactions*

On October 29, 2009, at 12:08:59.899, Moncada placed an order in the Serdika account to sell 154 lots at a price of 508 cents. (Harris Aff. ¶ 28). At 12:09:17.266, approximately 17.3 seconds later, Moncada placed an offsetting buy order in the BES account for 154 lots at a price of 508 ¼ cents, thereby bidding to buy at a price one tick higher than the Serdika sell order. (Harris Aff. ¶ 28).[5] Both orders were immediately and completely filled at a price of 508 cents. (Harris Aff. ¶ 28). The entirety of the BES buy orders and Serdika sell orders filled against each other. (Moncada Dep. 267:22-268:5). The offsetting trade on October 29 was the only transaction that Moncada made in the BES account on that day. (Harris Aff. ¶ 28).

Moncada was shown the trade data for the October 29 orders at his deposition. He testified again that he was trying to have the order in the BES account match against the order in the Serdika account. (Moncada Dep. 265:10-19).

### 2.   *Proposed Conclusions of Law*

### a)   **Moncada Violated Sections 6(c), 6(d), and 9(a)(2) of the Act by Attempting to Manipulate the December 2009 Wheat Futures Contract Price**

The facts establish, through Moncada's trading and the facts in the attached affidavits, relevant testimony, and the CFTC's expert witness report, that Moncada attempted to manipulate

---

[5] Buy orders placed at prices above the best offer price will first fill against any orders at the best offer price. (Benbrook Aff.. ¶ 16). Therefore, an order to buy at a price of 508 ¼ cents would first be filled against a sell order at a price of 508.

the price of the December 2009 Wheat Futures Contract in violation of Sections 6(c), 6(d), and 9(a)(2) of the Act.  7 U.S.C. §§ 9, 15, 13b, 13(a)(2) (2006).

Section 9(a)(2) of the Act makes it unlawful for "[a]ny person to manipulate or attempt to manipulate the price of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity…"  7 U.S.C. § 13(a)(2) (2006).  Section 6(c) of the Act authorizes the CFTC to serve a complaint and provide for the imposition of, among other things, civil monetary penalties and cease and desist orders if the CFTC "has reason to believe that any person is manipulating or attempting to manipulate or has manipulated or attempted to manipulate the market price of any commodity, in interstate commerce, or for future delivery on or subject to the rules of any registered entity, ... or otherwise is violating or has violated any of the provisions of [the] Act…"  7 U.S.C. § 9 (2006).  Section 6(d) of the Act is substantially identical to section 6(c).  *See* 7 U.S.C. § 13b (2006).

To prove attempted manipulation, the CFTC "must establish: (1) an intent to affect the market price of a commodity; and (2) some overt act in furtherance of that intent."  *CFTC v. Parnon Energy, Inc.*, 875 F.Supp.2d 233, 250 (S.D.N.Y. 2012) (citing *In the Matter of Hohenberg Bros.*, [1975-1977 Transfer Binder] Comm. Fut. L. Rep. ¶ 20,271 at 21,477 (CFTC Feb. 18, 1977)).  Courts have held that "the test of manipulation must largely be a practical one if the purposes of the Commodity Exchange Act are to be accomplished.  The methods and techniques of manipulation are limited only the ingenuity of man."  *Cargill, Inc. v. Hardin*, 452 F.2d 1154, 1163 (8th Cir. 1971).

"Intent is the essence of manipulation…the intent of the parties is the determinative element in a punishable manipulation….It is the intent of the parties which separates otherwise lawful business conduct from unlawful manipulative activity."  *In re Indiana Farm Bureau*,

36

[1982-1984 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 21,796 at 27,282-283 (CFTC Dec.

17, 1982).  The intent element of an attempted manipulation claim is met if the CFTC shows that

a defendant "acted (or failed to act) with the purpose or conscious object of causing or effecting

a price or price trend in the market that did not reflect the legitimate forces of supply and

demand."  *Parnon*, 875 F.Supp.2d, at 249 (quoting *In re Energy Transfer Partn. Nat. Gas Litig.*,

2009 U.S. Dist. Lexis 75859 (S.D. Tex., Aug. 26, 2009)).

By necessity intent must be inferred from a person's actions and the totality of the

circumstances.  *See In re Hohenberg Bros.*, [1975-1977 Transfer Binder] Comm. Fut. L. Rep. at

21,477.  Because "proof of intent will most often be circumstantial in nature, manipulative intent

must normally be shown inferentially from the conduct of the accused."  *Parnon*, 875 F.Supp.2d,

at 249 (quoting *Ind. Farm Bureau,* [1982-1984 Transfer Binder] Comm. Fut. L. Rep. (CCH) at

27,289 n. 12).

> [O]nce it is demonstrated that the alleged manipulator sought, by act or omission, to
> move the market away from the equilibrium or efficient price – the price which reflects
> the market forces of supply and demand – the mental element of manipulation may be
> inferred…  It is enough to present evidence from which it may reasonably be inferred that
> the accused 'consciously desire[d] that result, whatever the likelihood of that resulting
> happening from his conduct.'

*Ind. Farm Bureau* [1982-1984 Transfer Binder] Comm. Fut. L. Rep. (CCH) at 27,283 (quoting

*United States v. U.S. Gypsum Co.*, 438 U.S. 422, 445 (1978)).  To establish attempted

manipulation through circumstantial evidence, "a plaintiff must show that the defendant's

conduct is 'at the least, conduct which is highly unreasonable and which represents an extreme

departure from the standards of ordinary care to the extent that the danger was either known to

the defendant or so obvious that the defendant must have been aware of it.'"  *In re Amaranth*

*Natural Gas Commodities Litigation*, 587 F.Supp.2d 513, 531 (S.D.N.Y. 2008) (quoting *Kalnit*

*v. Eichler*, 264 F.3d 131, 142 (2nd Cir. 2001)).  A profit motive may also be evidence of intent,

although profit motive is not a necessary element of an attempted manipulation. *See In re DiPlacido* [2007-2009 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 30,970, at 62,484 (CFTC Nov. 5, 2008) (citing *In re Hohenberg Bros.*, [1975-1977 Transfer Binder] Comm. Fut. L. Rep. at 21,478)), *aff'd*, 364 F.App'x 657 (2nd Cir. 2009).

The second element of attempted manipulation is met by showing an overt act in furtherance of that intent to manipute. *Parnon*, 875 F.Supp.2d, at 250. Overt acts need not be unlawful or fraudulent acts, and can include ordinarily legitimate trading activity. *See CFTC v. Amaranth Advisors, LLC*, 554 F.Supp.2d 523, 533-34 (S.D.N.Y. 2008) (citing *SEC v. Masri*, 523 F.Supp.2d 361, 371 (S.D.N.Y. 2007)). "Because every transaction signals that the buyer and seller have legitimate economic motives for the transaction, if either party lacks that motivation, the signal is inaccurate. Thus, a legitimate transaction combined with an improper motive is commodities manipulation." *In re Amaranth Natural Gas Commodities Litig.*, 587 F. Supp. 2d at 534.

### (1) *Moncada Intended to Manipulate the Price of the December 2009 Wheat Futures Market*

Moncada's trading and testimony shows that he sought to "move the market away from the equilibrium price – the price which reflects market forces of supply and demand" through his large-lot orders. *Ind. Farm Bureau* [1982-1984 Transfer Binder] Comm. Fut. L. Rep. (CCH) at 21,796. Additionally, Moncada's trading and testimony shows that he did not intend to fill his large-lot orders. In fact, Moncada's large-lot orders spoofs (*i.e.* orders he entered and quickly canceled without intent to fill), affected the market price and he consistently traded on the opposite side of the market from his spoofs, showing that he intended to take advantage of the price movements they caused to his own financial benefit.

38

i.    **Moncada's Trading Shows He Intended to Manipulate the Market**

Moncada attempted to manipulate the December 2009 Wheat Futures market by spoofing and then attempting to profit from resulting price movements by placing small-lot orders on the opposite side of the market.  (Bessembinder Report, ¶¶ 30-45, 75).  One method of spoofing, regarded by academic authors as a manipulative tactic, is to place a fleeting order visible to the market in the opposite direction of the order that the trader genuinely desires to be filled.  (Bessembinder Report, ¶ 33).  Some traders have used the "spoofing" technique to place orders in the market to give the impression of interest on one side of the market, but cancel the order before it can be filled, in order to fill their small-lot orders on the opposite side of the market.  *See, e.g., In the Matter of Panther Energy Trading LLC*, [2012-2013 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 32,686 at 73,292-93 (CFTC July 22, 2013) (order instituting and settling charges for "spoofing"); *see also In the Matter of Ecoval Dairy Trade, Inc.*, [2011-2012 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 32,013 at 66,926-28 (CFTC July 19, 2011) (order instituting and settling charges of attempted manipulation by, among other strategies, placing and canceling orders before they could be filled).

(1)    *Moncada's Trading Shows He Did Not Intend to Fill His Large-Lot Orders*

Moncada's intent can best be determined by the actions that he took in the market.  The volume and frequency of his large-lot orders and immediate cancellations of them is indicative of his lack of intent to fill those orders.  As Dr. Bessembinder testified, "[i]f it's happening again and again and again, it would be consistent with the interpretation that he didn't intend to trade on one side.  Nothing speaks louder about intentions than actions."  (Bessembinder Dep. 33:5-8).

In this case, the following five facts about Moncada's trading show that he did not intend to fill his large-lot orders: 1) the sheer number of times that Moncada placed large-lot orders,

making him an outlier compared to other traders; 2) his high cancellation rate for his large-lot orders before they could be filled in the market; 3) his immediate cancellation of his large-lot orders before they could be filled in the market as compared to other traders; 4) that Moncada priced his large-lot orders aggressively, but those large-lot orders rarely resulted in any actual trading; and 5) the fact that Moncada chose not to use iceberg orders for his large-lot orders, thus ensuring that other traders would see those large-lot orders.

First, Moncada's extensive use of large-lot orders made him an outlier in the December 2009 Wheat Futures market.  Large-lot orders accounted for only 853 of the 472,000 orders placed in the market on the eight attempted manipulation dates.  Of the 853 large-lot orders placed in the market, Moncada accounted for 710 of them – the overwhelming majority – compared to the 143 large-lot orders placed by all other traders combined.  (Bessembinder Report, ¶ 4(i)).

Second, Moncada canceled over 99.6 percent of his large-lot orders on the eight attempted manipulation dates before they were filled.  (Bessembinder Report, ¶ 11).  On average, only 0.78 percent of the volume of his large-lot orders was filled.  (Bessembinder Report, ¶¶ 7-8).  By comparison, other traders canceled their large-lot orders only 28.7 percent of the time; on average, over 45 percent of the volume of other traders' large-lot orders were filled. (Bessembinder Report, ¶ 15, 19).  The low rate at which Moncada's large-lot orders resulted in any executed trades strongly indicates that Moncada did not intend for those large-lot orders to be filled.

Third, Moncada canceled his large-lot orders almost instantly before they could be filled in the market.  Moncada canceled his large-lot orders in an average of 2.1 seconds after placement, a far cry from the ten minute average that he would leave small-lot orders in the

market before canceling.  (Bessembinder Report, ¶ 11).  By comparison, other traders left their

large-lot orders in the market an average of 127 minutes.  (Bessembinder Report, ¶ 15).

Moncada canceled over 72 percent of his large-lot orders in less than one second after entering

them.  (Bessembinder Report, ¶ 11, Table 3).  By comparison, no other trader canceled a single

large-lot order within one second.  (Bessembinder Report, Table 3).  To summarize these

statistics:

|  | Moncada | All Other Traders Combined |
| --- | --- | --- |
| **Number of Large-Lot Orders** | 710 | 143 |
| **Large-Lot Orders Canceled** | 99.6% | 28.7% |
| **Volume of Large-Lot Orders Filled** | 0.78% | 45.2% |
| **Average Time to Cancel Large-Lot Orders** | 2.1 *seconds* | 127 *minutes* |

Moncada's frequent and rapid cancelation of his large-lot orders before they could be filled in

the market is consistent with spoofing.  (Bessembinder Report, ¶ 45).  As Dr. Bessembinder

testified, "[a] spoofer does not want their order to execute.  If you leave it out there a long time,

the risk of execution goes up."  (Bessembinder Dep. 77:23-25).

