## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **UNITED STATES COMMODITY FUTURES TRADING COMMISSION,** | ) <br> ) <br> ) |
| **Plaintiff,** | ) Civil Action No. <u>12-cv-8791 (CM)</u> <br> ) <u>(GWG)</u> |
| **v.** | ) <br> ) |
| **ERIC MONCADA; BES CAPITAL LLC; and SERDIKA LLC.** | ) <br> ) |
| **Defendant(s).** | ) <br> ) <br> ) <br> ) |

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANT ERIC MONCADA

**Table of Contents**

I.    SUMMARY OF THE CASE ................................................................................. 1

II.      SUMMARY OF UNDISPUTED MATERIAL FACTS SUPPORTING THE COMMISSION'S CLAIMS ................................................................................. 3

  A.  Moncada's Trading in the BES and Serdika Accounts ...................................................... 4

  B.  Summary of Moncada's Trading Activity Related to the Commission's Claims of Attempted Manipulation ................................................................................. 6

    1.   Moncada Entered and Canceled Hundreds of Large-Lot Orders Before They Were Filled ................................................................................. 6

    2.   Moncada's Large-Lot Orders Affected the Market Price ............................................... 9

    3.   Moncada Consistently Traded on the Opposite Side of the Market Following His Large-Lot Orders ................................................................................. 10

    4.   Moncada's Testimony on His Rationale for Entering and Canceling Large-Lot Orders ................................................................................. 11

       a.   Moncada Did Not Recall Why He Entered or Canceled his Large-Lot Orders ......... 11

       b.   Moncada's Three Purported Rationales for Placing the Large-Lot Orders ............... 12

       c.   Moncada's Only Purported Rationale for Canceling the Large-Lot Orders Before They Were Filled ................................................................................. 14

    5.   Testimony of Moncada's Colleague at Serdika ........................................................ 15

  C.  Summary of Moncada's Trading Activity Related to the Commission's Claims of Fictitious Sales and Non-Competitive Transactions ................................................................. 16

    1.   Moncada's Trading and Testimony on the October 6, 2009 Transactions ................... 16

    2.   Moncada's Trading and Testimony on the October 12, 2009 Transactions ................. 17

    3.   Moncada's Trading and Testimony on the October 15, 2009 Transactions ................. 17

    4.   Moncada's Trading and Testimony on the October 29, 2009 Transactions ................. 18

III.    LEGAL ARGUMENT ................................................................................. 18

  A.  Summary Judgment Standard of Review ................................................................... 18

  B.  Moncada Violated Sections 6(c), 6(d), and 9(a)(2) of the Act by Attempting to Manipulate the December 2009 Wheat Futures Contract Price ............................................ 19

    1.   Moncada Intended to Manipulate the Price of the December 2009 Wheat Futures Market ................................................................................. 22

       a.   Moncada's Trading Shows He Intended to Manipulate the Market ........................... 23

i

       i.   Moncada's Trading Shows He Did Not Intend to Fill His Large-Lot Orders ........ 23

       ii.  Moncada's Trading Shows He Affected the Market Price and He Attempted to Take Advantage of that Effect ............................................................................... 27

   b.   Moncada Can Offer No Explanation for his Large-Lot Orders that is Consistent with the Evidence ................................................................................................... 30

       i.   Moncada Did Not Recall Why He Placed or Canceled Particular Large-Lot Orders in October 2009 ................................................................................... 30

       ii.  Moncada's Purported Rationales for Placing and Canceling Large-Lot Orders are Refuted by His Trading and Testimony ................................................. 31

       iii. Moriarty's Testimony Shows Moncada Intended to Manipulate the Market ........ 37

   c.   Moncada's Trading Constituted Overt Acts in Furtherance of his Intent to Manipulate ........................................................................................................... 39

  2.    The Commission is Entitled to Summary Judgment on Each of the Eight Days Charged in the Complaint ................................................................................................ 40

C.   Moncada Violated the Act by Executing Orders that Constitute Fictitious Sales and Non-Competitive Transactions ................................................................................ 41

  1.    Moncada Violated Section 4c(a) by Entering into Fictitious Sales .............................. 41

  2.    Moncada Violated Regulation 1.38 by Entering into Non-Competitive Transactions . 44

IV.    COMMISSION ENTITLED TO SUMMARY JUDGMENT AND INJUNCTIVE RELIEF ........................................................................................................................... 45

A.   The Commission is Entitled as a Matter of Law to a Finding of Liability ...................... 46

B.   The Court Should Enjoin Moncada from Future Violations and from Engaging in any Commodity-Related Activity ............................................................................... 46

C.   The Court Should Impose Civil Monetary Penalties Against Moncada .......................... 48

V.     CONCLUSION ............................................................................................................ 50

TABLE OF AUTHORITIES

<u>C</u>ases

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)---------------------------------------------- 19

*Cargill, Inc. v. Hardin*, 452 F.2d 1154 (8th Cir. 1971) --------------------------------------- 21

*CFTC v. Am. Bd. of Trade, Inc.*, 803 F.2d 1242 (2d Cir. 1986) --------------------------------- 50

*CFTC v. Amaranth Advisors, LLC*, 554 F.Supp.2d 523 (S.D.N.Y. 2008)------------------23, 41

*CFTC v. Crown Colony Commodity Options, Ltd.*, 434 F. Supp. 911 (S.D.N.Y.1977) ------ 51

*CFTC v. Hunt*, 591 F.2d 1211 (7th Cir. 1979) --------------------------------------------------50, 51

*CFTC v. IBS, Inc.*, 113 F. Supp. 2d 830 (W.D.N.C. 2000) -------------------------------------- 50

*CFTC v. Kelly*, 736 F. Supp. 2d 801 (S.D.N.Y. 2010) --------------------------------------------- 50

*CFTC v. Kimberlynn Creek Ranch, Inc.*, 276 F.3d 187 (4th Cir. 2002) ------------------------- 50

*CFTC v. Noble Wealth Data Information Services, Inc.,* 90 F. Supp. 2d 676 (D. Md. 2000) 52

*CFTC v. Nunn*, Dkt. No. 11, 12-cv-7786 (LAK) (S.D.N.Y. December 18, 2013) ------------ 48

*CFTC v. Parnon Energy, Inc.*, 875 F.Supp.2d 233 (S.D.N.Y. 2012) ---------------------- passim

*CFTC v. Rosenberg*, 85 F. Supp. 2d 424 (D.N.J. 2000) ------------------------------------------- 52

*CFTC v. U.S. Metals Depository Co.,* 468 F. Supp. 1149 (S.D.N.Y. 1979)-------------------- 51

*CFTC v. Wilshire Investment Management Corp.*, 531 F.3d 1339 (11th Cir. 2008)----------- 51

*Harold Collins*, [1986-1987 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 22,982 (C.F.T.C.
    April 4, 1986)--------------------------------------------------------------------------------------44, 45, 46, 48

*In re Amaranth Natural Gas Commodities Litigation*, 587 F.Supp.2d 513 (S.D.N.Y. 2008)
    -------------------------------------------------------------------------------------------------------------- passim

*In re DiPlacido* [2007-2009 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 30,970 (CFTC
    Nov. 5, 2008) ---------------------------------------------------------------------------------------------23, 31

*In re Energy Transfer Partn. Nat. Gas Litig.*, 2009 U.S. Dist. Lexis 75859 (S.D. Tex., Aug.
    26, 2009) -------------------------------------------------------------------------------------------------------- 22

*In re GNP Commodities*, [1990-1992 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 25,360 (CFTC Aug. 11, 1992) ------------------------------------------------------------ 54

*In re Grossfeld*, [1996-1998 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,921 (CFTC Dec. 10, 1996) ------------------------------------------------------------------- 53

*In re Indiana Farm Bureau*, [1982-1984 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 21,796 (CFTC Dec. 17, 1982) ------------------------------------------------------------ passim

*In re Three Eight Corporation*, [1992-1994 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 25,749 (CFTC Jun. 16, 1993) ------------------------------------------------------------- 46

*In the Matter of Ecoval Dairy Trade, Inc.*, [2011-2012 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 32,013 (CFTC July 19, 2011) ------------------------------------------------- 25, 41

*In the Matter of Hohenberg Bros.*, [1975-1977 Transfer Binder] Comm. Fut. L. Rep. ¶ 20,271 (CFTC Feb. 18, 1977) ----------------------------------------------------------- passim

*In the Matter of Lorenzen*, [2012-2013 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 32,535 ( CFTC Feb. 8, 2013) ------------------------------------------------------------------- 47, 48

*In the Matter of Panther Energy Trading LLC*, [2012-2013 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 32,686 (CFTC July 22, 2013) ----------------------------------------------- 24, 40

*Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005) --------------------------------------- 20

*Kalnit v. Eichler*, 264 F.3d 131 (2nd Cir. 2001) ----------------------------------------------------- 23

*Lomotey v. Conn.-DOT*, 355 Fed.Appx. 478 (2d. Cir. 2013)----------------------------------- 19, 38

*Merrill Lynch Futures, Inc. v. Kelly,* 585 F.Supp. 1245 (S.D.N.Y. 1984)---------------------- 44

*Reddy v. CFTC*, 191 F.3d 109 (2nd Cir. 1999)--------------------------------------------------45, 54

*Schiano v. Quality Payroll Sys.*, 445 F.3d 597 (2d. Cir. 2006) ---------------------------------- 19

*SEC v. Masri*, 523 F.Supp.2d 361 (S.D.N.Y. 2007)------------------------------------------------ 23

*SEC v. Meltzer*, 440 F.Supp.2d 179 (E.D.N.Y. 2006)--------------------------------------------- 19

*SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801 (2d Cir 1975) ------------------------------------- 51

*SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801 (2d Cir. 1975) ------------------------------------ 51

*SEC v. Prater*, 289 F. Supp. 2d 39 (D. Conn. 2003) --------------------------------------------- 50

*SEC v. Princeton Econ. Int'l.*, 73 F. Supp. 2d 420 (S.D.N.Y. 1999) -------------------------- 50

*SEC v. Unifund SAL*, 910 F.2d 1028 (2d Cir. 1990)----------------------------------------- 50

*Stoller v. CFTC*, 834 F.2d 262 (2nd Cir. 1987) --------------------------------------------44, 45

*Thomas Collins,* [1996-1998 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 27,194 (C.F.T.C.
    December 10, 1997). ------------------------------------------------------------------- 45

*United States v. U.S. Gypsum Co.*, 438 U.S. 422 (1978) ------------------------------------22, 32

*Wilson v. CFTC*, 322 F.3d 555 (8th Cir. 2003) -------------------------------------------- 45

*Woodman v. WWOR-TV, Inc.*, 411 F.3d 69 (2d Cir. 2005)--------------------------------19, 38

## STATUTES AND REGULATIONS

17 C.F.R. § 1.38 (2012) ------------------------------------------------------------ 44, 49, 55

17 C.F.R. § 143.8 (2013)----------------------------------------------------------------- 53

17 C.F.R. §§ 1, *et seq.* -------------------------------------------------------------------1

7 U.S.C. § 13(a)(2)(2006)------------------------------------------------------------------ 20

7 U.S.C. § 13a-1(b) (2006) --------------------------------------------------------------- 49

7 U.S.C. § 13b (2006) -------------------------------------------------------------------- 21

7 U.S.C. § 6c(a) (2006) -----------------------------------------------------------------44, 47

7 U.S.C. § 6c(a)(2)------------------------------------------------------------------------ 44

7 U.S.C. § 6c(d)(1)(A) (2012) ------------------------------------------------------------ 53

7 U.S.C. § 6c(d)(1)(B) (2012) ------------------------------------------------------------ 53

7 U.S.C. § 9 (2006) ---------------------------------------------------------------------- 20

7 U.S.C. §§ 1, *et seq.* -------------------------------------------------------------------1

Fed.R.Civ.P. 56(a) --------------------------------------------------------------------- 19

S. Rep. No. 93-1131, (1974)------------------------------------------------------------- 47

Plaintiff U.S. Commodity Futures Trading Commission ("CFTC" or "Commission") submits this Memorandum in Support of its Motion for Summary Judgment Against Defendant Eric Moncada ("Moncada") in the above-captioned matter for violations of certain provisions of the Commodity Exchange Act (the "Act"), 7 U.S.C. §§ 1, *et seq.*, and Commission Regulations ("Regulations") promulgated thereunder, 17 C.F.R. §§ 1, *et seq.*  The Commission has moved this Court for summary judgment as to all charges in the Complaint (Dkt. No. 1):  attempted manipulation (Counts One through Eight of the Complaint), fictitious sales (Count Nine), and non-competitive transactions (Count Ten).

## I.   <u>SUMMARY OF THE CASE</u>

The present case involves no disputed material facts, making it ripe for summary judgment.  During October 2009 (the "relevant time period"), Moncada acted as an authorized trader for two proprietary trading firms, BES Capital LLC ("BES") and Serdika LLC ("Serdika"), from whom he received a share of profits generated by his commodity futures ("futures") trading.  Moncada actively traded, among other products, the #2 Soft Red Winter Wheat futures contract on the Chicago Board of Trade ("CBOT Wheat Futures").

On eight days in October 2009 – October 6, 12, 14, 19, 26, 27, 29 and 30, 2009 ("attempted manipulation dates") – Moncada entered and immediately canceled a total of over 700 orders to either buy or sell 200 or more contracts ("large-lot orders") of the December 2009 contract for CBOT Wheat Futures ("December 2009 Wheat Futures Contract") without the intent to have them filled.  Moncada's large-lot orders were outliers in the December 2009 Wheat Futures Contract, and Moncada accounted for the vast majority of them in the market.  Moncada canceled virtually all of his large-lot orders, leaving them in the market only seconds, but long enough to affect the market price.

