# EXHIBIT 11

TO PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL
FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY
JUDGMENT AGAINST DEFENDANT ERIC MONCADA

1

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

```
U.S. COMMODITY FUTURES            )
TRADING COMMISSION,               ) Deposition of:
                                  )
        Plaintiff,                ) HENDRIK BESSEMBINDER
                                  )
vs.                               )
                                  )
ERIC MONCADA,                     ) Civil No. 12-CV-8791
BES CAPITAL, LLC, and             )
SERDIKA, LLC,                     )
                                  )
        Defendants.               )
```

December 4, 2013 * 9:08 a.m.



Location:
United States Securities and Exchange Commission
Salt Lake District Office
15 West South Temple, Suite 1800
Salt Lake City, Utah   84101

Reporter:  Reporter:  Kathy Morgan, CSR, RPR

Utah License No. 259764-7801 Nevada License No. 357

Notary Public in and for the State of Utah

2

1              A P P E A R A N C E S

2

    FOR THE PLAINTIFFS:
3
                Andrew Ridnour, Trial Attorney
4               Jennifer Diamond, Trial Attorney
                UNITED STATES COMMODITY FUTURES
5               TRADING COMMISSION
                Division of Enforcement
6               1155 21st N.W. Washington, D.C.  20581
                Tel: 202.418.5244
7               jdiamond@cftc.gov

8   Present via teleconference:

9               Ken McCracken, Chief Trial Attorney
                UNITED STATES COMMODITY FUTURES
10              TRADING COMMISSION
                Division of Enforcement
11              1155 21st N.W. Washington, D.C.  20581
                Tel: 202.418.5244
12              kmccraken@cftc.gov

13  FOR THE DEFENDANTS:

14              Richard M. Asche
                LITMAN, ASCHE & GIOIELLA, LLP
15              140 Broadway
                New York, Yew York 10005
16              Tel: 212.809.4500
                Fax: 212.742.8757
17              richardasche@lagnyc.com

18                     I N D E X

19

20  HENDRIK BESSEMBINDER:                    PAGE

21  Examination by Mr. Asche _____ 3
    Examination by Mr. Ridnour _____ 110
22

23                   E X H I B I T S

24  NUMBER              DESCRIPTION          PAGE
25
      1     Expert report by Mr. Bessembinder _____ 4

1    carefully -- sorry -- if I understand your question

2    correctly, you're asking do I know whether the 143

3    orders includes or excludes large Iceberg orders?

4        Q.    No, not large Iceberg orders.  Yeah,

5    Iceberg orders, no one of which would be a large lot

6    order.  But in the aggregate, in other words, if a

7    trader wanted to buy or sell 200 contracts, but he

8    entered the orders 20 contracts at a time, would

9    those transactions be included in your 143 large lot

10   orders?

11       A.    No, not for Moncada and not for other

12   traders.  The large lot orders were defined by me as

13   orders where the individual order was 200 contracts

14   or more, not an accumulation.

15       Q.    And do you have any idea of what

16   percentage of trades where a trader wanted to

17   accumulate or sell 200 lots or more were accomplished

18   via the Iceberg method?

19       A.    No.  As I said, other than the data

20   pertaining to the two firms that Moncada was

21   associated with, I do not have anything that

22   identifies Iceberg orders for me.

23       Q.    And I believe you intimate or you say in

24   your report that the Iceberg method is a more

25   effective method of accumulating or disposing of

Bessembinder, Hendrick

1    large numbers of contracts?

2         A.    In general, what I had to say about

3    Iceberg orders is they can be effective for getting

4    your trades done without moving the price unduly.

5         Q.    So there may have been a large number of

6    traders who entered Iceberg orders for large lots,

7    but did it in small increments that are not captured

8    by this data; is that correct?

9         A.    I think we're using the word "large lot"

10   differently.  Again, I'm referring to "large lot" to

11   mean 200 or more contracts in a single order.

12        Q.    Correct, and I understand that.  What I'm

13   saying is that there may have been traders who wanted

14   to buy or sell 200 or more contracts at the same

15   time, but did it by the Iceberg method of entering

16   smaller orders sequentially?

17        A.    So when you say "smaller orders," do you

18   mean smaller displayed to the world orders?

19        Q.    Correct.

20        A.    In any event, the answer is it's certainly

21   possible, if somebody wanted to accumulate a big

22   position and used many small orders rather than one

23   big order.  That's certainly possible.

24        Q.    And you have stated in here that that is

25   an effective method of buying or selling large

1   numbers of contracts?

