**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **UNITED STATES COMMODITY FUTURES TRADING COMMISSION,** )<br>)<br>) | |
| **Plaintiff,** ) | Civil Action No. <u>12-cv-8791 (CM)</u> |
| ) | <u>(GWG)</u> |
| **v.** ) | |
| ) | |
| **ERIC MONCADA; BES CAPITAL LLC; and** ) | |
| **SERDIKA LLC.** ) | |
| **Defendant(s).** ) | |
| ) | |
| ) | |
| ) | |

**PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS**
**IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**
**AGAINST DEFENDANT ERIC MONCADA**

Plaintiff United States Commodity Futures Trading Commission ("Commission"), pursuant to Rule 56 of the Federal Rules of Civil Procedure ("F.R.C.P.") and Rule 56.1 of Local Rules for the United States District Court for the Southern District of New York, respectfully submits its *Statement of Undisputed Material Facts* in support of its *Motion for Summary Judgment Against Defendant Eric Moncada* and the *Memorandum Support* filed in the above-captioned proceeding.

## I.   JURISDICTION AND VENUE

1.      The Court has jurisdiction over this action.  This Court has jurisdiction over this action pursuant to Section 6c of the Commodity Exchange Act (the "Act"), 7 U.S.C. § 13a-1 (2006), which authorizes the Commission to seek injunctive relief against any person, or to enforce compliance with the Act, whenever it shall appear to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder.

2.      Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e) (2006), in that Defendants are found in this District, transact business in this District, and the acts and practices in violation of the Act have occurred, are occurring, or are about to occur within this District.  (Ex. 1, Deposition of Eric Moncada ("Moncada Dep.") 31:9-31:14, Complaint (Dkt. No. 1), ¶¶ 13, 14; Answer (Dkt. No. 18), ¶¶ 13, 14).

## II.   THE PARTIES

3.      The **U.S. Commodity Futures Trading Commission** is an independent federal regulatory agency that is charged by Congress with the responsibility for administering and enforcing the provisions of the Act, 7 U.S.C. §§ 1 *et seq*., and the Regulations promulgated thereunder, 17 C.F.R. §§ 1 *et seq*. (2012).  One of its core responsibilities is to protect the public interest by deterring and preventing price manipulations of the commodity markets or futures markets, or other disruptions to market integrity.  *See* 7 U.S.C. § 5(b) (2006).

4.      **BES Capital LLC** was a Delaware limited liability company with its principal place of business in New York, New York.  BES shared offices, common ownership and management with Serdika.  BES began operations in December 2008, and ceased trading in December 2009.  BES has never been registered with the Commission.  (Complaint, at ¶ 13; Answer, at ¶ 13).

5.      **Serdika LLC** was a Delaware limited liability company with a principal place of business in New York, New York.  Serdika shared offices, common ownership and management with BES.  Serdika began operations in November 2007, and ceased trading in June 2011.  Serdika has never been registered with the Commission.  (Complaint, at ¶ 14; Answer, at ¶ 14; Moncada Dep. 31:9-31:14).

6.      **Eric Moncada** at all relevant times resided in New York City, and was a futures trader authorized to trade certain accounts in the names of BES and Serdika during the relevant

time period.  Moncada was a member of both BES and Serdika and provided capital to both BES and Serdika for the purpose of posting margin for futures trading.  Moncada is a floor broker registered with the Commission.  (Complaint, at ¶ 15; Answer, at ¶ 15; Moncada Dep. 31:9-31:14, 41:25-42:16, 49:10-14).

### III.  BACKGROUND OF THE CBOT WHEAT FUTURES MARKET AND MONCADA'S TRADING

**A.    Overview of the CBOT Wheat Futures Market**

7.    The CBOT Wheat Futures contract is traded on the Chicago Board of Trade ("CBOT") futures market, which in October 2009 (the "relevant time period") was and continues to be a registered designated contract market with the Commission.  (Ex. 2, Affidavit of Greg Benbrook ("Benbrook Aff."), ¶ 2).

8.    Trading in the December 2009 Wheat Futures Contract was conducted either on the trading floor at the CBOT or through the Globex electronic trading platform operated by the CME Group, which in the relevant time period and all times since owned the CBOT.  (Benbrook Aff. ¶¶ 2, 13).

9.    Globex allows market participants to enter orders into its "order book," which consists of all orders to buy or sell that are currently available to trade in the electronic marketplace.  (Benbrook Aff. ¶ 16).

10.    Globex displays to market participants the total volume of all orders in its "order book" at the ten best bid prices (for buy orders) and ten best offer prices (for sell orders). (Benbrook Aff. ¶ 16).

11.    The highest bid price resting in the order book is considered the "best bid," while the lowest offer price is considered the "best offer."  (Benbrook Aff. ¶ 18).

12.     At all relevant times, the CBOT Wheat Futures market was open for trading on Globex from 9:30 am Central to 1:15 pm Central (the "regular trading hours"), with an additional overnight trading session.  (Benbrook Aff. ¶ 13).

13.     A single CBOT Wheat Futures contract (or "lot") is for the future delivery (by someone holding a "short" or "sell" position) or acceptance of delivery (by someone holding a "long" or "buy" position) of 5,000 bushels of wheat at a specified price on a specified future date (the "delivery date").  (Benbrook Aff. ¶ 3).

