UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

U.S. COMMODITY FUTURES TRADING
COMMISSION,

                          Plaintiff,                    Civil Action No. 12 CV 8791 (CM)

          -against-

ERIC MONCADA,                                           ECF Case
BES CAPITAL LLC, and
SERDIKA LLC,

                    Defendants.

-------------------------------------------------------X


# MEMORANDUM OF DEFENDANT ERIC MONCADA IN
# OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT


          Litman, Asche & Gioiella, LLP
          Attorneys for Defendant Eric Moncada
          140 Broadway – 38th Floor
          New York, New York  10005
          Tel. (212) 809-4500
          Fax (212) 742-8757

Table of Contents

Page

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

FACTS SHOW LACK OF MANIPULATIVE INTENT . . . . . . . . . . . . . . . . . . . . . 5

    1.   The undisputed evidence shows that Mr. Moncada's trading activity
        was not calculated to take advantage of an artificial change in price . . . . . . . . . 5

    2.   The undisputed evidence shows that Mr. Moncada was willing to, and
        did have his large lot orders executed . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    3.   Mr. Moncada had sound, strategic, non-manipulative reasons for
        placing large lot orders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    4.   It was reasonable for Mr. Moncada to cancel his large lot orders
        quickly after placing them . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    5.   Mr. Moncada does not appear to have profited from his large lot orders . . . . . . 17

    6.   The handpicked examples attached to plaintiff's moving papers fail to
        support plaintiff's theory of attempted manipulation . . . . . . . . . . . . . . . . . . 17

Alleged Fictitious Sales . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

ARGUMENT

    POINT I

    AT THE VERY LEAST, THERE ARE ISSUES OF FACT AS TO WHETHER
    MR. MONCADA HAD A SPECIFIC INTENT TO MANIPULATE . . . . . . . . . . . . . . 24

    POINT II

    MR. MONCADA DID NOT VIOLATE SECTION 4c(a) BY ENGAGING
    IN FICTITIOUS SALES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Table of Contents (cont.)                                                    Page

        POINT III

        THE COURT SHOULD NOT GRANT THE RELIEF REQUESTED
        BY PLAINTIFF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38


CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Table of Authorities

Page

Cases

In re Amaranth Natural Gas Commodities Litigation,
    587 F.Supp.2d 513 at 534-5 (S.D.N.Y. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25-27

Balderman v. United States Veterans Admin.
    870 F.2d 57, 60 (2d Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Cargill, Inc. v. Hardin,
    452 F.2d 1154 (8th Cir. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

CFTC v. The American Board of Trade, Inc.,
    803 F.2d 1242 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

CFTC v. Avco Financial Corp.,
    28 F.Supp.2d 120 (S.D.N.Y. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

CFTC v. Hall,
    2013 U.S. Dist. LEXIS 165540 (Md. N.C. 2013 at *17, 18) . . . . . . . . . . . . . . . . . . 38, 41

CFTC v. Highland Stone Capital Management, LLC
    2013 U.S. Dist. LEXIS 123,947 (S.D.N.Y. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . 24

CFTC v. Hunter,
    2012 U.S. Dist. LEXIS 12,384 (S.D.N.Y. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

CFTC v. Incomco,
    559 F.Supp. 529, 530-31 (S.D.N.Y. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

CFTC v. Nobel Wealth Data Info Servs., Inc.,
    90 F.Supp.2d 676 (D. Md. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

CFTC v. Parnon Energy,
    875 F.Supp2d 233 (S.D.N.Y. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

CFTC v. Rosenberg,
    85 F.Supp.2d 424 (D. N.J. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Page

CFTC v. U.S. Metals Depository Co.,
     468 F.Supp. 1149, 1162 (S.D.N.Y. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

CFTC v. Wilshire Inv. Mgm't. Corp.,
     531 F.2d 1339 (11th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

In the Matter of Collins,
     1996-1998 Transfer Binder Comm. Fut. L. Rep. (CCH) (1997) . . . . . . . . . . . . . .  36, 37

In re Diplacido,
     2007-2009 Transfer Binder Comm. Fut. L. Rep. (CCH) at ¶30,970 (2008) . . . . . . . . . 32

Matter of Escoval Dairy Trade Inc.,
     2011-2012 Transfer Binder Comm. Fut. L. Rep. (CCH) ¶32013 (2011) . . . . . . . . .  33, 34

In re Grossfeld,
     1996-1998 Transfer Binder Comm. Fut. L. Rep. (CCH) ¶44468 at n. 34) (1996)  . . . . . 41

In re Hohenberg Brothers,
     1975-1976 Transfer Binder Fut. Comm. L. Rep. (CCH) ¶2271 (1977) . . . . . . . . . . .  24, 32

In re Indiana Farm Bureau Cooperative Association,
     1982-1984 Transfer Binder Fut. Comm. L. Rep. (CCH) ¶21796 (1982) . . . . . . . . .  25, 32

In the Matter of Panther Energy Trading LLC
     2012-2013 Transfer Binder Comm. Fut. L. Rep. (CCH) at ¶32686 (2013) . . . . . . . .  33, 34

Patrick v. LeFevre,
     745 F.2d 153, 159 (2d Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

In re Piasio, 2002 CFTC LEXIS 13 (2002);
     aff'd, Piasio v. CFTC, 54 Fed. App. 702 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . 40

R&W Technical Services, Ltd. v. CFTC,
     205 F.3d 165, 178 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Ramseur v. Chase Manhattan Bank,
     865 F.2d 460, 465 (2d Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Alvin S. Schwartz, M.D. P.A. Employer/Employee Profit Sharing Plan v. O'Grady
     86 Civ. 4243 (JMC), 1990 U.S. Dist. LEXIS 13465 (S.D.N.Y. 1990) . . . . . . . . . . . . . 24

Page

SEC v. Treadway,
    430 F.Supp. 2d 293, 332 (S.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Stoller v. CFTC,
    834 F.2d 262, 265 (2d Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 36


Statutes

7 U.S.C. §4c(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

U.S. COMMODITY FUTURES TRADING
COMMISSION,

                              Plaintiff,              Civil Action No. 12 CV 8791 (CM)

              -against-

ERIC MONCADA,                                        ECF Case
BES CAPITAL LLC, and
SERDIKA LLC,

                              Defendants.

-------------------------------------------------------X

## MEMORANDUM OF DEFENDANT ERIC MONCADA IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

This Memorandum is submitted in opposition to the motion by plaintiff for summary judgment with respect to the plaintiff's claim of attempted manipulation of the market for December winter wheat futures on eight days in October 2009 and for alleged "fictitious sales."

### Preliminary Statement

Summary judgment in favor of plaintiff is inappropriate where, as here, plaintiff relies on circumstantial evidence comprised entirely of inconclusive and incomplete statistical analyses and ambiguous examples to prove a defendant's subjective intent to manipulate; this is particularly so where the defendant, supported by the expert opinion of a long-time and respected commodities trader and exchange board member, has denied under oath any manipulative intent. Issues of fact abound, and they are incapable of resolution prior to trial. Even without defendant's denial of manipulative intent, the plaintiffs' theory -- that defendant entered numerous large lot

orders in order to affect prices and then traded in the opposite direction of these orders to take advantage of the price movement -- is contradicted by defendant's actual trading pattern:

-- According to plaintiff's statistical expert, the effect of Mr. Moncada's large lot orders on price was minimal and transitory, measurable for at most 20 seconds. Yet the expert conceded that the "bulk" of defendant's trades in the opposite direction of his large lot orders occurred after a lapse of several minutes to an hour; if Mr. Moncada intended to take advantage of any price change caused by his large lot orders, why would he wait until after any such impact had dissipated?

-- Mr. Moncada often traded in the same direction of his large lot orders; if Mr. Moncada's intent was to manipulate the market by placing large lot orders, why would he trade in the same direction after placing them?

-- Mr. Moncada's method of placing and cancelling large lot orders actually placed him at risk that the orders would be filled, even though he could have used readily available devices to avoid such risk. During the period studied by plaintiff's expert, more than 6,000 December wheat contracts (more than 6% of all contracts executed in the markets) were actually filled against his large lot orders.  If Mr. Moncada was using large lot orders for the purpose of manipulating the market and had no intention to trade, why did he intentionally risk execution on those orders and engage in such substantial trading?

-- Mr. Moncada testified as to several strategic purposes for entering large numbers of large lot orders, defendant's expert witness (a lifelong professional commodities trader and board member of the CME) endorsed these as reasonable; and the plaintiff has submitted no issue of fact for trial.

2

‒‒    Mr. Moncada, supported by defendant's expert, gave a coherent and logical explanation for why he quickly cancelled most of his large lot orders; the plaintiff has submitted no contradictory evidence; as a minimum the bona fides of Mr. Moncada's explanation presents an issue of fact for trial.

‒‒    Mr. Moncada apparently did not profit from his allegedly manipulative conduct.

