UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

U.S. COMMODITY FUTURES TRADING
COMMISSION,

                              Plaintiff,                       Civil Action No. 12 CV 8791 (CM)

            -against-

ERIC MONCADA,                              ECF Case
BES CAPITAL LLC, and
SERDIKA LLC,

                        Defendants.

-------------------------------------------------------X


### DEFENDANT'S RESPONSE TO PLAINTIFF'S
### STATEMENT PURSUANT TO LOCAL RULE 56.1
### <u>AND DEFENDANT'S STATEMENT OF DISPUTED FACTS</u>


      Defendant Eric Moncada, for his response to Plaintiff's Rule 56.1 Statement of

Undisputed Material Facts, states:

| <u>Paragraph</u> | <u>Response</u> |
|---|---|
| 1-21 | Defendant admits the truth (but not the relevance) of these paragraphs. |
| 22 | Defendant admits that Moncada withdrew funds, which included contributed capital, between October 2008 and October 9, 2009 and avers that Moncada repaid Serdika $300,000 on November 23, 2009. Defendant denies that any of these funds represent trading profits in connection with the charged dates. |
| 23 | Defendant admits the truth of this paragraph. |
| 24 | Defendant admits the truth of this paragraph, except avers that Moncada was not required to post margin until the day after the trades, if he still held the position (Moncada EBT, p. 93). |
| 25-30 | Defendant admits the truth of this paragraph. |

31              Defendant admits the truth of this paragraph, except denies that Moncada would have had to post margin overnight. Margin was required to be posted, or the position liquidated the next morning. (Moncada EBT, p. 93)

32-37           Defendant admits the truth of these paragraphs.

38              Defendant admits the truth of this paragraph, except avers that the comparison plaintiff seeks to draw between the number of Moncada's large lot orders and the number of large lot orders of other participants in misleading. Other market participants would leave large lot orders on for an average of more than two hours, but would "modify" the orders as to price or size. According to Bessembinder, "we see a lot of modifications." (EBT, p. 27). Moncada, by contrast, would cancel and then reinstate his orders. This difference in technique is indistinguishable in effect. The statistics cited by Bessembinder do not include modifications (Bessembinder, p. 27) and Bessembinder did not quantify the number of modifications ordered by other traders. (id).

39              Defendant admits the truth of this paragraph.

40              Defendant admits the truth of this paragraph but denies that his large lot orders resulted in very little trading. In October 2009, the month which includes the charged dates, Moncada actually traded more than 4,100 contracts on his large lot orders. 14.4% of his large lot orders resulted in trades on the charged dates (Bessembinder Report, Table 5). In the period studied by Bessembinder, Mr. Moncada accounted for 6.1% of all trades resulting from large lot orders, as compared with 1.9% of all trades resulting from small lot orders (EBT, p. 57).

41              Defendant admits the truth of this paragraph, except avers that Moncada's percentage of trades to all trades in the market from large lot orders (6.1%) was more than triple his percentage to all trades in the market from small lot orders (1.9%) (Bessembinder EBT, p. 57).

42              Defendant admits the truth of this paragraph, except avers that the reasons other traders kept their trades open on average for 127 minutes were a) other traders placed trades at an average of 18 ticks from the BBO, while Moncada placed his trades at or near BBO, so that other traders had far lower risk of having their orders accepted quickly; and b) other traders modified their orders frequently, whereas Moncada prepared to cancel and reorder. As Steven Wollack, defendant's expert noted, "position traders or hedgers tend not to cancel large orders as frequently because they want to be filled at a given price regardless of how long it takes." (Wollack Report, p. 4)

43              Defendant admits the truth of this paragraph.

44                    Defendant admits the truth of this paragraph, except avers that iceberg orders were not suitable for Moncada's method of trading because he wanted to execute his trades quickly or not at all (Wollack Report, p. 4).

45                    Defendant admits the truth of this paragraph.

46                    Defendant denies the truth of this paragraph and specifically denies that Mr. Bessembinder was referring to cancellation of large lot orders in his testimony.

47                    Defendant denies the truth of this paragraph and specifically denies Mr. Bessembinder's conclusion concerning "spoofing."

Defendant avers that the example given by Mr. Bessembinder of spoofing, which consists of a quote from Hasbrouek and Saar (Bessembinder, ¶33) is materially different from the pattern Bessembinder attributed to Mr. Moncada. In the only example given of spoofing in Mr. Bessembinder's report, a trader posts a small buy order priced above the current bid and then sells into this higher price. Presumably, the quantity sold exceeds the quantity purchased. By contrast, Mr. Moncada placed a large bid at or below the current bid, and long after his bid could have any effect on the market, placed a small order in the opposite direction. Thus, Mr. Moncada's risk substantially exceeded his potential reward unlike the spoofing described in the Bessembinder report.