       Fourth, Moncada's large-lot orders were aggressively priced, making the low execution

rate of those orders all the more unusual.  This aggressive pricing ensured that the large-lot

orders would be shown to all traders.  (Bessembinder Report, ¶ 24; Benbrook Aff. ¶ 17).  Orders

at or near the best bid/best offer price (*i.e.*, aggressively priced) should result in "a large number

of executed trades."  (Bessembinder Report, ¶ 28).  Moncada's large-lot orders were certainly

priced aggressively, with over 77 percent of them at the best bid or best offer price.

(Bessembinder Report, ¶ 24).  The fact that Moncada's large-lot orders were so aggressively

priced is one reason "why it's all the more remarkable that he had such low execution rates on

orders that we would normally expect to have high execution rates." (Bessembinder Dep. 66:8-13).

Finally, all but a handful of Moncada's large-lot orders were fully visible to the market because Moncada rarely placed his large-lot orders as iceberg orders.  (Bessembinder Report, ¶ 25).  Traders might use iceberg orders to avoid tipping off the market that they are trying to execute a large trade.  Using iceberg orders reduces the impact that a large order would otherwise have on the market.  (Bessembinder Dep. 18:23-19:4; 19:20-20:7; 110:21-111:7).  Moncada knew that using iceberg orders would reduce the impact that a large-lot order would otherwise have on the market.  When asked if he ever used icebergs while trading for BES and Serdika during October 2009, Moncada testified:

> I would use them – I would use them.  There are many situations, I guess, where I'd use them.  I'd use them if the market was – I don't know if the market was falling, and I – I don't know.  I would use them whenever it just felt like it was a better way to get – might have a better chance of getting filled.

(Moncada Dep. 152:2-14).  Based on Moncada's testimony, if he truly wanted "a better chance of getting filled" on the large-lot orders he placed, he would have made them iceberg orders.  Instead, the few times that Moncada placed iceberg orders for 100 lots or greater included when he tried to unwind large-lot orders that had been filled.  (Bessembinder Report, ¶ 50-54).

Moncada's trading makes it obvious that he wanted other traders to *see* his large-lot orders, but not let other traders actually ***execute*** his large-lot orders.  Given that Moncada's large-lot orders were aggressively priced and fully visible to the market it is "therefore all the more striking that Moncada's large lot orders in the December 2009 wheat futures market had extremely low execution rates.  These low execution rates could not have been an accident.  I conclude that Moncada undertook strategies, including quick cancelations, to ensure low execution rates[.]"  (Bessembinder Report, ¶ 28).  Moncada's high cancellation rates and low

execution rates, despite being aggressively priced and not entered as iceberg orders, are all consistent with Moncada's intent to have his large-lot orders fully visible to the market but not execute.  (Bessembinder Report, ¶ 46).  Thus, Moncada's trading shows he did not intend to fill his large-lot orders.

Moncada engaged in a pattern of behavior that shows he did not intend to fill his large-lot orders and instead attempted to manipulate the December 2009 Wheat Futures market. Moncada's immediate and frequent cancellations of his large-lot orders shows he was an outlier in the market and constituted "an extreme departure from the standards of ordinary care" that traders take in the CBOT Wheat Futures market.  *See Amaranth Natural Gas Commodities Litig.*, 587 F.Supp.2d at 531.   Moreover, he failed to use iceberg trading, which would have kept the size of his large-lot orders hidden and diminished their price effect on the market.  Ultimately, it is clear that Moncada did not want to execute his large-lot orders, and only wanted the market place to see them and, in turn, react to them thereby moving the market price.  *CFTC v. Parnon Energy, Inc.*, 875 F.Supp.2d 233, 249-50 (S.D.N.Y. 2012) (citing *In re Hohenberg Bros.*, [1975-1977 Transfer Binder] Comm. Fut. L. Rep. at 21,477) and (quoting *Ind. Farm Bureau* 1982 [1982-1984 Transfer Binder] Comm. Fut. L. Rep. (CCH) at 27,283 (intent can be inferred by the conduct)).

ii.   **Moncada's Trading Shows He Affected the Market Price and He Attempted to Take Advantage of that Effect**

While Moncada did not intend to fill his large-lot orders, he did intend to affect the market price to his benefit.  In fact, Moncada's large-lot orders actually had an effect on the market price of the December 2009 Wheat Futures Contract.  Moncada's large-lot buy orders made the market price increase, while his large-lot sell orders made the market price decrease. The average effect, as quantified by Dr. Bessembinder and undisputed by Moncada, was small –

an increase of only 0.096 cents or about half a tick over about twenty seconds after order entry –
but the fact that there was an effect shows the true reason that Moncada placed those large-lot
orders.  (Bessembinder Report, ¶ 62, 76, 77(vi); Bessembinder Dep. 34:20-35:25, 43:10-14,
51:18-25).  Moncada placed between 37 and 188 large-lot orders **per day** in the December 2009
Wheat Futures market.  (Bessembinder Report, Table 1).  While an individual large-lot order
would have a relatively small effect on the market price, Moncada's placement of multiple large-
lot orders on the eight attempted manipulation days – up to 118 in a single day – made their
cumulative impact on other traders significant.  The goal of a spoofing strategy is to affect other
trader's order submissions and fool them into entering other orders, which is exactly what
Moncada did.  (Bessembinder Dep. 102:1-18).  In the wake of Moncada's large-lot orders, other
traders reacted by placing their own orders on the same side of the market as the large-lot orders.
(Bessembinder Report, ¶¶ 73-74, Bessembinder Dep. 102:19-103:19).

Moncada has offered no evidence or expert testimony contradicting these market effects.
Moncada admitted that he knew large-lot orders could have an impact on the market and more of
an impact than small-lot orders.  (Moncada Dep. 154:7-155:19).  Moncada knew that the large-
lot orders could impact the market even though they were often in the market for only a fraction
of second.  (Moncada Dep. 318:25-319:14).

Further, Moncada's trading shows that he attempted to take advantage of that effect by
executing small-lot trades on the opposite side of the market.  Moncada used his large-lot order
spoofs in the hope that they would push the market towards his small-lot orders, lying in wait, in
order to get better fill prices on the opposite side of the market.  Moncada consistently placed
small-lot orders on the opposite side of the market from his large-lot orders which, unlike the
large-lot orders, were consistently filled.  If prices moved away from the large-lot orders

44

(meaning prices moved up following a large-lot buy order and down following a large-lot sell order), those small-lot orders would fill at more beneficial prices.  Dr. Bessembinder testified, "…what he [Moncada] did was trade in the opposite direction of his large orders." (Bessembinder Dep. 30:17-20).

As previously stated, the CFTC need not show Moncada's trading created price effect to prevail on the attempted manipulation charges.  However, the existence of a price effect is irrefutable evidence of a profit motive and Moncada's intent to affect the market price.  *See DiPlacido* [2007-2009 Transfer Binder] Comm. Fut. L. Rep. (CCH) at 62,484 (citing *In re Hohenberg Bros.*, [1975-1977 Transfer Binder] Comm. Fut. L. Rep. at 21,478)), *aff'd*, 364 Fed. Appx. 657, No. 08-5559-ag, 2009 WL 3326624 (2nd Cir. 2009).

The proof of Moncada's intent is "shown inferentially from the conduct of the accused." *See Parnon*, 875 F.Supp.2d, at 249 (quoting *Ind. Farm Bureau,* [1982-1984 Transfer Binder] Comm. Fut. L. Rep. (CCH) at 27,283).  The "totality of the circumstances" of Moncada's trading activity – the combination of rapidly placed and canceled large-lot orders in order to cause price movements, plus actual trades on the opposite side of the market through small-lot orders – demonstrates that Moncada intended to manipulate the December 2009 Wheat Futures market. *See In re Hohenberg Bros.*, [1975-1977 Transfer Binder] Comm. Fut. L. Rep. at 21,477. Moncada sought through his large-lot orders, which created misleading impressions in the market of increased interest to buy or sell, "to move the market away from the equilibrium or efficient price – the price which reflects the market forces of supply and demand[.]"  *See Ind. Farm Bureau,* [1982-1984 Transfer Binder] Comm. Fut. L. Rep. (CCH) at 27,283 (quoting *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 445 (1978)).  Further, Moncada's small-lot trades on the opposite side of the market show that Moncada "consciously desire[d] that result,

45

whatever the likelihood of that resulting happening from his conduct." *See id.*  As such, the

CFTC has established that Moncada intended to manipulate the December 2009 Wheat Futures

market.

### iii.    Moncada Can Offer No Explanation for his Large-Lot Orders that is Consistent with the Evidence

#### *(1)    Moncada Did Not Recall Why He Placed or Canceled Particular Large-Lot Orders in October 2009*

Any evaluation of Moncada's intent when he placed and canceled his large-lot orders

must consider his failure to recall why he engaged in such trading conduct.  His testimony is

replete with memory failures regarding his large-lot orders.  In contrast, his memory regarding

his fictitious sales is clear.

The CFTC spent a great deal of time at Moncada's deposition asking him questions about

his large-lot orders.  Each time that he was asked about a particular large-lot order, Moncada

responded that he did not recall why he placed them.  (Moncada Dep. 166:24-167:7, 173:4-8,

190:3-8, 202:5-15, 210:21-24, 221:6-16, 222:16-223:3, 228:6-10, 229:12-15, 231:23-232:17,

234:20-23, and 235:12-15).  Even when exhibits showing his trading were placed in front of him

by the CFTC at deposition, his testimony included repeated responses such as "I don't know,"

"I'm not sure," "I don't know what I was trying to do," or "I don't know what the situation was

in the market here."  (Moncada Dep. 213:11, 216:2, 229:15 and 229:10-11).

In stark contrast to Moncada's inability to recall any of his 710 large-lot orders or

cancellations on the eight attempted manipulation dates, is his clear recollection of his intent and

motivation for placing the four sets of fictitious sales and non-competitive transactions during

October 2009, including those occurring on three of the eight attempted manipulation dates.

(Moncada Dep. 259:16-260:5, 262:17-22, 265:6-19, 268:10-20).

46

Moncada's failure to remember is at best evasive.  Each of the large-lot orders was a significant order in this market, a market that usually trades in 3 lots, and the positions such orders might generate could each cost Moncada $1 million to hold.  Moncada's trading was so far outside of the norm that it is unreasonable to believe that he did not remember a single reason why he placed even one of these orders.[6]  Moncada has apparently buried his head in the sand where his large-lot orders are concerned.  Regardless of whether he remembered or not, his trading is the clearest evidence of his intent – and it points to only one conclusion.

> ### (2)    *Moncada's Purported Rationales for Placing and Canceling Large-Lot Orders are Refuted by His Trading and Testimony*

While apparently unable to recall why he placed any of the large-lot orders, Moncada offered three possible explanations for placing those orders: (a) that he intended to send a "signal" to the market that he was looking to take on a position and thereby attract demand; (b) that he intended to get "size priority" in filling his large-lot orders based on his understanding of the matching algorithm used by Globex; or (c) that he placed the orders to take a position (*i.e.*, actually fill his order) based on his "view of the market" at the time.  (Moncada Dep. 100:25-101:18).  However, Moncada admitted he did not recall if he had ever used the first or second rationale in October 2009, only that he was aware that these rationales "could be used." (Moncada Dep. 129:13-130:2, 98:8-18, and 144:24-145:9).

Even if Moncada had used his first purported rationale, sending a "signal" to the market as "a way of asking for liquidity," his actual trading belies this purported rationale.  Moncada consistently traded on the ***opposite*** side of the market shortly after placing a large-lot order.

---

[6]  Moncada made a point of testifying that he had not reviewed any of the trading data provided to him by the Commission, or refreshed his recollection with "any documents of any kind" prior to his testimony to the Commission, even though he had no specific recollection of his trades in October 2009.  (Moncada Dep. 316:12-23).