Moncada, like all traders, wanted to "buy low then sell high" or "sell high then buy low" to make a profit.  However, Moncada wanted to profit by illegally causing price movements in the market by a practice commonly referred to as "spoofing" -- placing and immediately canceling orders without the intent to have them filled.  Moncada wanted his large-lot orders seen by other traders, but not filled.  In so doing, Moncada wanted his large-lot orders to create a misleading impression in the market of increasing liquidity (*i.e.*, market interest).  At the same time, Moncada placed small-lot orders on the opposite side of the market from his large-lot spoofs.  In fact, Moncada's large-lot spoofs moved the market price.  His large-lot spoofs caused other traders in the market to react and place orders, resulting in the market price moving towards Moncada's small-lot orders that were waiting on the opposite side of the market.  While market impact is not an element of an attempted manipulation charge, it provides strong circumstantial evidence that Moncada intended to manipulate the market price through his large-lot spoofs.  Moncada's manipulative scheme was that he intended to profit when his spoofing induced other traders to fill his small-lot orders at better prices than he otherwise would have received but for his spoofing large-lot orders.

Because Moncada repeatedly testified that he did not recall why he placed an immediately canceled his large-lot orders on the eight attempted manipulation dates, and because he would not testify that he actually intended to fill those large-lot orders, the Court need not assess his credibility on summary judgment.  Instead, the Court can simply look at Moncada's trading and reach its own conclusions on his intent when placing and canceling these large-lot orders.  Moncada offered possible rationales that "could be used" to possibly justify entering large-lot orders, but his own trading shows that he did not apply any of these rationales.  Instead,

the only reasonable conclusion to be drawn from Moncada's trading is that he was attempting to manipulate the December 2009 Wheat Futures Contract market in violation of the Act.

Additionally, the Commission charged that Moncada, separately and in violation of other provisions of the Act and Regulations, entered opposing buy and sell orders for December 2009 Wheat Futures Contracts on opposite sides of the market in his BES trading account and his Serdika trading account on four days in October 2009 – October 6, 12, 15, and 29, 2009 – at the same price, same quantity, at virtually the same time.  These orders, ranging in size from 80 to 271 lots, resulted in futures positions moving between the BES and Serdika accounts that Moncada traded.  Moncada admitted he knowingly placed those opposing orders with the intent that they would fill against each other thereby transferring positions between the BES and Serdika accounts he traded.  As such, these trades constituted violations of the Act's prohibition on fictitious sales and the Regulation's prohibition on non-competitive transactions.

## II.   SUMMARY OF UNDISPUTED MATERIAL FACTS SUPPORTING THE COMMISSION'S CLAIMS

The Commission provides this brief summary of the relevant facts upon which the Commission's Motion for Summary Judgment is based.  This summary will provide the Court an overview of  Moncada's trading in the December 2009 Wheat Futures Contract related to the charges, the report submitted by the Commission's expert witness (the "Bessembinder Report"), summaries of the relevant testimony from Moncada's deposition, the depositions of the Commission's and Defendant's experts[1],  and the deposition of another Serdika trader.  In

---

[1]     Moncada proffered Steven E. Wollack as an expert witness and submitted to the Commission a report by Mr. Wollack (the "Wollack Report").  However, the Wollack Report does not create any issues of material fact.  Wollack testified that he has never conducted any analysis of trade data.  (Statement of Undisputed Facts ("SUMF"), ¶ 81; Deposition of Steven Wollack ("Wollack Dep."), at 16:5-16:13, 106:9-107:19, 129:14-129:17).  Wollack admitted that he only "eyeballed" a limited set of data as a basis for the conclusions in his report.  (SUMF, ¶ 81; Wollack Dep. 121:3-121:15, 109:1-109:7).  Further, Wollack testified that he does not

support of the Commission's Summary Judgment Motion and Memorandum, the Commission

respectfully refers the Court to its Statement of Undisputed Material Facts ("SUMF") and

Appendix of Exhibits that accompany this Memorandum for a more in-depth background on

futures trading in general and the December 2009 Wheat Futures Contract market.

### A.      Moncada's Trading in the BES and Serdika Accounts

During the relevant time period, Moncada was a member of and/or trader for BES and

Serdika, two proprietary trading firms that traded futures using their own capital.  (SUMF, ¶ 18;

Deposition of Eric Moncada, "Moncada Dep." 38:8-38:25, 44:10-44:15, 45:1-45:11).  Moncada

contributed a total of $525,000 to BES and Serdika between early 2009 and December 2009, for

the purpose of posting margin in futures trading accounts and to cover trading losses.  (SUMF, ¶

19 Moncada Dep. 41:25-42:16, 49:8-14; Affidavit of Jessica Harris ("Harris Aff."), at ¶ 30).

During the relevant time period, Moncada was authorized to trade one account in the

name of BES (account number A5187, the "BES account") and one account in the name of

Serdika (account number A4858, the "Serdika account").  (SUMF, ¶ 20; Affidavit of William

Steele, ("Steele Aff."), ¶ 8).  During the relevant time period, Moncada was entitled to at least 40

percent of profits from his trading for Serdika and, along with another trader at BES, 80 percent

of BES's trading profits.  (SUMF, ¶ 21; Moncada Dep. 47:10-48:14; Plaintiff's First Set of

---

dispute the analysis of Moncada's trading contained in the Bessembinder Report, only the
conclusions that Moncada intended to manipulate the market.  (SUMF, ¶ 81; Wollack Dep.,
109:1-109:13, 120:10-120:12).

The Commission intends, if Moncada submits the Wollack Report as an exhibit to any
motion or as a trial exhibit, to move to strike the Wollack Report on a variety of grounds,
including but not limited to (a) Wollack's lack of qualification as an expert on any area relevant
to this matter; (b) his inadequate methodology in evaluating the trading data at issue; (c) his
failure to evaluate the relevant trading data, thus making his opinions unreliable; (d) his failure to
address the specific violations alleged in the Commission's complaint, thus making his opinions
irrelevant; and (e) his extensive inclusion of inappropriate legal conclusions.

Requests for Admissions, ¶¶ 15, 18; Response to Request for Admissions, ¶¶ 15, 18).  From October 2008 through the end of October 2009, Moncada withdrew $2,308,231.87 in profits from BES and Serdika.  (SUMF, ¶ 22; Harris Aff. ¶ 30).

The BES and Serdika accounts had to maintain funds to cover margin requirements before Moncada could trade futures in those accounts.  (SUMF, ¶ 23; Steele Aff. ¶ 11-12).  If either the BES or Serdika account carried an open futures position at the close of regular trading hours, Moncada was required to post margin on that position.  (SUMF, ¶ 24; Moncada Dep. 103:16-104:13; Steele Aff. ¶ 14).  The end-of-day equity for the two accounts, which is the difference between the cash value of the account and the margin requirements for positions held in the account, ranged from a margin deficit of over $1.1 million to a positive equity of just over $458,000 on the eight attempted manipulation days.  (SUMF, ¶ 28-29; Steele Aff., ¶¶ 15, 16; Harris Aff. ¶ 9).  The BES account had a margin deficit on each of the eight attempted manipulation dates, meaning that it was unable to meet the initial margin requirement for the positions it held.  (SUMF, ¶ 28; Harris Aff. ¶ 9, 11; Steele Aff.¶ 15-16).  Similarly, the Serdika account had a margin deficit on five of the days.  (SUMF, ¶ 29; Harris Aff. ¶ 9, 11; Steele Aff.¶ 15-16).

Moncada placed large-lot orders in the final minutes of trading on at least one day.  For example, in the last fifteen minutes of trading on October 14, Moncada placed and immediately canceled 10 large-lot buy orders, totaling 4,410 lots, in the BES account.  (SUMF, ¶ 31; Harris Aff. ¶ 20).  If any of these orders were filled, it would have increased Moncada's existing long position in the BES account, which stood at 198 lots at the end of trading on October 14.  (SUMF, ¶ 31; Harris Aff. ¶ 20).  Moncada would have had to either liquidate the position before the market closed (and be subject to any losses had the market price moved against his position)

or post sufficient margin to carry the position overnight.  (SUMF, ¶ 31; Moncada Dep., 103:16-104:13; Steele Aff. ¶¶ 12, 14).  Moncada testified that the initial margin requirement for a 500-lot position would be approximately $1 million (SUMF, ¶ 32; Moncada Dep., 217:10-218:4); if so, the initial margin requirement for a 4,410-lot position would be nearly $9 million.  At the end of the trading day on October 14, 2009, the BES account already had a margin deficit of over $297,000.  (SUMF, ¶ 32; Harris Aff. ¶ 9).

### B.   Summary of Moncada's Trading Activity Related to the Commission's Claims of Attempted Manipulation[2]

On the eight attempted manipulation dates, Moncada entered over 700 large-lot orders in the December 2009 Wheat Futures Contract at or near the best bid or offer price in the market.  (SUMF, ¶ 33; Bessembinder Report, ¶¶ 7, 24).[3]  Moncada canceled virtually all of these large-lot orders after entering them.  (SUMF, ¶ 40; Bessembinder Report, ¶ 11).  Moncada manually placed and canceled these large-lot orders in the Globex electronic trading platform.  (SUMF, ¶ 34; Wollack Dep. 97:2-97:4; Bessembinder Report, ¶ 6; Affidavit of James Moran "Moran Aff.", ¶¶ 5-7)

#### 1.   *Moncada Entered and Canceled Hundreds of Large-Lot Orders Before They Were Filled*

On the eight attempted manipulation dates, Moncada placed a total of over 700 large-lot orders, ranging from 200 to 500 lots, in the December 2009 Wheat Futures Contract as follows: (a) 46 large-lot orders on October 6, 2009; (b) 71 large-lot orders on October 12, 2009; (c) 115

---

[2] Because the trade data is voluminous (approximately one million lines of data per date), the Commission is not attaching the trade data itself as an exhibit.  Moncada has stipulated to the authenticity of the trade data by not responding to a request for admission.  Should the Court wish to see the trade data, the Commission will submit it in its entirety in electronic format.

[3] The Bessembinder Report also includes statistical analysis of the effect of Moncada's large-lot orders over the broader time frame of August 13, 2009 to November 30, 2009, finding virtually identical statistics regarding the effect over the broader time frame as on the eight attempted manipulation dates.  (See, generally, Bessembinder Report).

large-lot orders on October 14, 2009; (d) 116 large-lot orders on October 19, 2009; (e) 107 large-lot orders on October 26, 2009; (f) 98 large-lot orders on October 27, 2009; (g) 118 large-lot orders on October 29, 2009; and (h) 37 large-lot orders on October 30, 2009.  (SUMF, ¶ 36; Bessembinder Report, ¶ 7, Table 1).  Moncada placed large-lot orders in the BES account on six of the attempted manipulation dates – October 6, 12, 14, 19, 26, and 27 – and in the Serdika account on four of the attempted manipulation dates – October 26, 27, 29, and 30.  (SUMF, ¶ 37; Harris Aff. ¶ 34-43).

Moncada accounted for the vast majority of large-lot orders in the December 2009 Wheat Futures Contract market across the eight attempted manipulation dates.  Of the 470,000 total orders entered in the December 2009 Wheat Futures Contract market on the eight attempted manipulation dates, only 853 were large-lot orders – of which Moncada accounted for 710.  (SUMF, ¶ 38; Bessembinder Report, ¶ 4(i)).  As a point of comparison, the average order size across the entire market in the December 2009 Wheat Futures Contract from August 13, 2009 to November 30, 2009 was approximately 3 lots.  (SUMF, ¶ 38; Harris Aff. ¶ 32).  Excluding his large-lot orders, Moncada's average order size from August 13 to November 30, 2009 was approximately 7 lots (his "small-lot orders").  (SUMF, ¶ 38; Harris Aff. ¶ 33).

Moncada placed large-lot orders on both the buy and sell sides of the market.  (SUMF, ¶ 39; Bessembinder Report, ¶ 9).  In some instances, he placed and canceled large-lot orders on both sides of the market within minutes of each other.  For instance, on October 27, 2009 between 11:45:41 am and 11:55:45 am, Moncada placed and canceled (a) one large-lot *buy* order, followed by (b) one large-lot *sell* order, followed by (c) three large-lot *buy* orders, followed by (d) four large-lot *sell* orders, followed by (e) two large-lot *buy* orders.  (SUMF, ¶ 39; Harris Aff. ¶ 26-27).

Moncada's large-lot orders resulted in very little trading, particularly when compared to those entered by other traders. Moncada canceled 99.6 percent of his large-lot orders on the eight attempted manipulation dates. (SUMF, ¶ 40; Bessembinder Report, ¶ 11). By comparison, of the 143 large-lot orders placed by all other traders combined, only 28.7 percent were canceled. (SUMF, ¶ 40; Bessembinder Report, ¶¶ 7, 15). Only 0.78 percent of the total volume of Moncada's large-lot orders was actually filled. (SUMF, ¶ 40; Bessembinder Report, ¶ 7-8). Also by comparison, other traders filled over 45 percent of the total volume of their large-lot orders. (SUMF, ¶ 40; Bessembinder Report, ¶ 19).

In contrast to the low percentage of his large-lot orders filled, Moncada filled a high percentage of his small-lot orders, even when compared to the small-lot orders entered by other traders. Moncada filled over 45 percent of the volume of his own small-lot orders, while other traders filled on average only 28.2 percent of the volume of their small-lot orders. (SUMF, ¶ 41; Bessembinder Report, ¶ 19, 22).