2       A.    Well, what I did say is that you --

3   electing to use the Iceberg method, based on economic

4   reasoning in my analysis of an equity market that has

5   a similar option can be an effective method of

6   getting trades executed without moving the market as

7   much as you would if you exposed your orders.

8       Q.    So the only trades encompassed in the 143

9   large lot orders by other marketing participants were

10  trades of 200 or more contracts entered at the same

11  time not via the Iceberg method?

12      A.    Or orders of 200 or more.  Trades are

13  separate, a separate issue, yeah.

14      Q.    Separate issue.

15      A.    Orders of 200 or more, and again, on the

16  last part I'm not certain because I'm not certain --

17  again, the fact that something was not displayed to

18  traders in realtime is not necessarily the same as

19  saying that it was not recorded by the exchange in

20  their database.  So I'm using an exchange database,

21  so an Iceberg order says you don't display this to

22  the world in realtime, other than the tip of the

23  Iceberg, but that doesn't necessarily mean it's not

24  in the database.

25      Q.    You don't know?

30

1      Q.    That would be an example of what you're

2   talking about in paragraph (v)?

3      A.    That would be an example.  My analysis

4   says that, in fact, that's what he typically did.

5      Q.    Yeah, and so -- but wasn't it also true

6   that he typically already was either long or short in

7   the same direction as his large lot order?

8      A.    I didn't quantify that.

9      Q.    Would that be something you'd want to

10  know?

11     A.    Doesn't seem terribly central to me.

12  First of all, it's difficult for me to do without

13  actually seeing his account statements.  In other

14  words, I didn't know his overnight positions.  That

15  was not necessary for any of the analysis I did, but

16  it would be necessary for the analysis you propose.

17  I don't think it's particularly useful.  I think

18  nothing speaks louder about what somebody intends

19  than what they do, and what he did was trade in the

20  opposite direction of his large orders.

21     Q.    But he traded in the opposite direction of

22  existing positions.  Wouldn't that be relevant?

23     A.    I guess I don't see the relevance.

24  Whether this was done to liquidate an existing

25  position or put on a new position, in my mind the

33

1   question of whether it's legal, which is not for me

2   to decide.

3        Q.   It's not a question of whether it's legal.

4   Is it an indication that he didn't intend to trade?

5        A.   If it's happening again and again and

6   again, it would be consistent with the interpretation

7   that he didn't intend to trade on one side.  Nothing

8   speaks louder about intentions than actions.

9        Q.   If he routinely places orders at different

10  prices and the market moves in a direction which

11  leads him to execute one trade and cancel the other,

12  you're saying that that would be indicative of

13  manipulation?

14            MR. RIDNOUR:  Objection; asked and

15  answered.

16       A.   I'm not opining on manipulation.  Now, if

17  it was random on the buy side and the sell side, that

18  would be one thing.  If it was systematically on one

19  side versus the other, then I would ask, "Well,

20  what's this doing to other people's order strategy?

21  What's this doing to the liquidity in the market?

22  What's this doing to bid-ask spreads?  What's this

23  doing to volatility in the market?"  Those would all

24  be relevant questions that I would want to assess.

25       Q.   So what did his trading do to liquidity in

1    the market?

2         A.    Slightly widened the bid-ask spreads

3    around the times that he was entering his large

4    orders.

5         Q.    Slightly by how much?

6         A.    I'd -- report estimates.

7         Q.    Is it fair to say less than a tenth of a

8    penny, on average?

9         A.    There's coefficients in the tables, and

10   right offhand I can't convert that into a penny

11   amount for you.  I think it's safe to say moderate,

12   modest effects on the bid-ask spread, on average,

13   across all his orders.  Probably table 12 is probably

14   the one you're looking for.

15        Q.    I'm looking at the text here.

16        A.    Okay.  Probably page 29.

17        Q.    I think paragraph 62 on page 26.

18        A.    In 62, I think I'm focusing on the level

19   of prices rather than spreads.

20        Q.    Okay.  Is it fair to say that for every

21   1,000 net contract entered by Moncada, the increase

22   was about a tenth of a penny or less?

23        A.    So I'm just reading the paragraph 62 here.

24   So some of the coefficients .096, prices were

25   measured in cents.  Those are contracts, so for each

1    thousand contracts we have an increase of .09 cents,

2    correct, yes.

3         Q.    And --

4         A.    I should clarify that's on average, across

5    all.

6         Q.    And how are wheat contracts quoted?   In

7    increments of what?

8         A.    The tick size I've mentioned in here, I'm

9    not recalling offhand.