14.     The CBOT Wheat Futures market lists five contracts per year that are identical except for the delivery date.  (Benbrook Aff. ¶ 4).

15.     The December 2009 Wheat Futures Contract, traded in October 2009, had a delivery date of December 1, 2009.  (Benbrook Aff. ¶ 4).

16.     CBOT Wheat Futures contract prices are quoted in cents per bushel, with minimum price movements of ¼ cents (termed a "tick").  (Benbrook Aff. ¶ 6).

17.     An increase of one "tick" in the price of CBOT Wheat Futures would increase the value of a "long" position by $12.50 and decrease the value of a "short" position by the same amount.  (Benbrook Aff. ¶ 7).

**B.     Moncada's Trading in the BES and Serdika Accounts**

18.     During the relevant time period, Moncada was a member of and/or trader of BES and Serdika, two proprietary trading firms that traded commodity futures ("futures") using their own capital.  (Deposition of Eric Moncada, "Moncada Dep." 38:8-38:25, 44:10-44:15, 45:1-45:11).

19.     Moncada contributed a total of $525,000 to BES and Serdika between early 2009 and December 2009, for the purpose of posting margin in futures trading accounts and to cover

trading losses.  (Moncada Dep. 41:25-42:16, 49:8-49:14; Ex. 3, Affidavit of Jessica Harris ("Harris Aff.") at ¶ 30).

20.     During the relevant time period, Moncada was authorized to trade one account in the name of BES (account number A5187, the "BES account") and one account in the name of Serdika (account number A4858, the "Serdika account").  (Ex. 4, Affidavit of William Steele, ("Steele Aff."), ¶ 8).  Moncada's trader identification for activity associated with the BES and Serdika accounts was "EM4".  (Steele Aff. ¶¶ 9-10).

21.     During the relevant time period, Moncada was entitled to at least 40 percent of profits from his trading for Serdika and, along with the other trader in BES, 80 percent of BES's trading profits.  (Ex. 5, Plaintiff's First Set of Requests for Production, ¶¶ 15, 18; Ex. 6, Response to First Set of Requests for Admissions, ¶¶ 15, 18; Moncada Dep. 47:10-48:14).

22.     From October 2008 through the end of October 2009, Moncada withdrew $2,308,231.87 in profits from BES and Serdika.  (Harris Aff. ¶ 30).

23.     The BES and Serdika accounts had to hold funds to cover margin requirements before Moncada could trade futures in those accounts.  (Steele Aff. ¶¶ 11-12).  Advantage used equity in a trading account to cover any margin requirement imposed by the exchanges, including CBOT, for any open position held in an account.  (Steele Aff. ¶ 11).

24.     If either the BES or Serdika account carried an open futures position at the close of regular trading hours, Moncada was required to post margin on that position.  (Moncada Dep. 103:16-104:13; 217:5-217:19).  Advantage Futures calculated margin requirements at the end of each trading day, which for the CBOT Wheat Futures contract was based on net position held at 1:15 pm.  (Steele Aff. ¶ 14).

25.     The initial margin is the amount required to be posted upon entering a position. The maintenance margin is the amount of account value (net liquidating value or NLV) which must be maintained in order to hold a position without additional funding.  Should the account's NLV decline below the maintenance margin level, new funds must be deposited sufficient to bring the account's NLV back above the initial margin requirement or the position(s) must be liquidated in order to bring the initial margin requirement below the level of the account's NLV. (Steele Aff. ¶ 12).

26.     For the relevant period, the initial margin requirement (the amount required to be posted upon entering either a long or short position) for the December 2009 Wheat Futures Contract was $2,700 per lot from October 6, 2009 to October 26, 2009, and $2,362.50 per lot from October 27, 2009 to October 30, 2009.  The maintenance margin requirement for the December 2009 Wheat Futures Contract was $2,000 per lot from October 6, 2009 to October 26, 2009, and $1,750 per lot from October 27, 2009 to October 30, 2009.  (Steele Aff. ¶ 13).

27.     The equity in the BES and Serdika accounts is the difference between the cash value of the accounts and the initial margin requirement for any open futures position held in the accounts.  (Steele Aff. ¶¶ 15-16).  If an account had a cash value that exceeded the initial margin requirement, the account was considered to have "excess equity."  (Steele Aff. ¶ 16).  If an account had a cash value that did not meet its initial margin requirement, the account was considered to have a "margin deficit."  (Steele Aff. ¶ 16).

28.     On all eight days for which the Commission has alleged Moncada attempted to manipulate the December 2009 Wheat Futures Contract – October 6, 12, 14, 19, 26, 27, 29, and 30, 2009 (collectively the "attempted manipulation dates") – the BES account had a margin deficit, meaning that the BES account was unable to meet the initial margin requirement for the

positions it held.  (Harris Aff. ¶¶ 9, 11; Steele Aff.¶¶ 15, 16).  The margin deficit in the BES account ranged on the attempted manipulation dates from (-$297,076.35) to (-$1,168,171.00). (Harris Aff. ¶ 9).