The statistical evidence on which plaintiff relies at best raises fact issues. At most, the plaintiff has demonstrated that Mr. Moncada's trading methods were unusual, but even that is not clear from the statistical evidence. For example, plaintiff's expert compared Mr. Moncada's placement and cancellation of large lot orders with those of other traders and concluded that Mr. Moncada was an outlier ‒ that he placed far more orders and quickly cancelled than other traders. The expert admitted, however, that he could have, but did not, calculate the number of modifications (as opposed to cancellations and placement of new orders) entered by other traders. Modification is a well-known technique, whereby traders modify the offering price or size of an order but leave it open,  and is functionally identical to cancellations and reorders, a technique Mr. Moncada preferred. Even if Mr. Moncada's trading methods were unique, this would not amount to evidence, much less conclusive proof, that Mr. Moncada had a nefarious purpose.

Plaintiff has attempted to buttress its case by selecting brief time sequences on the dates charged in the complaint and showing that "at least once" during each sequence defendant traded on the opposite side of a large lot order. As will be demonstrated below, these excerpts (handpicked by the plaintiff) do not support plaintiff's theory and, if anything, show that Mr. Moncada did not have a manipulative purpose.

3

Every conclusion plaintiff asks the court to draw from its evidence is subject to substantial debate.  This motion for summary judgment is not the appropriate vehicle to resolve that debate.

* * *

Plaintiff also seeks summary judgment with respect to claims that Mr. Moncada engaged in fictitious sales.  As a matter of law, plaintiff's motion should be denied because undisputed facts show that the orders placed by Mr. Moncada involved risk, did not distort prices and were not intended to deceive market participants.

4

## Facts Show Lack of Manipulative Intent

The following facts compel denial of plaintiff's motion for summary judgment on the attempted manipulation claim:

:        1.    The undisputed evidence shows that Mr. Moncada's trading activity was not calculated to take advantage of an artificial change in price:   Plaintiff's expert Mr. Bessembinder attempted to determine whether Mr. Moncada's large lot orders had any impact on the market price of December wheat contracts, and, if so, whether Mr. Moncada's trades in the opposite direction of those orders benefitted from the impacted prices. Mr. Bessembinder concluded that Mr. Moncada's large lot orders had a very small impact on market price for up to 20 seconds after the orders were placed, but he acknowledged that he was unable to measure any impact after 20 seconds (EBT, p. 36).  Mr. Bessembinder admitted that  the "bulk" of Mr. Moncada's trading in the opposite direction of his large lot orders occurred long after the initial 20 seconds,   "from several minutes to an hour" after placing large lot orders. (EBT, p. 79). "It's out 10 minutes, 30 minutes, 60 minutes later that we see the largest cumulative trading in the opposite direction." (EBT, p. 51). [Emphasis added]

The plaintiff's claim that Mr. Moncada traded "consistently in the opposite direction" of his large lot orders is not supported by Mr. Bessembinder's statistics or any other evidence.  Mr. Bessembinder opined that in the 10 seconds after placing a large lot order Mr. Moncada traded on balance "slightly in the opposite direction" (EBT p. 40), an average of .65 contracts per thousand lot large orders on the charged dates (Report Table 8)[1].  However, Mr. Bessembinder made no effort or the same direction to determine what percentage of Mr. Moncada's trades which were in the opposite direction of his large lot orders (EBT, p. 41).  Even

---

[1]      Mr. Bessembinder made no effort to measure Mr. Moncada's trading at 20 second intervals after placement of the large lot orders [EBT, p. 40].

the examples provided by plaintiff in its motion papers show that, if anything, Mr. Moncada's trading in the 20 seconds after large lot orders was anything but consistent, with numerous trades of small lots in the same direction as his large lot orders (see below pp. 14-18).

Even in the twenty second window after placement of the orders, Mr. Bessembinder acknowledges that any impact Mr. Moncada's large lot orders had on price was barely measurable. According to Mr. Bessembinder, for every order of 1,000 large lots, the market price moved less than a tenth of a penny (.096 cents) per bushel. (EBT, pp. 34-35). Since prices are quoted in "ticks" of a quarter of a penny (.25), the theoretical movement caused by a 1000 lot order was not even enough to move the price one "tick" (EBT, p. 35).

A contract for one lot of wheat is 5,500 bushels.  (Plaintiff's Statement of Undisputed Facts #12-17).  Therefore, a tenth of a penny per bushel price change equates to $5.50 per contract.  If Mr. Moncada's average number of opposite direction contracts per 1,000 large lot orders was .65 in the first 10 seconds, then Mr. Moncada stood to make $3.63 as a result of price changes caused by a 1,000 large lot order.  However, Mr. Moncada never placed a 1,000 lot order.  Most of Mr. Moncada's large lot orders were from 200 to 400 lots.  Assuming a 300 lot order, Mr. Moncada stood to profit approximately $1.21 from the price change.  It is simply illogical to believe that Mr. Moncada would risk getting executed on a 300 lot order in order he did not wish to fill in order to make $1.21.  Even if Mr. Moncada placed 100 large lot orders a day (thus exposing himself to substantial risk), his profit from the alleged artificial price movement would be only $121.00,..

In sum, Mr. Moncada's trading activity shows that when he placed small orders in the opposite direction of large lot orders, the "bulk" of the time it was long after the large lot orders had any measurable effect in price. Plaintiff does not even attempt to explain why, if Mr.

Moncada was seeking to manipulate prices by placing large lot orders, he waited to trade (up to an hour) until there was no discernible impact on price. Mr. Moncada had to know that any effect on price would have been monetary. Indeed, as defendant's expert, Steven Wollack, a professional commodities trader and currently a member of the board of directors of the Chicago Mercantile Group (CME) which owns CBOT, pointed out (Report, p. 4, Exhibit A to the Declaration of Richard M. Asche in opposition to summary judgment):

> Frequent cancellation would not affect the price because traders would notice, adjust their trading accordingly and ignore frequent cancellations. Traders would be more concerned with large orders that are not cancelled because that would be more indicative of strength.

Even Mr. Bessembinder acknowledged that any trader who was "paying attention" would have noticed not only Mr. Moncada's orders but their quick cancellation (EBT, p. 63).

Since Mr. Moncada's trading activity was not calculated to take advantage of an artificial movement in price (however small), it cannot be inferred that he intended to manipulate the price with his large lot orders. As a minimum, a question of fact is presented.

2.   The undisputed evidence shows that Mr. Moncada was willing to, and did have his large lot orders executed:   Mr. Bessembinder acknowledged that Mr. Moncada's placement of large lot orders put Mr. Moncada at risk of having his orders accepted. (EBT, pp. 60-61). Mr. Moncada left his large lot orders open for an average of 2.1 seconds on the eight dates charged and 4.6 seconds during the entire period studied by Bessembinder. (Report, Table 3). According to Mr. Bessembinder, another trader using widely available computer programs, wishing to execute against Mr. Moncada's orders, could have done so within a millisecond. (EBT, p. 14).

Mr. Moncada did not take steps available to him to reduce the time his orders remained open. Had Mr. Moncada intended to avoid being executed on his large lot orders, he could have employed readily available algorithmic programs which could have canceled his orders within a microsecond. (EBT, p. 16).

Not only was Mr. Moncada willing to have his large lot orders executed, but during the period studied by Mr. Bessembinder <u>Mr. Moncada actually traded some 6,053 contracts as a result acceptance of whole or part of his large lot orders</u>. These trades represented about <u>6.1% of all contracts traded by all traders</u> as a result of large lot orders on the CBOT and KC exchanges during this period (Bessembinder EBT, p. 52).

In the month of October 2009 alone, when the alleged manipulations occurred, Mr. Moncada traded 4,103 contracts resulting from his large lot orders (Report, Table 1). On the eight charge dates in October, Mr. Moncada executed trades partially or wholly on 14.4% of the large lot orders he entered (Report, Table 5).

When Mr. Moncada did execute his large lot orders, he was in no rush to exit his position. Defendant's expert, Steven Wollack, notes (Exhibit A to the annexed Affirmation of Richard M. Asche, p. 4-5):

> On September 22nd (Bessembinder pg. 21 para. 48) Moncada was long 20 contracts just before the execution of a large buy order at 12:37:02 that increased his position to 437 contracts. He reduced his position to 306 contracts a little more than a minute later and waited another twenty three minutes (13:00:30) to reduce to 207 contracts. It wasn't until the pit closed at 13:15 that he reduced his position to 22 contracts, approximately the same as before the large order execution. If he did not intend to be executed he would have sold the entire executed order within a minute or two. Traders typically get out a trade immediately after an error or order that is not wanted. Moncada did not do this but instead he sat with 306 contracts for almost 23 minutes where every tick was $3825 and each one cent move was $15,300. Then he reduced his position to 207 contracts which he held for fourteen minutes where

every tick was $2587.50 and each one cent move was $10,350. It wasn't until the pit close, 38 minutes later, that he finally liquidated the large order. Clearly Moncada intended to be executed on this large order and took market risk.