Bessembinder admitted that "the lion's share" of Mr. Moncada's trading in the opposite direction occurred more than 20 seconds after the large order. "From several minutes to an hour later, the bulk of it." (EBT, p. 79).

48                    Defendant admits the truth of this paragraph.

49                    Defendant denies the truth of this paragraph, except admits that Bessembinder's report is accurately quoted. Defendant avers that if it was "striking" that Mr. Moncada's orders did not receive a higher percentage of execution, then the result probably would not have been predictable to Mr. Moncada either.

50                    Defendant admits the truth of this paragraph but avers that Mr. Bessembinder was unable to find any effect on price beyond 20 seconds after the entry of large lot orders (Bessembinder EBT, p. 36).

51                    Defendant admits the truth of this paragraph but avers that Mr. Moncada placed very few orders in the opposite direction within 20 seconds following his large lot orders (Bessembinder EBT, p. 36).

| | |
|---|---|
| 52 | Defendant denies the truth of this paragraph.  Mr. Moncada testified that he considered a large lot order to be larger than 500 (Moncada EBT, p. 155).  When asked if he thought a 500 lot order would have more of an impact than a two lot order, Mr. Moncada testified, "It seems like a – it could.  It depends on the market." (Id).  Mr. Moncada specifically denies that he "admitted that large lot orders could have an effect on the market even if only in the market for a fraction of a second."  (Moncada EBT, 318- 319). |
| 53 | Defendant denies the truth of this paragraph. |
| 54 | Defendant denies that Moncada "consistently" traded on the opposite side of the market after his large lot orders.  Bessembinder testified that he did not know what percentage of Moncada's trades after large lot orders were in the opposite direction.  Within the period in which any measurable change in price occurred following Mr. Moncada's large lot orders, Mr. Moncada entered an average of .65 contracts on the opposite side of every 1,000 large lot order. (Bessembinder EBT, p. 40; Report, Table 5) |
| 55 | Defendant denies the truth of this paragraph. |
| 56 | Defendant admits that this paragraph is accurate, but misleading.  The Court is respectfully referred to defendant's Statement of Disputed Facts, Facts #29-45 for a more complete description of defendant's trades as reflected in plaintiff's excerpts. |
| 57 | Defendant admits that this paragraph is accurate as far as it goes.  The Court is respectfully referred to defendant's Statement of Disputed Facts, Facts #46-51 for a more complete description of defendant's trades as reflected in plaintiff's excerpts. |
| 58, 59 | Defendant admits the truth of this paragraph. |
| 60 | Defendant admits that the excerpts from Mr. Moncada's deposition are accurately quoted, but avers that the quoted portion omits the following testimony on the same subject: |

> Q:   Were you fully – were you intending to execute those orders, though?  Those large lot orders?

> A:   If the market participants were willing to come to my price and trade on my price, and I put the order out there, yes, but that doesn't mean I could, that it necessarily was a good trade or that I would like it.

> Mr. Moncada also testified (pp. 324-325):

Q:      Why would you be putting a large lot order in that case at all?

A:      I would put it in with the <u>intention</u> of hopefully being filled from some order flow…[Emphasis added]

61-63      Defendant admits the truth of these paragraphs.

64      Defendant denies the truth of this paragraph and avers that Moncada gave a reason for cancelling his large lot orders quickly not reflected in plaintiff's Statement of Undisputed Facts. (Moncada EBT, p. 320-21 and <u>see</u> Defendant's Statement of Disputed Facts #7-11).

65-68      Defendant admits the truth of this paragraph.

69      Defendant admits the truth of this paragraph and avers that if Mr. Moncada thought the wheat market was going lower at the close, it would be logical for him to enter large lot sell orders. The date of this email is <u>not</u> one of the dates charged in this case.

70-80      Defendant admits the truth of these paragraphs.

81      Defendant admits the truth of this paragraph but refers to the Wollack report for the contents thereof which is far more extensive than reflected in this paragraph, and which is quoted throughout defendant's Memorandum in Opposition.

<u>Additional Facts as To Which There Exists a Genuine Issue to Be Tried</u>

1.      <u>Mr. Moncada had legitimate business purposes for entering large lot orders on the eight charged dates.</u>

2.      Mr. Moncada placed large lot orders as a way of testing the market or "asking for liquidity" (EBT, p. 99, 129-130). According to Mr. Wollack, using large lot orders to "test the strength of a trader's position or the direction of the market" is a normal strategy for active traders such as Moncada (Wollack Report, p. 3).