(Bessembinder Report, ¶¶ 39-42). Had Moncada actually been trying to "signal" to the market that he wanted to trade on one side of the market, he would actually have traded on that same side of the market after sending the signal. (Bessembinder Report, ¶ 35).

Similarly with Moncada's second purported rationale, placing large-lot orders to get "size priority" from the matching algorithm, his trading also contradicts this purported rationale. Simply put, the "size priority" rationale means that a trader puts in an order for a larger quantity than he actually desires because it would improve the chances that at least a portion of the order would be filled. Moncada testified that he could have used this rationale because he was having difficulty filling his small-lot orders. (Moncada Dep. 145:10-20). However, Moncada's testimony that he could not fill small-lot orders is simply not supported by his own trading. In fact, Moncada had no difficulty filling his small-lot orders (over 45 percent of the volume of those small-lot orders compared to 28.2 percent of other traders' small-lot orders), notwithstanding that he priced his small-lot orders less aggressively on average than his large-lot orders. (Bessembinder Report, ¶¶ 19, 22). If Moncada could fill a 5 lot order without difficulty, it is inconceivable that he would need to place a 500 lot order to get that same result.

Moncada's final purported rationale for placing large-lot orders, that he placed the large-lot orders to take a position (*i.e.*, actually fill his order) based on his "view of the market" at the time is once again refuted by his trading. Essentially, Moncada argues that he was trying to fill each one of these large-lot orders at the time he entered them.

First, though Moncada could not recall his intent on his specific large-lot orders he also failed to give a clear answer at his deposition about whether he could have intended to fill his large-lot orders. When asked, "Were there any times where you did not intend to fully fill a large-lot order?" Moncada responded, "I would have to – I would have to look at the situation."

(Moncada Dep. 135:18-21).  Additionally, when asked, "Do you recall ever placing a large lot order that you did not intend to fully fill?" he replied, "I would have to look at each time I placed one and the situation.  I don't recall." (Moncada Dep. 136:7-8, 136:13-14).  If Moncada actually intended to fill any of the large-lot orders he had placed, he would not have needed to look at "the situation" for each order.

When asked if he hoped his large-lot orders would be filled, Moncada testified "I don't recall what I was hoping for, but I do recall that there was always risks and chances, and if the order got filled, I would – I would have to make a decision on what I wanted to do then." (Moncada Dep. 148:9-16).  The most telling part of this testimony is when Moncada said he "would have to make a decision on what I wanted to do" in the event that a large-lot order filled. Moncada never **wanted** these large-lot orders to fill – in fact, he was **worried** that a large-lot order would be filled.

Moncada's reaction to a fully filled large-lot buy order on October 27 shows the "decision" that Moncada made when one of his large-lot orders filled.  This was one of only eight times that his large-lot orders were actually filled between August 2009 and November 2009 – and four of those instances involved Moncada trading with himself.  (Bessembinder Report, ¶ 47).  At 10:10:22 am, a large-lot (202 lot) buy order fully filled.  (Bessembinder Report, ¶ 51).  Moncada then scrambled to unwind that position by selling contracts.  In the following four minutes, Moncada placed four iceberg sell orders for 100 lots apiece in an effort to unwind his unwanted long position, one of the few times that he ever used iceberg orders of 100 lots or greater.  (Bessembinder Report, ¶ 51, Table 10).  Even more tellingly, Moncada placed 25 large-lot buy spoofs over the course of the following 45 minutes – and not a single lot of those orders filled.  (Harris Aff. ¶ 24).  In that 45 minute stretch, however, Moncada did sell a

net total of 163 lots that he bought when the large-lot buy order was filled.  (Harris Aff. ¶ 24; Bessembinder Report, ¶ 51, Figure 4,).

Moncada's thought process is clear.  Moncada did not want to fill the original 202 large-lot buy order.  He used iceberg orders to **sell** that position ***without*** causing the price to decline, meanwhile using large-lot **buy** spoofs to prop up the market price while he sold out of the position.  Moncada's reaction shows that he did not intend to fill the first large-lot buy order that actually did fill; it also shows that Moncada did not intend to fill the 25 large-lot buy spoofs he placed in the following 45 minutes as he tried to undo that first order.

Second, Moncada's swift shifts between large-lot buy orders and large-lot sell orders undermine any argument that he was actually trying to fill any of his large-lot orders.  A particularly egregious example of this swing is an instance on October 27 when Moncada switched between large-lot buy and large-lot sell orders four times in ten minutes while only filling only a negligible portion of one of those orders.  (Harris Aff. ¶ 26-27).  If Moncada were truly "taking a view of the market," he would not fundamentally change his mind that frequently and repeatedly in such a short period of time.  The frequent shift between large-lot buy orders and large-lot sell orders is "highly unreasonable" and "an extreme departure from the standards of ordinary care" that traders take in the CBOT Wheat Futures market.  *See Amaranth Natural Gas Commodities Litig.*, 587 F.Supp.2d, at 531.

Third, the BES and Serdika accounts simply did not have the funds to cover the millions of dollars in margin that such large positions would have required had he filled them.  On all eight attempted manipulation dates, Moncada's BES account was in margin deficit; likewise, his Serdika account was in margin deficit on five of the eight days.  (Harris Aff. ¶¶ 9, 11).

For instance, on October 14 in the last fifteen minutes of trading Moncada placed and immediately canceled 10 large-lot buy orders, totaling 4,410 lots, in the BES account.  (Harris Aff. ¶ 20).  If any of these orders were filled, it would have increased Moncada's existing long position in the BES account.  (Harris Aff. ¶ 20).  Moncada would have had to either liquidate the position before the market closed (and be subject to any losses had the market price moved against his position) or post sufficient margin to carry the position overnight.  (Moncada Dep. 103:16-104:13; Steele Aff. ¶¶ 12, 14).  By his own admission, the initial margin requirements for a position of 4,410 lots would have been approximately $9 million. (Moncada Dep. 217:10-218:4).  At the end of the trading day on October 14, 2009 the BES account had a margin deficit of nearly $300,000.  (Harris Aff. ¶ 9).  Simply stated, even if he actually wanted to fill those large-lot orders, Moncada's accounts likely could not have covered margin for the positions his large-lot orders would have generated, particularly those towards the end of the trading day.

Therefore, the three possible rationales that Moncada testified for why he might have placed the large-lot orders are all refuted by Moncada's trading and are implausible.  Moncada's purported rationale are, at best, "mere speculation and conjecture."  *See Lomotey v. Conn.-DOT*, 355 Fed.Appx. 478, 480 (2d. Cir. 2013) (quoting *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2nd Cir. 2005)).

While Moncada had three purported rationales for ***placing*** his large-lot orders, his explanation for why he ***cancelled*** his large-lot orders is also contradicted by his trading.  Instead, his testimony on this point reveals his true intent.  Moncada testified that the only reason he could think of for canceling his large-lot orders was that he was "constantly re-evaluating and adjusting to market conditions."  (Moncada Dep. 114:12-21).  Moncada testified that he was able to evaluate all of those markets conditions – including looking at weather reports, news, and the

"momentum and gyrations" of other commodity markets and equity markets – and decide to cancel his large-lot orders in under a second.  (Moncada Dep. 198:14-200:10, 324:16-325:4).

Moncada testified that he might cancel a large-lot order because he was "reacting to something in the market, changing my mind, changing my opinion, changing the feeling that I -- you know, maybe I just didn't want to hold a -- maybe I changed my mind on taking a position at that time, you know, ***not wanting to expose myself to the market running through me*** and decided not to."  (Moncada Dep. 115:6-16, emphasis added).  Moncada was asked what he meant by "run through."  Realizing that he had accidentally revealed his true intent when testifying about a series of large-lot orders canceled within 0.7 seconds after entry, Moncada attempted to recant by saying "I don't even know what that means." (Moncada Dep. 203:23-206:5).  Moncada testified:

> If [a large-lot order]'s not going to get filled I'm not going to leave my order out there so somebody could take their time and decide what they want to do.  I choose to trade at that moment at that price.  If I don't get filled I'm going to cancel my order and look for another spot to trade.

(Moncada Dep. 332:3-332:16).  Moncada further testified that he was "not going to leave the order out there for somebody to possibly take advantage of or lean against."  (Moncada Dep. 324:16-325:4).  The obvious implication of Moncada's testimony is that he wanted to cancel the large-lot orders before another trader could fill those orders, which Moncada referred to as "the market running through me" or "tak[ing] advantage of" his large-lot orders.

Moncada's testimony, when compared to his trading, shows that he did not intend to actually fill his large-lot orders.  Additionally, Moncada's actual trading and use of large-lot orders does not match up with any of the three potential rationales that he could think of to explain placing his large-lot orders.  Further, Moncada's explanation for why he might cancel a large-lot order is implausible and proves that he never had the intent to fill those orders.  All of

Moncada's rationales for placing and canceling the large-lot orders are contradicted by the unrefuted facts. No reasonable inferences – other than the inference that Moncada intended to manipulate the December 2009 Wheat Futures Contract – can be drawn from Moncada's testimony when compared to his trading.

**(3)    *Moriarty's Testimony Shows Moncada Intended to Manipulate the Market***

Finally, Moncada's intent is laid bare when he is caught bragging to Moriarty, his friend and fellow Serdika trader, about his ability to affect the December 2009 Wheat Futures Contract.

In an IM conversation on September 30, 2009, Moncada said to Moriarty, "Oh yeah, watch wheat dump Cada [*i.e.* go lower] on the close." (September 30 IM; Moriarty Dep. 82:1-88:22). "Cada" was Moncada's nickname, and "dump Cada" meant that Moncada thought the wheat market was going to go lower. (Moriarty Dep. 82:1-22). Two minutes later, Moncada spoofed two 500 lot sell orders and one 402 lot sell order in the December 2009 Wheat Futures Contract – attempting to cause the price to go lower. (Harris Aff. ¶ 15). Upon seeing those large-lot orders, Moriarty asked Moncada "is that you fucking around with the 500 lot?" (September 30 IM). Moncada sarcastically responded "of course ont [sic] not," causing Moriarty to "laugh out loud" in response. (September 30 IM; Moriarty Dep. 77:8-22, 83:14-84:8).

When asked what he meant by "fucking around" Moriarty testified he used the phrase "[b]ecause, I think it's a crazy thing to do[,]" and "[b]ecause there's too much leverage there." (Moriarty Dep. 94:11-19; 95:8-17). Moriarty assumed that Moncada had placed the 500 lot orders, testifying, "I don't know why I thought it was him, it was just on my mind and to be in the market for that much size to me is crazy and I would say why you effing around like this." (Moriarty Dep. 106:11-21).

53

Moncada boasted to Moriarty that the market price would go lower, then spoofed to make that prediction come true. Moriarty's characterization of Moncada's spoofing actions mirror the unrefuted evidence of Moncada's trading on the eight attempted manipulation dates. This is one instance where Moriarty saw Moncada spoof and is indicative of Moncada's subsequent pattern of behavior used to attempt to manipulate the December 2009 Wheat Futures Contract. *See, e.g., Panther Energy*, [2012-2013 Transfer Binder] Comm. Fut. L. Rep. (CCH) at 73,292-93 (settlement alleging the trading company engaged in the disruptive trading practice called spoofing in violations of the CEA); *see also Ecoval Dairy Trade, Inc.*, [2011-2012 Transfer Binder] Comm. Fut. L. Rep. (CCH) at 66,926-28 (order instituting and settling charges of attempted manipulation by, among other strategies, placing and canceling orders before they could be filled with the intent to push prices higher).

### iv.    Moncada's Trading Constituted Overt Acts in Furtherance of his Intent to Manipulate

Each of Moncada's large-lot spoof orders along with the small-lot orders on the opposite side of the market constitute the overt acts in furtherance of his attempt to manipulate the December 2009 Wheat Futures Contract market. The second element of attempted manipulation is met by showing an overt act in furtherance of that intent to manipulate. *Parnon*, 875 F.Supp.2d, at 250. Moncada's manipulative scheme involved placing and canceling those large-lot orders with the intent to cause the market price to move. The payoff for the scheme involved Moncada's small-lot orders on the opposite side of the market, which were poised to reap the benefit of such price moves.