Moncada also canceled his large-lot orders quickly compared to other traders' large-lot order cancellations. Moncada canceled his large-lot orders an average of 2.1 seconds after placing them, which included 72.1 percent of those canceled in less than one second. (SUMF, ¶ 42; Bessembinder Report, ¶ 11; Table 3). By comparison, other traders canceled large-lot orders only after an average of 127 minutes, with none canceled in less than one second. (SUMF, ¶ 42; Bessembinder Report, ¶ 15, Table 3). Additionally, Moncada did not cancel his small-lot orders until leaving them in the market for an average of 10 minutes. (SUMF, ¶ 42; Bessembinder Report, ¶ 16).

Even though Moncada canceled nearly all of his large-lot orders, he placed them in the market in a manner that ensured that other traders would see his large-lot orders. All of

Moncada's large-lot orders on the eight attempted manipulation dates were within ten ticks of the best bid/best offer prices, meaning that all of his large-lot orders would be displayed to the rest of the market on the Globex order book.  (SUMF, ¶ 43; Bessembinder Report, ¶ 24; Benbrook Aff. ¶ 17).  Moreover, Moncada placed 77.1 percent of his large-lot orders **at the same price as** the best bid (for buy orders) or best offer (for sell orders).  (SUMF, ¶ 43; Bessembinder Report, ¶ 24).  By comparison, other traders' large-lot orders were on average 18 ticks away from the best bid/best offer price.  (SUMF, ¶ 43; Bessembinder Report, ¶ 24).  Also by comparison, Moncada placed his small-lot orders on average 6.6 ticks from the best bid/best offer price.  (SUMF, ¶ 43; Bessembinder Report, ¶ 24).

In over 99 percent of instances for which the data is available, Moncada chose not to enter his large-lot orders as iceberg orders.  (SUMF, ¶ 44; Bessembinder Report, ¶ 25).  Iceberg orders allow traders to enter orders but only show a portion of that order to the rest of the market.  (SUMF, ¶ 44; Benbrook Aff. ¶ 20).  Traders tend to use iceberg orders to execute trades "without moving the price unduly" and "without moving the market as much as you would if you exposed your orders."  (SUMF, ¶ 44; Deposition of Hendrik Bessembinder ("Bessembinder Dep."), 18:23-19:4, 19:20-20:7; *See also*, Bessembinder Dep. 110:17-111:7; Bessembinder Report, ¶ 52).  Moncada said that traders might use iceberg orders because, if the full size of an order were showing, other traders could "lean on your order" or "use your order as a crutch[.]"  (SUMF, ¶ 44; Moncada Dep. 153:21-154:6).  When asked if he ever used iceberg orders while trading for BES and Serdika during October 2009, Moncada testified he would use them whenever he felt he might have a better chance of getting filled.  (SUMF, ¶ 44; Moncada Dep. 152:2-152:14).

## 2.   *Moncada's Large-Lot Orders Affected the Market Price* [4]

---

[4] As discussed in the Legal Argument section III.B., below, the Commission does not need to establish that Moncada actually caused an effect on the market price of the December 2009

Moncada's large-lot orders on the eight attempted manipulation dates affected the market price of the December 2009 Wheat Futures Contract.  Moncada's large-lot orders on average pushed the market price in the twenty seconds following their entry, meaning that his large-lot **buy** orders pushed the price **up** while his large-lot **sell** orders pushed the price **down**.  (SUMF, ¶ 50; Bessembinder Report, ¶¶ 62, 76, 77(vi)).

As a result, when Moncada placed and canceled a large-lot buy (or sell) order, the market price increased (or decreased), and other traders were induced to place additional buy (or sell) orders, respectively.  (SUMF, ¶ 51; Bessembinder Report, ¶ 73, 76).  While the effect of an individual large-lot order was relatively small, Moncada placed between 37 and 118 large-lot orders per day.  (SUMF, ¶ 51; Bessembinder Report, ¶ 62, Table 1).

Moncada admitted that large-lot orders could have an effect on the market even if only in the market for a fraction of a second.  (SUMF, ¶ 52; Moncada Dep. 318:25-319:14).  Academic literature in the stock market shows that computerized algorithms often responded to events, such as the arrival of a new order in the market, within two to three milliseconds.  (SUMF, ¶ 52; Bessembinder Report, ¶ 27).  Moncada knew that any order has an effect on the market. (SUMF, ¶ 52; Moncada Dep. 155:15-155:19).  Moncada also knew that large-lot orders would have more of an effect on the market than smaller lot orders.  (SUMF, ¶ 52; Moncada Dep. 154:7-155:19).

### 3.    *Moncada Consistently Traded on the Opposite Side of the Market Following His Large-Lot Orders*

Following a large-lot order on one side of the market, Moncada consistently traded on the opposite side of the market in the minutes afterwards, starting in the first ten seconds after a large-lot order.  (SUMF, ¶ 54; Bessembinder Report, ¶ 39).  Five minutes after placing a large-

Wheat Futures Contract to prove attempted manipulation.  The market impact of Moncada's large-lot orders simply provides indicia of his intent to manipulate the December 2009 Wheat Futures Contract market.

lot order on one side of the market, Moncada on average executed 19.3 contracts on the opposite side of the market for every 1,000 contracts of large-lot order.  (SUMF, ¶ 54; Bessembinder Report, ¶ 42).  By way of explanation, this would mean that if Moncada placed a 500 lot ***buy*** order (which did not get filled), he would on average actually ***sell*** orders of nearly 10 lots (which did get filled) in the five minutes following that large-lot buy order.  One sequence of Moncada's trading on October 27, 2009 illustrates his trading on the opposite side of the market from his large-lot orders.  First, one of Moncada's large-lot (202 lots) buy orders was fully filled.  (SUMF, ¶ 56; Bessembinder Report, ¶ 51).  This was one of only eight times between August and November 2009 when Moncada's large-lot orders were actually filled.  (SUMF, ¶ 56; Bessembinder Report, ¶ 47-55).  Second, during the following 45 minutes, Moncada placed 25 large-lot ***buy*** orders and one large-lot ***sell*** order, none of which resulted in a single executed trade.  (SUMF, ¶ 56; Harris Aff. ¶ 24).  Third, in that same 45 minute period, Moncada placed a series of four 100 lot iceberg ***sell*** orders.  (SUMF, ¶ 56; Bessembinder Report, ¶ 51, Table 10).  This was one of the few instances where Moncada placed iceberg orders for 100 lots or greater.  (SUMF, ¶ 56; Bessembinder Report, ¶50-52).  Through this 45 minute stretch, Moncada sold a net total of 163 lots.  (SUMF, ¶ 56; Harris Aff., ¶ 24; Bessembinder Report, Figure 4).

On each of the eight attempted manipulate dates, Moncada placed and filled small-lot orders on the opposite side of the market from his large-lot orders in the same time period that he placed at least one large-lot order.  (SUMF, ¶ 57; Harris Aff. ¶¶ 34-43).

### 4.    *Moncada's Testimony on His Rationale for Entering and Canceling Large-Lot Orders*

#### a.    <u>*Moncada Did Not Recall Why He Entered or Canceled his Large-Lot Orders*</u>

When presented with exhibits showing his large-lot orders and cancelations, Moncada repeatedly testified that he did not recall his reasons for placing and canceling any one of the

hundreds of individual large-lot orders in the December 2009 Wheat Futures Contract in October 2009.  (SUMF, ¶ 59; Moncada Dep. 166:24-167:7, 173:4-173:8, 190:3-190:8, 202:5-202:15, 210:21-210:24, 221:6-221:16, 222:16-223:3, 228:6-228:10, 229:12-229:15, 231:23-232:17, 234:20-234:23, and 235:12-235:15).  His testimony included responses such as "I don't know," "I'm not sure," "I don't know what I was trying to do," or "I don't know what the situation was in the market here."  (SUMF, ¶ 59; Moncada Dep. 213:11, 216:2, 229:15 and 229:10-11).  Moncada testified that he had not reviewed any of the trading data from October 2009 provided him by the CFTC or refreshed his recollection with "any documents of any kind" prior to his testimony to the CFTC.  (SUMF, ¶ 59; Moncada Dep. 316:12-23).

Moncada was asked repeatedly whether he intended to fill his large-lot orders.  When asked, "Were there any times where you did not intend to fully fill a large-lot order?"  Moncada responded, "I would have to – I would have to look at the situation."  (SUMF, ¶ 60; Moncada Dep. 135:18-135:21).   Additionally, when asked, "Do you recall ever placing a large lot order that you did not intend to fully fill?" he replied, "I would have to look at each time I placed one and the situation.  I don't recall." (SUMF, ¶ 60; Moncada Dep. 136:7-136:8, 136:13-136:14).  When asked if he hoped his large-lot orders would be filled, Moncada testified "I don't recall what I was hoping for, but I do recall that there was always risks and chances, and if the order got filled, I would – I would have to make a decision on what I wanted to do then."  (SUMF, ¶ 60; Moncada Dep. 148:9-148:16).

**b.**     ***Moncada's Three Purported Rationales for Placing the Large-Lot Orders***

While unable to recall reasons for individual large-lot orders he placed in the December 2009 Wheat Futures Contract, Moncada testified that there were only three rationales he might have used when placing large-lot orders.  (SUMF, ¶ 61; Moncada Dep. 100:25-101:18).

Moncada's first purported rationale was to send a signal to the market as "a way of asking for liquidity."  (SUMF, ¶ 61; Moncada Dep. 99:5-99:25 and 129:13-130:8).  He testified "I don't – I don't remember if I did in that – in October or not, but I know it's a – it's a – it's a method that's used."  (SUMF, ¶ 61; Moncada Dep. 129:24-130:2).  Moncada could not state whether he actually used this rationale when placing large-lot orders in October 2009, or at any time.  (SUMF, ¶ 61; Moncada Dep. 130:3-130:8).

Moncada's second purported rationale was to get "size priority" from the matching algorithm used by the Globex trading platform.  (SUMF, ¶ 62; Moncada Dep. 96:23-98:18).  Moncada testified that he understood that "[i]f you are one of the bigger bids or offers in the [Globex matching] engine, whether you're first or last, you could potentially get a partial fill."  (SUMF, ¶ 62; Moncada Dep. 138:11-138:17).  Moncada was not sure if he ever placed large-lot orders with the intent of getting size priority in October 2009 in the CBOT Wheat Futures market.  (SUMF, ¶ 62; Moncada Dep. 98:8-98:18, 144:24-145:9).  Moncada testified that he could have used this rationale because he was having difficulty filling his small-lot orders.  (SUMF, ¶ 62; Moncada Dep. 145:10-145:20).  When asked under what market conditions he would place large-lot orders to get size priority, Moncada responded "[i]t's very situational.  I mean, it's just depending on what, you know, what was going on the market, depending on, you know, how I felt about, you know, trading a big position."  (SUMF, ¶ 62; Moncada Dep. 144:15-144:23).

Moncada's third purported rationale was that he intended to actually take a position (*i.e*., actually fill his order) based on his "view of the market."  (SUMF, ¶ 63; Moncada Dep. 100:25-101:6).  Moncada testified that his "view of the market" would be based on "weather, news, outside markets, meaning most of the global commodity markets, equity markets, what the other

grains are doing."  (SUMF, ¶ 63; Moncada Dep. 81:21-81:25).  Moncada testified that "[i]t

would have to be more than just something like gold going up.  I would to be [*sic*] looking at

several other factors."  (SUMF, ¶ 63; Moncada Dep. 84:12-84:16).

<b><i>c.      <u>Moncada's Only Purported Rationale for Canceling the Large-<br>Lot Orders Before They Were Filled</u></i></b>

While Moncada had three purported rationales for ***placing*** his large-lot orders, he

testified that the only reason he could think of for ***canceling*** his large-lot orders before they filled

was that he was "constantly re-evaluating and adjusting to market conditions."  (SUMF, ¶ 64;

Moncada Dep. at 114:12-114:21).  Moncada testified that he was "prepared to make a decision

on the market at that moment and then change my mind, cancel and reevaluate."  (SUMF, ¶ 64;

Moncada Dep. 324:16-325:4).  When asked why he would cancel an order before it was filled

Moncada further testified:

> If that's not going to get filled I'm not going to leave my order out there so somebody
> could take their time and decide what they want to do.  I choose to trade at that
> moment at that price.  If I don't get filled I'm going to cancel my order and look for
> another spot to trade.

(SUMF, ¶ 64; Moncada Dep. 332:3-332:16).

When asked about a series of large-lot orders that he canceled within 0.7 seconds after

entry, Moncada testified that he might cancel a large-lot order because he was "reacting to

something in the market, changing my mind, changing my opinion, changing the feeling that I --

you know, maybe I just didn't want to hold a -- maybe I changed my mind on taking a position at

that time, you know, not wanting to expose myself to the market running through me and

decided not to."  (SUMF, ¶ 65; Moncada Dep. 115:6-115:16).  When asked what he meant by

"run through," Moncada responded, "I don't even know what that means." (SUMF, ¶ 65;

Moncada Dep. 203:23-206:5).

14

Moncada testified that he "re-evaluated" his large-lot orders based on a review of "all of the markets that have any relation to the grain trade and that includes currencies, that includes macro markets like gold, that includes U.S. equity indexes, that includes specifically the grains." (SUMF, ¶ 66; Moncada Dep. 197:21-198:9).  Moncada testified that he was able to evaluate all of those markets looking at the "momentum and gyrations of those markets" and decide, in under a second, to cancel his large-lot orders based on that evaluation.  (SUMF, ¶ 66; Moncada Dep. 198:14-200:10).