10        Q.    If I suggest 2-and-a-half cents; is that

11   correct?

12        A.    That sounds correct.

13             MR. RIDNOUR:  I think it's a quarter cent.

14             MR. ASCHE:  I'm sorry, quarter cent.

15             THE WITNESS:  I know I have it written

16   down here somewhere.

17             MR. ASCHE:  See, you can get a witness to

18   say anything.

19             THE WITNESS:  I know I have it written

20   down here at some point.

21             MR. ASCHE:  I think it's a quarter cent.

22             THE WITNESS:  Quarter cent, yeah.

23        Q.    (By Mr. Asche) So the average movement was

24   less than a tick?

25        A.    Per thousand.

Bessembinder, Hendrick

43

1    period of time.  He was an active trader.

2         Q.    And that would not even be unusual for an

3    average trader; correct?

4         A.    I guess it depends on the average trader.

5    I think, you know, my sense if there's a lot of

6    traders who just dabble a little bit in the market.

7    But there will be other active traders, and you will

8    find cases where traders are both buying and selling

9    in a given period.

10        Q.    Now, in the 20-second interval that you

11   say there was some effect on price, even though it

12   was less than quantifiable as a bid --

13        A.    I wouldn't agree it's less than

14   quantifiable.  It was quantifiable.

15        Q.    Well, it was less than the minimum

16   measurement on the --

17        A.    Per thousand contracts.

18        Q.    Correct.

19        A.    Over the periods where he put in many

20   thousands of contracts.

21        Q.    Yes.  So were you able to determine what

22   Mr. Moncada did in that 20-second interval?

23        A.    I'm sorry, which 20-second interval do you

24   have in mind in particular?

25        Q.    The interval that you referred to in

Bessembinder, Hendrick

1      Q.    And by far most of them?

2      A.    Indeed.  It's out 10 minutes, 30 minutes,

3  60 minutes later that we see the largest cumulative

4  trading in the opposite direction.

5      Q.    And you never quantified the effect on the

6  market of these large lot orders that far out?

7      A.    What do you mean "that far out"?  In terms

8  of did his orders affect prices 60 minutes out?

9      Q.    Yes.

10     A.    Yeah.  The data, there's just not enough

11  information in the data to reliably say what he did

12  to prices that far out.

13     Q.    Understood.  So coming back to the text on

14  page 4, you have a lot of -- you discuss what happens

15  within 2 minutes, within 10 minutes, within 30

16  minutes, within 60 minutes.  Do you see that?

17     A.    Yes.

18     Q.    But you have no information as to whether

19  those trades in the opposite direction benefitted

20  from any price change associated with his large lot

21  orders?

22     A.    That's correct.  My assessment of his

23  effect on the market shows short-term effects.  I

24  cannot say whether he affected the market that far

25  out.

1   way off the market?

2       A.    Yeah.   The more aggressive your prices,

3   the more competitive your prices -- you used the

4   phrase "greater risk of getting hit."  Another way to

5   say the same thing is a there's a greater chance of

6   executing your trade, which, in fact, I've documented

7   in a stock market.

8       Q.    And Moncada's bids were extremely

9   aggressive; right?

10      A.    That's why it's all the more remarkable

11  that he had such low execution rates on orders that

12  we would normally expect to have high execution

13  rates.

14      Q.    Well, some traders bid way off the market

15  and keep their bids out there, and Moncada bid at the

16  market and cancelled frequently.  Is that fair to

17  say?

18      A.    Those facts seem accurate, yes.

19      Q.    In paragraph 27, you say: "Although

20  Moncada most often cancelled his orders quickly, they

21  were visible long enough to generate responses

22  from" --

23      A.    I'm sorry, which paragraph are you

24  reading?

25      Q.    Twenty-seven, I'm sorry, page 13.

1    disseminates, in realtime, the top ten levels of the

2    book.

3          Q.    But the cancellation is also visible?

4          A.    Correct.

5          Q.    So he's not -- what the market sees is

6    he's ordered and cancelled?

7                MR. RIDNOUR:  Object to form.

8          A.    Correct.  Someone who's paying attention

9    would see --

10         Q.    (By Mr. Asche) A spoofer --

11         A.    -- a cancellation.

12               MR. RIDNOUR:  Let him finish answering his

13    question, please.

14               MR. ASCHE:  I'm sorry.

15         Q.    (By Mr. Asche) A spoofer leaves his buy

16    order above the market out there and allows it to be

17    hidden; correct?

18         A.    That does not seem right to me.  First of

19    all, it does not necessarily have to be above market.