29.     Similarly, the Serdika on the eight attempted manipulation dates ranged from an excess margin of positive $458,805.11 on October 19 to a margin deficit of negative $758,593.60 on October 30, 2009.  (Harris Aff. ¶ 9).

30.     On five of the eight charge days, the Serdika account had a margin deficit, meaning it was unable to meet the initial margin requirement for the positions it held.  (Harris Aff. ¶¶ 9, 11; Steele Aff.¶ 15).

31.     Moncada placed large-lot orders in the final minutes of trading on at least one day.  For example, in the last fifteen minutes of trading on October 14, Moncada placed and immediately canceled 10 large-lot buy orders, totaling 4,410 lots, in the BES account.  (Harris Aff. ¶ 20).  If any of these orders were filled, it would have increased Moncada's existing long position in the BES account, which stood at 198 lots at the end of trading on October 14.  (Harris Aff. ¶ 20).  Moncada would have had to either liquidate the position before the market closed (and be subject to any losses had the market price moved against his position) or post sufficient margin to carry the position overnight.  (Moncada Dep. 103:16-104:13, Steele Aff. ¶¶ 12, 14).

32.     Moncada testified that the initial margin requirement for a 500-lot position would be approximately $1 million (Moncada Dep. 217:10-218:4); if so, the initial margin requirement for a 4,410-lot position would be nearly $9 million.  At the end of the trading day on October 14, 2009, the BES account already had a margin deficit of over $297,000.  (Harris Aff. ¶ 9).

## IV.  SUMMARY OF MONCADA'S TRADING ACTIVITY RELATED TO THE COMMISSION'S CLAIMS OF ATTEMPTED MANIPULATION

33.     On the eight attempted manipulation dates, Moncada entered over 700 large-lot orders in the December 2009 Wheat Futures Contract at or near the best bid or best offer price available in the market at the time the large-lot orders were entered.  (Ex. 7, Bessembinder Report, ¶¶ 7, 24).

34.     Moncada placed and canceled these large-lot orders in the Globex electronic trading platform.  (Bessembinder Report, ¶ 6; Ex. 8, Affidavit of James Moran "Moran Aff." ¶¶ 5-7).

35.     Moncada placed and canceled these large-lot orders manually though a trading software program under license to Advantage Futures, which allows Advantage Futures' clients to access various exchanges.  (Ex. 9, Deposition of Steven Wollack ("Wollack Dep.") 97:2-97:4; Ex. 10, Affidavit of Lisa Jones ("Jones Aff.") ¶ 8).

### A.     Moncada Entered and Canceled Hundreds of Large-Lot Orders Before They Were Filled

36.     On the eight attempted manipulation dates, Moncada placed a total of over 700 large-lot orders, ranging from 200 to 500 lots, in the December 2009 Wheat Futures Contract as follows:  (a) 46 large-lot orders on October 6, 2009; (b) 71 large-lot orders on October 12, 2009; (c) 115 large-lot orders on October 14, 2009; (d) 116 large-lot orders on October 19, 2009; (e) 107 large-lot orders on October 26, 2009; (f) 98 large-lot orders on October 27, 2009; (g) 118 large-lot orders on October 29, 2009; and (h) 37 large-lot orders on October 30, 2009. (Bessembinder Report, ¶ 7, Table 1).

37.     Moncada placed large-lot orders in the BES account on six of the attempted manipulation dates – October 6, 12, 14, 19, 26, and 27 – and in the Serdika account on four of the attempted manipulation dates – October 26, 27, 29, and 30.  (Harris Aff. ¶¶ 34-43).

38.     Moncada accounted for the vast majority of large-lot orders in the December 2009 Wheat Futures Contract market across the eight attempted manipulation dates.  Of the 470,000 total orders entered in the December 2009 Wheat Futures Contract market on the eight attempted manipulation dates, only 853 were large-lot orders – of which Moncada accounted for 710. (Bessembinder Report, ¶ 4(i)).  As a point of comparison, the average order size across the entire market in the December 2009 Wheat Futures Contract from August 13, 2009 to November 30, 2009 was approximately 3 lots.  (Harris Aff. ¶ 32).  Excluding his large-lot orders, Moncada's average order size from August 13 to November 30, 2009 was approximately 7 lots (his "small-lot orders").  (Harris Aff. ¶ 33).

39.     Moncada placed large-lot orders on both the buy and sell sides of the market. (Bessembinder Report, ¶ 9).  In some instances, he placed and canceled large-lot orders on both sides of the market within minutes of each other.  For instance, on October 27, 2009 between 11:45:41 am and 11:55:45 am, Moncada placed and canceled (a) one large-lot *buy* order, followed by (b) one large-lot *sell* order, followed by (c) three large-lot *buy* orders, followed by (d) four large-lot *sell* orders, followed by (e) two large-lot *buy* orders.  (Harris Aff. ¶¶ 26-27).

40.     Moncada's large-lot orders resulted in very little trading, particularly when compared to those entered by other traders.  Moncada canceled 99.6 percent of his large-lot orders on the eight attempted manipulation dates.  (Bessembinder Report, ¶ 11).  By comparison, of the 143 large-lot orders placed by all other traders combined, only 28.7 percent were canceled. (Bessembinder Report, ¶¶ 7, 15).  Only 0.78 percent of the total volume of Moncada's large-lot orders was actually filled.  (Bessembinder Report, ¶¶ 7-8).  By comparison, other traders filled over 45 percent of the total volume of their large-lot orders.  (Bessembinder Report, ¶ 19).