On October 6, 2009 (a relevant date) Moncada bought 200 contracts at 9:30:00 and his additional buying and selling resulted in an increase in his position to 239 contracts at 9:38:38. It wasn't until 10:20:10 that he got out of his net long position. By holding a net long position for 50 minutes indicates intent to be executed.

On October 27, 2009 (a relevant date) Moncada bought 202 contracts at 10:10:22 increasing his long position to 429 contracts where every tick is $5362.50 and every one cent move is $21,450. It wasn't until 12:53:26 that he exited the 202 extra contracts. Clearly, taking two hours forty three minutes to get out of an order indicates intent to be executed.

Thus, while Mr. Moncada traded "slightly" in the opposite direction within twenty seconds of his large lot orders, he also executed trades on several thousand contracts resulting from those orders. And when those trades were executed, he did not immediately exit his position.

3.   <u>Mr. Moncada had sound, strategic, non-manipulative reasons for placing large lot orders</u> -- Mr. Moncada has testified that he did not enter orders with a manipulative purpose (EBT, p. 121):

Q:   Did you ever enter into a trade with the intent of moving the market?...

A:   No.

Mr. Wollack found nothing unusual or suspicious in Mr. Moncada's trading pattern. He opined that:

Moncada's trading style of buying and selling thousands of contracts and at times using large lot orders indicates he relied on a trader's intuition and feel of the market in addition to fundamental and technical analysis. <u>Sometimes large orders may be used to test</u>

9

> the strength of a trader's position or direction of the market. When executed on a large order, Moncada did not immediately exit the position but instead held it. He was an active trader, trading thousands of contracts per day.  At times, active traders such as Moncada put large orders in the market feeling that the market was going in their direction and want to add to their position but only if immediately executed (p. 2).

On the eight days charged in the complaint, Mr. Moncada traded 23,763 contracts or nearly 3,000 contracts a day.  (Attachments F-M to Harris affidavit in support of motion).

Mr. Moncada testified as to why he placed large lot orders:

First, Mr. Moncada stated that he placed large lot orders as a way of testing the market or "asking for liquidity" (EBT, 99, 129-130).   According to Mr. Wollack this is a perfectly legitimate method of trading and a perfectly good reason for bidding (Wollack Report, p. 2).

Mr. Moncada's testimony that by placing and cancelling orders, he was seeking liquidity or signaling interest finds resonance in an article relied on by plaintiff's expert, Mr. Bessembinder (cited at para. 33 of the Bessembinder report).  This article, written in 2002 by Joel Hasbrouck and Gideon Saar (then professors at the Stern Business School at NYU) and titled "Limit Orders and Volatility in a Hybrid Market:  The Island ECN", seeks, in part, to explain the phenomenon of "fleeting orders" and states (Exhibit C to Declaration of Richard M. Asche):

> Another possible reason for a fleeting limit order is that the submitted wants to fish for hidden orders that better the opposing quote.  A buyer, for example, might submit an order priced just short of the ask quote, hoping to trade against any hidden sell orders.  Here as well a fleeting limit order represents a liquidity demander, rather than a supplier.  Smart order routing systems may also submit limit order in an attempt to uncover hidden limit orders.  The distinction we make here is that such practices may be carried out by a human trader rather than a computer system…

The fact that many of the fleeting orders are visible, though, suggests that finding hidden sellers is not the only motive, and that the brief display serves some purpose.  The display might <u>signal tentative buying interest to prospective sellers</u>, without going so far as to provide them with a firm option. [emphasis supplied]

(Exhibit C to Affirmation of Richard M. Asche in Opposition to Motion).

The Hasbrouck and Saar article also discusses "spoofing" as a "potential" explanation but gives as an example of spoofing a fact pattern dissimilar to that presented here (<u>see</u>, p. 33 <u>infra</u>).

Second, Mr. Moncada testified that he placed orders based on his "view of the market." He was more than willing to trade large lots at a specific price and time, but not willing to leave his order to the mercies of a changing market (EBT, pp. 324-5)

Third, Mr. Moncada testified that he placed large lot orders in order to get size priority on his trade (Report, p. 3)

As Mr. Moncada testified (EBT, pp. 138, 139):

A:    The market has a size priority function in it, in the matching order.  If you are one of the bigger bids or offers in the engine, whether you're first or last, you could potentially get a partial fill.

Q:    Did you ever – is there a shorthand that we can use for this rationale just for simplicity's sake?

A:    Size priority.

Q:    Size priority, okay.  Let's talk about size priority.

Do you ever recall, or do you recall placing any orders, large lot orders on October 2009, in an effort to get size priority?

A:    Yeah.

Mr. Wollack confirmed that the desire to obtain priority was a valid reason for placing large lot orders.  (Report, pp. 3-4):

> One important reason for frequently entering and canceling orders is to obtain time and allocation priority in the execution of his orders.  Under the CME's matching algorithms for wheat futures (CME Globex Product Reference) the first order at a price level gets tops allocation up to a maximum of 100 contracts, then there is a Pro Rata allocation of all orders at the price level and if the incoming quantity is not satisfied, the remainder is filled using a FIFO allocation.
>
> Thus, if Moncada was the first large order at a price, he would have priority only on the first 100 contracts and then would be filled no a Pro Rata basis and possibly a FIFO allocation.  If Moncada was not the first order at a price, then he would only be filled on a Pro Rata basis and would only have partial fills on his large orders.  To obtain priority on the first 100 contracts Moncada would have to be the first order at a new price.  This would explain frequent entering and cancelling orders in order to obtain priority on the first 100 contracts or at least increase his Pro Rata share.

Nor is the fact that Mr. Moncada was seeking liquidity or signaling the market belied by Mr. Moncada's placement of small lot orders in the opposite direction of his large lot orders.  As Mr. Moncada explains in his affidavit in opposition to this motion, sometimes the absence of liquidity or interest compels him to trade in the opposite direction.  (Moncada Affidavit, p. 2).

What Mr. Moncada was unable to do at his deposition in 2013 was to tell what his rationale was with respect to any specific large lot order or group of large lot orders four years earlier in 2009.

Mr. Moncada testified as follows (EBT, pp. 149-150):

> Q:   You understand that there's a big difference between what you're saying of I wanted to send a signal to the market to get – to find somebody to come in and provide or to take the liquidity that I put out there, and I put out a big order to get a time priority – or a size priority?

A:     Well, those are two different situations that would arise in trading.

Q:     And could you tell when you used one versus the other?

A:     Could I tell from the data?  No.  I'd have to go back to the situation.

Q:     You couldn't tell from the data?

A:     No, not from the data from 2009.  We're talking about a situation in 2009.  You're asking me to remember how exactly I felt about the market and trading back then.

Plaintiff claims that Mr. Moncada did not testify that he "intended" to execute on large lot orders.  In the first place, plaintiff is wrong.  Mr. Moncada did testify that he intended to execute on his large lot orders.  In testimony omitted from plaintiff's Memorandum, Mr. Moncada testified as follows (EBT, p. 112):

Q:     Were you fully – were you intending to execute those orders, though?  Those large lot orders?

A:     If the market participants were willing to come to my price and trade on my price, and I put the order out there, yes, but that doesn't mean I could, that it necessarily was a good trade or that I would like it.

And (at p. 324-325):

Q:     Why would you be putting in a large lot order in that case at all?

A:     I would put it in with the intention of hopefully being filled from some order flow.  If there was back and forth order flow and I got filled possible that would be a position I would be happy to take, but I'm not going to leave the order out there for somebody to possibly take advantage of or lean against.  I'm prepared to make a decision on the market at that moment and then change my mind, cancel and reevaluate.

Secondly, as shown below (pp. 26), the issue in a  manipulation case is not necessarily whether a defendant "intended" every order to be executed <u>in full</u>, but whether he has a legitimate economic objective in placing the order – such as seeking out liquidity or testing the market.  As Mr. Moncada and Mr. Wollack have both confirmed, this can be done with an order placed and then quickly cancelled.

    4. <u>It was reasonable for Mr. Moncada to cancel his large lot orders quickly after placing them</u>:  The plaintiff relies heavily on Mr. Moncada's pattern of cancelling large lot orders quickly after entering them. Plaintiff claims that Mr. Moncada failed to offer an explanation as to why he cancelled large lot orders quickly.  Again, plaintiff omits relevant testimony.  Contrary to plaintiff's claim, Mr. Moncada did offer a rational explanation for why he would place and quickly cancel his large lot orders. Mr. Moncada testified as follows (Moncada EBT, pp. 320-321):

> Q: Apart from changes in the market, is there a reason why you would not have left a large lot order open for more than a fraction of a second? (sic)
>
> A: Yes.  The risk involved in a large lot order is again as I said big, and the risk reward also is a little challenging.  If you leave a large order in the market, and the market goes violently against you, you stand to have a lot of downside because you will get filled on that order and the market will move against you.  But if the market moves in favor of the order, you participate in zero upside because you were not filled and the market has moved in that direction.  So it seems logical to not want to leave your order, a stale order out there for a very long period of time.