3.      Mr. Moncada's testimony that by placing and cancelling orders, he was seeking liquidity or signally interest finds resonance in an article relied on by Mr. Bessembinder (cited at para. 33 of the Bessembinder report). This article, written in 2002 by Joel Hasbrouek

and Gideon Saar (then professors at the Stern Business School at NYU) and titled "Limited

Orders and Volatility in a Hybrid Market:  The Island ECN", seeks, in part, to explain the

phenomenon of "fleeting orders" and states:

> Another possible reason for a fleeting limit order is that the submitted wants to <u>fish for hidden orders</u> that better the opposing quote.  A buyer, for example, might submit an order priced just short of the ask quote, hoping to trade against any hidden sell orders.  Here as well a fleeting limit order represents a liquidity demander, rather than a supplier.  Smart order routing systems may also submit limit order in an attempt to uncover hidden limit orders.  The distinction we make here is that such practices may be carried out by a human trader rather than a computer system...
>
> The fact that many of the fleeting orders are visible, though, suggests that finding hidden sellers is not the only motive, and that the brief display serves some purpose.  The display might <u>signal tentative buying interest to prospective sellers</u>, without going so far as to provide them with a firm option. [emphasis supplied]

(Exhibit B to Affirmation of Richard M. Asche in Opposition to Motion).

The Hasbrouek and Saar article also discusses "spoofing" as a "potential"

explanation but gives as an example of spoofing a fact pattern dissimilar to that presented here.

4.    Mr. Moncada placed orders based on his "view of the market."  He was

more than willing to trade large lots at a specific price and time, but not willing to leave his order

to the mercies of a changing market (EBT, pp. 324-5)

5.    Mr. Moncada testified that he placed large lot orders in order to get size

priority on his trade, also a rationale endorsed by Mr. Wollack (Report, p. 3)

As Mr. Moncada testified (EBT, pp. 138, 139):

> A:    The market has a size priority function in it, in the matching order.  If you are one of the bigger bids or offers in the engine, whether you're first or last, you could potentially get a partial fill.

Q:      Did you ever – is there a shorthand that we can use for this rationale just for simplicity's sake?

A:      Size priority.

Q:      Size priority, okay.  Let's talk about size priority.

        Do you ever recall, or do you recall placing any orders, large lot orders on October 2009, in an effort to get size priority?

A:      Yeah.

According to Mr. Wollack, obtaining time and allocation priority was an "important" reason for frequently entering and cancelling orders (Report, p. 3).  Mr. Wollack also opined that Mr. Moncada had non-manipulative reasons for placing large lot orders.  Mr. Wollack found nothing unusual or suspicious in Mr. Moncada's trading pattern. He opined that:

> Moncada's trading style of buying and selling thousands of contracts and at times using large lot orders indicates he relied on a trader's intuition and feel of the market in addition to fundamental and technical analysis. <u>Sometimes large orders may be used to test the strength of a trader's position or direction of the market</u>. When executed on a large order, Moncada did not immediately exit the position but instead held it. He was an active trader, trading thousands of contracts per day.  At times, active traders such as <u>Moncada put large orders in the market feeling that the market was going in their direction and want to add to their position but only if immediately executed</u> (p. 2).

On the eight days charged in the complaint, Mr. Moncada traded 23,763 contracts or nearly 3,000 contracts a day.  (Attachments F-M to Harris Affidavit in support of motion).

6.      What Mr. Moncada was unable to do at his deposition in 2013 was to tell what his rationale was with respect to any <u>specific</u> large lot order or group of large lot orders four years earlier in 2009.

Mr. Moncada testified as follows (EBT, pp. 149-150):

7

Q:      You understand that there's a big difference between what you're saying of I wanted to send a signal to the market to get – to find somebody to come in and provide or to take the liquidity that I put out there, and I put out a big order to get a time priority – or a size priority?

A:      Well, those are two different situations that would arise in trading.

Q:      And could you tell when you used one versus the other?

A:      Could I tell from the data?  No.  I'd have to go back to the situation.

Q:      You couldn't tell from the data?

A:      No, not from the data from 2009.  We're talking about a situation in 2009.  You're asking me to remember how exactly I felt about the market and trading back then.

7.      <u>Mr. Moncada also had a rational business reason for cancelling his large lot orders quickly after placing them</u>.