Even ordinarily legitimate trading activity can be an overt act for purposes of an attempted manipulation charge. *See Amaranth*, 554 F.Supp.2d, at 533-34 *Amaranth Natural Gas Commodities Litig.*, 587 F.Supp.2d at 534. Moncada repeatedly tried to justify his actions by

saying that his large-lot orders were "at risk" of being filled.  (Moncada Dep. 317:18-319:14).  In

fact, Moncada was at risk of having these large-lot orders filled and a small portion of them

actually were filled.  Every bid or offer places the trader at risk of being filled, and every bid or

offer can be legitimate.  However, being at risk in the market is not a defense to attempted

manipulation if that trading activity is being conducted with a manipulative intent.  The fact that

Moncada's large-lot orders may have been "at risk" of being filled in the few seconds they were

in the market does not mean that Moncada did not intend for those large-lot orders to manipulate

the market price.  If anything, the fact that that such a small percentage of the volume of those

orders were filled – only 0.78 percent – despite being at risk shows that Moncada entered those

large-lot orders with a manipulative intent.  Moncada's large-lot spoofs accompanied by his

small-lot orders on the opposite side of the market were the overt acts in furtherance of his intent

to attempt to manipulate the December 2009 Wheat Futures Contract in violation of Sections

6(c), 6(d), and 9(a)(2) of the Act.  *Parnon Energy, Inc.*, 875 F.Supp.2d at 250 (citing *In re

Hohenberg Bros.*, [1975-1977 Transfer Binder] Comm. Fut. L. Rep. at 21,477).

On each of the eight attempted manipulation dates, Moncada placed and canceled

multiple large-lot orders.  (Bessembinder Report, Table 1).  Specifically, Moncada placed and

canceled: (1) 46 large-lot orders on October 6, 2009; (2) 71 large-lot orders on October 12, 2009;

(3) 115 large-lot orders on October 14, 2009; (4) 116 large-lot orders on October 19, 2009; (5)

107 large-lot orders on October 26, 2009; (6) 98 large-lot orders on October 27, 2009; (7) 118

large-lot orders on October 29, 2009; and (8) 37 large-lot orders on October 30, 2009.

(Bessembinder Report, ¶ 7, Table 1).  On each of the eight attempted manipulation dates,

Moncada placed and filled small-lot orders on the opposite side of the market within the same

time period that he placed his large-lot orders.  (Harris Aff., ¶¶ 34-43).

Because Moncada placed and canceled multiple large-lot order spoofs, and placed small-lot orders on the opposite side of the market from those large-lot orders, on each of the eight attempted manipulation days charged in the Complaint in furtherance of his manipulative scheme, the CFTC will show Moncada is liable for violations alleged in Counts One through Eight of the Complaint.  *Parnon Energy, Inc.*, 875 F.Supp.2d at 250 (citing *In re Hohenberg Bros.*, [1975-1977 Transfer Binder] Comm. Fut. L. Rep. at 21,477) (attempted manipulation is proven by showing intent to affect the marketplace and an overt act in furtherance of that intent).

### b)   Moncada Violated the Act by Executing Orders that Constitute Fictitious Sales and Non-Competitive Transactions

By virtue of his trading and deposition admissions, the CFTC will show that Moncada violated Section 4c(a) of the Act and Section 1.38 of the Commission Regulations.  7 U.S.C. § 6c(a) (2006), Regulation 1.38 (2012).

### (1)   *Moncada Violated Section 4c(a) by Entering into Fictitious Sales*

Section 4c(a) of the Act makes it unlawful to enter a transaction that "is, is of the character of, or is commonly known to the trade as, a 'wash sale' or 'accommodation trade'…or is a fictitious sale or is used to cause any price to be reported, registered, or recorded that is not a true and *bona fide* price."  7 U.S.C. § 6c(a)(2).  Congress enacted Section 4c(a) of the Act to prevent collusive trades conducted away from the market.  *See, generally, Merrill Lynch Futures, Inc. v. Kelly,* 585 F.Supp. 1245, 1251 n.3 (S.D.N.Y. 1984).

While "fictitious sales" is not defined in the Act, the CFTC has held that "the central characteristic of the general category of fictitious sales is the use of trading techniques that give the appearance of submitting trades to the open market while negating the risk of price competition incident to such a market."  *Harold Collins*, [1986-1987 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 22,982 at 31,902 (C.F.T.C. April 4, 1986), *rev'd on other grounds sub*

*nom. Stoller v. CFTC*, 834 F.2d 262 (2nd Cir. 1987). Prearranged trading is a form of fictitious

sale because "[b]y determining trade information such as price and quantity outside the [trading]

pit, then using the market mechanism to shield the private nature of the bargain from public

scrutiny, both price competition and market risk are eliminated." *Id.* at 31,903. The two

accounts involved in a trade do not need to be owned by the same individual or entity for the

trade to constitute a fictitious sale. *See, e.g., Thomas Collins,* [1996-1998 Transfer Binder]

Comm. Fut. L. Rep. (CCH) ¶ 27,194 at 45,743 (C.F.T.C. December 10, 1997).

       To establish that a transaction violates Section 4c(a), the CFTC first must prove "(1) the

purchase and sale (2) of the same delivery month of the same futures contract (3) at the same (or

a similar) price." *Wilson v. CFTC*, 322 F.3d 555, 559-560 (8th Cir. 2003). Second, the CFTC

must prove intent to enter into a fictitious sale, either directly or through circumstantial evidence.

*See Reddy v. CFTC*, 191 F.3d 109, 119 (2nd Cir. 1999). The issue is "whether [the] transactions

were initiated without the intent to make a *bona fide* trading transaction." *Harold Collins* [1986-

1987 Transfer Binder] Comm. Fut. L. Rep. (CCH) at 31,899, 31,902 (discussing wash sales,

which is a type of fictitious sale). Intent can be inferred "from the intentional structuring of a

transaction in a manner to achieve the same result as prearrangement." *In re Three Eight*

*Corporation*, [1992-1994 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 25,749 at 40,444 n.15

(CFTC Jun. 16, 1993) (citing *Harold Collins* [1986-1987 Transfer Binder] Comm. Fut. L. Rep.

(CCH) at 31,900-901).

       Moncada's four sets of orders in the December 2009 Wheat Futures Contract on October

6, 12, 15, and 29, 2009, each of which were placed with the same volume and same or similar

price satisfy the elements of a fictitious sale. First, on October 6, 2009, Moncada (a) placed a

buy order in the Serdika account in the December 2009 Wheat Futures Contract for 80 lots at a

price of 466 cents, then (b) less than two seconds later, he placed a sell order in the BES account

in the December 2009 Wheat Futures Contract for 80 lots at a price of 466 cents.  (Harris Aff.

¶ 16).  Second, on October 12, 2009, Moncada (a) placed a sell order in the BES account in the

December 2009 Wheat Futures Contract for 116 lots at a price of 483 ½ cents, then (b) less than

six tenths of a second later, he placed a buy order in the Serdika account in the December 2009

Wheat Futures Contract for 116 lots at a price of 483 ½ cents.  (Harris Aff. ¶ 18).  Third, on

October 15, 2009, Moncada (a) placed a sell order in the BES account in the December 2009

Wheat Futures Contract for 271 lots at a price of 499 cents, then (b) shortly thereafter placed a

buy order in the Serdika account in the December 2009 Wheat Futures Contract for 271 lots at a

price of 499 cents.  (Harris Aff. ¶ 22).  Fourth, on October 29, 2009, Moncada (a) placed a sell

order in the Serdika account in the December 2009 Wheat Futures Contract for 154 lots at a price

of 508 cents, then (b) placed a buy order in the BES account in the December 2009 Wheat

Futures Contract for 154 lots at the slightly higher price of 508 ¼ to match the Serdika order.

Moreover, this was the only trade that Moncada executed in the BES account on October 29,

2009.  (Harris Aff. ¶ 28).  Each of these buy orders were filled against the sell orders that

Moncada entered in the other account, effectively transferring the positions between the BES and

Serdika accounts.  (Moncada Dep. 263:4-10, 268:10-20, 260:6-16, and 267:22-268:5).

Moncada admitted that, on the four dates alleged in the CFTC's complaint, he placed

offsetting buy and sell orders in the BES and Serdika accounts with the intent of matching the

orders against each other to transfer the positions between the accounts, thus satisfying the intent

element.  (Moncada Dep. 259:16-260:5, 262:17-22, 265:6-19, 268:10-20).  Moncada's trading

and testimony demonstrate that Moncada placed these offsetting buy and sell orders with the

intent that they fill against each other.  Accordingly, Moncada entered into four transactions that

were fictitious sales in violation of Section 4c(a) of the Act on October 6, 12, 15, and 29, 2009.

7 U.S.C. § 6c(a) (2006).

**(2)**     ***Moncada Violated Regulation 1.38 by Entering into Non-***
***Competitive Transactions***

Regulation 1.38(a), 17 C.F.R. § 1.38(a) (2012), requires that all purchases and sales of

commodity futures be executed "openly and competitively."  The purpose of Regulation 1.38(a)

is to ensure "that all trades are directed into a centralized marketplace to participate in the

competitive determination of the price of futures contracts."  *In the Matter of Lorenzen*, [2012-

2013 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 32,535 at 72,119-20 ( CFTC Feb. 8, 2013)

(*citing* S. Rep. No. 93-1131, at 16 (1974)).  The same conduct that constitutes a violation of

Section 4c(a) also constitutes a violation of Regulation 1.38.

Non-competitive transactions include orders placed by a trader with the intent that those

orders trade against each other.  *See Lorenzen*, [2012-2013 Transfer Binder] Comm. Fut. L. Rep.

(CCH) at 72,118, 72,119-20.  Non-competitive transactions, although giving the appearance of

submitting trades to the open market, actually negate the market risk of a trade.  *Harold Collins*

[1986-1987 Transfer Binder] Comm. Fut. L. Rep. (CCH) at 31,903 n. 23.  Non-competitive

transactions cannot be cured merely by going through the motions of a trade in the market.  *See*

*Harold Collins*, [1986-1987 Transfer Binder] Comm. Fut. L. Rep. (CCH) at 45,743-744.  The

two accounts involved in a trade do not need to be owned by the same individual or entity for the

trade to constitute a non-competitive transaction.  *See, e.g., CFTC v. Nunn*, Dkt. No. 11, 12-cv-

7786 (LAK) (S.D.N.Y. December 18, 2013) [Current Transfer Binder] Comm. Fut. L. Rep.

(CCH) ¶ 32,891 (S.D.N.Y. December 18, 2013) (settlement for violations of Regulation 1.38(a)

based on trades between account owned by defendant and second account owned by another

person.).

59

On October 6, 12, 15, and 29, 2009, Moncada knowingly entered offsetting orders in the December 2009 Wheat Futures Contract market with the intent of having those orders trade against each other.  Moncada determined the price for these transactions outside of the market. Therefore, Moncada engaged in four non-competitive transactions in violations of Regulation 1.38(a) on October 6, 12, 15, and 29, 2009.  17 C.F.R. § 1.38 (2012).

> **c)**    **BES and Serdika are Liable for Moncada's Acts that Violated the Commodity Exchange Act**

Under Section 2(a)(1)(B) of the Act, strict liability is imposed upon principals for the actions of their agents.  *See* 7 U.S.C. §2(a)(1)(B).  *See also Rosenthal & Co. v. CFTC*, 802 F.2d 963, 966 (7th Cir. 1986); *Dohmen-Ramirez & Wellington Advisory, Inc. v. CFTC*, 837 F.2d 847, 957-58 (9th Cir. 1988).  That section provides:

> The act, omission, or failure of any official, agent or other person acting for any individual association, partnership, corporation, or trust within the scope of his employment or office shall be deemed the act, omission, or failure of such individual, association, partnership, corporation, or trust, as well as of such official, agent, or other person.