### 5.    *Testimony of Moncada's Colleague at Serdika*

At least one other trader at Serdika was aware that Moncada was placing and canceling large-lot orders.  James Moriarty ("Moriarty"), who was Moncada's friend and a fellow trader at Serdika in the CBOT Wheat Futures market, frequently exchanged instant messages ("IMs") with Moncada.  (SUMF, ¶ 67; Moncada Dep. 246:14-247:24; Deposition of James Moriarty ("Moriarty Dep."), 25:25-26:17, 33:25-34:11, 72:9-72:14).  During one such IM conversation on September 30, 2009, Moncada said to Moriarty, "Oh yeah, watch wheat dump Cada on the close."  (SUMF, ¶ 68-69; Instant Message dated September 30, 2009 (the "September 30 IM")).  "Cada" was Moncada's nickname, and "dump Cada" meant that Moncada thought the wheat market was going to go lower.  (SUMF, ¶ 69; Moriarty Dep. 82:1-22).  Two minutes later, Moncada placed and canceled two 500 lot sell orders and one 402 lot sell order in the December 2009 Wheat Futures Contract.  (SUMF, ¶ 69; Harris Aff. ¶ 15).  Moriarty then asked Moncada "is that you fucking around with the 500 lot?" (SUMF, ¶ 69; September 30 IM).  Moncada responded "of course ont [sic] not," eliciting Moriarty to respond "lol," meaning "laugh out loud."  (SUMF, ¶ 69; September 30 IM; Moriarty Dep. 77:8-77:22, 83:14-84:8).

When asked what he meant by "fucking around," Moriarty characterized the phrase to mean Moncada's "…putting that kind of size in on the market…"  (SUMF, ¶ 70; Moriarty Dep.

95:8-95:14).  Moriarty said he used the phrase "[b]ecause, I think it's a crazy thing to do[,]" and "[b]ecause there's too much leverage there."  (SUMF, ¶ 70; Moriarty Dep. 94:11-94:19). Moriarty assumed that Moncada had placed the 500 lot orders, testifying, "I don't know why I thought it was him, it was just on my mind and to be in the market for that much size to me is crazy and I would say why you effing around like this." (SUMF, ¶ 70; Moriarty Dep. 106:11-106:21).

### C.   Summary of Moncada's Trading Activity Related to the Commission's Claims of Fictitious Sales and Non-Competitive Transactions

Separate and apart from his large-lot order activity, Moncada executed a series of offsetting trades between the BES and Serdika accounts on October 6, 12, 15, and 29, 2009.  On those four days in October 2009, Moncada placed sizeable orders on opposite sides of the market for the same quantity and price within seconds of each other in the BES and Serdika accounts. (SUMF, ¶ 71; Harris Aff. ¶ 16, 18, 22, 28).  Moncada admitted that he placed buy orders in the December 2009 Wheat Futures Contract market for one account and sell orders in the market for the other account for the same price and quantity on at least ten occasions, with knowledge and intent that they would hit each other.  (SUMF, ¶ 71; Moncada Dep. 254:14-256:21).

### 1.   *Moncada's Trading and Testimony on the October 6, 2009 Transactions*

On October 6, 2009, at 10:20:09.476 am, Moncada placed a buy order in the Serdika account for 80 lots at a price of 466 cents.  (SUMF, ¶ 72; Harris Aff. ¶ 16).  At 10:20:10.943 am, approximately 1.5 seconds later, Moncada placed an offsetting sell order in the BES account for 80 lots also at a price of 466 cents.  (SUMF, ¶ 72; Harris Aff. ¶ 16).  The entire BES sell order filled at the price of 466 cents within 0.001 seconds.  The majority of the Serdika buy order, 58 lots, was filled at the price of 466 cents.  (SUMF, ¶ 72; Harris Aff. ¶ 16).  The majority of the

BES sell order and Serdika buy order filled against each other.  (SUMF, ¶ 72; Moncada Dep., 263:4-263:10).

Moncada was shown the Moncada's trading for the October 6 orders and asked if he was trying to have the order in the BES account match against the order in the Serdika account. Moncada agreed that he was trying to match the two orders against each other.  (SUMF, ¶ 73; Moncada Dep. 262:23-263:3).

### 2. *Moncada's Trading and Testimony on the October 12, 2009 Transactions*

On October 12, 2009, at 11:27:56.161 am, Moncada placed a sell order in the BES account for 116 lots at a price of 483 ½ cents.  (SUMF, ¶ 74; Harris Aff. ¶ 18).  At 11:27:57.793, approximately 1.6 seconds later, Moncada placed an offsetting buy order in the Serdika account for 116 lots at a price of 483 ½ cents.  (SUMF, ¶ 74; Harris Aff. ¶ 18).  Both orders immediately filled at the price of 483 ½ cents.  (SUMF, ¶ 74; Harris Aff. ¶ 18).  The majority of the BES sell orders and Serdika buy orders filled against each other.  (SUMF, ¶ 74; Moncada Dep. 268:10-268:20).

Moncada was shown the trade data for the October 12 orders at his deposition.  He testified again that he was trying to have the order in the BES account match against the order in the Serdika account.  (SUMF, ¶ 75; Moncada Dep. 265:6-19).

### 3. *Moncada's Trading and Testimony on the October 15, 2009 Transactions*

On October 15, 2009, at 10:34:54.801 am, Moncada placed an order in the BES account to sell 271 lots at a price of 499 cents.  (SUMF, ¶ 76; Harris Aff. ¶ 22).  At 10:34:55.516, approximately 0.7 seconds later, Moncada placed an offsetting buy order in the Serdika account for 271 lots at a price of 499 cents.  (SUMF, ¶ 76; Harris Aff. ¶ 22).  Both orders were completely filled at a price of 499 cents.  (SUMF, ¶ 76; Harris Aff. ¶ 22).  The majority of the

BES sell orders and Serdika buy orders filled against each other.  (SUMF, ¶ 76; Moncada Dep. 260:6-260:16).

Moncada was shown the trade data for the October 15 orders at his deposition.  He testified again that he was trying to have the order in the BES account match against the order in the Serdika account.  (SUMF, ¶ 77; Moncada Dep. 259:16-261:9).

4.      *Moncada's Trading and Testimony on the October 29, 2009 Transactions*

On October 29, 2009, at 12:08:59.899, Moncada placed an order in the Serdika account to sell 154 lots at a price of 508 cents.  (SUMF, ¶ 78; Harris Aff. ¶ 28).  At 12:09:17.266, approximately 17.3 seconds later, Moncada placed an offsetting buy order in the BES account for 154 lots at a price of 508 ¼ cents, thereby bidding to buy at a price one tick higher than the Serdika sell order.  (SUMF, ¶ 78; Harris Aff. ¶ 28).[5]  Both orders were immediately and completely filled at a price of 508 cents.  (SUMF, ¶ 78; Harris Aff. ¶ 28).  The entirety of the BES buy orders and Serdika sell orders filled against each other.  (SUMF, ¶ 78; Moncada Dep. 267:22-268:5).  The offsetting trade on October 29 was the only transaction that Moncada made in the BES account on that day.  (SUMF, ¶ 78; Harris Aff. ¶ 28).

Moncada was shown the trade data for the October 29 orders at his deposition.  He testified again that he was trying to have the order in the BES account match against the order in the Serdika account.  (SUMF, ¶ 80; Moncada Dep. 265:10-265:19).

III.      **LEGAL ARGUMENT**

A.      **Summary Judgment Standard of Review**

---

[5] Buy orders placed at prices above the best offer price will first fill against any orders at the best offer price.  (SUMF, ¶ 79; Benbrook Aff., ¶ 16).  Therefore, an order to buy at a price of 508 ¼ cents would first be filled against a sell order at a price of 508.

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (internal citations omitted).

In cases involving circumstantial evidence, the court must draw "all reasonable inferences" in favor of the nonmoving party.  *See Schiano v. Quality Payroll Sys.*, 445 F.3d 597, 603 (2d. Cir. 2006).  However, the court must "distinguish between evidence that allows for a reasonable inference…and evidence that gives rise to mere speculation and conjecture." *Lomotey v. Conn.-DOT*, 355 Fed.Appx. 478, 480 (2d. Cir. 2013) (quoting *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005)).

When the plaintiff moves for summary judgment, "it must show that the evidence supporting its claims is so compelling that no reasonable jury could return a verdict for the defendant." *SEC v. Meltzer*, 440 F.Supp.2d 179, 187 (E.D.N.Y. 2006).  As no jury demand has been made, the Court is the finder of fact in the present case.

To defeat a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and they may not rely on conclusory allegations or unsubstantiated speculation." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (internal citations omitted).

### B.    Moncada Violated Sections 6(c), 6(d), and 9(a)(2) of the Act by Attempting to Manipulate the December 2009 Wheat Futures Contract Price

The facts supporting the Commission's Motion establish, through Moncada's trading and the undisputed facts in the attached affidavits, relevant testimony, and the Commission's expert

witness report, that Moncada attempted to manipulate the price of the December 2009 Wheat Futures Contract in violation of Sections 6(c), 6(d), and 9(a)(2) of the Act.  7 U.S.C. §§ 9, 15, 13b, 13(a)(2) (2006).  Therefore, the Commission is entitled to judgment as a matter of law.

Section 9(a)(2) of the Act makes it unlawful for "[a]ny person to manipulate or attempt to manipulate the price of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity…"  7 U.S.C. § 13(a)(2) (2006).  Section 6(c) of the Act authorizes the Commission to serve a complaint and provide for the imposition of, among other things, civil monetary penalties and cease and desist orders if the Commission "has reason to believe that any person is manipulating or attempting to manipulate or has manipulated or attempted to manipulate the market price of any commodity, in interstate commerce, or for future delivery on or subject to the rules of any registered entity, ... or otherwise is violating or has violated any of the provisions of [the] Act…"  7 U.S.C. § 9 (2006).  Section 6(d) of the Act is substantially identical to section 6(c).  *See* 7 U.S.C. § 13b (2006).

To prove attempted manipulation, the Commission "must establish: (1) an intent to affect the market price of a commodity; and (2) some overt act in furtherance of that intent."  *CFTC v. Parnon Energy, Inc.*, 875 F.Supp.2d 233, 250 (S.D.N.Y. 2012) (citing *In the Matter of Hohenberg Bros.*, [1975-1977 Transfer Binder] Comm. Fut. L. Rep. ¶ 20,271 at 21,477 (CFTC Feb. 18, 1977)).  Courts have held that "the test of manipulation must largely be a practical one if the purposes of the Commodity Exchange Act are to be accomplished.  The methods and techniques of manipulation are limited only by the ingenuity of man."  *Cargill, Inc. v. Hardin*, 452 F.2d 1154, 1163 (8th Cir. 1971).

"Intent is the essence of manipulation…the intent of the parties is the determinative element in a punishable manipulation….It is the intent of the parties which separates otherwise

lawful business conduct from unlawful manipulative activity." *In re Indiana Farm Bureau*, [1982-1984 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 21,796 at 27,282-283 (CFTC Dec. 17, 1982).  The intent element of an attempted manipulation claim is met if the Commission shows that a defendant "acted (or failed to act) with the purpose or conscious object of causing or effecting a price or price trend in the market that did not reflect the legitimate forces of supply and demand." *Parnon*, 875 F.Supp.2d, at 249 (quoting *In re Energy Transfer Partn. Nat. Gas Litig.*, 2009 U.S. Dist. Lexis 75859 (S.D. Tex., Aug. 26, 2009)).

By necessity intent must be inferred from a person's actions and the totality of the circumstances.  *See In re Hohenberg Bros.*, [1975-1977 Transfer Binder] Comm. Fut. L. Rep. at 21,477.  Because "proof of intent will most often be circumstantial in nature, manipulative intent must normally be shown inferentially from the conduct of the accused."  *Parnon*, 875 F.Supp.2d, at 249 (quoting *Ind. Farm Bureau,* [1982-1984 Transfer Binder] Comm. Fut. L. Rep. (CCH) at 27,289 n. 12).

> [O]nce it is demonstrated that the alleged manipulator sought, by act or omission, to move the market away from the equilibrium or efficient price – the price which reflects the market forces of supply and demand – the mental element of manipulation may be inferred…  It is enough to present evidence from which it may reasonably be inferred that the accused 'consciously desire[d] that result, whatever the likelihood of that result happening from his conduct.'

*Ind. Farm Bureau* [1982-1984 Transfer Binder] Comm. Fut. L. Rep. (CCH) at 27,283 (quoting *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 445 (1978)).  To establish attempted manipulation through circumstantial evidence, "a plaintiff must show that the defendant's conduct is 'at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'"  *In re Amaranth Natural Gas Commodities Litigation*, 587 F.Supp.2d 513, 531 (S.D.N.Y. 2008) (quoting *Kalnit*

*v. Eichler*, 264 F.3d 131, 142 (2nd Cir. 2001)).  A profit motive may also be evidence of intent, although profit motive is not a necessary element of an attempted manipulation.  *See In re DiPlacido* [2007-2009 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 30,970, at 62,484 (CFTC Nov. 5, 2008) (citing *In re Hohenberg Bros.*, [1975-1977 Transfer Binder] Comm. Fut. L. Rep. at 21,478)), *aff'd*, 364 F.App'x 657 (2nd Cir. 2009).