20    In their example it's above market, but I don't see

21    that that's necessary.

22               Second, leaving it out there, it's

23    unclear.  A spoofer does not want their order to

24    execute.  If you leave it out there a long time, the

25    risk of execution goes up.  So it's not at all clear

Bessembinder, Hendrick

102

1        A.    So on table 12 I'm conducting additional

2    analyses to assess whether Mr. Moncada's large orders

3    affected the market.  So a regression analysis here,

4    a little simpler than GARCH, but, broadly speaking,

5    similar, letting the data speak, using all the data,

6    not eyeballing.

7              So in panel A, what we're assessing is

8    whether his large orders were associated with changes

9    in the bid-ask spread on the CBOT.

10             And in panel B, I'm assessing -- I

11   basically look at new order entry by everybody except

12   Moncada to see if his orders affect other people's

13   order submissions.  And that's particularly relevant

14   because the spoofing strategy says that that's the

15   goal, actually.  My understanding of the spoofing

16   strategy is that that's the goal, to get other

17   people -- to fool people and get them to enter other

18   orders.

19        Q.    But for that strategy to work, you have to

20   enter your order at a time when the spoofing strategy

21   is effective.

22             MR. RIDNOUR:  Object to form.

23        Q.    (By Mr. Asche) You can't do it the next

24   day?

25             MR. RIDNOUR:  Object to form.

103

 1        A.    I mean, the idea is to get -- the idea is

 2   you put in a buy order to fool other people and get

 3   them to put in buy orders also.  Then you would sell

 4   into it.  That's my understanding of a spoofing

 5   strategy.

 6        Q.    (By Mr. Asche) But you have to effect your

 7   sell at a time when the market has reacted to your

 8   spoof.

 9        A.    To be successful, yes.  I mean, more

10   generally, if you fail to fool the market, it's not

11   going to work.

12        Q.    Right.

13        A.    But if you do attract more orders on the

14   same side, it's consistent with the idea that to some

15   extent you fooled the market.  And that's actually

16   what panel B, the data, suggests, that around the

17   time that Mr. Moncada put in large orders, he

18   attracted net order entry on the same side around the

19   time that he did it.

20        Q.    Did you determine whether or not

21   Mr. Moncada placed his large buy orders because he

22   expected more orders on the same side?

23              MR. RIDNOUR:  Object; calls for

24   speculation.

25              MR. ASCHE:  I asked whether he tracked it.

Bessembinder, Hendrick

110

1  Q. Enron we talked about.  Internet Law

2 Library?

3  A. Short selling.  It was a short-selling

4 case.  The assertion was that some people had used

5 short-selling strategies to artificially depress

6 stock prices.  I was employed in that case by the

7 plaintiffs.

8   MR. ASCHE:  Okay.  I have no further

9 questions.

10   MS. DIAMOND:  Can we take a brief break?

11   MR. ASCHE:  Of course.

12   (Recess)

13   MR. RIDNOUR:  Back on the record.

14

15     EXAMINATION

16 BY MR. RIDNOUR:

17  Q. Dr. Bessembinder, I've got two clarifying

18 questions.  Earlier you testified that traders may

19 use Iceberg orders to get a better price.  What do

20 you mean by a "better price"?

21  A. So the Iceberg orders, my understanding of

22 the economics and also what I've documented in my

23 study of stock exchange trading in Paris, is Iceberg

24 orders are used to reduce the extent to which the

25 price will run away from your order, so somebody who

1    wants to buy is worried that the price could head up

2    before they can get their buy order executed.  So the

3    Iceberg function is used to reduce the extent to

4    which other people know that you have an interest in

5    doing a big buy, and hopefully you can get your big

6    buy done without pushing the price up.  So you're

7    doing it to reduce the price impact of your trades.

8         Q.    And you also testified earlier that there

9    is no volatility if the price moves one tick at a

10   time.  What do you mean by "moving one tick at a

11   time"?  And why does that mean there's no volatility?

12        A.    So hopefully the record will show that I

13   stated something slightly different than that, and

14   that's that if the price always went up by one tick,

15   that would be no volatility, because volatility is

16   computed around the average.  So if it always goes up

17   by one tick, then the average is one tick up.  And if

18   it's always up one tick, there's no volatility around

19   the average.  So that's what I intended to say.

20   Hopefully that's what the record shows I said.

21             Now, to broaden that a little bit, you

22   could have a market move in one-tick increments and

23   still you have a very volatile market.  It depends.