41.    Moncada's small-lot orders generated more trading compared to Moncada's large-lot orders and to small-lot orders placed by other traders.  Moncada filled over 45 percent of the volume of his own small-lot orders, while other traders filled on average only 28.2 percent of the volume of their small-lot orders.  (Bessembinder Report, ¶¶ 19, 22).

42.    Moncada also canceled his large-lot orders quickly compared to other traders' large-lot order cancellations.  Moncada canceled his large-lot orders an average of 2.1 seconds after placing them, including 72.1 percent canceled in less than one second.  (Bessembinder Report, ¶ 11; Table 3).  By comparison, other traders canceled large-lot orders only after an average of 127 minutes, with none canceled in less than one second.  (Bessembinder Report, ¶ 15, Table 3).  Additionally, Moncada canceled his small-lot orders only after leaving them in the market for an average of 10 minutes.  (Bessembinder Report, ¶ 16).

43.    Even though Moncada canceled nearly all of his large-lot orders, he placed them in the market in a manner that ensured that other traders would see his large-lot orders.  All of Moncada's large-lot orders on the eight attempted manipulation dates were within ten ticks of the best bid/best offer prices, meaning that all of his large-lot orders would be displayed to the rest of the market on the Globex order book.  (Bessembinder Report, ¶ 24; Benbrook Aff. ¶ 17).  Moreover, Moncada placed 77.1 percent of his large-lot orders **at the same price as** the best bid (for buy orders) or best offer (for sell orders).  (Bessembinder Report, ¶ 24).  By comparison, other traders' large-lot orders were on average 18 ticks away from the best bid/best offer price.  (Bessembinder Report, ¶ 24).  Also by comparison, Moncada placed his small-lot orders on average 6.6 ticks from the best bid/best offer price.  (Bessembinder Report, ¶ 24).

44.    In over 99 percent of instances for which the data is available, Moncada chose not to enter his large-lot orders as iceberg orders.  (Bessembinder Report, ¶ 25).  Iceberg orders

allow traders to enter orders but only show a portion of that order to the rest of the market. (Benbrook Aff. ¶ 20). Traders tend to use iceberg orders to execute trades "without moving the price unduly" and "without moving the market as much as you would if you exposed your orders." (Ex. 11, Deposition of Hendrik Bessembinder ("Bessembinder Dep."), 18:23-19:4 and 19:20-20:7; *See also*, Bessembinder Dep. 110:17-111:7; Bessembinder Report, ¶ 52). Moncada said that traders might use iceberg orders because, if the full size of an order were showing, other traders could "lean on your order" or "use your order as a crutch[.]" (Moncada Dep. 153:21-154:6). When asked if he ever used iceberg orders while trading for BES and Serdika during October 2009, Moncada testified he would use them whenever he felt he might have a better chance of getting filled. (Moncada Dep. 152:2-152:14).

45.     The few times that Moncada placed iceberg orders for 100 lots or greater included when he tried to unwind large-lot orders that had been filled. (Bessembinder Report, ¶¶ 50-54).

46.     Regarding Moncada's cancelation of his large-lot orders, Dr. Bessembinder testified, "[i]f it's happening again and again and again, it would be consistent with the interpretation that he didn't intend to trade on one side. Nothing speaks louder about intentions than actions." (Bessembinder Dep. 33:5-8).

47.     Dr. Bessembinder found that Moncada's frequent and rapid cancelation of his large-lot orders before they could be filled in the market is consistent with spoofing. (Bessembinder Report, ¶¶ 30-45, 75). One method of spoofing, regarded by academic authors as a manipulative tactic, is to place a fleeting order visible to the market in the opposite direction of the order that the trader genuinely desires to be filled. (Bessembinder Report, ¶ 33). Dr. Bessembinder testified, "[a] spoofer does not want their order to execute. If you leave it out there a long time, the risk of execution goes up." (Bessembinder Dep. 77:23-77:25).

48.     Dr. Bessembinder testified that the fact that Moncada's large-lot orders were so aggressively priced is one reason "why it's all the more remarkable that he had such low execution rates on orders that we would normally expect to have high execution rates." (Bessembinder Dep. 66:8-66:13).  Orders at or near the best bid/best offer price (*i.e.*, aggressively priced) should result in "a large number of executed trades."  (Bessembinder Report, ¶ 28).

49.     Dr. Bessembinder found that, given that Moncada's large-lot orders were aggressively priced and fully visible to the market it is "therefore all the more striking that Moncada's large lot orders in the December 2009 wheat futures market had extremely low execution rates.  These low execution rates could not have been an accident.  I conclude that Moncada undertook strategies, including quick cancelations, to ensure low execution rates[.]" (Bessembinder Report, ¶ 28).  Dr. Bessembinder found that Moncada's high cancellation rates and low execution rates, despite being aggressively priced and not entered as iceberg orders, are all consistent with Moncada's intent to have his large-lot orders fully visible to the market but not execute.  (Bessembinder Report, ¶ 46).