Mr. Moncada also testified in response to a question as to why he would quickly cancel.  "Well, the order didn't get filled immediately, and so I took the order out of the market to continue to figure out if and -- if and how I wanted to sell it."  (p. 164).  And at page 169:

14

Q:    What reason would you have for within 45 seconds put in three different sell orders for 302 lots, 402 lots and 402 lots and cancel them 8/10 of a second later?

A:    It looks like it would be multiple reasons but it looks like I didn't get any orders filled on my first two sell orders, <u>and moved my price down</u>. [emphasis added]

Mr. Wollack also agreed that it made sense for Mr. Moncada to cancel his orders

quickly (Report, p. 4):

…"[f]or traders like Moncada there is no upside to leaving a resting order waiting for the market to come back to his price because the dynamics of the market may have changed.   If Moncada was trading for the moment then he would want to be immediately executed because he thought the market was going in his direction.   If not executed then he would cancel because otherwise if the market would move away from his order and then subsequently come back to that price it might mean the market was reversing.  To avoid this possibility, he would cancel his orders.

Mr. Bessembinder endorsed Mr. Moncada's rationale for cancelling quickly

(EBT, pp. 25-26):

Q:    But if Mr. Moncada employed that reasoning that I just suggested in my question, that would be a reasonable – that would be a reasonable conclusion for a trade.  If he can't make money, if the market moves lower and he has to lose money, or he is at risk of losing money if it moves higher, isn't that a good reason for not leaving that large lot order out there?

A:    Well, certainly there are legitimate reasons for cancelling an order.

Q:    And that's one of them?

A:    The scenario you lay out is a reason that one might want to cancel an order.

Other traders did not have the same incentive to cancel large lot orders quickly.

As Mr. Bessembinder wrote, other traders typically priced their large lot orders an average of 18

ticks from BBO (Report, para. 24).  By contrast, Mr. Moncada placed his bids at or near BBO

(EBT, 66). Mr. Bessembinder acknowledged   that a trader who priced his large lot  bids "aggressively" (i.e. at or near BBO) was more likely to get executed than a trader who placed his bids several ticks away from the market (EBT, p. 64). Since Mr. Moncada's bids were closer to BBO than other traders, a small change in price against his bid could result in a loss to Moncada, whereas other traders would have a longer lag time before their bids might be hit.  And, as Mr. Bessembinder acknowledged, "a trader who is more motivated to get a trade done than others [would] tend to keep his offer on longer than one who is more price sensitive." (EBT, p. 28).

Mr. Bessembinder's comparison of Mr. Moncada's percentage of large lot orders and cancellations with that of other traders is misleading, if not meaningless. Mr. Bessembinder acknowledged than many traders (but not Mr. Moncada) "modify" large lot orders rather than cancelling them. That is, the trader would continually modify the bid price but leave the bid open.  Mr. Moncada testified that he would cancel his large lot orders "to re-evaluate."  (p. 180). "When the orders don't get filled, I don't like leaving them in." (p. 187).  Functionally, there is little difference between modifying an order and cancelling and then reentering an order at a different (or the same) price. In particular, there is no evidence that a trader who places a large lot order and modifies it several times during a two hour period has any lesser impact on price than a trader who repeatedly enters and cancels his large lot orders.  But the cancellation rates Mr. Bessembinder reports for other traders <u>do not include modifications</u> which Mr. Bessembinder did not see fit to "quantify."  (EBT, p. 27). This throws into question the validity of Mr. Bessembinder's statistics. For example, if Mr. Moncada placed an order for 200 lots, cancelled it and placed it again and repeated this five times, Mr. Moncada would have placed six large lot orders, with six cancellations.  If trader A placed a 200 lot order and modified the asking price five times, he would have placed only one large lot order and had no cancellations.

In short, the entire statistical difference between the ordering and cancellation activities of Mr. Moncada vs. the rest of the market could simply be explained by Mr. Moncada's preference for cancellation over modification as a technique of managing his orders.

5.     <u>Mr. Moncada does not appear to have profited from his large lot orders</u>: The available evidence shows that October 2009 was not a profitable month for Mr. Moncada. According to the chart contained in the moving affidavit of Jessica Harris, para. 30 (p. 8), before October 2009, Mr. Moncada enjoyed substantial earnings overall as a member of BES and Serdika. The last payment he received from either firm, however, was on October 9, 2009, and could thus not have reflected any trading profits or losses for the month of October which is the focus of plaintiff's complaint. Mr. Moncada never drew any more money from the companies after October 9.  In December 2000, Mr. Moncada was actually required to repay $300,000 to Serdika (<u>id</u>), presumably to cover losses.

6.     <u>The handpicked examples attached to plaintiff's moving papers fail to support plaintiff's theory of attempted manipulation</u>:  Plaintiff claims that "on each of the eight [alleged] attempted manipulation dates, Moncada placed and filled small-lot orders on the opposite side of his large lot orders in the same time period that he placed at least one large lot order" (Memo, p.11). However, the examples chosen by plaintiff (Harris affidavit paras. 34-43 and Attachments R-AA) are equivocal at best, showing purchases both on the same side and on the opposite side, numerous large lot orders which were <u>not</u> followed by any trades, and trades on the opposite side <u>preceding</u> the large lot orders, none of which is consistent with plaintiff's theory.

That Mr. Moncada evinced no pattern of trading consistent with the plaintiff's theory supports Mr. Moncada's assertion that he used these large lot orders to test the market,

because he wished to purchase the contracts, or because he was seeking priority – not because he wanted to manipulate the price.

The handpicked examples provided by the Commission are found as attachments R-AA to the moving affidavit of Patricia Harris:

Attachment R (October 6, 2009) – Attachment R shows seven large lot purchase orders. According to plaintiff's theory, these should have been followed closely by small lot sales. However, Attachment R shows that Mr. Moncada's first trades after the first three large lot purchase orders (for 500, 425 and 225 contracts) were purchases of 40 contracts. This behavior is inconsistent with the CFTC's theory that Mr. Moncada placed and cancelled large lot purchase orders to bring the price up so that he could sell at a higher price. If Mr. Moncada intended to use large lot purchase orders to artificially increase the price, he would not have bought contracts after entering the large lot purchase orders. Mr. Moncada did not execute any sales within 30 seconds of five of the seven large lot orders reflected on Attachment R. While Mr. Moncada thereafter sold 30 of the 40 contracts he purchased following large lot purchases, his net transaction on the excerpt provided by plaintiff was 10 contracts on the same side as his large lot orders.

Attachment S (October 12, 2009) – Attachment S shows five large lot purchase orders. Zero small lot sales are recorded within two minutes of four of the five large lot orders. A total of only 11 small lot contracts were sold within 16 seconds after the fifth large lot order.

Attachment T (October 14, 2009) – Attachment T shows eight large lot purchase orders. There were no small lot trades within a minute of the first three large lot purchase orders. The first small lot trade following the fourth and fifth large lot purchase orders was a purchase, not a sale, and therefore contradicts plaintiff's theory. No contracts were sold within 20 seconds

of the sixth large order.  But six seconds before his seventh large lot buy order, Mr. Moncada sold 12 contracts.  This sequence does not support plaintiff's theory.  If Mr. Moncada intended to use large lot purchase orders to artificially increase the price, he would not have sold contracts immediately before entering the large lot purchase order, but would have waited until the order had its desired effect of raising prices.  There were no trades between the seventh and eighth large lot order, and then a sale of 20 lots after the eight large lot order.

Attachment U (October 19, 2009) – In this excerpt, Mr. Moncada placed and cancelled three large lot purchase orders.  The only trades within 30 seconds of the first two large lot orders were purchases, not sales, which is consistent with the plaintiff's theory.

After the third large lot order, Mr. Moncada sold the two lots he had purchased after the first large lot orders (at a loss of four ticks).  Thus, there is literally no evidence with respect to the example provided for this date to support the plaintiff's theory.

Attachment V (October 26, 2009) – This attachment shows that in the excerpt provided by the Commission, Mr. Moncada made no trades after the first of three large lot purchase orders, sold five contracts exactly 20 seconds after the second large lot purchase order, and six contracts shortly after the third.

Attachment W (October 26, 2009) – This attachment shows two large lot sell orders.  Following the first large lot sell order, Mr. Moncada executed no trades for nearly three minutes, long after his large lot sell orders could have had any discernible impact on price.  Mr. Moncada purchased 30 contracts following the second large lot sell order.

Attachment X (October 27, 2009) – This attachment shows that within seven seconds after placing the first two of three large lot sell orders, Mr. Moncada continued to sell, eventually selling an additional 30 contracts.  Because Mr. Moncada was trading in the same

direction as his large lot orders, this pattern contradict the plaintiff's theory.  Mr. Moncada effected no small lot trades until more than 20 seconds after his last large lot order.