8.      Mr. Moncada testified as follows (EBT, p. 320-321):

Q:      Apart from changes in the market, is there a reason why you would not have left a large lot order open for more than a fraction of a second? (sic)

A:      Yes.  The risk involved in a large lot order is again as I said big, and the risk reward also is a little challenging.  If you leave a large order in the market, and the market goes violently against you, you stand to have a lot of downside because you will get filled on that order and the market will move against you.  But if the market moves in favor of the order, you participate in zero upside because you were not filled and the market has moved in that direction.  So it seems logical to not want to leave your order, a stale order out there for a very long period of time.

Q:      Did you ever enter into a trade with the intent of moving the market?  Did you ever enter an order with the intent of moving the market?

A:      No.

9.      Mr. Moncada also testified in response to a question as to why he would quickly cancel.  "Well, the order didn't get filled immediately, and so I took the order out of the market to continue to figure out if and -- if and how I wanted to sell it."  (p. 164).  And at page 169:

Q:      What reason would you have for within 45 seconds put in three different sell orders for 302 lots, 402 lots and 402 lots and cancel them 8/10 of a second later?

A:      It looks like it would be multiple reasons but it looks like I didn't get any orders filled on my first two sell orders, <u>and moved my price down</u>. [emphasis added]

10.      Mr. Bessembinder endorsed Mr. Moncada's rationale for cancelling quickly (EBT, pp. 25-26)…

Q:      Why would you be putting in a large lot order in that case at all?

A:      I would put it in with the intention of hopefully being filled from some order flow.  If there was back and forth order flow and I got filled possible that would be a position I would be happy to take, <u>but I'm not going to leave the order out there for somebody to possibly take advantage of or lean against.  I'm prepared to make a decision on the market at that moment</u> and then change my mind, cancel and reevaluate.

Q:      When you said that you're not going to leave it out there for someone else to take advantage of, what do you mean by that?

A:      I mean if people sense that general weakness in the market and you have an order out there, it could be an order that somebody else finds, you know, as an advantage to take because it's an order that is a little mispriced.

Q:      You would be worried about leaving a large lot order in the market because someone would want to take advantage of it?

9

A:      <u>Because it could be a mispriced order</u>.

11.     Mr. Wollack also opined that

…"[f]or traders like Moncada there is no upside to leaving a
resting order waiting for the market to come back to his price
because the dynamics of the market may have changed.   If
Moncada was trading for the moment then he would want to be
immediately executed because he thought the market was going in
his direction.   If not executed then he would cancel because
otherwise if the market would move away from his order and then
subsequently come back to that price it might mean the market was
reversing.  To avoid this possibility, he would cancel his orders.

<u>Other traders did not have the same incentive as Mr. Moncada for cancelling large lot orders</u>.

12.     As Mr. Bessembinder wrote, other traders typically priced their large lot

orders an average of 18 ticks from BBO (Report, para. 24).  By contrast, Mr. Moncada placed his

bids at or near BBO (EBT, 66). Mr. Bessembinder acknowledged  that a trader (such as

Moncada) who priced his large lot  bids "aggressively" (i.e. at or near BBO) was more likely to

get executed than a trader who placed his bids several ticks away from the market (EBT, p. 64).

Since Mr. Moncada's bids were closer to BBO than other traders, a small change in price against

his bid could result in a loss to Moncada, whereas other traders would have a longer lag time

before their bids might be hit.  And, as Mr. Bessembinder acknowledged, "a trader who is more

motivated to get a trade done than others [would] tend to keep his offer on longer than one who

is more price sensitive." (EBT, p. 28).

13.     <u>Mr. Bessembinder's comparison of the placement and cancellation of</u>

<u>large lot orders as compared with other traders is misleading, if not meaningless</u>.

14.     Mr. Bessembinder acknowledged than many traders "modify" large lot

orders rather than cancelling them. That is, the trader would continually modify the bid price but

leave the bid open.  Mr. Moncada testified that he would cancel his large lot orders "to re-

evaluate." (p. 180). "When the orders don't get filled, I don't like leaving them in." (p. 187). Functionally, there is little difference between modifying an order and cancelling and then reentering an order at a different (or the same) price. But the cancellation rates Mr. Bessembinder reports for other traders <u>do not include modifications</u>. (EBT, p. 27). This throws into question the validity of Mr. Bessembinder's statistics. For example, if Mr. Moncada placed an order for 200 lots, cancelled it and placed it again and repeated this five times, Mr. Moncada would have placed six large lot orders, with six cancellations.  If trader A placed a 200 lot order and modified the asking price five times, he would have placed only one large lot order and had no cancellations. In short, the entire statistical difference between the ordering and cancellation activities of Mr. Moncada vs. the rest of the market could simply be explained by Mr. Moncada's preference for cancellation over modification as a technique of managing his orders.