7 U.S.C. § 2(a)(1)(B).  In the Second Circuit Court of Appeals, the test for agency under Section 2(a)(1)(B) of the Act is not the same as the test for common law agency.  *See In re Amaranth Natural Gas Commodities Litig.*, 711 F. Supp.2d 301, 307 (S.D.N.Y. 2010).  According to the court in *Amaranth*, in order to impose agency under Section 2(a)(1)(B), the plaintiff must allege: (1) the principal's manifestation of intent to grant authority to the agent, and (2) agreement by the agent.  *See id.*  However, the plaintiff does not have to show "control" over the agent's behavior in order to show agency.  Instead, it is enough for the plaintiff to show that the agent was "acting for" the principal in executing the manipulative trades.  *See id.* at 311 (citing *Guttman v. CFTC*, 197 F.3d 33, 39 (2nd Cir. 1999)).

Based on the Second Circuit's standard for liability, BES and Serdika are strictly liable for the actions of Moncada. BES and Serdika granted authority to Moncada to act for BES and Serdika and, in turn, Moncada acted on behalf of BES and Serdika. (Moncada Dep. 38:8-25, 44:10-15, 45:1-11). Moncada had authority to trade BES's and Serdika's accounts and placed trades on behalf of BES and Serdika. (Moncada Dep. 38:8-25, 44:10-15, 45:1-11; Steele Aff. ¶ 8). Moncada was also paid by BES and Serdika through profit sharing in the accounts he traded. (Moncada Dep. 47:10-48:14; Plaintiff's First Set of Requests for Admissions, ¶¶ 15, 18; Response to Request for Admissions, ¶¶ 15, 18). Therefore, the CFTC will show that BES and Serdika should be held liable for Moncada's unlawful acts under 7 U.S.C. § 2(a)(1)(B).

**B.     Defendant's Contentions**

<u>DEFENDANT'S PROPOSED FINDINGS OF FACT</u>

1.     During 2008-2009 Eric Moncada was employed as a trader of commodities at BES Capital LLC and Serdika LLC at their offices in New York. Mr. Moncada was a member of both companies.

2.      Mr. Moncada was a prolific trader of commodities including winter wheat futures on the Chicago Board of Options Exchange and the Kansas City Board of Options Exchange.

3.     In 2012 the plaintiff Commodities Futures Trading CFTC commenced this action against Mr. Moncada BES and Serdika charging, inter alia, attempted manipulation of the price of December 2009 winter wheat futures, on eight dates in October 2009.

4.     There is no allegation that Mr. Moncada's alleged attempted manipulation was profitable; Mr. Moncada received no payments of any kind from BES or Serdika after October 9, 2009, and no moneys in respect of trading profits for October 2009.

5.     Mr. Moncada has not actively traded regulated commodities since early 2010, and both BES and Serdika have been out of business since 2010.

<u>The Government's Theory and the Bessembinder Report</u>:

6.      The Government's claim that Mr. Moncada attempted to manipulate the market in December 2009 Winter Wheat on CBOT and the Kansas City exchange on eight days in October 2009 is premised on an "Expert Report" of Hendrik Bessembinder.

7.      Bessembinder is "an academic, not a trader."  (Bessembinder EBT, p. 4).

8.      The conclusions reached by Bessembinder are not supported by facts set forth in his Report.

9.      The theory advanced by Bessembinder is that Mr. Moncada would enter and cancel numerous "large lot orders", i.e., orders for 200 or more contracts, hoping that the orders would move the market; Mr. Moncada would thereafter place and execute orders in the opposite direction of his large orders.  According to this theory, if Mr. Moncada placed and cancelled an order to purchase 200 contracts, his expectation would be that the order would move the market upward.  Mr. Moncada would then place an order to sell a small number of contracts, hoping to take advantage of the increase in price generated by his large order.

10.      The facts set forth in the Bessembinder report not only fail to support this theory, but actually refute it.

<u>Absence of Market Impact</u>:

11.      Mr. Bessembinder attempted to compute the impact on market price of Mr. Moncada's large lot orders.  He determined that in the same ten seconds as Mr. Moncada's orders were placed, and in the following ten seconds, Mr. Moncada's large lot orders impacted the market price of wheat by less than $1/10^{th}$ of one cent per thousand contracts (EBT, p. 35).  Thus, if Mr. Moncada placed and cancelled a 200 lot order, the impact on the market within 20 seconds would have been $1/50^{th}$ of one cent.

12.     Wheat contracts were quoted on the exchanges in quarter cent increments (EBT, p. 35), i.e. a quarter cent move in the market price would register as "one tick."  Thus, a $1/50^{th}$ of one cent impact in the market price would <u>not</u> result in any uptick or downtick.

13.     Bessembinder's report conceded that he was not able to find any impact on market price following the passage of 20 seconds after Mr. Moncada's large lot orders (EBT, p. 36).

14.     Thus, if Mr. Moncada was to profit from his alleged "strategy" of placing and cancelling large lot orders and then entering orders in the opposite direction, he would have to have done so within 10-20 seconds of placing a large lot order, and even then his profit, if any, would have been negligible.

15.     Bessembinder acknowledged in his deposition and in his report that the vast bulk of Mr. Moncada's trades in the opposite direction of a large lot order occurred long after the expiration of 20 seconds, generally within five minutes to an hour after the large lot trades, at a time when the large lot orders had no discernible impact on the market (EBT, pp. 39, 44, 51).

16.     The absence of a discernible impact on market price is supported by the realities of the marketplace.  Frequent placement of large lot orders and cancellations by Moncada was not reasonably calculated to move the market.  Traders would be able to tell when a large lot was placed and cancelled and would disregard the orders.  Traders would be more concerned with large orders that are not cancelled because they would be more indicative of strength.  (Expert Report of Steven Wollack)

17.     In short, according to Bessembinder's own testimony and his report, Mr. Moncada could not have profited from the alleged "manipulative strategy" posited by Bessembinder.

<u>Moncada's large lot orders placed him at risk</u>:

18.     Generally, individuals engaged in "spoofing" or sending false signals to the market do so in such a way as to avoid risk, or, as a minimum, to limit risk as compared to potential reward.

19.     As Bessembinder admitted in his deposition, Mr. Moncada's "strategy" of placing and cancelling large lot orders placed Mr. Moncada at risk (EBT, pp. 60-61).

20.     The average time between Mr. Moncada's placing a large lot order and its cancellation was approximately 2.4 seconds (EBT, p. 14).  As Bessembinder admitted, a trader wishing to accept Moncada's large lot order could do so in a millisecond (<u>id</u>).  Moreover, had Moncada wished to avoid the risk inherent in having an order "hit" by another trader, he could have cancelled it in "microseconds had he wished to" (EBT, pp. 15, 16) rather than leaving it open for what, in trading terms, is an eternity.

21.     If Moncada had not intended to have his large lot orders executed, he would have used computer algorithms and high-frequency trading to enter and cancel orders immediately without any risk of execution.  Instead, his orders were placed and cancelled manually (Wollack Report).

22.     A large number of Mr. Moncada's large lot orders were executed.  Mr. Moncada accounted for more than 6% of <u>actual</u> executions of all large lot orders in the market during the period studied by Mr. Bessembinder (EBT, p. 52).  On the eight dates charged in the Complaint, Moncada had 2,136 contracts executed on his large lot orders.

23.     Moncada traded actively throughout the period covered by the lawsuit making numerous trades, taking large intraday and overnight positions.  On the eight dates charged in the

Complaint, Mr. Moncada traded 21,658 contracts.  For the month of October, he traded 79,560 contracts.

24.     As noted in the expert report of Steven Wollack, Moncada's trading style of buying and selling thousands of contracts and at times using large lot orders indicates that he relied on a trader's intuition and feel of the market in addition to fundamental and technical analysis.

<u>Comparison with other traders</u>:

25.     Bessembinder's report attempts to support his theory by showing that Moncada had a higher percentage of cancellations of large lot orders than the rest of the market. Bessembinder admitted, however, that many traders, rather than cancelling an order, would "modify" the order by changing the price of a bid.  Bessembinder acknowledged that he did not count modifications by other traders as "cancellations."  There is no way of knowing what percentage of large lot orders by other traders were subject to 'modification" as opposed to cancellation (EBT, p. 27).

26.     The fact that Moncada cancelled large lot orders more frequently and more quickly than other traders does not show that he intended to manipulate the prices. Bessembinder acknowledged that while Mr. Moncada's large lot orders were placed at or near the best bid or offer ("BBO"), typically other traders would place large lot orders substantially off the market (several ticks lower if a buy order; several ticks higher if a sell order), hoping to buy or sell at bargain prices.  These orders entailed little risk since it generally took the market a long time to move several ricks.  By contrast, there is substantially more risk involved in leaving a large lot order open if the order is at or near the market.

27.     Bessembinder conceded that a trader who is more motivated to get a trade done will leave his order open longer than a trader who is price sensitive (EBT, p. 28).  Unlike many traders of large lots, Moncada was particularly price sensitive.

28.     There was no potential upside and significant downside to leaving open a large lot order at or near the market.  If, for example, Mr. Moncada sought to purchase contracts at a specific price, and the market went down, his offer would be "hit" by other traders, and be forced to buy at a price higher than the market.  On the other hand, if the market moved above the price at which he offered to purchase, no one would accept his offer.  Thus, by leaving a large lot order open for an extended period of time, Mr. Moncada would have run the risk of losing a substantial amount of money without any concomitant possibility of reward -– a no win situation.  As Bessembinder conceded, "the scenario you lay out is a reason that one might want to cancel an order."  (EBT, p. 25)

29.     Another important reason for frequently entering and cancelling large lot orders is to obtain time and allocation priority in execution of the orders.  Under the CME's matching algorithm for wheat futures, after an allocation of 100 contracts to the first order at a particular price, there is a pro-rata allocation of all other orders at that price.

30.     Large lot orders are frequently used to test the strength of a trader's position or the direction of the market.

31.     Bessembinder made no effort to determine whether Mr. Moncada's trading during the period he studied was in fact profitable.

Failure to use "iceberg" orders:

32.     Bessembinder noted that many traders of large lots used "iceberg" orders, while Mr. Moncada did not.  An "iceberg" order is sometimes used by a trader who wishes to purchase

or sell a large quantity of contracts but wants to conceal his strategy from the rest of the market. Instead of offering to buy or sell 200 or more lots, he will enter an order which discloses to the market only at 10 or 20 lot orders.  When that order is "hit", a second small order will be displayed, and so on until the desired volume has been achieved.

33.     Moncada's aggressive style is contrasted by the style of "position traders" or hedgers who tend not to cancel orders as frequently, because they want their orders filled at a given price regardless of how long it takes.  Those traders are also more likely to use "iceberg" orders.  By contrast, for aggressive traders like Moncada, time is of the essence and the use of iceberg orders is not a practical method of trading.

Analysis of specific trades shows no attempt to manipulate:

34.     When executed on a large lot order, Moncada did not immediately exit his position but held it.

35.     The expert report of Steven E. Wollack, a long-time trader, attorney and member of the board of the CME, sets forth examples of trades by Mr. Moncada on the relevant dates which tend to refute the plaintiff's claim of intent to manipulate:

36.     On September 22nd (Bessembinder pg. 21 para. 48) Moncada was long 20 contracts just before the execution of a large buy order at 12:37:02 that increased his position to 437 contracts. He reduced his position to 306 contracts a little more than a minute later and waited another twenty three minutes (13:00:30) to reduce to 207 contracts. It wasn't until the pit closed at 13:15 that he reduced his position to 22 contracts, approximately the same as before the large order execution. If he had not intended to be executed he would have sold the entire executed order within a minute or two. Traders typically get out a trade immediately after an error or order that is not wanted. Moncada did not do this but instead he sat with 306 contracts

for almost twenty three minutes where every tick was $3825 and each one cent move was $15,300. Then he reduced his position to 207 contracts which he held for fourteen minutes where every tick was $2587.50 and each one cent move was $10,350. It wasn't until the pit close, 38 minutes later, that he finally liquidated the large order. Clearly Moncada intended to be executed on this large order and took market risk.