The second element of attempted manipulation is met by showing an overt act in furtherance of that intent to manipulate.  *Parnon*, 875 F.Supp.2d, at 250.  Overt acts need not be unlawful or fraudulent acts, and can include ordinarily legitimate trading activity.  *See CFTC v. Amaranth Advisors, LLC*, 554 F.Supp.2d 523, 533-34 (S.D.N.Y. 2008) (citing *SEC v. Masri*, 523 F.Supp.2d 361, 371 (S.D.N.Y. 2007)).  "Because every transaction signals that the buyer and seller have legitimate economic motives for the transaction, if either party lacks that motivation, the signal is inaccurate.  Thus, a legitimate transaction combined with an improper motive is commodities manipulation."  *In re Amaranth Natural Gas Commodities Litigation*, 587 F. Supp. 2d 513, 534 (S.D.N.Y. 2008).

### 1. *Moncada Intended to Manipulate the Price of the December 2009 Wheat Futures Contract Market*

Moncada's trading and testimony shows that he sought to "move the market away from the equilibrium price – the price which reflects market forces of supply and demand" through his large-lot orders.  *Ind. Farm Bureau* [1982-1984 Transfer Binder] Comm. Fut. L. Rep. (CCH) at 21,796.  Additionally, Moncada's trading and testimony shows that he did not intend to fill his large-lot orders.  In fact, Moncada's large-lot order spoofs (*i.e.* orders he entered and quickly canceled without intent to fill), affected the market price and he consistently traded on the opposite side of the market from his spoofs, showing that he intended to take advantage of the price movements they caused to his own financial benefit.

### a. *Moncada's Trading Shows He Intended to Manipulate the Market*

Moncada attempted to manipulate the December 2009 Wheat Futures Contract market by spoofing and then attempting to profit from resulting price movements by placing small-lot orders on the opposite side of the market.  (SUMF, ¶ 47; Bessembinder Report, ¶ 30-45, 75).  One method of spoofing, regarded by academic authors as a manipulative tactic, is to place a fleeting order visible to the market in the opposite direction of the order that the trader genuinely desires to be filled.  (SUMF, ¶ 47; Bessembinder Report, ¶ 33).  Some traders have used the "spoofing" technique to place orders in the market to give the impression of interest on one side of the market, but cancel the order before it can be filled, in order to fill their small-lot orders on the opposite side of the market.  *See, e.g., In the Matter of Panther Energy Trading LLC*, [2012-2013 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 32,686 at 73,292-93 (CFTC July 22, 2013) (order instituting and settling charges for "spoofing"); *see also In the Matter of Ecoval Dairy Trade, Inc.*, [2011-2012 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 32,013 at 66,926-28 (CFTC July 19, 2011) (order instituting and settling charges of attempted manipulation by, among other strategies, placing and canceling orders before they could be filled).

### i. *Moncada's Trading Shows He Did Not Intend to Fill His Large-Lot Orders*

Moncada's intent can best be determined by the actions that he took in the market.  The volume and frequency of his large-lot orders and immediate cancellations of them is indicative of his lack of intent to fill those orders.  As Dr. Bessembinder testified, "[i]f it's happening again and again and again, it would be consistent with the interpretation that he didn't intend to trade on one side.  Nothing speaks louder about intentions than actions."  (SUMF, ¶ 46; Bessembinder Dep. 33:5-8).

In this case, the following five facts about Moncada's trading show that he did not intend to fill his large-lot orders: 1) the sheer number of times that Moncada placed large-lot orders, making him an outlier compared to other traders; 2) his high cancellation rate for his large-lot orders before they could be filled in the market; 3) his immediate cancellation of his large-lot orders before they could be filled in the market as compared to other traders; 4) that Moncada priced his large-lot orders aggressively, but those large-lot orders rarely resulted in any actual trading; and 5) the fact that Moncada chose not to use iceberg orders for his large-lot orders, thus ensuring that other traders would see his large-lot orders.

First, Moncada's extensive use of large-lot orders made him an outlier in the December 2009 Wheat Futures Contract market. Large-lot orders accounted for only 853 of the 472,000 orders placed in the market on the eight attempted manipulation dates. Of the 853 large-lot orders placed in the market, Moncada accounted for 710 of them – the overwhelming majority – compared to the 143 large-lot orders placed by all other traders combined. (SUMF, ¶ 38; Bessembinder Report, ¶ 4(i)).

Second, Moncada canceled over 99.6 percent of his large-lot orders on the eight attempted manipulation dates before they were filled. (SUMF, ¶ 40; Bessembinder Report, ¶ 11). On average, only 0.78 percent of the volume of his large-lot orders was filled. (SUMF, ¶ 40; Bessembinder Report, ¶ 7-8). By comparison, other traders canceled their large-lot orders only 28.7 percent of the time; on average, over 45 percent of the volume of other traders' large-lot orders were filled. (SUMF, ¶ 40; Bessembinder Report, ¶ 15, 19). The low rate at which Moncada's large-lot orders resulted in any executed trades strongly indicates that Moncada did not intend for those large-lot orders to be filled.

Third, Moncada canceled his large-lot orders almost instantly before they could be filled in the market.  Moncada canceled his large-lot orders in an average of 2.1 seconds after placement, a far cry from the ten minute average that he would leave small-lot orders in the market before canceling.  (SUMF, ¶ 42; Bessembinder Report, ¶ 11).  By comparison, other traders left their large-lot orders in the market an average of 127 minutes.  (SUMF, ¶ 42; Bessembinder Report, ¶ 15).  Moncada canceled over 72 percent of his large-lot orders in less than one second after entering them.  (SUMF, ¶ 42; Bessembinder Report, ¶ 11, Table 3).  By comparison, no other trader canceled a single large-lot order within one second.  (SUMF, ¶ 42; Bessembinder Report, Table 3).  To summarize these statistics:

|  | Moncada | All Other Traders Combined |
|---|---|---|
| **Number of Large-Lot Orders** | 710 | 143 |
| **Large-Lot Orders Canceled** | 99.6% | 28.7% |
| **Volume of Large-Lot Orders Filled** | 0.78% | 45.2% |
| **Average Time to Cancel Large-Lot Orders** | 2.1 *seconds* | 127 *minutes* |

Moncada's frequent and rapid cancelation of his large-lot orders before they could be filled in the market is consistent with spoofing.  (SUMF, ¶ 47; Bessembinder Report, ¶ 45).  As Dr. Bessembinder testified, "[a] spoofer does not want their order to execute.  If you leave it out there a long time, the risk of execution goes up."  (SUMF, ¶ 47; Bessembinder Dep. 77:23-77:25).

Fourth, Moncada's large-lot orders were aggressively priced, making the low execution rate of those orders all the more unusual.  This aggressive pricing ensured that the large-lot orders would be shown to all traders.  (SUMF, ¶ 43; Bessembinder Report, ¶ 24; Benbrook Aff. ¶ 17).  Orders at or near the best bid/best offer price (*i.e.*, aggressively priced) should result in "a large number of executed trades."  (SUMF, ¶ 48; Bessembinder Report, ¶ 28).  Moncada's large-

lot orders were certainly priced aggressively, with over 77 percent of them at the best bid or best offer price. (SUMF, ¶ 43; Bessembinder Report, ¶ 24). The fact that Moncada's large-lot orders were so aggressively priced is one reason "why it's all the more remarkable that he had such low execution rates on orders that we would normally expect to have high execution rates." (SUMF, ¶ 48; Bessembinder Dep. 66:8-66:13).

Finally, all but a handful of Moncada's large-lot orders were fully visible to the market because Moncada rarely placed his large-lot orders as iceberg orders. (SUMF, ¶ 44; Bessembinder Report, ¶ 25). Traders might use iceberg orders to avoid tipping off the market that they are trying to execute a large trade. Using iceberg orders reduces the impact that a large order would otherwise have on the market. (SUMF, ¶ 44; Bessembinder Dep. 18:23-19:4; 19:20-20:7; 110:21-111:7). Moncada knew that using iceberg orders would reduce the impact that a large-lot order would otherwise have on the market. When asked if he ever used icebergs while trading for BES and Serdika during October 2009, Moncada testified:

> I would use them – I would use them. There are many situations, I guess, where I'd use them. I'd use them if the market was – I don't know if the market was falling, and I – I don't know. I would use them whenever it just felt like it was a better way to get – might have a better chance of getting filled.

(SUMF, ¶ 44; Moncada Dep. 152:2-14). Based on Moncada's testimony, if he truly wanted "a better chance of getting filled" on the large-lot orders he placed, he would have made them iceberg orders. Instead, the few times that Moncada placed iceberg orders for 100 lots or greater included when he tried to unwind large-lot orders that had been filled. (SUMF, ¶ 45; Bessembinder Report, ¶ 50-54).

Moncada's trading makes it obvious that he wanted other traders to *see* his large-lot orders, but not let other traders actually *execute* his large-lot orders. Given that Moncada's large-lot orders were aggressively priced and fully visible to the market it is "therefore all the

more striking that Moncada's large lot orders in the December 2009 wheat futures market had extremely low execution rates.  These low execution rates could not have been an accident.  I conclude that Moncada undertook strategies, including quick cancelations, to ensure low execution rates[.]"  (SUMF, ¶ 49; Bessembinder Report, ¶ 28).  Moncada's high cancellation rates and low execution rates, despite being aggressively priced and not entered as iceberg orders, are all consistent with Moncada's intent to have his large-lot orders fully visible to the market but not execute.  (SUMF, ¶ 49; Bessembinder Report, ¶ 46).  Thus, Moncada's trading shows he did not intend to fill his large-lot orders.

Moncada engaged in a pattern of behavior that shows he did not intend to fill his large-lot orders and instead attempted to manipulate the December 2009 Wheat Futures Contract market.  Moncada's immediate and frequent cancellations of his large-lot orders shows he was an outlier in the market and constituted "an extreme departure from the standards of ordinary care" that traders take in the CBOT Wheat Futures market.  *See Amaranth Nat. Gas Comm. Lit.*, 587 F.Supp.2d, at 531.   Moreover, he failed to use iceberg trading, which would have kept the size of his large-lot orders hidden and diminished their price effect on the market.  Ultimately, it is clear that Moncada did not want to execute his large-lot orders, and only wanted the market place to see them and, in turn, react to them thereby moving the market price.  *CFTC v. Parnon Energy, Inc.*, 875 F.Supp.2d 233, 249-50 (S.D.N.Y. 2012) (citing *In re Hohenberg Bros.*, [1975-1977 Transfer Binder] Comm. Fut. L. Rep. at 21,477) and (quoting *Ind. Farm Bureau* 1982 [1982-1984 Transfer Binder] Comm. Fut. L. Rep. (CCH) at 27,283 (intent can be inferred by the conduct)).

ii.      *Moncada's Trading Shows He Affected the Market Price and He Attempted to Take Advantage of that Effect*

27

While Moncada did not intend to fill his large-lot orders, he did intend to affect the market price to his benefit. In fact, Moncada's large-lot orders actually had an effect on the market price of the December 2009 Wheat Futures Contract. Moncada's large-lot buy orders made the market price increase, while his large-lot sell orders made the market price decrease. The average effect, as quantified by Dr. Bessembinder and undisputed by Moncada, was small – an increase of only 0.096 cents or about half a tick over about twenty seconds after order entry – but the fact that there was an effect shows the true reason that Moncada placed those large-lot orders. (SUMF, ¶¶ 50-51; Bessembinder Report, ¶ 62, 76, 77(vi); Bessembinder Dep. 34:20-35:25, 43:10-14, 51:18-25). Moncada placed between 37 and 188 large-lot orders **per day** in the December 2009 Wheat Futures Contract market. (SUMF, ¶ 36; Bessembinder Report, Table 1). While an individual large-lot order would have a relatively small effect on the market price, Moncada's placement of multiple large-lot orders on the eight attempted manipulation days – up to 118 in a single day – made their cumulative impact on other traders significant. The goal of a spoofing strategy is to affect other trader's order submissions and fool them into entering other orders, which is exactly what Moncada did. (SUMF, ¶ 53; Bessembinder Dep. 102:1-18). In the wake of Moncada's large-lot orders, other traders reacted by placing their own orders on the same side of the market as the large-lot orders. (SUMF, ¶ 51; Bessembinder Report, ¶ 73-74, Bessembinder Dep., 102:19-103:19).

Moncada has offered no evidence or expert testimony contradicting these market effects. Moncada admitted that he knew large-lot orders could have an impact on the market and more of an impact than small-lot orders. (SUMF, ¶ 52; Moncada Dep. 154:7-155:19). Moncada knew that the large-lot orders could impact the market even though they were often in the market for only a fraction of second. (SUMF, ¶ 52; Moncada Dep. 318:25-319:14).

28

Further, Moncada's trading shows that he attempted to take advantage of that effect by executing small-lot trades on the opposite side of the market.  Moncada used his large-lot order spoofs in the hope that they would push the market towards his small-lot orders, lying in wait, in order to get better fill prices on the opposite side of the market.  Moncada consistently placed small-lot orders on the opposite side of the market from his large-lot orders which, unlike the large-lot orders, were consistently filled.  If prices moved away from the large-lot orders (meaning prices moved up following a large-lot buy order and down following a large-lot sell order), those small-lot orders would fill at more beneficial prices.  Dr. Bessembinder testified, "…what he [Moncada] did was trade in the opposite direction of his large orders." (SUMF, ¶ 55; Bessembinder Dep. 30:17-20).

As previously stated, the Commission need not show Moncada's trading created price effect to prevail on the attempted manipulation charges.  However, the existence of a price effect is irrefutable evidence of a profit motive and Moncada's intent to affect the market price.  *See DiPlacido* [2007-2009 Transfer Binder] Comm. Fut. L. Rep. (CCH) at 62,484 (citing *In re Hohenberg Bros.*, [1975-1977 Transfer Binder] Comm. Fut. L. Rep. at 21,478)), *aff'd*, 364 Fed. Appx. 657, No. 08-5559-ag, 2009 WL 3326624 (2d Cir. 2009).