24   So if you have up-and-down moves, you have

25   volatility, and it depends on how many moves there

1                    <u>REPORTER'S CERTIFICATE</u>

2

STATE OF UTAH            )

3                            )  ss.
COUNTY OF SALT LAKE      )

4

5              I, Kathy Morgan, Registered Professional
Reporter and Notary Public in and for the State of

6    Utah, do hereby certify:

7              That prior to being examined, the witness,
HENDRIK BESSEMBINDER, was by me duly sworn to tell

8    the truth, the whole truth, and nothing but the
truth;

9
             That said deposition was taken down by me

10   in stenotype on December 4, 2013 at the place therein
named, and was thereafter transcribed and that a true

11   and correct transcription of said testimony is set
forth in the preceding pages;

12
             I further certify that, in accordance with

13   Rule 30(e), a request having been made to review the
transcript, a reading copy was sent to the witness

14   for him to read and sign, and the original transcript
will be delivered to Mr. Richard Asche for

15   safekeeping.

16             I further certify that I am not kin or
otherwise associated with any of the parties to said

17   cause of action and that I am not interested in the
outcome thereof.

18
             WITNESS MY HAND AND OFFICIAL SEAL this

19   9th day of December, 2013.

20

21

22

23

24

25                    Kathy H. Morgan, CSR, RPR
     My commission expires May 24, 2015

Notary Public
KATHY H MORGAN
Commission Number #10133
My Commission Expires
May 24, 2015
State of Utah

1   Case:  CFTC v. Moncada, et al.
    Case No.:  12-CV-8791
2   Reporter:  Kathy Morgan
    Date taken: December 4, 2013
3
                  WITNESS CERTIFICATE
4
         I, **HENDRIK BESSEMBINDER**, HEREBY DECLARE:
5        That I am the witness in the foregoing
    transcript; that I have read the transcript and know
6   the contents thereof; that with these corrections I
    have noted this transcript truly and accurately
7   reflects my testimony.   *SEE  ATTACHED*

8   PAGE-LINE            CHANGE/CORRECTION            REASON
9   _____     _____     _____
10  _____     _____     _____
11  _____     _____     _____
12  _____     _____     _____
13  _____     _____     _____
14  _____     _____     _____
15  _____     _____     _____
16  _____     _____     _____
17  _____     _____     _____
18  _____     _____     _____

    _____     No corrections were made.
19
         I, HENDRIK BESSEMBINDER, HEREBY DECLARE
20  UNDER THE PENALTIES OF PERJURY OF THE LAWS OF THE
    UNITED STATES OF AMERICA AND THE LAWS OF THE STATE OF
21  UTAH THAT THE FOREGOING IS TRUE AND CORRECT.
22
23                         HENDRIK BESSEMBINDER
24          _12/25/13_____
                         Date Signed
25

Case: CFTC v. Moncada, et al.
Case No.: 12-CV-8791
Reporter: Kathy Morgan
Date taken: December 4, 2013

**WITNESS CERTIFICATE**

I, **HENDRIK BESSEMBINDER**, HEREBY DECLARE: That I am the witness in the foregoing transcript; that I have read the transcript and know the contents thereof; that with these corrections I have noted this transcript truly and accurately reflects my testimony.

| Page/Line | Correction | Reason |
| --- | --- | --- |
| p. 15, line 1 | "lag files" should be "log files" | Transcript is in error |
| p. 16, line 22 and line 23 | "lag files" should be "log files" | Transcript is in error |
| p. 20, line 4 | "reasoning in my analysis" should be "reasoning and my analysis" | Transcript is in error |
| p. 20, line 12 | "Or orders" should be "Orders" | Transcript is in error |
| p. 60, line 10 | "going on" should be "Going in" | Transcript is in error |
| p. 64, line 5 | "older trader" should be "alert trader" | Transcript is in error |
| p. 79, line 19. | "I'm not sure if there's" should be "I'm not sure.  There is" | Transcript is in error |
| p. 84, lines 1 to 3. | "I shouldn't say beginning of the day since they've pointed the day" should be  "I should have said beginning of the day to that point in the day" | Transcript is in error |
| p. 92, line 12 | "by measuring" should be "I measure" | Transcript is in error |
| p. 93, line 4 | "like to look at his buy order, his sell orders" should be "look at his buy orders less his sell orders" | Transcript is in error |
| p. 94, lines 12 and 13 | "that's a value" should be "the absolute value" | Transcript is in error |
| p. 100, line 25. | "level of crisis" should be "level of prices" | Transcript is in error |
| p. 101, line 19. | "I traded in" should be "he traded in" | Transcript is in error |