### B.     Moncada's Large-Lot Orders Affected the Market Price

50.     Moncada's large-lot orders on the eight attempted manipulation dates affected the market price of the December 2009 Wheat Futures Contract.  Moncada's large-lot orders on average pushed the market price in the twenty seconds following their entry, meaning that his large-lot **buy** orders pushed the price **up** while his large-lot **sell** orders pushed the price **down**. (Bessembinder Report, ¶¶ 62, 76, 77(vi)).  The average effect of Moncada's large-lot orders was 0.096 cents or about half a tick over about twenty seconds after order entry per thousand lots of large-lot orders.  (Bessembinder Report, ¶¶ 62, 76, 77(vi); Bessembinder Dep. 34:20-35:25, 43:10-14, 51:18-25).

51.     As a result, when Moncada placed and canceled a large-lot buy (or sell) order, the market price increased (or decreased), and other traders were induced to place additional buy (or sell) orders, respectively.  (Bessembinder Report, ¶¶ 73, 76).  While the effect of an individual large-lot order was relatively small, Moncada placed between 37 and 118 large-lot orders per day.  (Bessembinder Report, ¶ 62, Table 1).

52.     Moncada admitted that large-lot orders could have an effect on the market even if only in the market for a fraction of a second.  (Moncada Dep. 318:25-319:14).  Academic literature in the stock market shows that computerized algorithms often responded to events, such as the arrival of a new order in the market, within two to three milliseconds.  (Bessembinder Report, ¶ 27).  Moncada knew that any order has an effect on the market. (Moncada Dep. 155:15-155:19).  Moncada also knew that large-lot orders would have more of an effect on the market than smaller lot orders.  (Moncada Dep. 154:7-155:19).

53.     The goal of a spoofing strategy is to affect other trader's order submissions and fool them into entering other orders, which is exactly what Moncada did.  (Bessembinder Dep. 102:1-18).

C.     **Moncada Consistently Traded on the Opposite Side of the Market Following His Large-Lot Orders**

54.     Following a large-lot order on one side of the market, Moncada consistently traded on the opposite side of the market in the minutes afterwards, starting in the first ten seconds after a large-lot order.  (Bessembinder Report, ¶ 39).  Five minutes after placing a large-lot order on one side of the market, Moncada on average executed 19.3 contracts on the opposite side of the market for every 1,000 contracts of large-lot order.  (Bessembinder Report, ¶ 42).  By way of explanation, this would mean that if Moncada placed a 500 lot *buy* order (which did not

get filled), he would on average actually *sell* orders of nearly 10 lots (which did get filled) in the five minutes following that large-lot buy order.

55.     Regarding trading on the opposite side of the market following large-lot orders, Dr. Bessembinder testified, "…what he [Moncada] did was trade in the opposite direction of his large orders." (Bessembinder Dep. 30:17-20).  Had Moncada actually been trying to "signal" to the market that he wanted to trade on one side of the market, he would actually have traded on that same side of the market after sending the signal.  (Bessembinder ¶ 35).

56.     One sequence of Moncada's trading on October 27, 2009 illustrates his trading on the opposite side of the market from his large-lot orders.  First, one of Moncada's large-lot (202 lots) buy orders was fully filled at 10:10:22 am.  (Bessembinder Report, ¶ 51).  This was one of only eight times between August and November 2009 when Moncada's large-lot orders placed during regular trading hours were actually filled; four of those instances involved Moncada filling offsetting buy and sell orders in the BES and Serdika accounts.  (Bessembinder Report, ¶¶ 47-55).  Second, during the following 45 minutes (from 10:10:22.131 am to 10:54:30.917 am), Moncada placed 25 large-lot *buy* orders and one large-lot *sell* order, none of which resulted in a single executed trade.  (Harris Aff. ¶ 24).  Third, in that same 45 minute period, Moncada placed a series of four 100 lot iceberg *sell* orders.  (Bessembinder Report, ¶ 51, Table 10).  This was one of the few instances where Moncada placed iceberg orders for 100 lots or greater. (Bessembinder Report, ¶50-52).  In this 45 minute period, Moncada had a net long intra-day position in the BES and Serdika accounts.  (Bessembinder Report, ¶ 48, Figure 4).  Through this 45 minute stretch, Moncada sold a net total of 163 lots.  (Harris Aff. ¶ 24, Bessembinder Report, Figure 4).

57.     On each of the eight attempted manipulate dates, Moncada filled small-lot orders on the opposites side of the market from his large-lot orders within the same time period that he placed at least one large-lot order.  (Harris Aff. ¶¶ 34-43).

58.     At his deposition, Moncada was shown ten excerpts of trading data for time periods during which he placed and canceled large-lot orders on one side of the market while also placing small-lot orders on the opposite side of the market.  (Moncada Dep. 158:18-162:5 (Dep. Ex. 6), 184:10-186:12 (Dep. Ex. 9), 200:18-201:9 (Dep. Ex. 10), 210:7-210:24 (Dep. Ex. 11), 219:16-220:14 (Dep. Ex. 12), 221:17-222:10 (Dep. Ex. 13), 223:14-224:4 (Dep. Ex. 14), 231:16-232:17 (Dep. Ex. 15), 233:8-233:24 (Dep. Ex. 16), 234:24-235:15 (Dep. Ex. 17)).