The excerpt contained in Attachment X begins at 9:36:00 a.m.  As Mr. Wollack point out in his report (pp.6-7), just prior to the period reflected in plaintiff's exhibit, between 9:32:42 and 9:32:57, Mr. Moncada entered and cancelled two large lot <u>sell</u> orders.  Less than a second after the second large lot sell order was cancelled, Mr. Moncada <u>sold</u> 66 contracts, i.e., -- contrary to plaintiff's theory – immediately after cancelling a large lot order he traded a small lot in the <u>same direction</u> as the large lot orders, not the opposite direction.  His activity is inconsistent with the plaintiff's theory that by placing large lot purchase orders he hoped to increase the price so he could sell.

Attachment Y (October 27, 2009) – This attachment shows that Mr. Moncada placed and cancelled two large lot purchase orders.  Mr. Moncada sold zero contracts within <u>nine minutes</u> of the first such order or within <u>five minutes</u> of the second such order.  When he finally did sell, long after large lot orders could have had any effect, he sold only four contracts.

Attachment Z (October 29, 2009) – The excerpt contained in Attachment Z begins at 10:33:19 a.m.  As Mr. Wollack points out (Report, pp. 6-7), immediately before the period covered by plaintiff's excerpt, the record shows a different story.  At 10:23:45 and at 10:27:28, Mr. Moncada entered and then cancelled large lot <u>purchase</u> orders for 402 and 500 contracts, respectively (Wollack, p. 5)  Mr. Moncada's next trade was a <u>purchase</u> of 25 contracts, i.e., a trade in the <u>same</u> direction as two large lot orders.

Attachment AA (October 30, 2009) – This attachment shows that three contracts were sold following each of two large lot purchase orders, and that zero contracts were sold following the third large lot purchase order.

In summary, as the foregoing analysis shows, no trades in the opposite direction were placed within twenty seconds of 27 of the 41 large lot orders highlighted by plaintiff as prime examples of attempted manipulation.

Mr. Moncada's purchase of 202 contracts on October 27, 2009 is inconsistent with plaintiff's theory:  At page 11 of its Memorandum, the plaintiff points to a sequence on October 27 in which Mr. Moncada placed an order for 202 contracts, which was filled in its entirety.  The Commission asserts that following this trade, Moncada entered a series of orders, cancellations and sales which it claims supports its manipulation theory.  A closer look does not support this contention.  The excerpt shows that Mr. Moncada made several trades in the same direction as his large lot orders, and most of Moncada's trades in the opposite direction occurred a minute or more after the most recent large lot purchase order, well beyond the time when the purchase order could have had any impact on price.

As reflected on Attachment N to the Harris Affidavit, Mr. Moncada's purchase of 202 lots occurred at 10:10:22.  His first sale did not occur until 10:12:13, nearly two minutes later when he sold 20 lots.  This sale occurred well beyond the time when the large lot purchases had any discernible influence on price.  (Immediately after selling 20 lots, Mr. Moncada bought back 20 lots).

Mr. Moncada then entered and cancelled large lot purchase orders at 10:14:30 (402 lots); at 10:14:59 (300 lots); at 10:18:22 (500 lots); at 10:19:13 (500 lots); at 10:21:59 (402 lots); at 10:26:15 (402 lots) and between 10:29:05 and 10:31:05 (nine orders of 202 lots each).  During this entire period from 10:14:30 through 10:31:05, Mr. Moncada did not sell a single contract.  Thus, although Mr. Moncada ordered and cancelled large lots 15 times, he did not trade after these orders even once.  The first sale after the last of these 15 orders occurred more

than one minute after 10:31:05, beyond the period when the orders could have had any effect on price. Indeed, during this period, Mr. Moncada actually purchased several lots; i.e., he traded in the <u>same</u> direction as his large lot orders.

Thereafter, Mr. Moncada ordered and cancelled contracts at 10:36:48 (500 lots) and 10:37:20 (402 lots) with no sales for more than two minutes. Mr. Moncada also entered a large lot order for 402 contracts at 10:39:39 but did not sell any contracts for 46 seconds after that; and Mr. Moncada entered and cancelled large lot purchase orders at 10:45:20 (500 lots) and 10:54:30 (500 lots) while selling only a single contract during that period.

Conversely, in the excerpt provided by plaintiffs on Attachment N, Mr. Moncada sold 115 lots which were <u>not</u> preceded within 30 seconds by large lot purchase orders.

In sum, 20 of the 25 large lot purchase orders placed by Mr. Moncada in the example posited by plaintiff were not followed by sales within the time frame when the large lot orders could have affected market price.

Presumably, plaintiff's moving papers contain the best examples plaintiff can find to support its theory. It is all the more revealing, therefore, that plaintiff cannot present, even within these handpicked examples any solid evidence of Mr. Moncada followed a pattern designed to take advantage any price movement resulting from his large lot orders. The overwhelming inference is that the orders were not placed for manipulative purposes.

<u>Alleged Fictitious Sales</u>

The facts surrounding plaintiff's claim of fictitious sales are not in dispute. We agree with plaintiff's recitation of the facts at pages 17-18 of its Memorandum, and supporting trading records. However, the undisputed fact pattern demonstrates that the trades at issue placed the parties at risk and are therefore excluded from the definition of fictitious sales. Also, the facts do not show that Mr. Moncada had any nefarious purpose in effecting the trades.

Rather, he was simply trying to close out a position in one account by bringing contracts on the open market at the BBS from the other accounts.   In the interest of brevity, we will set forth those facts to the extent relevant in Point II of the Argument, infra, pp.35-37.

ARGUMENT

I.

AT THE VERY LEAST, THERE ARE ISSUES
OF FACT AS TO WHETHER MR. MONCADA
HAD A SPECIFIC INTENT TO MANIPULATE

Courts are particularly cautious in granting summary judgment where the issue is

the subjective intent of the defendant.  CFTC v. Highland Stone Capital Management, L.L.C.,

2013 U.S. Dist. LEXIS 123,947 (S.D.N.Y. 2013). As the Court there noted:

> Before trial…"[t]he Second Circuit has repeatedly held that where
> subjective issues regarding intent, motive or state of mind are
> implicated, summary judgment is usually inappropriate." See, e.g.,
> Balderman v. United States Veterans Admin., 870 F.2d 57, 60 (2d
> Cir. 1989); Alvin S. Schwartz, M.D., P.A. Employer/Employee
> Profit Sharing Plan v. O'Grady, No. 86 Civ. 4243 (JMC), 1990
> U.S. Dist. LEXIS 13465, 1990 WL 156274 (S.D.N.Y. Oct. 12,
> 1990) (denying summary judgment as to §4(b) claim to the extent
> it relied upon subjective intent of defendant) (citing Balderman,
> 870 F.2d at 60); Ramseur v. Chase Manhattan Bank, 865 F.2d 460,
> 465 (2d Cir. 1989); Patrick v. LeFevre, 745 F.2d 153, 159 (2d Cir.
> 1984).

See also Stoller v. CFTC, 834 F.2d 262, 265 (2d Cir. 1987) and cases cited therein; CFTC v.

Hunter, 2012 U.S. Dist. LEXIS 12,384 at *6-7 (S.D.N.Y. 2012) ("To resolve the issue of intent

the court would have to weigh conflicting evidence and choose among the contrary inferences

argued by both parties, which is inappropriate at this stage of the proceedings"); CFTC v.

Incomco, 559 F.Supp. 529, 530-31 (S.D.N.Y. 1989); SEC v. Treadway, 430 F.Supp.2d 293, 332

(S.D.N.Y. 2006) ("The Second Circuit has been lenient in allowing scienter issues to withstand

summary judgment based on fairly tenuous inferences.")

As the CFTC itself observed in In re Hohenberg Brothers, 1975-1976 Transfer

Binder Fut.. Comm. L. Rep. (CCH) ¶2271 (1977):

...where we are asked to infer an intent to manipulate the price of a futures contract from the facts and circumstances, <u>the credibility of witnesses is an important factor</u>.   The Court observed in *Great Western Food Distributors*, *supra*, that the <u>credibility and demeanor of witnesses is '[o]ften the "most telling part" of the evidence.'</u>" [Emphasis added]

(at p. 21,477).

Plaintiff has the burden of proving by a preponderance of evidence that Mr. Moncada had a "specific intent" on each of the eight days charged to manipulate the price of wheat.  <u>See</u>, e.g., <u>In re Indiana Farm Bureau Cooperative Association</u>, [1982-84 Transfer Binder Fut.. Comm. L Rep. (CCH) ¶21796 (1982) (cited by plaintiff).  As the Court noted in <u>In re Amaranth Natural Gas Commodities Litigation</u>, 587 F.Supp.2d 513 at 534-5 (S.D.N.Y. 2008) (cited by plaintiff):

...in close cases, there should be no liability.  The laws that forbid market manipulation should not encroach on legitimate economic decisions lest they discourage the very activity that underlies the integrity of the markets they seek to protect,...plaintiffs face a substantial hurdle in alleging that a legitimate transaction plus scienter constitutes commodities fraud.

The Court further observed that "[if] a trading pattern is supported by a legitimate economic rationale, it cannot be the basis for liability under the Act because it does not send a false signal." (<u>Id</u>. at 534).