15.     <u>Mr. Moncada's trading activity following the placement of large lot orders shows that he did not intend to manipulate prices.</u>

16.     Mr. Bessembinder attempted to determine whether Mr. Moncada's large lot orders had any impact on the market price of December wheat contracts, and, if so, whether Mr. Moncada's trades in the opposite direction of those orders benefitted from the impacted prices. Mr. Bessembinder concluded that Mr. Moncada's large lot orders had a very small impact on market price up to 20 seconds after the orders were placed, but he acknowledged that there was no measurable impact thereafter (EBT, p. 36). Further, Mr. Bessembinder admitted that  the "bulk" of Mr. Moncada's trading in the opposite direction of his large lot orders occurred "from several minutes to an hour" after placing large lot orders. (EBT, p. 79). "<u>It's out 10 minutes, 30 minutes, 60 minutes later than we see the largest cumulative trading in the opposite direction.</u>" (EBT, p. 51). [Emphasis added]

17.     The plaintiff's claim that Mr. Moncada traded "consistently in the opposite direction" of his large lot orders is not supported by Mr. Bessembinder's statistics or any other evidence.   Mr. Bessembinder opined that in the 10 seconds after placing a large lot order Mr. Moncada traded "slightly in the opposite direction" (EBT p. 40), .65 contracts per thousand lot large order on the charged dates (Report Table 8).   Mr. Bessembinder made no effort to measure Mr. Moncada's trading at 20 second intervals after placement of the large lot orders [EBT, p. 40].

18.     Mr. Bessembinder made no effort to determine the percentage of Mr. Moncada's trades which were in the opposite direction of his large lot orders (EBT, p. 41). Mr. Moncada's expert, Steven Wollack, gives examples of trades made by Mr. Moncada immediately following large lot orders which are in the same direction of those orders (Wollack Report, p. 5-11).   Even the examples provided by plaintiff in its motion papers show that, if anything, Mr. Moncada's trading in the 20 seconds after large lot orders was anything but consistent.

19.     Even in the twenty second window after placement of the orders, Mr. Bessembinder acknowledges that any impact Mr. Moncada's large lot orders had on price was barely measurable. According to Mr. Bessembinder, for every order of 1,000 large lots, the price moved less than a tenth of a penny (.096 cents) per bushel. (EBT, pp. 34-35). Since prices are quoted in increments of a quarter of a penny (.25), the theoretical movement caused by a 1000 lot order was not even enough to move the price one "tick" per thousand large lot contracts (EBT, p. 35).   A tenth of a penny price change per bushel on a 550 bushel contract -- if it could be measured -- would equate to $5.50 per contract.  Since Mr. Moncada traded an average of .65 contracts per 1,000 large lot orders in the opposite direction during the 10 seconds after his large lot orders, the average price benefit would have been $3.62.  However, Mr. Moncada never

placed a 1,000 lot order.  Typically, his orders were between 200 and 400 lots.  Assuming a 300 lot order, Mr. Moncada's "profit" from the impacted price would be $1.21 per contract.

20.     Mr. Moncada was willing to and did have his large lot orders executed

21.     Mr. Bessembinder acknowledged that Mr. Moncada's placement of large lot orders put Mr. Moncada at risk of having his orders accepted. (EBT, pp. 60-61). Mr. Moncada left his large lot orders open for an average of 2.1 seconds on the eight dates charged and 4.6 seconds on the three month period studied by Bessembinder. (Report, Table 3). According to Mr. Bessembinder, another trader wishing to execute against Mr. Moncada's orders could have done so within a millisecond (EBT, p. 14).

22.     Mr. Moncada did not take steps available to him to reduce the time his orders remained open.  Had Mr. Moncada intended to avoid being executed on his large lot orders, he could have employed readily available algorithm programs which could have canceled his orders within a microsecond. (EBT, p. 16).

23.     Not only was Mr. Moncada willing to have his large lot orders executed, but during the period studied by Mr. Bessembinder Mr. Moncada actually traded some 6,053 contracts as a result of his large lot orders.  These trades represented about 6.1% of all contracts traded as a result of large lot orders on the CBOT and KC exchanges during the period studied by Mr. Bessembinder (EBT, p. 52).  By contrast, Mr. Moncada accounted for only 1.9% of all small lot trading (Bessembinder EBT, p. 57).