37.    On October 6, 2009 (a relevant date) Moncada bought 200 contracts at 9:30:00 and his additional buying and selling resulted in an increase in his position to 239 contracts at 9:38:38. It wasn't until 10:20:10 that he got out of his net long position. Holding a net long position for 50 minutes indicated intent to be executed.

38.    On October 27, 2009 (a date represented in one of the Counts in the Complaint), Moncada bought 202 contracts at 10:10:22 increasing his long position to 429 contracts where every tick is $5362.50 and every one cent move is $21,450. It wasn't until 12:53:26 that he exited the 202 extra contracts. Clearly, taking two hours forty three minutes to get out of an order indicated intent to be executed.

<u>Relevant Dates Detailed in Complaint</u>

<u>October 29, 2009 (Complaint, pg. 9)</u>

39.    Prior to the trades referred to in the Complaint, by 10:23:42 Moncada had accumulated a net long position of 144 contracts.  Immediately thereafter, at 10:23:45 he entered and cancelled a buy order for 402 contracts, then at 10:27:28 he entered and cancelled another buy order for 500 contracts and at 10:29:00 entered and cancelled a third buy order for 500 contracts.  Yet after canceling the three orders, Moncada added to his long position at 10:33:19-10:33:21 by buying 25 contracts bringing his position to long 169 contracts.  Since Moncada

added to his long position after canceling three large buy orders, he obviously was not trying to induce selling as he must have thought the market was going higher.

40.     Mr. Moncada then entered and cancelled six large buy orders prior to selling the 66 contracts.  Moncada was selling the contracts only one or two ticks better than the price bid on his large orders.  The large buy orders had little or no effect.  Rather than showing that he was manipulating the market to sell on the offer side, the more logical explanation is that he thought the market was no longer going higher and was reducing his long position and exposure to risk.

October 27, 2009 (Complaint, pg. 11)

41.     Prior to the trades in question, Moncada started to accumulate a short position at 9:31:00 totaling 350 contracts by 9:33:55. These positions were accumulated at prices ranging from 517.50 to 525.75 of which 289 contracts were from 517.50 to 521.0. During this period at 9:32:42 and 9:32:57 he entered and cancelled two large sell orders at the offer price of 521. In 0.823 seconds after the second cancellation the market rallied above 521 at which time Moncada sold another 66 contracts at prices ranging from 524.75 to 525.75 increasing his losing short position to 350 contracts. Thus, following his cancelled sell orders he sold contracts at a higher price. This clearly shows that the entering of large sell orders does not necessarily result in lower prices and that Moncada was following large lot orders by executed orders on the same side, not the opposite side.

42.     Then as set forth in the complaint he bought 42 contracts at prices from 521.75 to 523 leaving him with a position of short 303 contracts in which was losing money. Moncada was simply covering his early sales from 517.50 to 518.25 for a loss of 17 to 19 ticks per contract. Moncada was doing what many traders do when faced with a losing position. He covered some of his position to reduce his loss and reduce exposure to further loss. The market had rallied against him on his previous large cancelled sell orders and there was no reason to say that it

wouldn't continue to do so.  These trades involving placing and cancelling large lot orders do not reflect an intent to manipulate the market.

43.     After buying the 42 contracts, Moncada started selling again increasing his position at 9:36:35 to 363 contracts. During this period Moncada entered and cancelled the first two of 5 large sell orders at the offer price of 524 and 523.75, respectively, which was above his sales prices of 523.75 and 523.50. He was using large sell orders while increasing his short position at lower prices. He was not using the large sell orders to buy lower. He finally covered his remaining 321 contracts at a loss between 9:38:15 and 9:42:50 at prices from 521.75 to 526.25.

Other Relevant Dates

October 26, 2009

44.     In BES Capital, Moncada was long 236 contracts at 10:10:33 when he entered an order to buy 500 at 538 and immediately sold 5 contracts at 538.25 while the buy order was still active. He then cancelled the buy order and sold 5 more contracts, 4 at 538.50 and 1 at 538.75. By starting to sell on the offer side before cancelling the large order, Moncada was at risk on 500 contracts just to try to make 1 tick. Traders often bid and offer 1 tick apart and are willing to take either side because they believe that they have an edge by either buying on the bid or selling on the offer. This is especially true if they feel that the market is going sideways. To do so with a large buy order and small sell order Moncada was putting himself at risk.

45.     In the Serdika account at 11:54:45 he offered to sell 500 contracts at 530.50 and then bought 33 contracts at 530.25 before cancelling his large sell order. This is a form of scalping and not intent to manipulate. He was willing to risk being filled on 500 contracts in order to make 1 tick on 33 contracts. This is a common scalping technique among traders who

make a two way market. The fact that the offer is larger than the buys may indicate a trader's bias but he is making a market and taking risk.

October 12, 2009

46.      Moncada was long 131 contracts at 9:45:13 when he entered and cancelled a large order to buy 500 contracts at 484.50. Then at 9:45:31 to 9:45:35 he sold 11 contracts at 484.50. Again, Moncada may have anticipated that the market was not be going higher and decided to liquidate a portion of his long position. This is not manipulating the market when the market didn't move.

October 6, 2009

47.      At 10:01:49 Moncada, who was long 130 contracts, entered an order to buy 425 contracts at 462.25 and 0.02 seconds later entered another order to buy 225 contracts at 462.50. While both orders were still active, he bought 40 contracts at 463. He then cancelled the large buy orders leaving him with a long position of 170 contracts. Here he was using large orders to add to his position.

48.      At 10:02:29 he sold 4 contracts at 463 and immediately thereafter entered an order to buy 325 contracts at 462.75 and then immediately sold 11 contracts at 463 before deleting the buy order. He then sold another 5 contracts at 463 before entering and cancelling an order to buy 500 at 462.75. He then sold another 10 contracts at 463.

49.      The net result was Moncada scratched his trade of 40 contracts at 463 using only large buy orders and taking risk when some of his sells occurred while his large buy order was still active. This is not manipulation with the intent to push the market higher.

        Moncada's Canceled Orders Did Not Increase Market Volatility and Did Not Adversely Affect the Wheat Futures Market: Time and Sales data for the relevant dates do not

indicate any increased volatility during the period of his large cancelled orders to the time of the executed smaller trades.

        a.    <u>October 6, 2009</u>

    50.    From 10:00:00 to 10:01:03 Time and Sales shows a range in CBOT December wheat of 462 to 463. At 10:01:03 Moncada entered the first of 4 large buy orders at prices of 462 to 462.50 of which he cancelled only the first two orders prior to purchasing 40 contracts at 463, the last at 10:01:55:83. Subsequently by 10:02:04 Moncada deleted the other two large buy orders and entered and cancelled another buy order.

    51.    At 10:02:29 Moncada sold 4 contracts at 463 and at 10:02:31:214 entered an order to buy 325 contracts at 462.75 and less than 0.032 seconds later sold 11 contracts at 463. He then deleted the order, sold 5 more contracts at 463. At 10:02:36 he entered and cancelled another large buy order for 500 contracts at 462.75 before selling another 10 contracts at 463, the last at 10:02:46.

    52.    Moncada's activity had no effect on the volatility where wheat traded in the same range during which he entered his large orders and bought and sold 40 contracts, i.e. 462 to 463.

        b.    <u>October 12, 2009</u>

    53.    From 9:41:24 to 9:45:12 Moncada entered and cancelled 5 large buy orders at prices of 484.25 and 484.50. During this period Time and Sales shows a one cent range from 483.75 to 484.75. From 9:45:31-37 Moncada sold 11 contracts at 484.50. Subsequently through 9:47 the market traded in a range of 483.75 to 484.50.   Moncada's activity had no effect on volatility.

        c.    <u>October 14, 2009</u>

54.     From 9:50:30 to 9:52:58 Moncada entered and cancelled 5 large buy orders at decreasing prices 522.50, 522 and 521.75 in which he bought 5 contracts on the last order at 521.75. At 9:53:00 he sold 5 more contracts at 522 and then entered a large buy order at 522 and while it was open sold 2 contracts at 522. He then cancelled the large buy order and at 9:53:43 sold 12 contracts at prices ranging from 522.25 to 523.25. Moncada then entered and cancelled two large buy orders at prices of 522.75 and 522.50. After the cancellation at 9:54:19-26 he sold 17 contracts at prices from 523.25 to 524.

55.     From 9:50:30 the time of the first large buy order to the last sales at 9:54:26, Time and Sales indicates a range of 3.25 cents with the market moving in 1 tick increments. This range is not excessive volatility.

    d.     October 19, 2009

56.     At 9:32:19-28 Moncada entered and cancelled two large buy orders, the first at a price of 509.75 and the second at 509.25 in which he got filled on 2 contracts. At 9:32:35 he sold 2 contracts at 509.25. From 9:30 to 9:33 the market had a range of 506.25 to 509.50 and then from 9:33 to 9:34 the market range was 504.50 to 508.50.  This illustrates that the market did not move on Moncada's large buy orders. The sell-off was orderly and moved in one tick increments.

    e.     October 26, 2009

57.     At 10:10:00 in Bes Capital account Moncada entered three large buy orders, the first two at the price of 537.75 and the third at 538. Prior to cancelling the third order, at 10:10:33 he sold 5 contracts at 538.25. He then cancelled the third large order and at 10:10:42 he entered and cancelled a large buy order at 538.25. He then sold 6 contracts, 5 at 538.50 and 1 at

538.75. From 10:08 to 10:15 the price range was 536.50 to 539, not excessive over a 7 minute period.

58.     Later at 11:54 in the Serdika account, Moncada entered a large sell order for 500 contracts at 530.50. While that order was open, he bought 33 contracts at 530.25 and then cancelled the large sell order. From 11:50 to 11:56 the price range was 530 to 532 indicating no volatility.

       f.    <u>October 27, 2009</u>

59.     From 9:36:09 through 9:38:01 Moncada sold 55 contracts of which 53 were at 523.50 and 2 at 523.75 and then bought 42 contracts from 521.75 to 5.23. This price range occurred at one tick increments and does not reflect increased volatility.

       g.    <u>October 29, 2009</u>

60.     From 10:33:19 to 10:39:30 Moncada bought 25 contracts and sold 42 contracts. From 10:30 to 10:42, the market traded in a range from 506 to 508.75 that does not reflect any increased volatility despite Moncada entering and cancelling 8 large buy orders and 2 large sell orders.

       h.    <u>October 30, 2009</u>

61.     At 9:56 Moncada cancelled a large buy order at 499.25 and then sold 5 contracts at 500 to 500.50. The price range from 9:56 to 9:60 was 498.75 to 500.50 indicating a lack of volatility.

<u>CFTC's Request for Injunctive Relief</u>:

62.     Mr. Moncada has not been engaged in the business of trading regulated commodities since 2010.

63.    There is little or no likelihood that Mr. Moncada will violate the laws with respect to regulated commodities in the future.

DEFENDANT MONCADA'S PROPOSED CONCLUSIONS OF LAW

64.    The plaintiff has not sustained its burden of proving that Mr. Moncada attempted to manipulate the price of December winter wheat futures on the dates charged.

65.    (Alternative) The plaintiff has not demonstrated that injunctive relief barring Mr. Moncada from trading regulated commodities is necessary or appropriate.

66.    (Alternative) In view of the fact that there is no evidence that Mr. Moncada profited from the alleged attempted manipulation, and in view of the fact thee there is no evidence of any impact on the market resulting from defendant's attempted manipulation, any monetary penalty assessed should be nominal.

**V.    ISSUES TO BE TRIED**

The parties agree that the following issues will be tried:

**A.    Attempted Manipulation**

The first issue to be tried is whether Moncada, individually and acting as an employee or agent of BES and Serdika, and BES and Serdika, through the acts of its employees or agents, violated sections 6(c), 6(d), and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b, and 13(a)(2) (2006), which make it illegal for any person to attempt to manipulate the price of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, including any contract market, on the eight alleged attempted manipulation dates, October 6, 12, 14, 19, 26, 27, 29, and 30, 2009.  Specifically, whether Moncada, individually and acting as an agent of BES and Serdika, and BES and Serdika, through the acts of its employees or agents, (1)

75

intended to affect the market price of a commodity; and (2) engaged in some overt act in furtherance of that intent.  Further, whether BES and Serdika are each liable under Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2006), and Regulation 1.2, 17 C.F.R. § 1.2 (2012), as a principal for its employee's or agent's acts, omissions or failures.