The proof of Moncada's intent is "shown inferentially from the conduct of the accused." *See Parnon*, 875 F.Supp.2d, at 249 (quoting *Ind. Farm Bureau,* [1982-1984 Transfer Binder] Comm. Fut. L. Rep. (CCH) at 27,283).  The "totality of the circumstances" of Moncada's trading activity – the combination of rapidly placed and canceled large-lot orders in order to cause price movements, plus actual trades on the opposite side of the market through small-lot orders – demonstrates that Moncada intended to manipulate the December 2009 Wheat Futures market. *See In re Hohenberg Bros.*, [1975-1977 Transfer Binder] Comm. Fut. L. Rep. at 21,477.

Moncada sought through his large-lot orders, which created misleading impressions in the
market of increased interest to buy or sell, "to move the market away from the equilibrium or
efficient price – the price which reflects the market forces of supply and demand[.]"   *See Ind.
Farm Bureau,* [1982-1984 Transfer Binder] Comm. Fut. L. Rep. (CCH) at 27,283 (quoting
*United States v. U.S. Gypsum Co.*, 438 U.S. 422, 445 (1978)).   Further, Moncada's small-lot
trades on the opposite side of the market show that Moncada "consciously desire[d] that result,
whatever the likelihood of that result happening from his conduct."   *See id.*   As such, the
Commission has established that Moncada intended to manipulate the December 2009 Wheat
Futures Contract market.

> **b.** **_Moncada Can Offer No Explanation for his Large-Lot Orders
> that is Consistent with the Evidence_**

> **i.** **_Moncada Did Not Recall Why He Placed or Canceled
> Particular Large-Lot Orders in October 2009_**

Any evaluation of Moncada's intent when he placed and canceled his large-lot orders
must consider his failure to recall why he engaged in such trading conduct.   His testimony is
replete with memory failures regarding his large-lot orders.   In contrast, his memory regarding
his fictitious sales is clear.

The Commission spent a great deal of time at Moncada's deposition asking him questions
about his large-lot orders.   Each time that he was asked about a particular large-lot order,
Moncada responded that he did not recall why he placed them.   (SUMF, ¶ 59; Moncada Dep.,
166:24-167:7, 173:4-173:8, 190:3-190:8, 202:5-202:15, 210:21-210:24, 221:6-221:16, 222:16-
223:3, 228:6-228:10, 229:12-229:15, 231:23-232:17, 234:20-234:23, and 235:12-235:15).   Even
when exhibits showing his trading were placed in front of him by the Commission at deposition,
his testimony included repeated responses such as "I don't know," "I'm not sure," "I don't know

what I was trying to do," or "I don't know what the situation was in the market here."  (SUMF, ¶ 59; Moncada Dep. 213:11, 216:2, 229:15 and 229:10-11).

In stark contrast to Moncada's inability to recall any of his 710 large-lot orders or cancellations on the eight attempted manipulation dates, is his clear recollection of his intent and motivation for placing the four sets of fictitious sales and non-competitive transactions during October 2009, including those occurring on three of the eight attempted manipulation dates.  (SUMF, ¶¶ 73, 75, 77, 80; Moncada Dep. 259:16-260:5, 262:17-262:22, 265:6-265:19, 268:10-268:20).

Moncada's failure to remember is at best evasive.  Each of the large-lot orders was a significant order in this market, a market that usually trades in 3 lots, and the positions such orders might generate could each cost Moncada $1 million to hold.  Moncada's trading was so far outside of the norm that it is unreasonable to believe that he did not remember a single reason why he placed even one of these orders.[6]  Moncada has apparently buried his head in the sand where his large-lot orders are concerned.  Regardless of whether he remembered or not, his trading is the clearest evidence of his intent – and it points to only one conclusion.

      ***ii.***     ***Moncada's Purported Rationales for Placing and Canceling Large-Lot Orders are Refuted by His Trading and Testimony***

While apparently unable to recall why he placed any of the large-lot orders, Moncada offered three possible explanations for placing those orders: (a) that he intended to send a "signal" to the market that he was looking to take on a position and thereby attract demand; (b) that he intended to get "size priority" in filling his large-lot orders based on his understanding of

---

[6]  Moncada made a point of testifying that he had not reviewed any of the trading data provided to him by the Commission, or refreshed his recollection with "any documents of any kind" prior to his testimony to the Commission, even though he had no specific recollection of his trades in October 2009.  (SUMF, ¶ 59; Moncada Dep. 316:12-23).

the matching algorithm used by Globex; or (c) that he placed the orders to take a position (*i.e.*, actually fill his order) based on his "view of the market" at the time. (SUMF, ¶¶ 61-63; Moncada Dep. 100:25-101:18). However, Moncada admitted he did not recall if he had ever used the first or second rationale in October 2009, only that he was aware that these rationales "could be used." (SUMF, ¶¶ 61-62; Moncada Dep. 129:13-130:2, 98:8-98:18, and 144:24-145:9).

Even if Moncada had used his first purported rationale, sending a "signal" to the market as "a way of asking for liquidity," his actual trading belies this purported rationale. Moncada consistently traded on the ***opposite*** side of the market shortly after placing a large-lot order. (SUMF, ¶¶ 54-58 ; Bessembinder Report, ¶ 39-42). Had Moncada actually been trying to "signal" to the market that he wanted to trade on one side of the market, he would actually have traded on that same side of the market after sending the signal. (SUMF, ¶ 55; Bessembinder Report, ¶ 35).

Similarly with Moncada's second purported rationale, placing large-lot orders to get "size priority" from the matching algorithm, his trading also contradicts this purported rationale. Simply put, the "size priority" rationale means that a trader puts in an order for a larger quantity than he actually desires because it would improve the chances that at least a portion of the order would be filled. Moncada testified that he could have used this rationale because he was having difficulty filling his small-lot orders. (SUMF, ¶ 62; Moncada Dep. 145:10-145:20). However, Moncada's testimony that he could not fill small-lot orders is simply not supported by his own trading. In fact, Moncada had no difficulty filling his small-lot orders (over 45 percent of the volume of those small-lot orders compared to 28.2 percent of other traders' small-lot orders), notwithstanding that he priced his small-lot orders less aggressively on average than his large-lot

orders.  (SUMF, ¶ 41; Bessembinder Report, ¶ 19, 22).  If Moncada could fill a 5 lot order without difficulty, it is inconceivable that he would need to place a 500 lot order to get that same result.

Moncada's final purported rationale for placing large-lot orders, that he placed the large-lot orders to take a position (*i.e.*, actually fill his order) based on his "view of the market" at the time is once again refuted by his trading.  Essentially, Moncada argues that he was trying to fill each one of these large-lot orders at the time he entered them.

First, though Moncada could not recall his intent on his specific large-lot orders, he also failed to give a clear answer at his deposition about whether he could have intended to fill his large-lot orders.  When asked, "Were there any times where you did not intend to fully fill a large-lot order?", Moncada responded, "I would have to – I would have to look at the situation." (SUMF, ¶ 60; Moncada Dep. 135:18-135:21).  Additionally, when asked, "Do you recall ever placing a large lot order that you did not intend to fully fill?" he replied, "I would have to look at each time I placed one and the situation.  I don't recall." (SUMF, ¶ 60; Moncada Dep. 136:7-136:8, 136:13-136:14).  If Moncada actually intended to fill any of the large-lot orders he had placed, he would not have needed to look at "the situation" for each order.

When asked if he hoped his large-lot orders would be filled, Moncada testified "I don't recall what I was hoping for, but I do recall that there was always risks and chances, and if the order got filled, I would – I would have to make a decision on what I wanted to do then." (SUMF, ¶ 60; Moncada Dep. 148:9-148:16).  The most telling part of this testimony is when Moncada said he "would have to make a decision on what I wanted to do" in the event that a large-lot order filled.  Moncada never *wanted* these large-lot orders to fill – in fact, he was *worried* that a large-lot order would be filled.

Moncada's reaction to a fully filled large-lot buy order on October 27 shows the "decision" that Moncada made when one of his large-lot orders filled.  This was one of only eight times that his large-lot orders were actually filled between August 2009 and November 2009 – and four of those instances involved Moncada trading with himself.  (SUMF, ¶ 56; Bessembinder Report, ¶ 47).  At 10:10:22 am, a large-lot (202 lot) buy order fully filled. (SUMF, ¶ 56; Bessembinder Report, ¶ 51).  Moncada then scrambled to unwind that position by selling contracts.  In the following four minutes, Moncada placed four iceberg sell orders for 100 lots apiece in an effort to unwind his unwanted long position, one of the few times that he ever used iceberg orders of 100 lots or greater.  (SUMF, ¶ 56; Bessembinder Report, ¶ 51, Table 10). Even more tellingly, Moncada placed 25 large-lot buy spoofs over the course of the following 45 minutes – and not a single lot of those orders filled.  (SUMF, ¶ 56; Harris Aff. ¶ 24).  In that 45 minute stretch, however, Moncada did sell a net total of 163 lots that he bought when the large-lot buy order was filled.  (SUMF, ¶ 56; Harris Aff. ¶ 24; Bessembinder Report, ¶ 51, Figure 4,).

Moncada's thought process is clear.  Moncada did not want to fill the original 202 large-lot buy order.  He used iceberg orders to **sell** that position ***without*** causing the price to decline, meanwhile using large-lot **buy** spoofs to prop up the market price while he sold out of the position.  Moncada's reaction shows that he did not intend to fill the first large-lot buy order that actually did fill; it also shows that Moncada did not intend to fill the 25 large-lot buy spoofs he placed in the following 45 minutes as he tried to undo that first order.

Second, Moncada's swift shifts between large-lot buy orders and large-lot sell orders undermine any argument that he was actually trying to fill any of his large-lot orders.  A particularly egregious example of this swing is an instance on October 27 when Moncada switched between large-lot buy and large-lot sell orders four times in ten minutes while only

filling a negligible portion of one of those orders.  (SUMF, ¶ 39; Harris Aff. ¶ 26-27).  If Moncada were truly "taking a view of the market," he would not fundamentally change his mind that frequently and repeatedly in such a short period of time.  The frequent shift between large-lot buy orders and large-lot sell orders is "highly unreasonable" and "an extreme departure from the standards of ordinary care" that traders take in the CBOT Wheat Futures market.  *See Amaranth Nat. Gas Comm. Lit.*, 587 F.Supp.2d, at 531.

Third, the BES and Serdika accounts simply did not have the funds to cover the millions of dollars in margin that such large positions would have required had he filled them.  On all eight attempted manipulation dates, Moncada's BES account was in margin deficit; likewise, his Serdika account was in margin deficit on five of the eight days.  (SUMF, ¶¶ 28, 30; Harris Aff. ¶ 9, 11).

For instance, on October 14 in the last fifteen minutes of trading Moncada placed and immediately canceled 10 large-lot buy orders, totaling 4,410 lots, in the BES account.  (SUMF, ¶ 31; Harris Aff. ¶ 20).  If any of these orders were filled, it would have increased Moncada's existing long position in the BES account.  (SUMF, ¶ 31; Harris Aff. ¶ 20).  Moncada would have had to either liquidate the position before the market closed (and be subject to any losses had the market price moved against his position) or post sufficient margin to carry the position overnight.  (SUMF, ¶ 31; Moncada Dep., 103:16-104:13; Steele Aff. ¶ 12, 14).  By his own admission, the initial margin requirements for a position of 4,410 lots would have been approximately $9 million. (SUMF, ¶ 32; Moncada Dep., 217:10-218:4).  At the end of the trading day on October 14, 2009 the BES account had a margin deficit of nearly $300,000. (SUMF, ¶ 32; Harris Aff. ¶ 9).  Simply stated, even if he actually wanted to fill those large-lot

orders, Moncada's accounts likely could not have covered margin for the positions his large-lot

orders would have generated, particularly those towards the end of the trading day.

 Therefore, the three possible rationales that Moncada testified for why he might have

placed the large-lot orders are all refuted by Moncada's trading and are implausible.  Moncada's

purported rationale are, at best, "mere speculation and conjecture."  *See Lomotey v. Conn.-DOT*,

355 Fed.Appx. 478, 480 (2d. Cir. 2013) (quoting *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75

(2d Cir. 2005)).

 While Moncada had three purported rationales for ***placing*** his large-lot orders, his

explanation for why he ***cancelled*** his large-lot orders is also contradicted by his trading.  Instead,

his testimony on this point reveals his true intent.  Moncada testified that the only reason he

could think of for canceling his large-lot orders was that he was "constantly re-evaluating and

adjusting to market conditions."  (SUMF, ¶ 64; Moncada Dep. 114:12-114:21).  Moncada

testified that he was able to evaluate all of those markets conditions – including looking at

weather reports, news, and the "momentum and gyrations" of other commodity markets and

equity markets – and decide to cancel his large-lot orders in under a second.  (SUMF, ¶ 64;

Moncada Dep. 198:14-200:10, 324:16-325:4).

 Moncada testified that he might cancel a large-lot order because he was "reacting to

something in the market, changing my mind, changing my opinion, changing the feeling that I --

you know, maybe I just didn't want to hold a -- maybe I changed my mind on taking a position at

that time, you know, ***not wanting to expose myself to the market running through me*** and

decided not to."  (SUMF, ¶ 65; Moncada Dep. 115:6-115:16, emphasis added).  Moncada was

asked what he meant by "run through."  Realizing that he had accidentally revealed his true

intent when testifying about a series of large-lot orders canceled within 0.7 seconds after entry,

Moncada attempted to recant by saying "I don't even know what that means." (SUMF, ¶ 59; Moncada Dep. 203:23-206:5).  Moncada testified:

> If [a large-lot order]'s not going to get filled I'm not going to leave my order out there so somebody could take their time and decide what they want to do.  I choose to trade at that moment at that price.  If I don't get filled I'm going to cancel my order and look for another spot to trade.