**D.     Moncada's Testimony on His Rationale for Entering and Canceling Large-Lot Orders**

       1.     *Moncada Did Not Recall Why He Entered or Canceled his Large-Lot Orders*

59.     When presented with exhibits showing his large-lot orders and cancelations, Moncada repeatedly testified that he did not recall his reasons for placing and canceling any one of the hundreds of individual large-lot orders in the December 2009 Wheat Futures Contract in October 2009.  (Moncada Dep. 166:24-167:7, 173:4-173:8, 190:3-190:8, 202:5-202:15, 210:21-210:24, 221:6-221:16, 222:16-223:3, 228:6-228:10, 229:12-229:15, 231:23-232:17, 234:20-234:23, and 235:12-235:15).  His testimony included responses such as "I don't know," "I'm not sure," "I don't know what I was trying to do," or "I don't know what the situation was in the market here."  (Moncada Dep. 213:11, 216:2, 229:15, 229:10-11).  Moncada testified that he had not reviewed any of the trading data from October 2009 provided him by the CFTC or refreshed his recollection with "any documents of any kind" prior to his testimony to the CFTC.  (Moncada Dep. 316:12-23).

60.     Moncada was asked repeatedly whether he intended to fill his large-lot orders.
When asked, "Were there any times where you did not intend to fully fill a large-lot order?"
Moncada responded, "I would have to – I would have to look at the situation."  (Moncada Dep.
135:18-135:21).   Additionally, when asked, "Do you recall ever placing a large lot order that
you did not intend to fully fill?" he replied, "I would have to look at each time I placed one and
the situation.  I don't recall." (Moncada Dep. 136:7-136:8, 136:13-136:14).  When asked if he
hoped his large-lot orders would be filled, Moncada testified "I don't recall what I was hoping
for, but I do recall that there was always risks and chances, and if the order got filled, I would – I
would have to make a decision on what I wanted to do then."  (Moncada Dep. 148:9-148:16, *see
also* Moncada Dep. 317:18-319:14).

### 2.     *Moncada's Three Purported Rationales for Placing the Large-Lot Orders*

61.     While unable to recall reasons for individual large-lot orders he placed in the
December 2009 Wheat Futures Contract, Moncada testified that there were only three rationales
he might have used when placing large-lot orders.  (Moncada Dep. 100:25-101:18).  Moncada's
first purported rationale was to send a signal to the market as "a way of asking for liquidity."
(Moncada Dep. 99:5-99:25 and 129:13-130:8).  He testified "I don't – I don't remember if I did
in that – in October or not, but I know it's a – it's a – it's a method that's used."  (Moncada Dep.
129:24-130:2).  Moncada could not state whether he actually used this rationale when placing
large-lot orders in October 2009, or at any time.  (Moncada Dep. 130:3-130:8).

62.     Moncada's second purported rationale was to get "size priority" from the
matching algorithm used by the Globex trading platform.  (Moncada Dep. 96:23-98:18).
Moncada testified that he understood that "if you are one of the bigger bids or offers in the
[Globex matching] engine, whether you're first or last, you could potentially get a partial fill."

(Moncada Dep. 138:11-138:17).  Moncada was not sure if he ever placed large-lot orders with the intent of getting size priority in October 2009 in the CBOT Wheat Futures market. (Moncada Dep. 98:8-98:18, 144:24-145:9).  Moncada testified that he could have used this rationale because he was having difficulty filling his small-lot orders.  (Moncada Dep. 145:10-145:20).  When asked under what market conditions he would place large-lot orders to get size priority, Moncada responded "[i]t's very situational.  I mean, it's just depending on what, you know, what was going on the market, depending on, you know, how I felt about, you know, trading a big position."  (Moncada Dep. 144:15-144:23).

63.     Moncada's third purported rationale was that he intended to actually take a position (*i.e*., actually fill his order) based on his "view of the market."  (Moncada Dep. 100:25-101:6).  Moncada testified that his "view of the market" would be based on "weather, news, outside markets, meaning most of the global commodity markets, equity markets, what the other grains are doing."  (Moncada Dep. 81:21-81:25).  Moncada testified that "[i]t would have to be more than just something like gold going up.  I would to be [*sic*] looking at several other factors."  (Moncada Dep. 84:12-84:16).

### 3.     *Moncada's Only Purported Rationale for Canceling the Large-Lot Orders Before They Were Filled*

64.     While Moncada had three purported rationales for ***placing*** his large-lot orders, he testified that the only reason he could think of for ***canceling*** his large-lot orders before they filled was that he was "constantly re-evaluating and adjusting to market conditions."  (Moncada Dep. at 114:12-114:21).  Moncada testified that he was "prepared to make a decision on the market at that moment and then change my mind, cancel and reevaluate."  (Moncada Dep. 324:16-325:4).  When asked why he would cancel an order before it was filled Moncada further testified:

> If that's not going to get filled I'm not going to leave my order out there so
> somebody could take their time and decide what they want to do.  I choose to
> trade at that moment at that price.  If I don't get filled I'm going to cancel my
> order and look for another spot to trade.