As the CFTC said in <u>Indiana Farm Bureau</u>, <u>supra</u> at p. 27,283:

Since the self-interest of every market participant plays a legitimate part in the price-setting process, it is not enough to prove simply that the accused intended to influence price.

Plaintiff has failed to address the central question concerning Mr. Moncada's trading pattern and whether it evinced an attempt to manipulate:  First, if Mr. Moncada intended to take advantage of an artificial price created by his large lot orders, why, in the "bulk" of his

trades, would he wait several minutes to an hour to execute the orders?  Surely, common sense dictates – and Mr. Bessembinder found – that whatever small effect Mr. Moncada's large lot orders had on the market would disappear in a matter of seconds.  Even in the 10 seconds after a large lot order, Mr. Moncada's trades (according to Mr. Bessembinder) were only "slightly" in the opposite direction of his large orders (EBT, p. 40).  Second, Mr. Moncada sought to manipulate its price, would he have executed numerous orders in the same direction as his large lot orders?  In short, the plaintiff's theory makes no sense given Mr. Moncada's actual practice.

Plaintiff asserts that "five facts about Mr. Moncada's trading show that he did not intend to fill his large lot orders." (Memorandum, p. 24).  Before addressing these "facts," it is important to note that plaintiff has misstated the issue.  The issue is not whether plaintiff "intended" to fill his contracts in their entirety, but rather whether the orders had "no legitimate economic rationale." (Amaranth, supra, at 534).

Mr. Moncada testified as to his reasons for placing the large lot orders. These reasons included a desire to obtain a partial fill by gaining priority with a large order, to test the market, to see if there was liquidity or to actually have his large lot orders filled.  Each of these rationales -- which implies a willingness but not necessarily an "intent" to have his orders filled in their entirety -- is a legitimate non-manipulative objective.  Plaintiff has produced no affidavit or report casting doubt on Mr. Moncada's explanation.  The only trader who has been proffered in this case, other than Mr. Moncada, is defendant's expert, Mr. Wollack, a lifelong trader and board member of CME, who has opined that in his opinion Mr. Moncada's pattern of trading was consistent with an economic objective other than an intent to manipulate.

The five "facts" which plaintiff claims show manipulative intent, fail to demonstrate such intent:

First, plaintiff points out ("Fact" #1) that Moncada accounted for a high percentage of all large lot orders on the charged dates. As noted above, plaintiff's comparison with other traders' practices is defective because it fails to account for other traders' "modifications" of large lot orders. Another trader might modify an order fifty times and it would count as only a single large lot order. Neither plaintiff nor its expert has suggested that there was anything suspicious about plaintiff's preference for cancelling and reordering, as opposed to modifying.

Moreover, even if there were reliable evidence that Mr. Moncada was an outlier, or had a unique method of trading, this would not show manipulative intent. Large volume alone is not proof of manipulative intent. See e.g. In re: Amaranth Natural Gas Commodities Litigation, 587 F.Supp. 2d 514, 535 (S.D.N.Y. 2008).

Plaintiff next asserts ("Facts" #2 and 3) that plaintiff quickly cancelled an unusually high percentage of his orders. Mr. Moncada testified — and his testimony is uncontradicted and unimpeached – that by placing a large lot order which is "aggressively priced", i.e., at or near BBO, if the order is not immediately executed, he had no incentive to leave it open. As he testified (EBT, p. 321), if, for example, he placed a large lot buy order, and the market went down, his order would be executed and he would lose money; if, on the other hand, the market went up, his order would not be executed (i.e., this order would now be below the market), and he would not make money (p. 321-324) (see also Bessembinder, pp. 25-26 and Wollack Report, p. 4). Only if the order is executed almost at once, before the market has had a chance to move up, would Mr. Moncada have an opportunity to earn a profit (Bessembinder, p. 65).

Mr. Moncada's technique of placing large lot orders at or near the market distinguished his trading style from that of traders who typically placed large lot orders at prices several ticks above or below the market, and who therefore could afford to leave their orders open for a longer period (Bessembinder, p. 66).

Plaintiff next asserts ("Fact" #4) that Mr. Moncada's large lot orders accounted for "very little trading." (Memo, p. 8). This claim is refuted by the evidence. In absolute terms (as opposed to percentages), Mr. Moncada purchased and sold a significant number of contracts through large lot orders. During the period studied by Bessembinder, Moncada actually purchased or sold upwards of 6,000 contracts via large lot orders, a number that represented 6.1 % of all trades from large lot orders in the entire market. In October alone, Mr. Moncada entered into more than 4,100 contracts resulting from large lot bids.  By any standard that is not, as plaintiff claims, "very little trading."  Indeed, Mr. Moncada's share of the market from large lot executions (6.1%) was more than triple his share of the market from small lot executions (1.9%) (Bessembinder EBT, p. 57).

Moreover, the 6,000 contracts traded reflect trades only on orders of 200 or more contracts.  In addition, Mr. Moncada's trading records (Attachments F-M to moving affidavit of Patricia Harris) show that on the eight days charged, Mr. Moncada actually executed 29 contracts of between 100 and 200 lots and 39 contracts of between 50 and 100 lots.  For a trader as prolific as Mr. Moncada, bids or offers of 200 lots or more would not seem out of the ordinary.

Plaintiff next asserts (Fact #5) that Mr. Moncada generally chose not to enter his large lot orders as "iceberg" orders.  As Mr. Wollack opines, traders and hedgers "are more likely to use iceberg orders whereas to Moncada time is much more of the essence and not conducive

to iceberg orders." (Wollack report, p. 4).   Mr. Moncada testified that "I don't use iceberg very often." (p. 229).

In short, plaintiff's five facts (Memorandum, p. 24) which it claims entitle plaintiff to summary judgment are at best the start of the inquiry, and a full trial is required to explore their reliability and import.

In addition to its five "facts", plaintiff makes a number of other assertions which are either inaccurate or not probative on the issue of intent to manipulate.

--   Plaintiff claims that Mr. Moncada did not testify that he intended to execute on large lot orders.   This is untrue.   As noted above (p. 13), Mr. Moncada did testify that he intended to execute at the right price.

--   Plaintiff claims that Mr. Moncada was unable to give a good reason for cancelling his large lot orders quickly (Memo, p. 14-15).   As noted above, this claim is also not true.   Mr. Moncada gave such testimony throughout his deposition (see, p. 14-15, supra).

--   Plaintiff points out (Memorandum, p. 7) that Mr. Moncada would place large lot buy and sell orders "within minutes" of each other. But plaintiff has not offered any evidence that this practice is unusual or suspicious.   Moncada bought and sold all day long, frequently switching from buy to sell on small as well as large lot orders. Frequently, he would place orders to buy at one price and sell at another price. (See e.g. Wollack report, p. 4).   As Mr. Moncada testified (p. 190):

Q:   Why then were you putting in sell orders for five lots between when you put in that 500 lot buy order and the 402 lot buy order?

A:   Sell orders were higher prices, so I was probably trying to buy at one price and sell on another.

29

-- Plaintiff contends, without further explanation, that there was something suspicious about Moncada placing his large lot orders at or near the BBO. (Memorandum, p. 9). Again, plaintiff has presented no evidence, or even a theoretical reason as to why this did not represent a legitimate trading strategy if the market price seemed attractive.

-- Plaintiff claims that Moncada's large lot orders affected market price. (Memo, pp. 9-10). However, as Mr. Bessembinder found, the effect was both slight and fleeting (less than one tenth of a cent for every thousand contracts ordered for less than 30 seconds). Most significantly, Moncada only rarely took advantage of the effect on market price by trading in the 20 seconds after placing a large lot order (EBT, p. 36) and, as Bessembinder acknowledges, most traders who pay attention will see not only the placement of a large lot order, but also its cancellation (EBT, pp. 63, 76-7; see also Wollack Report, p. 4). Indeed, traders who leave large lot orders on for longer periods than Moncada are far more likely to affect market price.

-- Plaintiff claims that Moncada "consistently" traded on the opposite side of the market following his large lot orders. (Memo, pp. 10-11). This claim is unsupported by the evidence. Mr. Bessembinder testified that on average, Mr. Moncada traded more often in the opposite direction following his large lot orders, but he candidly admitted that he did not quantify the percentage of trades in the opposite direction vs. trades in the same direction (EBT, p. 41). Moreover, he admitted that "it's out 10 minutes, 30 minutes, 60 minutes later that we see the largest cumulative trading in the opposite direction." (EBT, p.51).

-- Plaintiff asserts that a statistic from Bessembinder to the effect that five minutes after placing a large lot order, Mr. Moncada would execute an average of 19.3 contracts in the opposite direction for every 1000 contracts of large lot orders. As Bessembinder

acknowledged, however, there was no measurable effect on price beyond 20 seconds after a large lot order, and Mr. Bessembinder did not know how many contracts were executed in those 20 seconds. Accordingly, statistics showing trades five minutes after placing a large lot order are meaningless.