24.     In the month of October alone, when the alleged manipulations occurred, Mr. Moncada traded 4,103 contracts resulting from his large lot orders (Report, Table 1).  On the eight charge dates, Mr. Moncada executed trades on 14.4% of the large lot orders he entered (Report, Table 5).

25.     When Mr. Moncada did execute his large lot orders, he was in no rush to exit his position.  Defendant's expert, Steven Wollack, a professional commodities trader and currently a member of the board of directors of the Chicago Mercantile Exchange Group (CME), which owns CBOT, notes (Exhibit A, pp. 4-5 to the annexed Declaration of Richard M. Asche):

> On September 22[nd] (Bessembinder pg. 21 para. 48) Moncada was long 20 contracts just before the execution of a large buy order at 12:37:02 that increased his position to 437 contracts.  He reduced his position to 306 contracts a little more than a minute later and waited another twenty three minutes (13:00:30) to reduce to 207 contracts.  It wasn't until the pit closed at 13:15 that he reduced his position to 22 contracts, approximately the same as before the large order execution.  If he did not intend to be executed he would have sold the entire executed order within a minute or two.  Traders typically get out a trade immediately after an error or order that is not wanted.  Moncada did not do this but instead he sat with 306 contracts for almost 23 minutes where every tick was $3825 and each one cent move was $15,300.  Then he reduced his position to 207 contracts which he held for fourteen minutes where every tick was $2587.50 and each one cent move was $10,350.  It wasn't until the pit close, 38 minutes later, that he finally liquidated the large order.  Clearly Moncada intended to be executed on this large order and took market risk.
> On October 6, 2009 (a relevant date) Moncada bought 200 contracts at 9:30:00 and his additional buying and selling resulted in an increase in his position to 239 contracts at 9:38:38.  It wasn't until 10:20:10 that he got out of his net long position.  By holding a net long position for 50 minutes indicates intent to be executed.
>
> On October 27, 2009 (a relevant date) Moncada bought 202 contracts at 10:10:22 increasing his long position to 429 contracts where every tick is $5362.50 and every one cent move is $21,450.  It wasn't until 12:53:26 that he exited the 202 extra contracts.  Clearly, taking two hours forty three minutes to get out of an order indicates intent to be executed.

26.     Thus, while Mr. Moncada traded "slightly" in the opposite direction within twenty seconds of his large lot orders, he actually executed trades on several thousand contracts

resulting from those orders.   And when those trades were executed, he was in no hurry to exit his position.

27.    Mr. Moncada does not appear to have profited from his large lot orders.

28.    The available evidence shows that October 2009 was not a profitable month for Mr. Moncada.  According to the chart contained in the moving Affidavit of Jessica Harris, para. 30 (p. 8), before October 2009 Mr. Moncada enjoyed substantial earnings overall as a member of BES and Serdika. The last payment he received from either firm, however, was on October 9, 2009, and could thus not have reflected any trading profits or losses for the month of October which is the focus of plaintiff's complaint. Mr. Moncada never drew any more money from the companies after October 9.  In December 2000, Mr. Moncada was actually required to repay $300,000 to Serdika (id), presumably to cover losses.

29.    The examples attached to plaintiff's moving papers failed to support plaintiff's theory of attempted manipulation.

30.    Plaintiff claims that "on each of the eight [alleged] attempted manipulation dates, Moncada placed and filled small-lot orders on the opposite side of his large lot orders in the same time period that he placed at least one large lot order" (Memo, p.11).  However, the examples chosen by plaintiff (Harris Affidavit, paras. 34-43 and Attachments R-AA) are equivocal at best, showing purchases both on the same side and on the opposite side, numerous large lot orders which were not followed by any trades, and trades on the opposite side preceding the large lot orders, none of which is consistent with plaintiff's theory.

31.    That Mr. Moncada evinced no pattern of trading consistent with the plaintiff's theory supports Mr. Moncada's assertion that he used these large lot orders to test the

market, because he wished to purchase the contracts, or because he was seeking priority – not because he wanted to manipulate the price.

32.    The handpicked examples provided by the Commission are found as attachments R-AA to the moving affidavit of Patricia Harris.

33.    <u>Attachment R (October 6, 2009)</u> – Attachment R shows seven large lot purchase orders.  According to plaintiff's theory, these should have been followed closely by small lot sales.  However, Attachment R shows that Mr. Moncada's first trades after three large lot purchase orders (for 500, 425 and 225 contracts) were <u>purchases</u> of 40 contracts.  This behavior is inconsistent with the CFTC's theory that Mr. Moncada placed and cancelled large lot purchase orders to bring the price up so that he could sell at a higher price.  Mr. Moncada did not execute any sales within 30 seconds of five of the seven large lot orders reflected on Attachment R.  Only 30 contracts were sold in the time period reflected on Attachment R.  As noted above, Mr. Bessembinder could find no effect on the market more than 20 seconds after a large lot order).