> **B.**      **Fictitious Sales and Non-Competitive Transactions**

     Additionally, the parties agree that the second issue to be tried is whether Moncada, individually and acting as an employee or agent of BES and Serdika, and BES and Serdika, through the acts of its employees or agents, engaged in fictitious sales and entering into non-competitive transactions on four trading dates in October 2009 in violation of Section 4c(a) of the Act, as amended, to be codified at 7 U.S.C. § 6c(a) and Regulation 1.38(a), 17 C.F.R. § 1.38(a) (2012).  Section 4c(a)(1) provides, in relevant part, "It shall be unlawful for any person to offer to enter into, enter into, or confirm the execution of a transaction described in paragraph (2) involving the purchase or sale of any commodity for future delivery . . .  if the transaction is or may be used to (A) hedge any transaction in interstate commerce in the commodity or the product or byproduct of the commodity," or "(C) deliver any such commodity sold, shipped or received in interstate commerce for the execution of the transaction."  7 U.S.C. § 6c(a)(1).  Paragraph (2) of Section 4c(a), in turn, provides, "[a] transaction referred to in paragraph (1) is a transaction that . . . is, is of the character of, or is commonly known to the trade as, a 'wash sale' or 'accommodation trade' . . . or is a fictitious sale or is used to cause any price to be reported, registered or recorded that is not a true and *bona fide* price."  7 U.S.C. § 6c(a)(2).  Commission Regulation 1.38(a), 17 C.F.R. § 1.38(a) (2012), provides, in relevant part:

> *Competitive execution required; exceptions.*  All purchases and sales of any commodity for future delivery  . . .  on or subject to the rules of a contract market shall be executed openly or competitively by open outcry or posting of bids and offers or by other equally open and competitive methods, in the trading pit or ring or similar place provided by the contract market, during the

regular hours prescribed by the contract market for trading in such commodity. . . . *Provided however*, That this requirement shall not apply to transactions which are executed noncompetitively in accordance with the written rules of the contract market which have been submitted to and approved by the Commission, specifically providing for the noncompetitive execution of such transactions.

Specifically, the issue to be tried is whether, on the trading dates of October 6, 12, 15, and 29, 2009, Moncada, while trading in the BES and Serdika accounts, entered opposing buy and sell orders in the December 2009 Wheat Futures Contracts into Globex for the purpose of transferring positions between an account in the name of BES and an account in the name of Serdika with the knowledge and intent that the orders would match opposite one another in these accounts with common ownership. Further, whether BES and Serdika are each liable under Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2006), and Regulation 1.2, 17 C.F.R. § 1.2 (2012), as a principal for its employee's or agent's acts, omissions or failures.

C.      Relief

The final issue to de tried is whether the CFTC is entitled to an entry of an order against each Defendant of permanent injunction, civil monetary penalties ("CMPs") and other equitable relief, including but not limited to a permanent injunction that includes a prohibition from trading on or subject to the rules of any registered entity  or entering into any transactions involving commodity futures, options on commodity futures, commodity options, security futures products, swaps and/or foreign currency and a prohibition from applying for registration or claiming exemption from registration with the CFTC in any capacity, engaging in any activity requiring such registration or exemption from registration with the CFTC, CMPs commensurate with any finding of liability against each Defendant, and any other equitable relief the Court deems appropriate.

## VI.   PLAINTIFF'S EXHIBITS

Plaintiff intends to use the following exhibits in presenting its case in chief:

**A.   Litigation Documents:**

1.      Answer of Eric Moncada (Dkt. No. 18).

2.      Plaintiff's First Set of Requests for Admissions to Defendant Eric Moncada, dated May 6, 2013.

3.      Response to First Set of Requests for Admissions, dated May 13, 2013.

4.      Plaintiff's Second Set of Requests for Admissions to Defendant Eric Moncada, dated August 16, 2013.

5.      The Expert Report of Hendrick Bessembinder dated April 25, 2013.

**B.   Trade Data:**

6.      CBOT audit trail data for the December 2009 Wheat Futures contract, including all trading days from August 13, 2009 to November 30, 2009 ("CBOT Audit Data"), including but not limited to:

        a.   MASKED_ZWZ9_10062009: Globex trade data from October 6, 2009.

        b.   Excerpt(s) from MASKED_ZWZ9_10062009 (including but not limited to Moncada Dep. Ex. 19).

        c.   Demonstrative exhibit(s) derived from MASKED_ZWZ9_10062009.

        d.   MASKED_ZWZ9_10122009: Globex trade data from October 12, 2009.

        e.   Excerpt(s) from MASKED_ZWZ9_10122009 (including but not limited to Moncada Dep. Ex. 20).

        f.   Demonstrative exhibit(s) from MASKED_ZWZ9_10122009.

        g.   MASKED_ZWZ9_10142009: Globex trade data from October 14, 2009.

        h.   Excerpt(s) from MASKED_ZWZ9_10142009.

i.   Demonstrative exhibit(s) from MASKED_ZWZ9_10142009.

j.   MASKED_ZWZ9_10152009: Globex trade data from October 15, 2009.

k.   Excerpt(s) from MASKED_ZWZ9_10152009 (including but not limited to Moncada Dep. Ex. 18).

l.   Demonstrative exhibit(s) from MASKED_ZWZ9_10062009.

m.   MASKED_ZWZ9_10192009: Globex trade data from October 19, 2009.

n.   Excerpt(s) from MASKED_ZWZ9_10192009.

o.   Demonstrative exhibit(s) from MASKED_ZWZ9_10192009.

p.   MASKED_ZWZ9_10262009: Globex trade data from October 26, 2009.

q.   Excerpt(s) from MASKED_ZWZ9_10262009.

r.   Demonstrative exhibit(s) from MASKED_ZWZ9_10262009.

s.   MASKED_ZWZ9_10272009: Globex trade data from October 27, 2009.

t.   Excerpt(s) from MASKED_ZWZ9_10272009 (including but not limited to Moncada Dep. Ex. 21).

u.   Demonstrative exhibit(s) from MASKED_ZWZ9_10272009.

v.   MASKED_ZWZ9_10292009: Globex trade data from October 29, 2009.

w.   Excerpt(s) from MASKED_ZWZ9_10292009.

x.   Demonstrative exhibit(s) from MASKED_ZWZ9_10292009.

y.   MASKED_ZWZ9_09152009: Globex trade data from September 15, 2009.

z.   Excerpt(s) from MASKED_ZWZ9_09152009 (including but not limited to Moriarty Dep. Ex. 8).

aa.   Demonstrative exhibit(s) from MASKED_ZWZ9_09152009.

bb.   MASKED_ZWZ9_09152009: Globex trade data from September 30, 2009.

cc. Excerpt(s) from MASKED_ZWZ9_09302009 (including but not limited to Moriarty Dep. Ex. 6).

dd. Demonstrative exhibit(s) from MASKED_ZWZ9_09302009.

36.    Futures Commission Merchant Advantage Futures message traffic related to December 2009 wheat futures orders by BES and Serdika, for portions of the period August 25 to November 23, 2009, data referred to as '"FCM log files" by Bessembinder, including but not limited to:

a.    WHEAT-AF-000207:  order activity log generated by TT trading platform for BES account from October 6, 2009

b.    Excerpt(s) from WHEAT-AF-000207 (including but not limited to Moncada Dep. Ex. 13).

c.    WHEAT-AF-000210:  order activity log generated by TT trading platform for BES account from October 12, 2009.

d.    Excerpt(s) from WHEAT-AF-000210 (including but not limited to Moncada Dep. Ex. 17).

e.    WHEAT-AF-000212:  order activity log generated by TT trading platform for BES account from October 14, 2009.

f.    Excerpt(s) from WHEAT-AF-000212 (including but not limited to Moncada Dep. Ex. 12).

g.    WHEAT-AF-000215: order activity log generated by TT trading platform for BES account from October 19, 2009.

h.    Excerpt(s) from WHEAT-AF-000215 (including but not limited to Moncada Dep. Ex. 16).

i.   WHEAT-AF-000217: order activity log generated by TT trading platform for BES account from October 26, 2009.

j.   Excerpt(s) from WHEAT-AF-000217 (including but not limited to Moncada Dep. Ex. 11).

k.   WHEAT-AF-000013: order activity log generated by TT trading platform for Serdika account from October 26, 2009

l.   Excerpt(s) from WHEAT-AF-000013 (including but not limited to Moncada Dep. Ex. 14).

m.   WHEAT-AF-000218: order activity log generated by TT trading platform for BES account from October 27, 2009.

n.   Excerpt(s) from WHEAT-AF-000218 (including but not limited to Moncada Dep. Ex. 6).

o.   WHEAT-AF-000014: order activity log generated by TT trading platform for Serdika account from October 27, 2009.

p.   Excerpt(s) from WHEAT-AF-000014 (including but not limited to Moncada Dep. Ex. 15).

q.   WHEAT-AF-000016: order activity log generated by TT trading platform for Serdika account from October 29, 2009.

r.   Excerpt(s) from WHEAT-AF-000016 (including but not limited to Moncada Dep. Ex. 9).

s.   WHEAT-AF-000017: order activity log generated by TT trading platform for Serdika account from October 30, 2009.

t.   Excerpt(s) from WHEAT-AF-000017 (including but not limited to Moncada Dep. Ex. 10).

37.   Kansas City Board of Trade audit trail data for all trading days from August 31 to November 29, 2009 ("KCBT Audit Data").

38.   Continuous record of best bid and offer ("BBO") prices for the December 2009 CBOT wheat futures contract, from August 1 to November 30, 2009 ("CBOT BBO data").

**C.   Advantage Futures Daily Account Statements**

39.   Daily account statements for BES account and Serdika account, October 6, 2009 (WHEAT-SDK-000382).

40.   Daily account statements for BES account and Serdika account, October 12, 2009 (WHEAT-SDK-000386).

41.   Daily account statements for BES account and Serdika account, October 14, 2009 (WHEAT-SDK-000388).

42.   Daily account statements for BES account and Serdika account, October 15, 2009 (WHEAT-SDK-000389).

43.   Daily account statements for BES account and Serdika account, October 19, 2009 (WHEAT-SDK-000391).

44.   Daily account statements for BES account and Serdika account, October 26, 2009 (WHEAT-SDK-000396).

45.   Daily account statements for BES account and Serdika account, October 27, 2009 (WHEAT-SDK-000397).

46.   Daily account statements for BES account and Serdika account, October 29, 2009 (WHEAT-SDK-000399).

47.     Daily account statements for BES account and Serdika account, October 30, 2009 (WHEAT-SDK-000400).

**D.     Deposition Transcripts:**

48.     Deposition of Eric Moncada, July 2 and 3, 2013.

49.     Deposition of Emil Dontchev, July 23, 2013.

50.     Deposition of James Patrick Moriarty, July 26, 2013.

51.     Deposition of Steven E. Wollack, December 3, 2013.

52.     Deposition of Dr. Hendrik Bessembinder, December 4, 2013.

**E.     Investigative Testimony Transcripts:**

53.     Testimony of Eric Moncada, February 7, 2011.

54.     Testimony of Emil Dontchev, February 8 and 9, 2011.

**F.     Sworn Affidavits:**

55.     Affidavit of William Steele, Chief Risk Officer at Advantage Futures LLC, dated January 8, 2014.

56.     Affidavit of Lisa Jones, Chief Compliance Officer at Advantage Futures LLC, dated June 20, 2013.

57.     Affidavit of Greg Benbrook, Executive Director of Market Regulation, Investigations Department at CME Group, dated December 17, 2013.

58.     Affidavit of Paul Millhuff, Managing Director of the Global Command Center of CME Group, Inc., dated January 8, 2014.

59.     Affidavit of James Moran, Executive Director, Global Head of Market Regulation Strategic and Technology Initiatives at CME Group, Inc., July 1, 2013.