(SUMF, ¶ 66; Moncada Dep. 332:3-332:16).  Moncada further testified that he was "not going to leave the order out there for somebody to possibly take advantage of or lean against."  (SUMF, ¶ 65; Moncada Dep. 324:16-325:4).  The obvious implication of Moncada's testimony is that he wanted to cancel the large-lot orders before another trader could fill those orders, which Moncada referred to as "the market running through me" or "tak[ing] advantage of" his large-lot orders.

Moncada's testimony, when compared to his trading, shows that he did not intend to actually fill his large-lot orders.  Additionally, Moncada's actual trading and use of large-lot orders does not match up with any of the three potential rationales that he could think of to explain placing his large-lot orders.  Further, Moncada's explanation for why he might cancel a large-lot order is implausible and proves that he never had the intent to fill those orders.  All of Moncada's rationales for placing and canceling the large-lot orders are contradicted by the unrefuted facts.  No reasonable inferences – other than the inference that Moncada intended to manipulate the December 2009 Wheat Futures Contract – can be drawn from Moncada's testimony when compared to his trading.

### iii.    *Moriarty's Testimony Shows Moncada Intended to Manipulate the Market*

Finally, Moncada's intent is laid bare when he is caught bragging to Moriarty, his friend and fellow Serdika trader, about his ability to affect the December 2009 Wheat Futures Contract.

In an IM conversation on September 30, 2009, Moncada said to Moriarty, "Oh yeah, watch wheat dump Cada [*i.e.* go lower] on the close."  (SUMF, ¶ 69; September 30 IM; Moriarty Dep. 82:1-88:22).  "Cada" was Moncada's nickname, and "dump Cada" meant that Moncada thought the wheat market was going to go lower.  (SUMF, ¶ 69; Moriarty Dep. 82:1-22).  Two minutes later, Moncada spoofed two 500 lot sell orders and one 402 lot sell order in the December 2009 Wheat Futures Contract – attempting to cause the price to go lower.  (SUMF, ¶ 69; Harris Aff. ¶ 15).  Upon seeing those large-lot orders, Moriarty asked Moncada "is that you fucking around with the 500 lot?" (SUMF, ¶ 69; September 30 IM).  Moncada sarcastically responded "of course ont [sic] not," causing Moriarty to "laugh out loud" in response.  (SUMF, ¶ 69; September 30 IM; Moriarty Dep., 77:8-77:22, 83:14-84:8).

When asked what he meant by "fucking around" Moriarty testified he used the phrase "[b]ecause, I think it's a crazy thing to do[,]" and "[b]ecause there's too much leverage there." (SUMF, ¶ 70; Moriarty Dep. 94:11-19; 95:8-95:17).  Moriarty assumed that Moncada had placed the 500 lot orders, testifying, "I don't know why I thought it was him, it was just on my mind and to be in the market for that much size to me is crazy and I would say why you effing around like this." (SUMF, ¶ 70; Moriarty Dep. 106:11-21).

Moncada boasted to Moriarty that the market price would go lower, then spoofed to make that prediction come true.  Moriarty's characterization of Moncada's spoofing actions mirror the unrefuted evidence of Moncada's trading on the eight attempted manipulation dates.  This is one instance where Moriarty saw Moncada spoof and is indicative of Moncada's subsequent pattern of behavior used to attempt to manipulate the December 2009 Wheat Futures Contract. *See, e.g., Panther Energy*, [2012-2013 Transfer Binder] Comm. Fut. L. Rep. (CCH) at 73,292-93 (settlement alleging the trading company engaged in the disruptive trading practice called

spoofing in violations of the CEA); *see also Ecoval Dairy Trade, Inc.*, [2011-2012 Transfer

Binder] Comm. Fut. L. Rep. (CCH) at 66,926-28 (order instituting and settling charges of

attempted manipulation by, among other strategies, placing and canceling orders before they

could be filled with the intent to push prices higher).

**c.**    ***Moncada's Trading Constituted Overt Acts in Furtherance of his Intent to Manipulate***

Each of Moncada's large-lot spoof orders along with the small-lot orders on the opposite

side of the market constitute the overt acts in furtherance of his attempt to manipulate the

December 2009 Wheat Futures Contract market.  The second element of attempted manipulation

is met by showing an overt act in furtherance of that intent to manipulate.  *Parnon*, 875

F.Supp.2d, at 250.  Moncada's manipulative scheme involved placing and canceling those large-

lot orders with the intent to cause the market price to move.  The payoff for the scheme involved

Moncada's small-lot orders on the opposite side of the market, which were poised to reap the

benefit of such price moves.

Even ordinarily legitimate trading activity can be an overt act for purposes of an

attempted manipulation charge.  *See Amaranth*, 554 F.Supp.2d, at 533-34; *Amaranth Nat. Gas

Comm. Lit.*, 587 F.Supp.2d, at 534.  Moncada repeatedly tried to justify his actions by saying that

his large-lot orders were "at risk" of being filled.  (SUMF, ¶ 60; Moncada Dep. 317:18-319:14).

In fact, Moncada was at risk of having these large-lot orders filled and a small portion of them

actually were filled.  Every bid or offer places the trader at risk of being filled, and every bid or

offer can be legitimate.  However, being at risk in the market is not a defense to attempted

manipulation if that trading activity is being conducted with a manipulative intent.  The fact that

Moncada's large-lot orders may have been "at risk" of being filled in the few seconds they were

in the market does not mean that Moncada did not intend for those large-lot orders to manipulate

39

the market price.  If anything, the fact that that such a small percentage of the volume of those

orders were filled – only 0.78 percent – despite being at risk shows that Moncada entered those

large-lot orders with a manipulative intent.  Moncada's large-lot spoofs accompanied by his

small-lot orders on the opposite side of the market were the overt acts in furtherance of his intent

to attempt to manipulate the December 2009 Wheat Futures Contract in violation of Sections

6(c), 6(d), and 9(a)(2) of the Act.  *Parnon Energy, Inc.*, 875 F.Supp.2d at 250 (citing *In re*

*Hohenberg Bros.*, [1975-1977 Transfer Binder] Comm. Fut. L. Rep. at 21,477).

> **2.      *The Commission is Entitled to Summary Judgment on Each of the Eight Days Charged in the Complaint***

As alleged in the Complaint, on each of the eight attempted manipulation dates in

October 2009 – October 6, 12, 14, 19, 26, 27, 29 and 30, 2009 – Moncada executed a

manipulative scheme in the December 2009 Wheat Futures Contract market.

Moncada spoofed in order to create a misleading impression of market interest to other

traders, with the intent to illegally cause the market price to move and fill his small-lot orders

waiting on the other side of the market on each of the eight attempted manipulation dates.  As

shown *supra*, Moncada's large-lot orders were an outlier in the market and he placed them to

achieve maximum price effect.  Additionally, Moncada could not recall his reasons or provide

any rational economic explanation for placing and canceling his large-lot orders on any of the

eight attempted manipulation dates.  The possible rationales he provided directly conflict with

the facts of his trading.  Therefore, the Court should reach the only plausible conclusion in light

of Moncada's trading, his testimony, and Moriarty's testimony -- that Moncada was attempting

to manipulate the December 2009 Wheat Futures Contract market in violation of the Act on each

of the eight attempted manipulation dates.

On each of the eight attempted manipulation dates, Moncada placed and canceled multiple large-lot orders.  (SUMF, ¶ 36; Bessembinder Report, Table 1).  Specifically, Moncada placed and canceled: (1) 46 large-lot orders on October 6, 2009; (2) 71 large-lot orders on October 12, 2009; (3) 115 large-lot orders on October 14, 2009; (4) 116 large-lot orders on October 19, 2009; (5) 107 large-lot orders on October 26, 2009; (6) 98 large-lot orders on October 27, 2009; (7) 118 large-lot orders on October 29, 2009; and (8) 37 large-lot orders on October 30, 2009.  (SUMF, ¶ 36; Bessembinder Report, ¶ 7, Table 1).  On each of the eight attempted manipulation dates, Moncada placed and filled small-lot orders on the opposite side of the market within the same time period that he placed his large-lot orders.  (SUMF, ¶¶ 57-58; Harris Aff., ¶¶ 34-43).

Because Moncada placed and canceled multiple large-lot order spoofs, and placed small-lot orders on the opposite side of the market from those large-lot orders, on each of the eight attempted manipulation days charged in the Complaint in furtherance of his manipulative scheme, the Commission is entitled to summary judgment on Counts One through Eight of the Complaint.  *See Parnon Energy, Inc.*, 875 F.Supp.2d at 250 (citing *In re Hohenberg Bros.*, [1975-1977 Transfer Binder] Comm. Fut. L. Rep. at 21,477) (attempted manipulation is proven by showing intent to affect the marketplace and an overt act in furtherance of that intent).

### C. Moncada Violated the Act by Executing Orders that Constitute Fictitious Sales and Non-Competitive Transactions

By virtue of his trading and deposition admissions, Moncada violated Section 4c(a) of the Act and Section 1.38 of the Commission Regulations.  7 U.S.C. § 6c(a) (2006), Regulation 1.38 (2012).  Therefore, the Commission is entitled to judgment as a matter of law.

### 1. *Moncada Violated Section 4c(a) by Entering into Fictitious Sales*

Section 4c(a) of the Act makes it unlawful to enter a transaction that "is, is of the character of, or is commonly known to the trade as, a 'wash sale' or 'accommodation trade'…or is a fictitious sale or is used to cause any price to be reported, registered, or recorded that is not a true and *bona fide* price." 7 U.S.C. § 6c(a)(2). Congress enacted Section 4c(a) of the Act to prevent collusive trades conducted away from the market. *See, generally, Merrill Lynch Futures, Inc. v. Kelly,* 585 F.Supp. 1245, 1251 n.3 (S.D.N.Y. 1984).

While "fictitious sales" is not defined in the Act, the Commission has held that "the central characteristic of the general category of fictitious sales is the use of trading techniques that give the appearance of submitting trades to the open market while negating the risk of price competition incident to such a market." *Harold Collins*, [1986-1987 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 22,982 at 31,902 (C.F.T.C. April 4, 1986), *rev'd on other grounds sub nom. Stoller v. CFTC*, 834 F.2d 262 (2nd Cir. 1987). Prearranged trading is a form of fictitious sale because "[b]y determining trade information such as price and quantity outside the [trading] pit, then using the market mechanism to shield the private nature of the bargain from public scrutiny, both price competition and market risk are eliminated." *Id*. at 31,903. The two accounts involved in a trade do not need to be owned by the same individual or entity for the trade to constitute a fictitious sale. *See, e.g., Thomas Collins,* [1996-1998 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 27,194 at 45,743 (C.F.T.C. December 10, 1997).

To establish that a transaction violates Section 4c(a), the Commission first must prove "(1) the purchase and sale (2) of the same delivery month of the same futures contract (3) at the same (or a similar) price." *Wilson v. CFTC*, 322 F.3d 555, 559-560 (8th Cir. 2003). Second, the Commission must prove intent to enter into a fictitious sale, either directly or through circumstantial evidence. *See Reddy v. CFTC*, 191 F.3d 109, 119 (2nd Cir. 1999). The issue is

42

"whether [the] transactions were initiated without the intent to make a *bona fide* trading transaction." *Harold Collins* [1986-1987 Transfer Binder] Comm. Fut. L. Rep. (CCH) at 31,899, 31,902 (discussing wash sales, which is a type of fictitious sale).  Intent can be inferred "from the intentional structuring of a transaction in a manner to achieve the same result as prearrangement." *In re Three Eight Corporation*, [1992-1994 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 25,749 at 40,444 n.15 (CFTC Jun. 16, 1993) (citing *Harold Collins* [1986-1987 Transfer Binder] Comm. Fut. L. Rep. (CCH) at 31,900-901).

     Moncada's four sets of orders in the December 2009 Wheat Futures Contract on October 6, 12, 15, and 29, 2009, each of which were placed with the same volume and same or similar price satisfy the elements of a fictitious sale.  First, on October 6, 2009, Moncada (a) placed a buy order in the Serdika account in the December 2009 Wheat Futures Contract for 80 lots at a price of 466 cents, then (b) less than two seconds later, he placed a sell order in the BES account in the December 2009 Wheat Futures Contract for 80 lots at a price of 466 cents.  (SUMF, ¶¶ 72-73; Harris Aff. ¶ 16).  Second, on October 12, 2009, Moncada (a) placed a sell order in the BES account in the December 2009 Wheat Futures Contract for 116 lots at a price of 483 ½ cents, then (b) less than six tenths of a second later, he placed a buy order in the Serdika account in the December 2009 Wheat Futures Contract for 116 lots at a price of 483 ½ cents.  (SUMF, ¶¶ 74-75; Harris Aff. ¶ 18).  Third, on October 15, 2009, Moncada (a) placed a sell order in the BES account in the December 2009 Wheat Futures Contract for 271 lots at a price of 499 cents, then (b) shortly thereafter placed a buy order in the Serdika account in the December 2009 Wheat Futures Contract for 271 lots at a price of 499 cents.  (SUMF, ¶¶ 76-77; Harris Aff. ¶ 22).  Fourth, on October 29, 2009, Moncada (a) placed a sell order in the Serdika account in the December 2009 Wheat Futures Contract for 154 lots at a price of 508 cents, then (b) placed a

buy order in the BES account in the December 2009 Wheat Futures Contract for 154 lots at the slightly higher price of 508 ¼ to match the Serdika order.  Moreover, this was the only trade that Moncada executed in the BES account on October 29, 2009.  (SUMF, ¶¶ 78-80; Harris Aff. ¶ 28).  Each of these buy orders were filled against the sell orders that Moncada entered in the other account, effectively transferring the positions between the BES and Serdika accounts. (SUMF, ¶¶ 72, 74, 76, 78; Moncada Dep., 263:4-263:10, 268:10-268:20, 260:6-260:16, and 267:22-268:5).