(Moncada Dep. 332:3-16).

65.     When asked about a series of large-lot orders that he canceled within 0.7 seconds

after entry, Moncada testified that he might cancel a large-lot order because he was "reacting to

something in the market, changing my mind, changing my opinion, changing the feeling that I --

you know, maybe I just didn't want to hold a -- maybe I changed my mind on taking a position at

that time, you know, not wanting to expose myself to the market running through me and

decided not to."   (Moncada Dep. 115:6-115:16).  When asked what he meant by "run through,"

Moncada responded, "I don't even know what that means." (Moncada Dep. 203:23-206:5).

Moncada further testified that he was "not going to leave the order out there for somebody to

possibly take advantage of or lean against."  (Moncada Dep. 324:16-325:4).

66.     Moncada testified that he "re-evaluated" his large-lot orders based on a review of

"all of the markets that have any relation to the grain trade and that includes currencies, that

includes macro markets like gold, that includes U.S. equity indexes, that includes specifically the

grains."  (Moncada Dep. 197:21-198:9).  Moncada testified that he was able to evaluate all of

those markets looking at the "momentum and gyrations of those markets" and decide, in under a

second, to cancel his large-lot orders based on that evaluation.  (Moncada Dep. 198:14-200:10).

**E.     Testimony of Moncada's Colleague at Serdika**

67.     At least one other trader at Serdika was aware that Moncada was placing and

canceling large-lot orders.  James Moriarty ("Moriarty"), who was Moncada's friend and a

fellow trader at Serdika in the CBOT Wheat Futures market, frequently exchanged instant

messages ("IMs") with Moncada.  (Moncada Dep. 246:14-247:24; Ex. 12, Deposition of James

Moriarty ("Moriarty Dep."), 26:4-26:7, 33:25-34:11, 72:9-72:14).

68.     On September 30, 2009, Moncada and Moriarty exchanged an IM.  (Ex. 13,

Instant Message dated September 30, 2009 (the "September 30 IM")).  Both Moncada and

Moriarty were located in New York City at the time, meaning that the times in the September 30

IM were given in Eastern Daylight Time.  (Moriarty Dep. 88:11-89:3).  The CBOT is located in

Chicago, meaning that trading data for the December 2009 Wheat Futures Contract were given

in Central Daylight Time.  (Benbrooke Aff. ¶ 13).

69.     At 1:12 EDT/12:12 CDT, Moncada said to Moriarty, "Oh yeah, watch wheat

dump Cada on the close."  ("September 30 IM", at 2).  "Cada" was Moncada's nickname, and

"dump Cada" meant that Moncada thought the wheat market was going to go lower.  (Moriarty

Dep. 82:1-22).  Between 12:14:30 pm CDT and 12:15:35 pm CDT, Moncada placed and

canceled two 500 lot sell orders and one 402 lot sell order in the December 2009 Wheat Futures

Contract.  (Harris Aff. ¶ 15).  At 1:15 EDT/12:15 CDT, Moriarty then asked Moncada "is that

you fucking around with the 500 lot?" (September 30 IM).  Moncada responded "of course ont

[sic] not," eliciting Moriarty to respond "lol," meaning "laugh out loud."  (September 30 IM;

Moriarty Dep. 77:8-77:22, 83:14-84:8).

70.     When asked what he meant by "fucking around," Moriarty characterized the

phrase to mean Moncada's "…putting that kind of size in on the market…"  (Moriarty Dep.

95:8-95:14).  Moriarty said he used the phrase "[b]ecause, I think it's a crazy thing to do[,]" and

"[b]ecause there's too much leverage there."  (Moriarty Dep. 94:11-94:19).  Moriarty assumed

that Moncada had placed the 500 lot orders, testifying, "I don't know why I thought it was him,

it was just on my mind and to be in the market for that much size to me is crazy and I would say why you effing around like this." (Moriarty Dep. 106:11-106:21).

## V.   SUMMARY OF MONCADA'S TRADING ACTIVITY RELATED TO THE COMMISSION'S CLAIMS OF FICTITIOUS SALES AND NON-COMPETITIVE TRANSACTIONS

71.     Separate and apart from his large-lot order activity, Moncada executed a series of offsetting trades between the BES and Serdika accounts on October 6, 12, 15, and 29, 2009.  On those four days in October 2009, Moncada placed sizeable orders on opposite sides of the market for the same quantity and price within seconds of each other in the BES and Serdika accounts. (Harris Aff. ¶¶ 16, 18, 22, 28).  Moncada admitted that he placed buy orders in the December 2009 Wheat Futures Contract market for one account and sell orders in the market for the other account for the same price and quantity on at least ten occasions, with knowledge and intent that they would hit each other.  (Moncada Dep. 254:14-256:21).

### A.     Moncada's Trading and Testimony on the October 6, 2009 Transactions

72.     On October 6, 2009, at 10:20:09.476 am, Moncada placed a buy order in the Serdika account for 80 lots at a price of 466 cents.  (Harris Aff. ¶ 16).  At 10:20:10.943 am, approximately 1.5 seconds later, Moncada placed an offsetting sell order in the BES account for 80 lots also at a price of 466 cents.  (Harris Aff. ¶ 16).  The entire BES sell order filled at the price of 466 cents within 0.001 seconds.  The majority of the Serdika buy order, 58 lots, was filled at the price of 466 cents.  (Harris Aff. ¶ 16).  The majority of the BES sell order and Serdika buy order filled against each other.  (Moncada Dep. 263:4-263:10).