--      The plaintiff seeks to impute significance to a series of emails with fellow trader James Moriarty (Plaintiff's Memorandum, pp. 15-6). These emails reflect that on a particular date Moncada thought the market was going down and that -- consistent with that belief -- he placed two large lot sell orders. The scenario plaintiff attempts to create on the slim evidence of these emails (Memorandum, p. 38) is sheer fantasy.

--      The plaintiff seeks to draw an inference from the fact that on October 14, Mr. Moncada placed several large lot purchase orders in the last ten minutes of trading (Memorandum, p. 35). According to plaintiff's theory, BES and Serdika did not have the capital to obtain margin for these purchases. However, as Mr. Moncada testified at his deposition, margin is <u>not</u> required in the purchase of commodities unless a position is held overnight, and even then, it is not required to be posted until the next day (p. 93). This delay gave Mr. Moncada ample time to exit his position, even if he chose to maintain a position overnight as opposed to liquidating it in the last ten minutes of trading on the exchange. Given the speed with which trading occurred, Moncada would have had no difficulty covering all or a significant portion of his purchases prior to the close, thereby avoiding margin.

Furthermore, it is conceivable that Mr. Moncada was in a net short position in the last ten minutes, and wished to purchase a large lot in order to liquidate the short position. The Commission offers no evidence on this subject.

--      The plaintiff claims that a "frequent shift between large lot buy and large lot sale orders is 'highly unreasonable.'" (Memorandum, p. 35). However, plaintiff does not cite to any evidence for this proposition.

Plaintiff's cases are inapposite: The cases cited by the plaintiff featured conclusive proof that the defendant was engaged in manipulation. For example, in CFTC v. Parnon Energy, 875 F.Supp.2d 233 (S.D.N.Y. 2012), the Court, deciding a Rule 12(b)(6) motion, was confronted with a classic squeeze in which the defendant took physical possession of 92% of the oil traded on the market, causing spread prices to double. The defendant then dumped its physical inventory at a loss but made a substantial profit on the spread. The conspiracy to manipulate was supported by internal communications, and the market reacted so drastically that it shifted quickly from a condition of "backwardation" to contango (apparently a rare event).

Similarly, Cargill, Inc. v. Hardin, 452 F.2d 1154 (8th Cir. 1971) involved a classic "squeeze", a form of manipulation not alleged here.

The plaintiff also cites In re Diplacido [2007-2009 Transfer Binder Comm. Fut. L. Rep. (CCH) at ¶30,970 (2008)]. In that case, unlike the case at bar, there were numerous tape recordings spelling out the Respondent's manipulative intent. (At one point, the Respondent was heard to say, "Forget it, it's like murder.") (p. 62471). Moreover, in Diplacido, there was evidence of "uneconomic" trading, i.e., bidding to buy at prices higher than prevailing offers and offering to sell at prices lower than prevailing bids (p. 62,487). No such evidence exists at bar.

Plaintiff also cites In re Indiana Farm Bureau, supra, and In re Hohenberg Bros. [1975-1977 Transfer Binder Comm. Fut. L. Rep. (CCH) ¶2271 (1977)]. In each of these cases, the Commission found insufficient evidence of manipulation, and dismissed the proceeding.

Plaintiff claims at bar that defendant was guilty of "spoofing." However, Mr. Moncada's pattern of trading was dissimilar to the example of spoofing contained in the Bessembinder Report (see Report, para. 33, p. 15). Mr. Bessembinder, citing Hasbrouck and Saar, 2002, supra, gives as his only example of spoofing a sequence in which a trader places a small buy order priced above the current bid in hopes of convincing other buyers to match or outbid. If this occurs, the trader can then sell into the higher price. Unlike the plaintiff's theory of spoofing here, this example makes sense. The spoofer minimizes his risk by using a small order as bait. If he gets executed his loss is minimal. He them follows up with an execution of presumably a larger order, so that on balance he has made money.

Plaintiff's theory at bar turns the Hasbrouck and Saar example on its head. Mr. Moncada placed large orders at or near – but not above – the BBO, putting himself at risk; then, usually several minutes later, when his orders could not be expected to have any effect on prices, placed much smaller orders, thereby minimizing an opportunity for profit. As Mr. Bessembinder admitted, for a spoofer to be successful, he has to trade at a time when the market has reacted to the spoof (EBT, p. 103) -- not up to an hour later.

To support its claim that Mr. Moncada was guilty of spoofing, plaintiff cites two cases which were actually settlements, not contested litigations, and therefore have no precedential value. (In the Matter of Panther Energy Trading LLC [2012-2013 Transfer Binder Comm. Fut. L. Rep. (CCH) at ¶32686 (2013)]; and Matter of Escoval Dairy Trade Inc. [2011-2012 Transfer Binder Comm. Fut. L. Rep. (CCH) ¶32013 (2011)). It is noteworthy that in Panther, unlike the case at bar, the Respondent who was accused of spoofing placed and cancelled orders via electronic trading platform, which unlike the hand method used by Mr. Moncada, could cancel trades in a fraction of a second, thereby eliminating any risk of being

executed.   Second, in <u>Panther</u>, unlike the case at bar, the alleged spoofing offers were for purchases at ever increasing prices <u>above</u> BBO (for which there can be no legitimate economic motivation).

Third, in <u>Panther</u>, the Respondent designed his algorithm so that upon consummation of the trade for small lot orders, the algorithm would automatically reverse and enter large lot orders at in the opposite direction of the previous large lot orders.   Finally, in <u>Panther</u>, unlike the case at bar, the CFTC was able to show that the Respondent made a profit ($1.4 million) using the spoofing algorithm.

<u>Escoval</u> is distinguishable from the case at bar in terms of the quality of evidence. In <u>Escoval</u>, unlike the case at bar, the Respondent's employees exchanged several emails regarding use of a strategy designed to "push" prices higher than the existing market forces dictated so Respondent could establish large short positions.

II.

## MR. MONCADA DID NOT VIOLATE
## SECTION 4c(a) BY ENGAGING IN FICTITIOUS SALES

Plaintiff alleges that on four occasions Mr. Moncada caused BES or Serdika to place orders to buy or sell wheat contracts which were filled in whole or in part by the other company after a brief time interval, and that this activity violated Section 4c(a) of the Act (7 U.S.C. §6c(a) and Regulation 1.38 thereunder).

We agree with the plaintiff that there are no undisputed facts.  The only issue is whether Mr. Moncada's conduct, which he freely acknowledged, violated the law.

It is undisputed that on the four occasions referred to by plaintiff Mr. Moncada decided to offset a position in BES against a position in Serdika, to "close out" one of the positions (EBT, p. 254).  In pursuance of that goal, he caused one of these entities to offer to purchase or sell a number of contracts at a price and caused the other entity at a time interval ranging from .7 seconds to 17.5 seconds, to offer to sell or buy at the same price.  Although the offers and bids were ultimately filled, in three of the four cases they were filled only partially by trading between BES and Serdika.  That is, in three of the four instances, other traders met either BES' or Serdika's bid or offer for a portion of the orders (See Plaintiff's Memorandum, pp. 17-18).

In the fourth instance, on October 29, 2009, Mr. Moncada placed a sell order in the Serdika account and then waited 17.5 seconds before placing a buy order in the BES account, ample time for another trader to match the bid.

There is no claim by plaintiff that these transactions had any manipulative or nefarious purpose.

A "fictitious" or "wash" sale occurs where a trade is prearranged to occur in the market in such a way as to 1) eliminate all market risk and 2) for no "legitimate market purpose." Stoller v. CFTC, 834 F.2d 262, 264 (2d Cir. 1987).  (Id. at 266).  See also In the Matter of Collins, [1996-1998 Transfer Binder Comm. Fut. L. Rep (CCH) (1997) at p. 45,743.  The CFTC observed:

> …we have stated that
>
> 'the central characteristic of the general category of fictitious sales is the use of trading techniques that give the appearance of submitting trades to the open market while negating the risk or price competition incident to such a market.  Collins, ¶22,982 at 31,902.

The Second Circuit in Stoller quoted In re Collins, [1986-87 Transfer Binder Comm. Fut. L. Rep. (CCH) ¶23,401 (1986) as follows:

> Transactions structured to minimize rather than negate risk…do not violate Section 4c(a)…

Collins at ¶33,078.

At bar, Mr. Moncada's transactions were admittedly intended by him to effect a sale by one of his entities and a purchase by the other at the same price.  However, the transactions were not constructed to eliminate or negate a risk that some other trader might take a portion on all of the offered contracts.  The plaintiff's evidence shows that there was a gap of .7 to 17.5 seconds between the orders of BES and Serdika.  Although .7 seconds seems like a brief time, if it is assumed that the order is placed at the prevailing market price (plaintiff does not claim otherwise), the offer could have been accepted by other traders in microseconds, particularly if the other traders were using algorithmic trading methods.  Certainly, 17.5 seconds is an eternity in the commodities market, ample time for another bidder to accept an order.