34.    <u>Attachment S (October 12, 2009)</u> – Attachment S shows five large lot purchase orders.  Zero small lot sales are recorded within two minutes of four of the five large lot orders.  A total of only 11 small lot contracts were sold within 30 seconds of the fifth large lot order.

35.    <u>Attachment T (October 14, 2009)</u> – Attachment T shows eight large lot purchase orders.  The first small lot trade following the large lot purchase orders was a <u>purchase</u>, not a sale, and therefore does not comport with plaintiff's theory.  There were no small lot sales with more than a minute of the first three large lot orders.  After the fourth and fifth large lot orders, Mr. Moncada first <u>purchased</u> five lots and then sold them.  27 seconds after the sixth

large lot order, Mr. Moncada sold 12 lots.  This sale occurred six seconds before his next large lot buy order.  There were no trades between the seventh and eighth large lot order, and then a sale of 20 lots after the eight large lot order.  This sequence does not support plaintiff's theory.  If Mr. Moncada intended to use large lot purchase orders to artificially increase the price, he would not have sold contracts four seconds <u>before</u> entering the large lot purchase order, but would have waited until the order had its desired effect of raising prices.

36.    <u>Attachment U (October 19, 2009)</u> – In this excerpt, Mr. Moncada placed and cancelled three large lot purchase orders.  The only trades within 30 seconds of the first two large lot orders were <u>purchases</u>, not sales, which is not consistent with the plaintiff's theory.

37.    After the third large lot order, Mr. Moncada sold the two lots he had purchased after the first large lot orders (at a loss of four ticks).  Thus, there is literally no evidence with respect to the example provided for this date to support the plaintiff's theory.

38.    <u>Attachment V (October 26, 2009</u> – This attachment shows that in the excerpt provided by the Commission, Mr. Moncada made no trades after the first of three large lot purchase orders, sold five contracts exactly 20 seconds after the second large lot purchase order, and six contracts shortly after the third.

39.    <u>Attachment W (October 26, 2009</u> – This attachment shows two large lot sell orders.  Following the first large lot sell order, Mr. Moncada executed no trades for nearly three minutes, long after his large lot sale orders could have had any discernible impact on price.  Mr. Moncada did purchase 30 contracts following the second large lot sell order.

40.    <u>Attachment X (October 27, 2009</u> – This attachment shows that within five seconds <u>before</u> placing any large lot sell order, Mr. Moncada <u>sold</u> 24 contracts.  Within seven seconds after placing the first two of three large lot <u>sell</u> orders, Mr. Moncada continued to <u>sell</u>,

17

eventually selling an additional 30 contracts Because Mr. Moncada was trading in the <u>same</u> direction as his large lot orders, this pattern does not fit the plaintiff's theory.  Thereafter, Mr. Moncada purchased 32 contracts beginning more than 21 seconds after his last large lot order. His large lot order had no measurable effect on price.

41.     The excerpt contained in Attachment X begins at 9:36:00 a.m.  As Mr. Wollack point out in his report (pp.6-7), just prior to the period reflected in plaintiff's exhibit, between 9:32:42 and 9:32:57, Mr. Moncada entered and cancelled two large lot <u>sell</u> orders.  Less than a second after the second large lot sell order was cancelled, Mr. Moncada <u>sold</u> 66 contracts, i.e., -- contrary to plaintiff's theory – immediately after cancelling a large lot order he traded a small lot in the <u>same direction</u> as the large lot orders, not the opposite direction.  His activity is inconsistent with the plaintiff's theory that by placing large lot purchase orders he hoped to increase the price so he could sell.

42.     <u>Attachment Y  (October 27, 2009)</u> – This attachment shows that Mr. Moncada placed and cancelled two large lot purchase orders.  Mr. Moncada sold zero contracts within <u>nine minutes</u> of the first such order or within <u>five minutes</u> of the second such order. When he finally did sell, long after large lot orders could have had any effect, he sold only four contracts.

43.     <u>Attachment Z (October 29, 2009)</u> – The excerpt contained in Attachment Z begins at 10:33:19 a.m.  As Mr. Wollack points out (Report, pp. 6-7), immediately before the period covered by plaintiff's excerpt, the record shows a different story.  At 10:23:45 and at 10:27:28, Mr. Moncada entered and then cancelled large lot <u>purchase</u> orders for 402 and 500 contracts, respectively (Wollack, p. 5)  Mr. Moncada's next trade was a <u>purchase</u> of 25 contracts, i.e., a trade in the <u>same</u> direction as two large lot orders.