**G.     Bank Records**

60.     Redacted Citibank records of personal checking account of Eric Moncada for the time period of October 2008 to January 2010, produced to CFTC by Moncada on August 9, 2009.

61.     Bank records, including but not limited to signature cards, bank statements, wire transfer advices, and deposit slips, produced by JP Morgan Chase for account ending in 7455 in the name of BES Capital from December 17, 2008 to November 30, 2010.

62.     Bank records, including but not limited to signature cards, bank statements, wire transfer advices, and deposit slips, produced by TD Bank, N.A. for account ending in 9012 in the name of Serdika from January 1, 2008 to December 9, 2010.

**H.     Emails and Instant Messages:**

63.     Email from Eric Moncada to Emil Dontchev, dated February 6, 2008 (Moncada Dep. Ex. 3).

64.     Excel spreadsheet attachment to email from Moncada to Dontchev, dated February 6, 2008 (Moncada Dep. Ex. 4).

65.     Email from Moncada to Mike O'Brien (Advantage Futures), dated January 5, 2009 (Bates number BES-Advantage-0000199.0001 to .0002).

66.     Email from Linda Bergdahl (Advantage Futures) to Moncada, dated January 8, 2009 (Bates number BES-Advantage-000195.0001 to .0002).

67.     Email from Robert Polusky (Advantage Futures)  to Moncada  to Moncada, dated January 12, 2009 (Bates number BES-Advantage-000190.0001 to .0002).

68.     Email from Mike Walsh (Advantage Futures) to Moncada, dated January 13, 2009 (Bates number BES-Advantage-0000188.0001).

69.     Email from Moncada to Mike Dennis (Advantage Futures) and Dontchev, dated January 18, 2009 (Bates number BES-Advantage-000181.0001 to .0002).

70.     Email from Robert Polusky (Advantage Futures) to Moncada, dated February 6, 2009 (Bates number BES-Advantage-000163.0001).

71.     Instant message communication between Eric Moncada and James Patrick Moriarty, dated September 15, 2009 (Moriarty Dep. Exh. 5).

72.     Instant message communication between Eric Moncada and James Patrick Moriarty, dated September 30, 2009 (Moncada Dep. Ex. 27).

73.     Email from Uriel Cohen to Dontchev, dated October 22, 2009 (Dontchev Testimony Ex. 24).

74.     Instant message communication between Eric Moncada and Emil Dontchev, dated October 23, 2009 (Moncada Dep. Ex. 26).

75.     Email from Dontchev to Moncada, dated October 30, 2009 (Moncada Dep. Ex. 25).

76.     Email Dontchev to Cohen, dated December 7, 2009 (Dontchev Testimony Ex. 27).


## VII.    DEFENDANT'S EXHIBITS

Defendant Moncada intends to use the following exhibits in presenting its case in chief:

1.     BES and Serdika Advantage Account statements - October 6, 12, 14, 19, 26, 27 and 29, 2009.

2.     BES and Serdika Advantage Account monthly statement –October 2009.

3.     KCBOT Wheat Time and Sales Data October 2009.

4.      CBOT Wheat Time and Sales Data October 2009.

5.      Expert report of Steven Wollack.

6.      Schedule showing receipts from BES and Serdika.


**VIII.   STIPULATION AND OBJECTIONS WITH RESPECT TO EXHIBITS**

   **A.          Authenticity and Admissibility**

The parties have stipulated to the authenticity and admissibility of the following

categories of documents:

1.      Sworn Affidavits listed above in Section VI.F.

   **B.   Authenticity**

The parties have stipulated to the authenticity of the following categories of documents:

1.      All documents produced to the CFTC by or on behalf of Moncada, BES, and/or

Serdika pursuant to voluntary requests and/or investigative subpoenas, in the course of the

CFTC's investigation.

2.      All daily and monthly account statements for accounts in the name of BES and

Serdika originally produced to the CFTC by Advantage Futures.

3.      All account opening applications and all supporting documents for accounts in the

name of BES and Serdika originally produced to the CFTC by Advantage Futures.

4.      All emails and written correspondence between Advantage Futures and Eric

Moncada original produced to the CFTC by Advantage Futures.

5.      All emails and written correspondence between Advantage Futures and Emil

Dontchev originally produced to the CFTC by Advantage Futures.

6.      All emails and written correspondence between Advantage Futures and Cary

Krumholtz originally produced to the CFTC by Advantage Futures.

7.      All emails and written correspondence between Advantage Futures and William Brindise originally produced to the CFTC by Advantage Futures.

8.      All emails and written correspondence between Advantage Futures and Uriel Cohen originally produced to the CFTC by Advantage Futures.

9.      All emails and written correspondence between Advantage Futures and Annie Lau originally produced to the CFTC by Advantage Futures.

10.     Logs of order activity associated with accounts held in the name of BES and Serdika originally produced to the CFTC by Advantage Futures.

11.     Documents produced to the CFTC by CME Group which were redacted by the CFTC pursuant to a previously agreed upon protective order, consisting exclusively of Globex trade data for the December 2009 Wheat Futures Contract and the December 2009 Kansas City Board of Trade #2 Soft Red Winter Wheat futures contract, with Bates numbers following the naming conventions "MASKED_ZWZ9_date" and "MASKED_date," respectively.

12.     All documents produced by CME Group not previously identified above.

13.     All documents produced by Advantage Futures not previously identified above.

**C.     Plaintiff's Objections**

1.      Plaintiff objects to qualification of Defense Witness Steven Wollack as an expert, as well as the admissibility and relevancy of Defendant's Expert Report of Steven Wollack.

2.      Plaintiff reserves the right to object to admissibility and relevancy of Defendant's Exhibits 1-4 and 6.

## IX.    PLAINTIFF'S WITNESS LIST

| Name | Type of Witness | Deposition Pages, if relevant |
|---|---|---|
| Greg Bembrook<br>Chicago, Illinois | Fact Witness, CME Group | |
| Linda Bergdahl<br>Chicago, Illinois | Fact Witness, Treasurer, Advantage Futures, LLC | |
| Dr. Hendrik Bessembinder<br>Salt Lake City, Utah | Plaintiff's Expert Witness | |
| Uriel Cohen<br>Saint Thomas, Virgin Islands | Fact Witness | |
| Mike Dennis<br>Chicago, Illinois | Fact Witness, Client Services, Advantage Futures, LLC | |
| Emil Stoyanov Dontchev<br>Pompano Beach, Florida | Fact Witness, Owner of Serdika | Testimony Offered by Deposition Pages:  33:9- 42:4; 44:7-45:18, 80:13-84:10 |
| Lisa Jones<br>Chicago, IL | Fact Witness, Chief Compliance Officer, Advantage Futures LLC | |
| Jessica Mills Harris<br>Washington, D.C. | Fact Witness, CFTC Investigator | |
| Paul Millhuff<br>Chicago, Illinois | Fact Witness, Director of the Global Command Center of CME Group Inc. | |
| Eric Gabriel Moncada | Defendant | |
| James Moran<br>Chicago, Illinois | Fact Witness, CME Group | |
| James Patrick Moriarty<br>Salt Point, New York | Fact Witness, Former trader at Serdika | Testimony Offered by Deposition Pages:  25:25-26:17; 33:25-34:11; 72:9-72:14; 77:8-77:22; 82:1-82:1-88:22; 94:11-94:19; 95:8-95:14; 106:11-21 |
| Mike O'Brien<br>Chicago, Illinois | Fact Witness, Vice President, Chicago Operations at Advantage Futures, LLC | |
| Robert Polusky<br>Chicago, Illinoia | Fact Witness, Vice President, Operations at Advantage Futures, LLC | |
| William Steele<br>Chicago, IL | Fact Witness, Chief Risk Officer, Advantage Futures LLC | |
| Mike Walsh<br>Chicago, Illinois | Fact Witness, Advantage Futures, LLC | |

*Plaintiff reserves the right to call rebuttal witnesses which cannot be reasonably anticipated.*


## X.      DEFENDANT MONCADA'S WITNESS LIST

1.      Eric Moncada

2.      Steven E. Wollack


## XI.      RELIEF SOUGHT

Plaintiff, CFTC, seeks judgment as to liability, entry of an order of permanent injunction, CMPs and other equitable relief, including but not limited to a permanent injunction that includes a prohibition from trading on or subject to the rules of any registered entity  or entering into any transactions involving commodity futures, options on commodity futures, commodity options, security futures products, swaps and/or foreign currency and a prohibition from applying for registration or claiming exemption from registration with the CFTC in any capacity, and engaging in any activity requiring such registration or exemption from registration with the CFTC, to prevent the Defendants from further violations of the Act.  (*See* Attachment A.)

The Act provides guidance on how to calculate the CMPs, and the amount is calculated on, among other things, the charges.  For Counts 1 through 8, Section 6c(d)(1)(B) of the Act provides that each violation of Section 9(a)(2) is punishable up to $1,000,000.  7 U.S.C. § 13a-1(d)(1)(B) (2012).   The CFTC believes that each overt act committed by Moncada in furtherance of his manipulative scheme represents a separate and distinct violation of Section 9(a)(2) of the Act, 7 U.S.C. § 13(a) (2006).  As such, the maximum CMP that the CFTC could seek against BES, Serdika and Moncada would be in excess of $700 million (more than 700 overt acts multiplied by $1 million).  Rather than suggest a $700 million CMP, the CFTC recommends that

BES and Serdika be ordered to pay CMPs of $18 million and $12 million, respectively.  This represents a CMP of $3 million for each day of multiple overt acts that BES and Serdika engaged in the manipulative conduct.  Further, the CFTC recommends that Moncada be ordered to pay a CMP amount commensurate with the violative acts and consistent with BES and Serdika of at least $3 million per day for at least $24 million.

For Counts 9 and 10, Section 6c(d)(1) of the Act provides that "the Commission may seek and the Court shall have jurisdiction to impose . . . on any person found in the action to have committed any violation, a civil penalty in the amount of not more than the higher of $100,000 or triple the monetary gain to the person for each violation." 7 U.S.C. §13a-1(d)(1)(A) (2006). Regulation 143.8 adjusts the statutory civil monetary penalty of $100,000 for inflation. *See* 17 C.F.R. § 143.8. For the period at issue, the statutory civil monetary penalty was $140,000 per violation.  *Id.*  BES and Serdika, through Moncada's actions, and Moncada individually, were charged with four transactions that violated Section 4c(a) of the Act, 7 U.S.C. § 6c(a) (2006), under Count 9 and that violated Regulation 1.38(a), 17 C.F.R. § 1.38 (2013), under Count 10, totaling eight violations each for BES and Serdika, totaling $1,120,000 for each entity. Further, the CFTC recommends that Moncada be ordered to pay a CMP amount commensurate with the violative acts and consistent with BES and Serdika of at least $140,000 per violation for a total of at least $1,120,000.

Dated: January 29, 2014

_____
                    The Honorable Colleen McMahon
          U.S. District Judge for the Southern District of New York


_____/s/ Richard M. Asche_____          _____/s/ Andrew Ridenour_____
Richard M. Asche (RMA7081)              Andrew Ridenour (D.C. Bar No. 501628)
Litman, Asche, and Gioiella, LLP        Richard Glaser (Member, New York State Bar
Attorneys for Defendant Eric Moncada    and U.S. District Court for the Southern District
                                        of New York Bar No. RG8652)
140 Broadway- 38th Floor                Jennifer S. Diamond (Illinois Bar No. 6278482)
New York, NY  10005                     Kenneth McCracken (Missouri Bar No. 44049)
(212)8094500                            U.S. Commodity Futures Trading Commission
richardasche@lagnyc.com                 1155 21st Street, NW
                                        Washington, DC 20581
                                        Tel:  (202) 418-5358 (Glaser)
                                        Tel:  (202) 418-5438 (Ridenour)
                                        Tel:  (202) 418-5244 (Diamond)
                                        Tel:  (202) 418-5348 (McCracken)
                                        Fax:  (202) 418-5937
                                        rglaser@cftc.gov
                                        aridenour@cftc.gov
                                        jdiamond@cftc.gov
                                        kmccracken@cftc.gov