Moncada admitted that, on the four dates alleged in the Commission's complaint, he placed offsetting buy and sell orders in the BES and Serdika accounts with the intent of matching the orders against each other to transfer the positions between the accounts, thus satisfying the intent element.  (SUMF, ¶¶ 73, 75, 77, 80; Moncada Dep., 259:16-260:5, 262:17-262:22, 265:6-265:19, 268:10-268:20).  Moncada's trading and testimony demonstrate that Moncada placed these offsetting buy and sell orders with the intent that they fill against each other.  Accordingly, Moncada entered into four transactions that were fictitious sales in violation of Section 4c(a) of the Act on October 6, 12, 15, and 29, 2009.  7 U.S.C. § 6c(a) (2006).

## 2. *Moncada Violated Regulation 1.38 by Entering into Non-Competitive Transactions*

Regulation 1.38(a), 17 C.F.R. § 1.38(a) (2012), requires that all purchases and sales of commodity futures be executed "openly and competitively."  The purpose of Regulation 1.38(a) is to ensure "that all trades are directed into a centralized marketplace to participate in the competitive determination of the price of futures contracts."  *In the Matter of Lorenzen*, [2012-2013 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 32,535 at 72,119-20 (CFTC Feb. 8, 2013) (*citing* S. Rep. No. 93-1131, at 16 (1974)).  The same conduct that constitutes a violation of Section 4c(a) also constitutes a violation of Regulation 1.38.

Non-competitive transactions include orders placed by a trader with the intent that those orders trade against each other.  *See Lorenzen*, [2012-2013 Transfer Binder] Comm. Fut. L. Rep. (CCH) at 72,118, 72,119-20.  Non-competitive transactions, although giving the appearance of submitting trades to the open market, actually negate the market risk of a trade.  *Harold Collins* [1986-1987 Transfer Binder] Comm. Fut. L. Rep. (CCH) at 31,903 n. 23.  Non-competitive transactions cannot be cured merely by going through the motions of a trade in the market.  *See Harold Collins*, [1986-1987 Transfer Binder] Comm. Fut. L. Rep. (CCH) at 45,743-744.  The two accounts involved in a trade do not need to be owned by the same individual or entity for the trade to constitute a non-competitive transaction.  *See, e.g., CFTC v. Nunn*, Dkt. No. 11, 12-cv-7786 (LAK) (S.D.N.Y. December 18, 2013) [Current Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 32,891 (S.D.N.Y. December 18, 2013) (settlement for violations of Regulation 1.38(a) based on trades between account owned by defendant and second account owned by another person.).

On October 6, 12, 15, and 29, 2009, Moncada knowingly entered offsetting orders in the December 2009 Wheat Futures Contract market with the intent of having those orders trade against each other.  Moncada determined the price for these transactions outside of the market.  Therefore, Moncada engaged in four non-competitive transactions in violations of Regulation 1.38(a) on October 6, 12, 15, and 29, 2009.  17 C.F.R. § 1.38 (2012).

## IV.  COMMISSION ENTITLED TO SUMMARY JUDGMENT AND INJUNCTIVE RELIEF

Because there are no material facts in dispute, and because the facts as established satisfy all elements of all counts in the Commission's complaint against Moncada, the Commission is entitled to summary judgment.  The Commission seeks summary judgment as to liability, entry

of an order of permanent injunction, civil monetary penalties, and other equitable relief to prevent Moncada from engaging in further violations of the Act.

A.    **The Commission is Entitled as a Matter of Law to a Finding of Liability**

As discussed above, the undisputed facts in this case support a finding that Moncada attempted to manipulate the December 2009 Wheat Futures Contract on October 6, 12, 14, 19, 26, 27, 29, and 30, 2009, as well as a finding that Moncada made fictitious sales and non-competitive transactions in the December 2009 Wheat Futures Contract on October 6, 12, 15, and 29, 2009.

B.    **The Court Should Enjoin Moncada from Future Violations and from Engaging in any Commodity-Related Activity**

The undisputed facts in this case also support a judgment of injunctive relief against Moncada.  Section 6c(b) of the Act provides in pertinent part that "[u]pon a proper showing, a permanent . . . injunction . . . shall be granted without bond."  7 U.S.C. § 13a-1(b) (2006).  Unlike private actions for equitable relief, a Commission action for injunctive relief is a creature of statute.  "In actions for a statutory injunction, the agency need not prove irreparable injury or the inadequacy of other remedies as required in private injunctive suits.  A *prima facie* case of illegality is sufficient."  *CFTC v. Muller*, 570 F.2d 1296, 1300 (5th Cir, 1978).  *See also SEC v. Prater*, 289 F. Supp. 2d 39, 49 (D. Conn. 2003) (citing *SEC v. Unifund SAL*, 910 F.2d 1028, 1036 (2d Cir. 1990)); *SEC v. Princeton Econ. Int'l.*, 73 F. Supp. 2d 420, 422 (S.D.N.Y. 1999) (applying a less restrictive injunctive standard to actions brought in courts by SEC and CFTC); *CFTC v. IBS, Inc.*, 113 F. Supp. 2d 830, 848 (W.D.N.C. 2000), *aff'd, CFTC v. Kimberlynn Creek Ranch, Inc.*, 276 F.3d 187 (4th Cir. 2002); *CFTC v. Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979).

46

In order to obtain a permanent injunction, "the CFTC must show that 'there is a likelihood that, unless enjoined, the violations will continue.'" *CFTC v. Kelly*, 736 F. Supp. 2d 801, 804 (S.D.N.Y. 2010) (quoting *CFTC v. Am. Bd. of Trade, Inc.*, 803 F.2d 1242, 1250-51 (2d Cir. 1986)); *accord SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 808 (2d Cir. 1975) ("SEC suits for injunctions are creatures of statute.  Proof of irreparable injury or inadequacy of other remedies as in the usual suit for injunction is not required.").  A district court may infer a likelihood of future violations from defendant's past unlawful conduct.  *CFTC v. Crown Colony Commodity Options, Ltd.*, 434 F. Supp. 911, 919 (S.D.N.Y.1977).  Further, "past illegal conduct is highly suggestive of the likelihood of future violations."  *SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 807 (2d Cir. 1975); *see also Hunt*, 591 F.2d at 1220.

The scope of the injunctive relief can be tailored to meet the circumstances of the violations shown.  For example, courts have entered permanent injunctions against future violations of the Act upon the Commission's showing of a violation and likelihood of future violations.  *See, e.g., CFTC v. U.S. Metals Depository Co.*, 468 F. Supp. 1149 (S.D.N.Y. 1979).  Other courts have issued broader injunctions prohibiting trading activity.  *See, e.g., Wilshire Inv. Mgmt. Corp.*, 531 F.3d at 1346 (upholding district court's permanent injunction prohibiting defendants from "engaging in any commodity-related activity"); *see also CFTC v. Noble Wealth Data Info. Servs., Inc.*, 90 F. Supp. 2d 676, 692 (D. Md. 2000)  ("[t]he pervasiveness and seriousness of [the defendant's] violation justify the issuance of a permanent injunction prohibiting him from violating the Act and from engaging in any commodity-related activity, including soliciting customers and funds"); *CFTC v. Rosenberg*, 85 F. Supp. 2d 424, 454-55 (D.N.J. 2000) (permanently enjoining defendant from trading commodities on behalf of others).

Here, Moncada's manipulative activity was pervasive not just on the eight attempted manipulation dates, but across at least four months. (*See, generally,* Bessembinder Report, ¶ 7-10, discussing Moncada's large-lot order activity from August 13, 2009 to November 30, 2009). Permanent injunctive relief, including a prohibition from trading on or subject to the rules of any registered entity  or entering into any transactions involving commodity futures, options on commodity futures, commodity options, security futures products, swaps and/or foreign currency and a prohibition from applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, is warranted against Moncada in order to prevent any future occurrences, based on the long-running and pervasive nature of his manipulative activity, the seriousness of the charges, as well as the fact that he has failed to acknowledge his wrongdoing.  To date, Moncada has never acknowledged any wrong doing and nothing prevents him from going back into the market now and engaging in manipulative conduct absent an injunction.

### C.      The Court Should Impose Civil Monetary Penalties Against Moncada

Based on the violations of the Act and Regulations described above, the Court should impose civil monetary penalties against Moncada.  The Act includes separate civil monetary penalty provisions for (a) attempted manipulation, and (b) fictitious sales and non-competitive transactions.  The Act provides for civil monetary penalties of up to $1,000,000 *for each violation* of the prohibition on manipulation and attempted manipulation.  Section 6c(d)(1)(B) of the Act,  7 U.S.C. § 6c(d)(1)(B) (2012).  For all other violations of the Act and Regulations, including the prohibitions on fictitious sales and non-competitive transactions, the Act provides for civil monetary penalties of up to $140,000 *for each violation*.  Section 6c(d)(1)(A) of the Act, 7 U.S.C. § 6c(d)(1)(A) (2012); 17 C.F.R. § 143.8 (2013) (adjusting for inflation).

48

The Commission has set forth several factors to consider in assessing a civil monetary penalty. These factors include: the relationship of the violation at issue to the regulatory purposes of the Act and whether or not the violations involved core provisions of the Act; whether or not scienter was involved; the consequences flowing from the violative conduct; financial benefits to a defendant; and harm to customers or the market. *See In re Grossfeld*, [1996-1998 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,921 at 44,467-8 (CFTC Dec. 10, 1996), *aff'd*, 137 F.3d 1300 (11th Cir. 1998). Civil monetary penalties should "reflect the abstract or general seriousness of each violation and should be sufficiently high to deter future violations," which means that civil monetary penalties should make it financially detrimental to a defendant to fail to comply with the Act and Regulations so that the defendant would rather comply than risk violations. *Id*. As the Commission has stated:

> [Civil monetary] penalties signify the importance of particular provisions of the Act and the Commission's rules, and act to vindicate these provisions in individual cases, particularly where the respondent has committed the violations intentionally. Civil monetary penalties are also exemplary; they remind both the recipient of the penalty and other persons subject to the Act that noncompliance carries a cost. To effect this exemplary purpose, that cost must not be too low or potential violators may be encouraged to engage in illegal conduct.

*In re GNP Commodities*, [1990-1992 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 25,360 at 39,222 (CFTC Aug. 11, 1992). *See also Reddy v. CFTC*, 191 F.3d 109, 123 (2d Cir. 1999) (civil monetary penalties serve to further Act's remedial policies and to deter others from committing similar violations).

In the present case, Moncada's violations of the Act and Regulations were long-running and pervasive, as noted above. In addition, his violations of the prohibition on attempted manipulation impacted the market and directly affected other traders by causing price movements in the December 2009 Wheat Futures Contract market. Moncada's actions caused

harm to other traders and undermined the integrity of the market.  The CFTC believes that each overt act committed by Moncada in furtherance of his manipulative scheme represents a separate and distinct violation of Section 9(a)(2) of the Act, 7 U.S.C. § 13(a) (2006).  As such, the maximum civil monetary penalty ("CMP") that the CFTC could seek against Moncada would be in excess of $700 million (more than 700 overt acts multiplied by $1 million).  Rather than suggest a $700 million CMP, but to preserve the integrity of the financial markets and to prevent this conduct from reoccurring not only by the Defendant, but to prevent others in the industry from committing similar violations, the Commission requests that the Court impose a CMP of $24 million ($24,000,000) on Moncada for his violations of the prohibition on attempted manipulation.  This represents a CMP of $3 million for each attempted manipulation date of multiple overt acts that Moncada engaged in the manipulative conduct.

Additionally, the Commission requests a CMP of $1,120,000 for Moncada's violations of the prohibitions on fictitious sales and non-competitive transactions. This represents a civil monetary penalty of $140,000 for the four transactions that violated Section 4c(a) of the Act, 7 U.S.C. § 6c(a) (2006), under Count 9 and the four transactions that violated Regulation 1.38(a), 17 C.F.R. § 1.38 (2013), under Count 10.  Therefore, the Commission recommends the Court impose a total CMP of $25.12 million ($25,120,000) for all ten counts in the Complaint.

## V.   <u>CONCLUSION</u>

For the reasons stated above, the Commission respectfully requests that the Court grant the Commission's Motion and enter summary judgment against Moncada and award the relief requested herein.

Dated this 29th Day of January, 2014

Respectfully submitted,


_____/s/ Andrew Ridenour_____
Richard Glaser (Member, New York State Bar
and U.S. District Court for the Southern District
of New York Bar No. RG8652)
Andrew Ridenour (D.C. Bar No. 501628)
Jennifer S. Diamond (Illinois Bar No. 6278482)
Kenneth McCracken (Missouri Bar No. 44049)
U.S. Commodity Futures Trading Commission
1155 21st Street, NW
Washington, DC 20581
Tel:  (202) 418-5358 (Glaser)
Tel:  (202) 418-5438 (Ridenour)
Tel:  (202) 418-5244 (Diamond)
Tel:  (202) 418-5348 (McCracken)
Fax:  (202) 418-5937
rglaser@cftc.gov
aridenour@cftc.gov
jdiamond@cftc.gov
kmccracken@cftc.gov

51