73.     Moncada was shown the Moncada's trading for the October 6 orders and asked if he was trying to have the order in the BES account match against the order in the Serdika account.  Moncada agreed that he was trying to match the two orders against each other. (Moncada Dep. 262:23-263:3).

**B.      Moncada's Trading and Testimony on the October 12, 2009 Transactions**

74.      On October 12, 2009, at 11:27:56.161 am, Moncada placed a sell order in the BES account for 116 lots at a price of 483 ½ cents.  (Harris Aff. ¶ 18).  At 11:27:57.793, approximately 1.6 seconds later, Moncada placed an offsetting buy order in the Serdika account for 116 lots at a price of 483 ½ cents.  (Harris Aff. ¶ 18).  Both orders immediately filled at the price of 483 ½ cents.  (Harris Aff. ¶ 18).  The majority of the BES sell orders and Serdika buy orders filled against each other.  (Moncada Dep. 268:10-268:20).

75.      Moncada was shown the trade data for the October 12 orders at his deposition. He testified again that he was trying to have the order in the BES account match against the order in the Serdika account.  (Moncada Dep. 265:6-19).

**C.      Moncada's Trading and Testimony on the October 15, 2009 Transactions**

76.      On October 15, 2009, at 10:34:54.801 am, Moncada placed an order in the BES account to sell 271 lots at a price of 499 cents.  (Harris Aff. ¶ 22).  At 10:34:55.516, approximately 0.7 seconds later, Moncada placed an offsetting buy order in the Serdika account for 271 lots at a price of 499 cents.  (Harris Aff. ¶ 22).  Both orders were completely filled at a price of 499 cents.  (Harris Aff. ¶ 22).  The majority of the BES sell orders and Serdika buy orders filled against each other.  (Moncada Dep. 260:6-260:16).

77.      Moncada was shown the trade data for the October 15 orders at his deposition. He testified again that he was trying to have the order in the BES account match against the order in the Serdika account.  (Moncada Dep. 259:16-261:9).

**D.      Moncada's Trading and Testimony on the October 29, 2009 Transactions**

78.      On October 29, 2009, at 12:08:59.899, Moncada placed an order in the Serdika account to sell 154 lots at a price of 508 cents.  (Harris Aff. ¶ 28).  At 12:09:17.266, approximately 17.3 seconds later, Moncada placed an offsetting buy order in the BES account

for 154 lots at a price of 508 ¼ cents, thereby bidding to buy at a price one tick higher than the Serdika sell order.  (Harris Aff. ¶ 28).  Both orders were immediately and completely filled at a price of 508 cents.  (Harris Aff. ¶ 28).  The offsetting trade on October 29 was the only transaction that Moncada made in the BES account on that day.  (Harris Aff. ¶ 28).  The entirety of the BES buy orders and Serdika sell orders filled against each other.  (Moncada Dep. 267:22-268:5).

79.      Buy orders placed at prices above the best offer price will first fill against any orders at the best offer price.  (Benbrook Aff. ¶ 16).  Therefore, an order to buy at a price of 508 ¼ cents would first be filled against a sell order at a price of 508.

80.      Moncada was shown the trade data for the October 29 orders at his deposition. He testified again that he was trying to have the order in the BES account match against the order in the Serdika account.  (Moncada Dep. 265:10-265:19).

## VI.   THE WOLLACK REPORT

81.      Moncada proffered Steven E. Wollack as an expert witness and submitted to the Commission a report by Mr. Wollack (the "Wollack Report").  Wollack testified that he has never conducted any analysis of trade data.  (Wollack Dep. 16:5-16:13, 106:9-107:19, 129:14-129:17).  Wollack admitted that he only "eyeballed" a limited set of data as a basis for the conclusions in his report.  (Wollack Dep. 121:3-121:15, 109:1-109:7).  Further, Wollack testified that he does not dispute the analysis of Moncada's trading contained in the Bessembinder Report, only the conclusions that Moncada intended to manipulate the market.  (Wollack Dep. 109:1-109:13, 120:10-120:12).

Dated this 29th Day of January, 2014

Respectfully submitted,


_____/s/ Andrew Ridenour_____
Richard Glaser (Member, New York State Bar
and U.S. District Court for the Southern District
of New York Bar No. RG8652)
Andrew Ridenour (D.C. Bar No. 501628)
Jennifer S. Diamond (Illinois Bar No. 6278482)
Kenneth McCracken (Missouri Bar No. 44049)
U.S. Commodity Futures Trading Commission
1155 21st Street, NW
Washington, DC 20581
Tel:  (202) 418-5358 (Glaser)
Tel:  (202) 418-5438 (Ridenour)
Tel:  (202) 418-5244 (Diamond)
Tel:  (202) 418-5348 (McCracken)
Fax:  (202) 418-5937
rglaser@cftc.gov
aridenour@cftc.gov
jdiamond@cftc.gov
kmccracken@cftc.gov