The facts at bar actually demonstrate the risk involved. In three of the four instances in which BES and Serdika placed identical offsetting orders, some other trader or traders managed to take part of one of the orders. While the orders were all filled, they were not all filled by trades between BES and Serdika. As shown in the actual transactions, while the risk involved may not have been great, it was not entirely "negated."

Additionally, the reported cases appear to involve an intent to "mislead" or "to serve other illicit purposes." Stoller, supra at 266. See also Collins, supra, at p. 45,743:

> In Collins, ¶22,982 at 31,903 n. 34, we reiterated this view by defining "fictitious sales" as presenting a "false appearance coupled with market price circumvention." Since Collins we have continued to define the term "fictitious sales" to include those sales purportedly executed on an exchange which distort and/or mislead the commodity markets and their participants. [Citations omitted] [Emphasis supplied]

Here, there is no evidence that the orders in question were intended to or did deceive anyone, or that they were intended to or did distort the price.

For the foregoing reasons, the Court should deny plaintiff's motion for summary judgment as to the alleged "fictitious sales."

III.

## THE COURT SHOULD NOT GRANT
## THE RELIEF REQUESTED BY PLAINTIFF

Beginning at page 45 of its Memorandum in support, plaintiff discusses the relief it seeks in the event that summary judgment is granted as to liability.  Since plaintiff is not entitled to summary judgment on liability, the Court need not reach the issue of remedy on this motion.  If, however, the Court determines that plaintiff is entitled to judgment on its manipulative claim, the Court should not grant the draconian relief sought by plaintiff.

A.     A permanent injunction:  Defendant concedes that if the Court finds, contrary to our view of the evidence, that Mr. Moncada attempted to manipulate, some form of injunctive relief is well within the Court's discretion to grant.  Numerous cases, including cases cited by the plaintiff, enjoin the defendant from future violations of the commodities laws, however, they do not bar defendant from trading commodities for his own account.

In CFTC v. The American Board of Trade, Inc., 803 F.2d 1242 (2d Cir. 1996), the district court issued a permanent injunction but, as the Second Circuit observed,

> …the injunction was carefully tailored to avoid any interference with legitimate activities. Thus, the Court stated that the injunction was intended
>
> > 'to make the claim that the conduct which is permanently enjoined is conduct which is prohibited under the Act and the regulations thereunder.  The injunction is not intended to prohibit commodities option transactions or activities which conform to the requirements of the Act and the regulations thereunder.'

(80 F.2d at 1251).

See, also, CFTC v. Avco Financial Corp., 28 F.Supp. 2d 104 at 120 (S.D.N.Y. 1998); CFTC v. Hall, 2013 U.S. Dist. LEXIS 165540 (Md. N.C. 2013 at *17-18), and CFTC v.

U.S. Metals Depository Co., 468 F. Supp. 1149 (S.D.N.Y. 1979) (cited by plaintiff in its Memorandum, p. 47), in which the district court enjoined defendants from future violations of the Act, but not from trading.  And in CFTC v. U.S. Metals, supra, 468 F.Supp. at 1162, 63, the Court found that defendants engaged in pervasive and systematic illegality, including running a boiler room, and that they defrauded numerous customers.  The Court ordered a permanent injunction, "to put a stop to [defendant's] unrepentant fraud on the public."  (468 F.Supp. at 1163).  However, the Court apparently limited the scope of the injunction to "future violations of the Act."  (See, Plaintiff's Memorandum, p. 47).

Plaintiff cites two cases in other circuits in which courts have extended the permanent injunction to encompass all commodities related activities.  In CFTC v. Wilshire Inv. Mgm't. Corp., 531 F. 3d 1339 (11th Cir. 2008), the Court upheld a complete bar where defendants had been found to have defrauded customers including multiple acts by multiple brokers at multiple times.  Plaintiff also cited CFTC v. Noble Wealth Data Info. Servs., Inc., 90 F.Supp. 2d 676 (D. Md. 2000).  In that case, as in Wilshire, defendants were found to have defrauded the public through the operation of commodities firms.  In Noble Wealth, defendants engaged in "mass marketing to small investors."  Defendants misappropriated funds and misled investors.  In short, they committed blatant acts of fraud on unsophisticated individuals.

Plaintiff also cites CFTC v. Rosenberg, 85 F. Supp. 2d 424 (D. N.J. 2000),  in which the Court enjoined defendant "from trading commodities on behalf of others."  (Plaintiff's Memorandum, p. 47).  However, that case is inapposite since Moncada was not engaged in the business of trading commodities "on behalf of others."

Unlike in the cases in which a defendant has been barred from commodities trading, Mr. Moncada is not alleged to have defrauded customers or misappropriated funds.  He

is not even accused or manipulation, but of attempt.  It is not claimed that he profited from his alleged misconduct or that other traders suffered losses.

Plaintiff's conduct in prosecuting this case was not consonant with a belief that Mr. Moncada poses a danger in the future.  Plaintiff was aware of Mr. Moncada's conduct at bar in 2010 (when it conducted on the record interviews); yet it did not then and has not to date sought a preliminary injunction.

For these reasons, any injunction should not be so restrictive that Mr. Moncada cannot in the future trade commodities.

Nor does the charge of four "fictitious" purchases and sales warrant a trading ban. Mr. Moncada is not alleged to have entered into these trades with any manipulative or other bad intent.  He merely sought to close out a position in one account by purchasing or selling commodities to another.  He was advised that the only way this could be accomplished was through trades on the open market (EBT, p. 254).

Under the circumstances, if the Court finds Mr. Moncada violated §4c(a), the Court should, at most,  issue a "cease and desist order" or the equivalent but should not prohibit Mr. Moncada from trading.  See, e.g. In re Piasio, 2002 CFTC LEXIS 13 (2002), aff'd., Piasio v. CFTC, 54 Fut.. App. 702 (2d Cir. 2002).

B.    Any civil monetary penalty should be commensurate with absence of demonstrated loss to the public or gain to the defendant and Mr. Moncada's negative net worth:

In R&W Technical Services, Ltd. v. CTFC,  205 F.3d 165, 178 (5th Cir. 2000), the Court found the imposition of a penalty by the CFTC to be "capricious and indefensible."  In addressing the issue, the Court stated the law as follows (205 F.3d at 178):

> In calculating a civil penalty, "the financial benefit that accrued to the respondent and/or the loss suffered by customers as a result of the wrongdoing are especially pertinent factors."

See, also, CFTC v. Hall, supra (2013 U.S. Dist. LEXIS 165540 at *19-20) and In re Grossfeld (1996-1998 Transfer Binder Comm. Fut. L. Rep. (CCH) ¶ 44468 at n.34) (1996).

In this case, the CFTC has made no effort to show -- and indeed has not even alleged -- that Mr. Moncada either caused a monetary loss to any member of the public or experienced a monetary gain as a result of his alleged attempt to manipulate. Mr. Moncada received no money from BES or Serdika after October 9, 2009. In fact, in October 2009, Mr. Moncada apparently lost money trading, as indicated by the fact that in December of that year, he was required to return $300,000 to Serdika. Obviously, Mr. Moncada received no compensation attributable to his alleged manipulative conduct.

In addition to considering the defendant's gain or the public's loss, the Court should also take into account the financial condition of the defendant. In CFTC v Hall, supra at *20, the Court said:

> "Some authority establishes that the [Court] may, in its discretion, consider Defendant['s] net worth in assessing a civil penalty under 7 U.S.C. §13a-1(d)(1)." CFTC v. King, No. 3:06-CV-1583-M, 20007 U.S. Dist. LEXIS 33338, 2007 WL 1321762, at *5 (N.D. Tex. May 7, 2007) (unpublished); see, also, CFTC v. R.J. Fitzgerald & Co., No. 8:99-CV-1558-T-MSS, 2006 U.S. Dist. LEXIS 31841, 2006 WL 1406542, at *1 (M.D. Fla. May 19, 2006) (unpublished) ("The case law cited by [the] [d]efendants shows that the changes in [the] Act in 1992 does [sic] not bar the introduction of such evidence. The Court will consider evidence of [the] [d]efendants' 'net worth' or ability to pay when determining the amount of civil penalties to assess this case.

As shown in the attached affidavit of Mr. Moncada, he has a negative net worth of approximately $24,000.

As to the charge of "fictitious trading", we submit that any penalty be nominal.  In Piasio, supra, the Court approved a $40,000 fine for eleven wash sales.  However, the penalty was subject to a hearing with respect to Respondent's ability to pay.

CONCLUSION

Plaintiff's motion for summary judgment should be, in all respects, denied.  In any event, the Court should not issue an injunction barring defendant from trading and should not impose a monetary penalty in excess of a nominal amount, taking into consideration the lack of demonstrated profits to defendant or losses to others, and Mr. Moncada's reduced economic circumstances.

Dated:     New York, New York

February 26, 2014

Respectfully submitted,

Litman, Asche & Gioiella, LLP
Attorneys for Defendant Eric Moncada

By:     /s/     Richard M. Asche
Richard M. Asche-7081

140 Broadway – 38th Floor
New York, New York  10005
Tel. (212) 809-4500
Fax (212) 742-8757