44.   <u>Attachment AA (October 30, 2009)</u> – This attachment shows that three contracts were sold following each of two large lot purchase orders, but that zero contracts were sold following the third large lot purchase order.

45.   In summary, as the foregoing analysis shows, no trades in the opposite direction were placed within twenty seconds of 27 of the 41 large lot orders highlighted by plaintiff as prime examples of attempted manipulation.

46.   <u>The examples given in plaintiff's moving papers of a purchase of 202 contracts on October 27, 2009 is inconsistent with plaintiff's theory</u>.

47.   As reflected on Attachment N to the Harris Affidavit, Mr. Moncada's purchase of 202 lots occurred at 10:10:22. His first sale did not occur until 10:12:13, nearly two minutes later when he sold 20 lots. This sale occurred well beyond the time when the large lot purchases had any discernible influence on price. (Immediately after selling 20 lots, Mr. Moncada bought back 20 lots).

48.   Mr. Moncada then entered and cancelled large lot purchase orders at 10:14:30 (402 lots); at 10:14:59 (300 lots); at 10:18:22 (500 lots); at 10:19:13 (500 lots); at 10:21:59 (402 lots); at 10:26:15 (402 lots) and between 10:29:05 and 10:31:05 (nine orders of 202 lots each). During this entire period from 10:14:30 through 10:31:05, Mr. Moncada <u>did not sell a single contract</u>. Thus, although Mr. Moncada ordered and cancelled large lots 15 times, he did not trade after these orders even once. The first sale after the last of these 15 orders occurred more than one minute after 10:31:05, beyond the period when the orders could have had any effect on price. Indeed, during this period, Mr. Moncada actually purchased several lots; i.e., he traded in the <u>same</u> direction as his large lot orders (Harris Affidavit, Attachment N).

49.     Thereafter, Mr. Moncada ordered and cancelled contracts at 10:36:48 (500 lots) and 10:37:20 (402 lots) with no sales for more than two minutes.  Mr. Moncada also entered a large lot order for 402 contracts at 10:39:39 but did not sell any contracts for 46 seconds after that; and Mr. Moncada entered and cancelled large lot purchase orders at 10:45:20 (500 lots) and 10:54:30 (500 lots) while selling only a single contract during that period (Id).

50.     Conversely, in the excerpt provided by plaintiffs on Attachment N, Mr. Moncada sold 115 lots which were not preceded within 30 seconds by large lot purchase orders.

51.     In sum, 20 of the 25 large lot purchase orders placed by Mr. Moncada in the example posited by plaintiff were not followed by sales within the time frame when the large lot orders could have affected market price (Id).

52.     When Mr. Moncada entered large lot orders, he intended them to be executed at the time and price at which they were placed (Moncada EBT, p. 112).

53.     Mr. Moncada did not attempt to manipulate the price of wheat futures contracts on the dates charged in the Complaint or at any other time (Moncada EBT, p. 321).

### Alleged Fictitious Sales

54.     The BES and Serdika orders which comprise the alleged fictitious trades were placed in such a way that the companies faced a risk that their orders would be accepted by a trader other than BES or Serdika.  In fact, with respect to three of the transactions at issue, a third party accepted a portion of the contracts being offered.  With respect to the fourth transaction, the offer was open for 17.5 seconds.  (Harris Affidavit in support of motion, ¶s 16-22 and Attachment I).  The risk was not "negated."

55.     Mr. Moncada entered the trades comprising the alleged fictitious sales in order to close out a position in either BES or Serdika, but not with the intent of deceiving the market, moving the price or doing anything else illegal or improper.

<u>Penalty</u>

56.     Mr. Moncada has a negative net worth (Moncada Affirmation, Exhibit A).

57.     There is no evidence that Mr. Moncada profited from his alleged attempted manipulation.  Mr. Moncada received no funds from BES or Serdika resulting from his trading in October 2009.  Indeed, following October 2009, Mr. Moncada refunded to Serdika $300,000.  (Affidavit of Jessica Harris, ¶30).

Dated:      New York, New York
            February 26, 2014

                          Litman, Asche & Gioiella, LLP
                          Attorneys for Defendant Eric Moncada


                          By:     /s/    Richard M. Asche
                                  Richard M. Asche

                          140 Broadway – 38th Floor
                          New York, New York  10005
                          (212) 809-4500