# ATTACHMENT B

To Plaintiff's Memorandum in Support of Motion to Strike The Expert Report of Steven Wollack

## Deposition Transcript of Steven Wollack (excerpts)

1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE SOUTHERN DISTRICT OF NEW YORK

 3      UNITED STATES COMMODITY    )
        FUTURES TRADING            )
 4      COMMISSION,                )
                                   )
 5              Plaintiff,         )
                                   )
 6        vs.                      ) No. 12-cv-8791 (CM)
                                   ) (GWG)
 7      ERIC MONCADA; BES          )
        CAPITAL LLC; and           )
 8      SERDIKA LLC,               )
                                   )
 9              Defendants.        )

10          The deposition of STEVEN E. WOLLACK, ESQ.,

11      called for examination pursuant to the Rules of

12      Civil Procedure for the United States District

13      Courts pertaining to the taking of depositions,

14      taken before JENNIFER M. DALY, a Certified Shorthand

15      Reporter, within and for the County of Cook and

16      State of Illinois, at 525 West Monroe Street,

17      Suite 1100, Chicago, Illinois, on the 2nd day of

18      December, 2013, at the hour of 8:07 o'clock a.m.

19

20

21

22

23

24
```

2

```
 1                    APPEARANCES:

 2         COMMODITY FUTURES TRADING COMMISSION

 3         BY:  MR. ANDREW RIDENOUR, ESQ.

 4              aridenour@cftc.gov

 5              MS. JENNIFER S. DIAMOND, ESQ.

 6              jdiamond@cftc.gov

 7              MR. KENNETH McCRACKEN, ESQ. (Via Video)

 8                kmccracken@cftc.gov

 9              1155 21st Street, N.W.

10              Washington, D.C.  20581

11              (202) 418-5438

12              (202) 418-5531 (fax)

13                   On behalf of the Plaintiff;

14

15         LITMAN, ASCHE & GIOIELLA, LLP

16         BY:  MR. RICHARD M. ASCHE, ESQ.

17              richardasche@lagnyc.com

18              140 Broadway

19              New York, New York 10005

20              (212) 809-4500

21              (212) 742-8757 (fax)

22                   On behalf of the Defendants.

23   REPORTED BY:  JENNIFER M. DALY, RPR, CSR, CCR

24   LICENSE NO.:  084-004688
```

3

1                          I N D E X

2     WITNESS:   STEVEN E. WOLLACK, ESQ.

3     EXAMINATION                          PAGE

4     BY MR. RIDENOUR                      6

5     BY MR. ASCHE                         138

6

7

8                      E X H I B I T S

9     CFTC                                 PAGE

10    No. 1 -                              6

11    No. 2 -                              15

12    No. 3 -                              54

13    No. 4 -                              76

14    No. 5 -                              83

15

16

17

18

19

20

21

22

23

24

13

```
 1          A.    ███████████████████████████████
 2   as in boy, Chicago, ██████.
 3          Q.    What's your personal email address?
 4          A.    ████████████ .com.
 5          Q.    Are you known by any other names?
 6          A.    No.
 7          Q.    What is your date and place of birth?
 8          A.    ██████████████████████████████ .
 9          Q.    Mr. Wollack, you are being offered as an
10   expert witness by counsel for defendant Eric
11   Moncada, correct?
12          A.    Correct.
13          Q.    You're a licensed attorney, correct?
14          A.    Yes.
15          Q.    You're not testifying here as a legal
16   expert, correct?
17          A.    Correct.
18          Q.    You don't intend to provide legal
19   opinions for the Court, correct?
20          A.    Correct.
21          Q.    You don't intend to interpret the law
22   for the Court, correct?
23          A.    Correct.
24          Q.    What type of expert witness are you
```

14

1  acting as?

2          MR. ASCHE:  Object to form.

3          THE WITNESS:  A commodities and

4    futures expert.

5  BY MR. RIDENOUR:

6      Q.   What do you mean by "commodities and

7  futures expert"?

8      A.   Someone who has traded commodities and

9  futures since 1977, someone who has served on the

10  board of directors at the Chicago Mercantile

11  Exchange.  I've been an officer of the Exchange.

12  Someone who has been a chairman of the disciplinary

13  committees of the Chicago Mercantile Exchange.

14          So that's my background as to my

15  expertise in what I'm testifying about.

16      Q.   Are all --

17      A.   Let me make it clear:  I am not

18  testifying as a representative of the Chicago

19  Mercantile Exchange, on behalf of the Exchange.  I'm

20  testifying as an individual in my own capacity as a

21  trader and member of the Chicago Mercantile

22  Exchange.

23      Q.   Are all of the experiences that would

24  qualify you to act as a commodity and futures

```
 1   BY MR. RIDENOUR:

 2        Q.    Are you providing -- is your expert

 3   testimony based on an analysis of data?

 4        A.    Partially, yes.

 5        Q.    Do you have a background analyzing

 6   trading data?

 7        A.    A general background in the course of my

 8   experience as a trader as a member -- as a chairman

 9   of the disciplinary committees, do I sit there and

10   analyze data the same way as a market regulation

11   person would who's an auditor, no, but in terms of a

12   general oversight, a general looking at data, yes,

13   I've done that.

14        Q.    Mr. Wollack, the document that we've

15   marked as Exhibit 2, the document doesn't have page

16   numbers on it?

17        A.    Correct.

18        Q.    Can we agree to start marking pages

19   starting on the page with the header,

20   "Qualifications as an Expert" as page 1?

21             MR. ASCHE:  Yes.

22             THE WITNESS:  Yes.

23   BY MR. RIDENOUR:

24        Q.    Okay.  Could you, I guess, just go ahead
```

1    referred to it in the report as I didn't have the

2    data for that.

3         Q.    And what specific data are you saying

4    you didn't have access to?

5         A.    I believe it was Eric Moncada's trades

6    on those dates of -- there were, I think, three or

7    four dates that I didn't -- three dates I didn't

8    have data of; October 14th, 19th, and 30th of 2009.

9              So, I wasn't able to analyze any of the

10   trade data from that day.

11        Q.    If Mr. Wollack does supplement his

12   report, we would reserve the right to take a

13   separate deposition regarding any supplementation.

14        A.    Sure.

15        Q.    And when you're saying that you didn't

16   have access to trade data, what -- and it was trade

17   data regarding Eric Moncada's trades on three of the

18   dates?

19        A.    Correct.  And all of his large, you

20   know, lot orders that were either executed or

21   cancelled.

22        Q.    What data did you have access to when

23   you prepared your report?

24        A.    I had the trades he made on the days

1    about, I guess for the record, these are programs

2    where a computer reviews trade data and recommends

3    trades based on market factors?

4         A.    Those and then there are some where

5    there are so-called expert traders who will tell

6    you, based on their study of the market, that you

7    should buy or sell at a given level, or something

8    like that.

9         Q.    When you provided your expert opinion in

10   the Pearce matter, did you conduct any analysis of

11   any trading?

12        A.    No.

13        Q.    What was the ultimate outcome of that

14   case?

15        A.    A hung jury.  It was a criminal matter.

16        Q.    The second case that you reference on

17   page 2 of your expert report, which is marked as

18   Exhibit 2, is an NFA hearing testimony in

19   November 2012 in the matter Conway v. Dorman,

20   D-O-R-M-A-N, Trading, LLC, 10-ARB-120.

21             On whose behalf did you testify in that

22   matter?

23        A.    Conway, the plaintiff.

24        Q.    What were the allegations in this

1    matter?

2         A.    He claimed that the Commodity Trading

3    Advisor was not registered and gave bad advice.

4         Q.    What opinion did you provide in this

5    matter?

6         A.    I provided opinion as to his lack of

7    registration.

8         Q.    Did you provide an opinion on anything

9    else?

10        A.    No, I do not believe I did.

11        Q.    What was the basis for your opinion as

12   to the lack of registration?

13        A.    The NFA rules on registration and

14   exemptions for CTAs.

15        Q.    I guess, just to clarify for the record,

16   CTA is Commodity Trading Advisor?

17        A.    Correct.

18        Q.    And for the record, NFA is National

19   Futures Association, correct?

20        A.    Yes.

21        Q.    So just, I guess, to clarify, the

22   opinion that you provided was whether or not the

23   defendant in that arbitration was required to be

24   registered under NFA rules?

30

1          A.     Correct.

2          Q.     Did you conduct any analysis of trading

3     for that matter?

4          A.     No.

5          Q.     What was the ultimate outcome of that

6     matter?

7          A.     Conway obtained a judgment of -- an

8     award, I should say, of 500 and something thousand

9     dollars, but that was far less than he was asking.

10          Q.     And the third matter that you referred

11     to is the matter of Sonson, S-O-N-S-O-N, v.

12     MF Global Inc., matter in the U.S. District Court

13     for the Northern District of Illinois, Case

14     No. 1:10-cv-3870.

15               On whose behalf did you testify in this

16     matter?

17          A.     Mr. Sonson.

18          Q.     What were the allegations in this

19     matter?

20          A.     He claimed that MF Global improperly

21     liquidated his account without proper notice and

22     resulting in a huge loss to him.

23          Q.     What opinion did you provide in that

24     matter?

1      A.    I gave the opinion that MF Global

2  improperly liquidated his account.

3      Q.    Did you provide any other opinions in

4  that matter?

5      A.    No.

6      Q.    What was the basis for your opinion that

7  MF Global improperly liquidated the account?

8      A.    The rules of -- at the time of the

9  Chicago Mercantile Exchange providing you had to

10  provide reasonable notice, and the fact -- that plus

11  he was told by MF Global that he had until the end

12  of the business day to come up with additional

13  margin, and they, in fact, liquidated him several

14  hours before the close of the business day.

15      Q.    Did you conduct any analysis of trading

16  for this opinion?

17      A.    I -- I was aware of the positions that

18  he had and -- and the amount of the margin calls and

19  that, but no, I didn't conduct an analysis of

20  whether his positions were proper or how he was

21  trading or anything of that nature.

22      Q.    What was the ultimate outcome of this

23  case?

24      A.    It is -- as a result subsequent to my

52

1    part of preparation of this report?

2         A.    No.

3         Q.    On page 2 of your report, you state that

4    you reviewed court documents.  Which court documents

5    did you review?

6         A.    The Complaint.

7         Q.    Any other documents?  Any other court

8    documents?

9         A.    Probably the Answer.  I don't know

10   though.

11        Q.    When did you receive those documents?

12        A.    I'd have to check my time records, but

13   probably shortly after I was retained by Mr. Asche.

14        Q.    And when were you retained by Mr. Asche?

15        A.    Somewhere in June of this year.

16        Q.    And I guess, for the record, you just

17   looked back at your handwritten timesheets again?

18        A.    Correct.

19        Q.    And from whom did you receive the

20   Complaint and Answer?

21        A.    Mr. Asche.

22        Q.    On page 2 of your report, you state that

23   you reviewed "exhibits from Deposition of Eric

24   Moncada."

58

1        Q.      Was it one or two compact discs?

2        A.      I believe it was one.

3        Q.      Do you have the compact disc with you?

4        A.      No, I do not.  That I left at home.

5        Q.      Could we -- following up, could you

6    identify which compact disc you received from

7    Mr. Asche?  It should be marked as either Exhibit 7

8    or Exhibit 8.

9        A.      I don't know off the top of my head.

10        Q.      Following the deposition, could you just

11    check your file and see which one of those two you

12    received?

13        A.      Okay.

14        Q.      And did you open the CD?

15        A.      Quite honestly, no.

16        Q.      Turning back to page 2 of your report,

17    which is marked as Exhibit 2, you state that you

18    reviewed "a portion of the CFTC data."  What do you

19    mean when you refer to CFTC data?

20        A.      The trade data excerpts showing the

21    various trades of the various traders on a given

22    day.

23        Q.      Are these the exhibits that the CFTC

24    presented at Mr. Moncada's deposition?

59

1      A.     Those and there was also -- I don't know

2   what you call it.  There was a portion of all the

3   trades in a given day, trading date -- relevant

4   trading dates showing all the traders, the orders

5   entered and large lot orders, small lot orders,

6   trades executed, et cetera.

7      Q.     Was that also an exhibit to

8   Mr. Moncada's deposition?

9      A.     I don't recall if that was an exhibit or

10  if it was Mr. Asche got it for me, and I believe he

11  had requested it from your staff.

12     Q.     Was this in electronic format?

13     A.     Yes.  You had to open it up, and it

14  opened up into big spreadsheets.

15     Q.     So, the "CFTC data" that you refer to

16  here, does that show all market activity, not just

17  Mr. Moncada's?

18     A.     I believe it did, yes, and then you were

19  able to isolate each trader by moving in by filter

20  and the data that was set.

21     Q.     Did this trade data have a column that

22  showed who the trader was entering?

23     A.     Yes.

24     Q.     And did that -- in that column, did it

60

1    identify traders other than Mr. Moncada?

2         A.    Yes.

3         Q.    Were they anonymized so it only said

4    trader one, two, three?

5         A.    Correct.

6         Q.    And so when we're -- just to make sure,

7    when we talk about different types of data, when you

8    say "CFTC data," are you only referring to the data

9    that we just described that shows all market

10   activity, not just Mr. Moncada's?

11        A.    Well, I did refer to just Moncada's

12   activity.

13        Q.    And -- and trade data or -- would that

14   also be in electronic format?

15        A.    Yes.

16        Q.    So there are two sets of data?  I'm just

17   trying to make sure that we're very clear.

18        A.    Well, it was on one set of data, then

19   there were all these tag numbers for the different

20   traders.  Then if you filter in and put in Moncada's

21   tag number, then it would just have Moncada's

22   trades.

23        Q.    Okay.  So -- and I'm -- I'm just trying

24   to make sure that when we talk about -- when we use

61

1   a term like "CFTC data," we know exactly what we're

2   talking about and can tell because there were a

3   couple of different data sets that are involved

4   here.

5           So, when you say, "CFTC data," is that

6   exclusively that spreadsheet that will show all

7   traders, including Mr. Moncada, even if you can

8   filter, where it will only show Mr. Moncada's?

9       A.   Repeat it.  Is that -- you said

10  exclusively?

11      Q.   Right.  There's another set of trade

12  data that is -- that was generated by the Futures

13  Commission Merchant that only shows Mr. Moncada's

14  and does not show other traders.

15      A.   I've seen -- from Advantage Futures?

16      Q.   Yes.

17      A.   I've seen some of Advantage Futures's

18  documents, yes.

19      Q.   When you say, "CFTC data," are you

20  referring to --

21      A.   I would have included that in my

22  statement only because I -- maybe improperly I just

23  assumed that the CFTC obtained Advantage documents,

24  and, therefore, I considered them CFTC data, not

1    necessarily that you generated the daily statements

2    or the monthly statements from Advantage.

3         Q.    Okay.

4         A.    When I say, "CFTC data," I was referring

5    to all data that you had and then you forwarded.

6    So, that would have included the Advantage Futures

7    also.

8         Q.    Okay.  Okay.  So, I guess just to wrap

9    everything in a bow, when you say, "CFTC data," you

10   are referring to two different sets of data.  One

11   was produced by Advantage Futures, or generated by

12   Advantage Futures and then produced by the CFTC to

13   Mr. Moncada?

14        A.    Right.

15        Q.    The second set of data, which also falls

16   under the category "CFTC data," is the data that

17   shows trades by all market participants, including

18   Mr. Moncada?

19        A.    Yes.

20        Q.    Okay.  You state in your report that you

21   reviewed a "portion of the CFTC data."

22             What portion of that data did you

23   review?

24        A.    I reviewed -- I concentrated mostly on

63

1   Mr. Moncada's trades and large lot orders.

2        Q.    Did you use the filter function --

3        A.    Yes.

4        Q.    -- to isolate Mr. Moncada's trades?

5        A.    Yes.

6        Q.    What days of the CFTC data did you

7   review?

8        A.    They would be the days that I specified

9   in my report.  The eight relevant trade dates that

10  are in the Complaint.  I reviewed all the days

11  except for three dates:  October 14th, 19th, and

12  30th of 2009.

13       Q.    Did you review the entire days' trade

14  data for those days, for the days that you -- the

15  eight trade days minus the 14th, 19th and 30th?

16       A.    I looked at the days for Moncada's

17  trades, yes.

18       Q.    At the full day?

19       A.    Yes.

20       Q.    Did you look at trades placed by traders

21  other than Mr. Moncada?

22       A.    No, other than -- I should say just

23  generally, I just -- you know, I looked at the other

24  large lot traders just to see what they were and the

64

1    frequency, but basically, relied on Mr. Moncada's

2    data.

3         Q.    And when you say, "large lot orders,"

4    are you talking about orders for 200 lots or more?

5         A.    Yes.

6         Q.    When did you receive these documents or

7    the CFTC data?

8         A.    I don't recall.

9         Q.    Would your timesheets --

10        A.    They might reflect it.

11        Q.    Could you take a moment to review your

12   timesheet?

13        A.    Sure.   I would -- looks like around end

14   of June.

15        Q.    And from whom did you receive these

16   documents?

17        A.    Mr. Asche.

18        Q.    Did you receive them in electronic

19   format?

20        A.    Yes.

21        Q.    And did you get them on a hard drive or

22   how did you -- how did you physically receive the

23   electronic documents?

24        A.    It was a hard drive that was sent to me.

65

1        Q.    And approximately how many files were on

2   that hard drive?

3        A.    Too many.  I don't know.  I don't

4   recall.

5        Q.    More than 20?

6        A.    Documents you're saying?

7        Q.    Yes.

8        A.    Oh, I would say so, yes.

9        Q.    Over a hundred?

10       A.    Perhaps.  It was just a lot of

11   documents, a lot of data.

12             MR. ASCHE:  It was a large lot hard

13     drive.

14   BY MR. RIDENOUR:

15       Q.    On page 2 of your report, which is

16   marked as Exhibit 2, you state that you reviewed

17   "CBOT Time and Sales"?

18       A.    Yes.

19       Q.    What do you mean by "CBOT Time and

20   Sales"?

21       A.    The time and sales for the eight dates

22   in question.  The -- I asked the Exchange for the

23   time and sales for those dates.

24       Q.    By "the Exchange," you mean the CME?

75

```
 1    them from Mr. Asche or Mr. Moncada.

 2         Q.    Did the daily account statements that

 3    you receive have Bates numbers at the bottom of

 4    them?

 5         A.    Have what numbers?

 6         Q.    Bates numbers.

 7         A.    Bates numbers?  What are Bates numbers?

 8              MR. ASCHE:  They don't have them.

 9    BY MR. RIDENOUR:

10         Q.    They don't?

11         A.    There's no numbers at the bottom.

12         Q.    Okay.  No numbers at the bottom.

13              MS. DIAMOND:  Bates numbers are just

14         identification numbers.  Usually when you get

15         documents in, we'll number them so that we can

16         keep track.

17              THE WITNESS:  Okay.

18    BY MR. RIDENOUR:

19         Q.    Going back for a moment, you mentioned

20    that you had gotten a hard drive with electronic

21    documents on it.

22              Did you open all of the files on that

23    hard drive?

24         A.    I believe I opened all of them, and some
```

76

```
 1     of them I couldn't get all the data because it was

 2     beyond the spreadsheet capability of my Excel.

 3          Q.     Turning over to page 3 of your report,

 4     which is marked as Exhibit 2, in the third paragraph

 5     down starting with the phrase "One important

 6     reason" --

 7          A.     Mm-hmm.

 8          Q.     -- the second sentence, there's a

 9     parenthetical that says, quote, "CME Globex Product

10     Reference" --

11          A.     Correct.

12          Q.     -- end quote.

13                 What document is that?

14          A.     It's on the website.  It is a -- it

15     shows which products -- which algorithms -- matching

16     algorithms are applicable to which product and the

17     amount of the priority and pro-rata and FIFO

18     allocation to that order.

19          Q.     Mr. Wollack, I'm going to mark this

20     document as Exhibit 4, if you can please take a look

21     at it.

22                      (Wollack Exhibit No. 4 marked

23                        for identification.)

24                 THE WITNESS:  Okay.
```

79

1        10:41 a.m.

2    BY MR. RIDENOUR:

3        Q.    Just a follow-up on a previous question

4    that we had.  Earlier we were talking about daily

5    account statements that you received for the BES and

6    Serdika accounts traded by Eric Moncada.

7              Did you receive daily statements for --

8    what -- for what days did you receive daily account

9    statements?

10       A.    I'd have to check my folders.

11             October 6th, 30th, in no particular

12   order, October 1st.  Some of these are not complete

13   statements, they're just partials.

14       Q.    And if they're partial statements, do

15   you know what -- why did you only receive partial?

16       A.    I have no idea.

17       Q.    You said that the first is a partial

18   statement?

19       A.    First is a partial.  I did receive one

20   for October 8th, but that wasn't a relevant date.  I

21   don't think I even pulled the data.

22             October 12th, 13th, 14th, 19th, 26th,

23   that's a master, the 26th.  There's some dailies in

24   there too, and some non-master.  Then October 30th

1    was a partial of a master.

2        Q.   And you said that on the 1st and 30th,

3    you received partial account statements.  The

4    partial -- you received partial statements for the

5    master account?

6        A.   Yes.

7        Q.   Did you receive full statements for the

8    two sub accounts in which Mr. Moncada traded?

9        A.   I don't believe I did for October 1st.

10   October 6th I did.  Looks like I did for

11   October 12th, October -- let's see -- 13th is a

12   master here.  I might have been incorrect before.  I

13   did receive October 13th, but that's master only.

14   October 14th I received for the sub accounts, his

15   accounts.  October 19th is a master and his

16   accounts.  October 26th is a master and his

17   accounts, and October 30th was just the one page of

18   a master.

19       Q.   Did you receive any account statements

20   for any accounts for October 27th?

21       A.   If they're not here, I did not.

22       Q.   And also for October 29th, you didn't

23   mention that date.  Did you receive any account

24   statements for October 29th?

81

1          A.     Apparently not.

2                 I received the monthly statement.

3          Q.     Which accounts did you receive the

4    monthly statement for?

5          A.     For the Serdika and the BES Capital.

6          Q.     Was that for --

7          A.     4858 and 5187.

8          Q.     And that's for the month of October?

9          A.     Correct.

10         Q.     October 2009?

11         A.     Yes.

12         Q.     Just to confirm, there are no Bates

13   numbers or identifying numbers at the bottom of

14   any --

15         A.     No, none of the statements I received

16   were there any numbers at the bottom.

17         Q.     Going back to the document that we

18   marked as Exhibit 4 --

19                MR. McCRACKEN:  The list he just read

20      from, since there are no Bates numbers on them,

21      we're assuming they weren't produced by us.

22      Can he give us copies of those?

23                MR. ASCHE:  Sure.

24                THE WITNESS:  Yeah, sure.  Okay.

Wollack, Steven

82

1    BY MR. RIDENOUR:

2         Q.    You said earlier you're not sure if you

3    received those from Mr. Moncada or Mr. Asche?

4         A.    Correct.

5         Q.    But you had received them from either

6    Mr. Moncada or Mr. Asche?

7         A.    Yes.

8              MR. McCRACKEN:  Everything that came

9         from the CFTC, all the data would have had

10        Bates numbers on it, so . . .

11             MR. ASCHE:  He's not saying he didn't

12        get them also from the CFTC.  Just the ones he

13        was working on he didn't.

14   BY MR. RIDENOUR:

15        Q.    So the ones that you reviewed for --

16             MR. ASCHE:  He got a hard drive.

17   BY MR. RIDENOUR:

18        Q.    The ones he reviewed for purpose --

19             MR. ASCHE:  Right.

20   BY MR. RIDENOUR:

21        Q.    -- of preparing your report --

22             MR. ASCHE:  Right.

23   BY MR. RIDENOUR:

24        Q.    -- were the ones you received from

83

1    either Mr. Moncada or Mr. Asche?

2         A.    Correct.

3         Q.    Okay.  And I guess let's get back to the

4    document that we had previously marked as Exhibit 4.

5              Richard, when we had spoken, you

6    indicated that this was the document he got, his

7    understanding of the matching algorithm.

8              The document that you just gave us a

9    moment ago we're going to mark as Exhibit 5.  At the

10   top it says, "CME Globex Product Reference" dated

11   September 20, 2013.  It's a two-page document.

12                   (Wollack Exhibit No. 5 marked

13                    for identification.)

14   BY MR. RIDENOUR:

15        Q.    Mr. Wollack, where did you get

16   Exhibit 5?

17        A.    From the CME website.

18        Q.    And when did you download this document?

19        A.    I'd have to check my time records if I

20   even did that.

21             MR. ASCHE:  It's dated September 23rd.

22   BY MR. RIDENOUR:

23        Q.    Right.  It's dated September 20th at the

24   top of the document, and your expert report was

91

1    BY MR. RIDENOUR:

2          Q.    Did you review the transcript of

3    Mr. Moncada's deposition testimony?

4          A.    I read it.

5          Q.    When did you receive a copy of

6    Mr. Moncada's deposition?

7          A.    Well, I reviewed deposition exhibits on

8    July 23rd, so I would assume I reviewed it somewhere

9    around then.

10         Q.    And you're basing that recollection off

11   of?

12         A.    My timesheet.

13         Q.    To clarify, was this Mr. Moncada's

14   deposition from the litigation or prior

15   investigative testimony?

16         A.    I don't recall.

17         Q.    Who did you receive a copy of the

18   transcript of Mr. Moncada's testimony from?

19         A.    Mr. Asche.

20         Q.    Did you review transcripts of any other

21   depositions taken in this litigation?

22         A.    No.

23         Q.    Did you review transcripts of any

24   investigative testimony related to the CFTC's

1    investigation of Mr. Moncada?

2         A.    No.

3         Q.    Earlier you mentioned, I guess just to

4    clarify, that you reviewed the deposition exhibits

5    from Mr. Moncada's deposition on or about July 23rd.

6    At approximately that same time, you also read the

7    transcript of Mr. Moncada's deposition?

8         A.    I would assume so.

9         Q.    When did you first talk to counsel for

10   Mr. Moncada about acting as an expert?

11        A.    It would have been in June.

12             MR. McCRACKEN:  Andrew?

13             MR. RIDENOUR:  Yes.

14             MR. McCRACKEN:  Can I ask a quick

15      question to clarify?

16             MR. RIDENOUR:  Sure.

17             MR. McCRACKEN:  Mr. Wollack, you

18      mentioned that -- I think you testified a

19      moment ago you didn't recall whether or not

20      what you reviewed was Mr. Moncada's deposition

21      from this litigation or whether it was

22      investigative testimony.

23             Do you recall saying that?

24             THE WITNESS:  I recall saying that,

93

1        yes.

2                MR. McCRACKEN:  Okay.  Do you know

3        whether you received both the deposition and

4        the investigative testimony?

5                THE WITNESS:  I don't know for sure.

6        I do not believe I received the investigative

7        testimony, but I may be wrong on that.

8                MR. McCRACKEN:  Do you recall whether

9        the transcript that you reviewed was dated for

10       a deposition in, I believe, what, July 2nd or

11       3rd of this year?

12               THE WITNESS:  I don't recall the date

13       on the deposition.

14   BY MR. RIDENOUR:

15       Q.    Do you recall if it was a single day

16   transcript --

17       A.    No, I do not.

18       Q.    -- or a two-day transcript?

19       A.    I do not.

20               MR. McCRACKEN:  Did you rely on your

21       review of the testimony as to come to your

22       opinion in this report?

23               THE WITNESS:  I basically relied more

24       on the data, the trades that he made, and the

94

1   position that he had, not on the deposition

2   testimony.

3              MR. McCRACKEN:  I'm just trying to

4   clarify because we covered a couple times what

5   you relied on, and this is the first time you

6   mentioned reading his deposition, so I just

7   wanted to be clear whether you relied on his

8   deposition or not in preparing your report.

9              THE WITNESS:  I do not -- did not rely

10   on his deposition in preparing the report.

11              MR. McCRACKEN:  All right.

12   BY MR. RIDENOUR:

13       Q.    Mr. Wollack, had you met Mr. Moncada

14   before being retained as an expert witness in this

15   litigation?

16       A.    No.

17       Q.    How many times have you talked to

18   Mr. Moncada?

19       A.    I would say three or four times on the

20   telephone.  I've never met him personally.

21       Q.    What days did you -- what dates did you

22   talk to Mr. Moncada?

23       A.    I'd have to check my --

24       Q.    Yes, check your timesheets.

Wollack, Steven

97

1   me no.  And I relied on that.

2        Q.   What did Mr. Moncada tell you he used to

3   cancel -- to enter and cancel his orders?

4        A.   He said he did it manually.

5        Q.   And that conversation was either

6   July 11th or July 25th?

7        A.   Correct.  I assume it was one of those.

8        Q.   What else did you discuss with

9   Mr. Moncada on July 11th?

10       A.   Only in his assistance in getting me

11  data for the -- certain of the trade dates that were

12  in question that I didn't have and didn't have a

13  chance to review and so forth.

14       Q.   What else did you discuss with

15  Mr. Moncada on July 25th?

16       A.   That would, basically, be it.  Most of

17  my substantive conversations were with Mr. Asche.

18       Q.   Other than asking for Mr. Moncada's

19  assistance in getting data and the question as to

20  whether or not he was using high-frequency trading

21  algorithm, what other topics did you discuss with

22  Mr. Moncada?

23       A.   I may have -- I think I may have asked

24  him whether or not he had any particular trading

1    pattern or style in his trading, and, basically, I

2    think his answer was that he was pretty much -- how

3    do you want to -- what's the right word?  A

4    discretionary-type trader.

5         Q.    What do you mean by "discretionary-type

6    trader"?

7         A.    He would look at the markets, determine

8    whether he thought they were going up or down and

9    would enter orders accordingly.

10        Q.    Is "discretionary trader" an industry

11   term?

12        A.    I don't know if you'd call it an

13   industry term.  I refer to it as someone who's not

14   mechanical.  In other words, one who only trades

15   when certain -- I don't know if you call them --

16   not -- when certain trading patterns are, you know,

17   exhibited.  They don't go on the basis of feel of

18   the market.  They go on the basis of purely

19   technical analysis or pure fundamental analysis.

20             But a fundamental trader tends to be a

21   little discretionary because it's a question of

22   when -- when he decides to put the trade on based on

23   fundamentals, or as a technical trader, if he stays

24   with a system, will make his trade at a -- when his

1    various technical indicators fall in line with

2    whatever his particular technical system is and he

3    then makes the trade.

4              You can argue that even he's

5    discretionary because he could elect not to make the

6    trade even though the system tells him to make the

7    trade.

8         Q.   So, Mr. Moncada is not a chart trader?

9         A.   Oh, I don't know that he doesn't use

10   charts.  I don't -- I just -- he's not mechanical in

11   the sense that he relies on his own feelings and

12   opinions at the moment, in addition to doing charts

13   and fundamentals.

14        Q.   And when you use the -- "discretionary

15   trader" is your description of Mr. Moncada's trading

16   style, right?  It's not what he, himself, calls his

17   trading style?

18        A.   I don't know what he calls -- I don't

19   recall what he said his trading style is.

20        Q.   "Discretionary trader" is your

21   description of his trading style, correct?

22        A.   Yes, one's --

23        Q.   What else did Mr. Moncada tell you about

24   his trading style?

100

1          A.    That was, basically, it.  That he -- he

2     was active, made a lot of trades.  He took market

3     risk, he said.  He would take positions overnight.

4     Sometimes rely on the feel of the market, what he

5     felt the market was going to do.

6               Kind of eclectic.  Maybe that was the

7     word I meant to use instead of discretionary.

8          Q.    That's not an industry term?

9          A.    No.

10              MR. ASCHE:  In some industries.

11    BY MR. RIDENOUR:

12         Q.    Did Mr. Moncada talk to you about the

13    size of positions that he would carry overnight?

14         A.    I don't believe we discussed that.

15         Q.    Did you discuss the equity that he had

16    in his trading accounts?

17         A.    No.

18         Q.    Did you discuss the margin requirements

19    that he had in his trading accounts?

20         A.    No.

21         Q.    Other than what we've already covered,

22    did you discuss anything else with Mr. Moncada on

23    the telephone?

24         A.    No, not that I recall.

1          Q.    Did you review any documents while

2     talking to Mr. Moncada?

3               MR. ASCHE:  While?

4               THE WITNESS:  While I was on the

5        phone?

6     BY MR. RIDENOUR:

7          Q.    Correct.

8          A.    No, I do not believe I did.  Except --

9     no, I wouldn't review them when I asked him for some

10    technical help of how to download a document off the

11    hard drive and that, I didn't review the document.

12    I was just asking for his help in how do I do it.

13         Q.    Did you discuss with Mr. Moncada any of

14    the documents that you reviewed, such as the trade

15    data?

16         A.    No.

17         Q.    Did Mr. Moncada tell you why he placed

18    large lot orders in CBOT wheat futures in

19    October 2009?

20         A.    He mentioned that at times he felt the

21    market was going his way and would put in large

22    orders.

23         Q.    Did you discuss any particular trades

24    that Mr. Moncada or any particular large lot orders

1    that Mr. Moncada placed in the CBOT wheat futures

2    market in October 2009?

3         A.    No, I did not discuss individual trades

4    with him.

5         Q.    When did Mr. Moncada tell you that he,

6    at times, felt the market was going his way in the

7    CBOT wheat futures market?

8         A.    One of the telephone conversations.  I

9    don't know which date.

10        Q.    Was this before you reviewed the, what

11   you would call, the "CFTC data"?

12        A.    No, it would have been after I

13   originally looked at the data.

14        Q.    You had said that you didn't talk to

15   Mr. Moncada about any individual trades.  Did you

16   discuss any of the individual days charged in the

17   Complaint and in Mr. Moncada's trading on those

18   days?

19        A.    The only -- no, I would only -- I only

20   discussed -- no, I did not.  I just wanted to know

21   which of the two accounts he traded in and why he

22   used large orders, and that's, basically, it.

23        Q.    You said that's, basically, it.  Was

24   there anything else that you had discussed?

Wollack, Steven

1       A.    Other than asking his technical

2   assistance so that I could find out what trades he

3   made on a given day out of all that data, I can't

4   think of anything else that we discussed.

5       Q.    Did Mr. Moncada tell you why he canceled

6   large lot orders in the CBOT wheat futures market?

7       A.    He told me that at that moment he felt

8   that the orders should no longer be there for his

9   feel of the market.

10      Q.    Why did he say his orders should no

11  longer be there?

12      A.    I think, basically, he said that he

13  didn't get filled, and he didn't want the orders

14  anymore.

15      Q.    Did Mr. Moncada tell you that he

16  intended to fill his large lot orders in

17  October 2009?

18      A.    He said that he put in the orders.  If

19  he got filled, fine.  If not, he would cancel.

20      Q.    But did he say if he intended to fill

21  the large lot orders?

22      A.    I don't believe we discussed that.

23      Q.    Did you ask him if he intended to fill

24  the large lot orders he placed in October 2009?

1          A.     I don't recall if I asked him or not.

2          Q.     Earlier when you were discussing his

3     trading style as eclectic and you had talked about a

4     couple of different things that you had talked about

5     with him in terms of trading style, did Mr. Moncada

6     give you any examples of how he traded?

7          A.     No.

8          Q.     Did you ever discuss spread trading with

9     Mr. Moncada?

10         A.     No.

11         Q.     When you -- a couple of times you have

12    mentioned a "feel of the market."  Is that a term

13    that Mr. Moncada had used?

14         A.     I don't recall if he used that word or

15    not.

16         Q.     When you mention "feel of the market,"

17    what does that mean to you?

18         A.     At the moment a trader feels that the

19    market is going up or down from all of the data, all

20    the stimuli that he gets from observing price

21    movement, observing size, looking at his charts,

22    whatever it is.  It's just a feel that, "Oh, this

23    market is going higher or this market is going

24    lower," or, "I don't know where this market's

105

1     going."  So, that's a "feel of the market."

2          Q.    That's your understanding of the term?

3          A.    Yes.

4          Q.    Did you discuss that concept with

5     Mr. Moncada?

6          A.    I didn't discuss the concept, no.

7          Q.    Earlier when I asked you if Mr. Moncada

8     told you why he canceled the large lot orders in

9     October 2009, you mentioned that he felt his orders

10    should no longer be there based on his feel of the

11    market.  What did he tell you exactly that -- that

12    you then interpret as being based on his feel of the

13    market?

14         A.    Well, my -- my opinion of the way he

15    traded was that when he said that he no longer

16    wanted that order and he canceled it is that he felt

17    that conditions probably have changed.

18               I didn't go into great detail with him.

19         Q.    Did he talk about specific instances

20    where --

21         A.    No, we did not talk about specific

22    trades or instances.

23         Q.    Did you talk about the eight days

24    charged in the CFTC's complaint and his trading on

Wollack, Steven

1    those days?

2         A.    I did ask him which trades the CFTC was

3    specifically looking at, and he, quite honestly,

4    didn't seem to know.

5         Q.    For the eight days charged in the

6    Complaint, was that your only discussion with

7    Mr. Moncada about trading on those eight days?

8         A.    I believe so.

9         Q.    Mr. Wollack, I'd like to ask you a few

10   questions about your general experience looking at

11   trading data.

12             Have you ever had any experience doing

13   statistical analysis of trade data?

14        A.    No.

15        Q.    Earlier you had mentioned that in the

16   context of Business Conduct Committee proceedings at

17   the CME that you had looked at time and sales data.

18   When you looked at those time and sales data, what

19   were you looking for?

20        A.    We were looking for whether the trades

21   could have occurred when people said they occurred.

22        Q.    Those time and sales data, did those

23   relate to pit trades?

24        A.    Back then, yes.

107

1       Q.   So, those time and sales data did not

2  relate to electronic trading?

3       A.   There was not electronic trading in

4  those days to speak of.

5       Q.   Prior to your retention in this case,

6  had you ever reviewed trade data of an -- and aside

7  from your review of time and sales data at Business

8  Conduct Committee proceedings, had you reviewed

9  trading data of the sort that was produced to you by

10  Mr. Asche?

11       A.   No, except I have reviewed daily and

12  monthly statements before, but not the other data

13  which showed the -- all the trades of all the

14  various traders and what orders they entered, what

15  orders they canceled, et cetera.

16       Q.   And the daily and monthly statements

17  wouldn't include times the trades were executed,

18  correct?

19       A.   Correct, it wouldn't.

20       Q.   Mr. Wollack, if I can point you back to

21  your report, which we've marked as Exhibit 2, in the

22  second paragraph on Page 2 of your report, you refer

23  to "Moncada's trading style."

24       A.   Mm-hmm.

108

1        Q.     When you refer to Mr. Moncada's trading

2    style, is that based off of the conversations that

3    you had with Mr. Moncada?

4        A.     Well, partly.  He told me he had made

5    numerous trades, and so forth, but the data bore

6    that out.

7        Q.     The data bore out that he made numerous

8    trades?

9        A.     Correct.  And which he had told me he

10   traded a lot and took positions intra-day and

11   overnight.  The data bore that out.

12              I didn't have to -- I didn't have to ask

13   him whether he intended to be executed on large

14   orders because that's the basis of the Complaint,

15   and if he's -- no point in asking a question where

16   if he said -- if he denied it in his Answer, so, you

17   know, it was -- of course he intended to be executed

18   in large orders, otherwise he would have pled guilty

19   and the case would be over.

20              So, it's -- you know . . .

21       Q.     You said that the data bore out

22   Mr. Moncada's statements about that he made numerous

23   trades --

24       A.     Mm-hmm.

1          Q.      -- and carried overnight positions.

2                  Did you review the data to determine

3     what other market participants were doing in terms

4     of their trading style?

5          A.      No, I did not.

6                  I mean, I was aware from -- is it

7     Mr. Bessembinder?

8          Q.      Bessembinder?

9          A.      That Mr. Moncada's trades, percentage of

10    large orders vis-a-vis others, that I accepted his

11    data.  I didn't go and review the other traders and

12    what they did with their large orders and how many

13    trades they made and so forth.

14         Q.      Looking over to page 3 of your report

15    marked as Exhibit 2, in the first paragraph, about

16    halfway down the first paragraph you say, "In most

17    cases he was adding to an existing position."

18                 Do you see that?

19         A.      The first full paragraph or the partial

20    at the top?

21         Q.      The first partial paragraph.

22         A.      Yes.

23         Q.      What do you mean by, "In most cases"?

24         A.      Well, on the -- on the dates in

119

1    increments, and I found no evidence that all of a

2    sudden there were no trades for two, three, four

3    ticks, that there was no spikes up in the market

4    where you could get a five cent move in a matter of

5    a half a minute or a minute.

6              Seemed to me that a market participant

7    could get filled a quarter tick from wherever his

8    large order was entered.

9         Q.    So I guess to summarize, you're saying,

10   in your mind, "erratic price movement" is when the

11   price moves more than one tick between trades?

12        A.    More than one tick when there's lack of

13   liquidity, but this market was moving in almost --

14   in all instances moving in one-quarter ticks at the

15   most.  It would sometimes stay there for a while.

16   Sometimes his -- if he had a big buy order, it was

17   selling.  He was -- sometimes a big buy order was on

18   the bid side of the market, and he was selling on

19   the offer side of the market one quarter tick.  It's

20   not an erratic price.

21        Q.    What's your support for your

22   interpretation of erratic price movement?

23        A.    My experience as a trader.  A flash

24   crash would be an example.

120

1          Q.    You said that you didn't see any spikes

2    of such as a five cent move in 30 seconds to a

3    minute after the large lot order.  Did you do any

4    analysis of trade data to determine what price

5    movements did occur following the 710 large lot

6    orders Moncada placed on the eight days charged in

7    the Complaint?

8          A.    No, I did not.

9          Q.    Did you --

10         A.    I found -- I did look at Bessembinder's

11   report, and his data seemed to support my opinion,

12   although he reached a different conclusion.

13         Q.    By saying that his data supports your

14   opinion, what do you mean?  What data --

15         A.    I think he -- I think somewhere in his

16   report, if my recollection is correct, he said the

17   result of these large orders would increase the

18   bid-ask by one-tenth of one cent, or something,

19   which is less than the -- a one-quarter tick.

20              In other words, it didn't move the

21   market, and he says this is a result, this becomes a

22   result of excessive market movement.  And it just

23   isn't there.  The data's not there.  The market

24   never moved.

121

1          He makes a statement.  I could look at

2     it in his report, but . . .

3          Q.    Did you conduct any analysis of trade

4     data for time periods when Moncada was not placing

5     large lot orders to determine what average price

6     movement is in the CBOT wheat futures market?

7          A.    No, I just basically looked at the time

8     and sales and looked to see whether the market

9     during the day was moving in one-quarter tick

10    increments in which case it was doing so almost all

11    the time.

12         Q.    So you just eyeballed the time and

13    sales?

14         A.    Yeah, I looked down, but I didn't do

15    a -- any kind of detailed analysis.

16         Q.    Looking back --

17         A.    I did look at time and sales in relation

18    to some of his large lot orders that were entered

19    into the market to see whether that had an affect of

20    having the market run or not, and you know --

21         Q.    By "market run," what do you mean?

22         A.    Puts in an order to buy a large lot at

23    534 and a quarter, and I looked to see what the next

24    trades were, and it was 531 and a half, 531 and a

1    quarter, 531 and a half, three-quarters.

2              In other words, there was no -- I didn't

3    find any evidence that he put in a 500 lot order, a

4    large order, and the market went from 534 all the

5    way to 535 just like that.

6              In other words, it would just move up

7    orderly if it moved up at all.  Sometimes it didn't

8    move up at all.  Sometimes it actually came back

9    down.

10       Q.    Did you look to see how often after the

11   710 times that Moncada put in large lot orders the

12   price did move and in the same direction of his

13   order?

14       A.    No, I did not look in terms of make a

15   study of that.

16       Q.    A little bit farther down on page 3 at

17   the end of that first partial paragraph on page 3 of

18   your report, Exhibit 2, you state, quote, "In fact,

19   on some occasions, the market went the opposite

20   direction of his large buy or sell orders."

21             What do you mean by "opposite

22   direction"?

23       A.    Well, the one instance when he was -- I

24   think it was October -- I forget the date.  He was

124

1   interested in buying his orders, then he feels he's

2   in the right position, you know.  There's nobody

3   willing to sell to him.  So his long position is the

4   right position, and he cancels the order then when

5   he's not filled immediately.

6        Q.    When you said -- I guess the second part

7   of that is direction of the market.

8             Are you saying that large lot orders can

9   be used to test the direction of the market?

10       A.    Well, it's basically the same -- the

11  same thing.

12            In other words, if he puts in a large

13  buy order and no one sells to him, then he could

14  draw the conclusion that this market is more likely

15  to go up than go down.

16       Q.    Did Mr. Moncada tell you that he entered

17  large lot orders to test the strength of the market?

18       A.    Quite honestly, I don't recall if he

19  told me that or not.

20       Q.    In the next paragraph on page 3 of your

21  report marked as Exhibit 2, you state, quote, "One

22  important reason for frequently entering and

23  canceling orders is to obtain time and allocation

24  priority in the execution of his orders," close

128

1      just wanted to make sure "his."

2                  MR. ASCHE:  He's an expert in

3      commodities, not grammar.

4                  MS. DIAMOND:  Me either.  I just

5      wanted to make sure I understood "his."  Thank

6      you.

7                  THE WITNESS:  And then I went down to

8      explain, as an example, "Thus, if Moncada was

9      the first, he would get this."

10                 MS. DIAMOND:  Okay.  Thank you.

11     BY MR. RIDENOUR:

12          Q.    Turning over to page 4 of your expert

13     report marked as Exhibit 2, on the first full

14     paragraph about three-quarters of the way down, you

15     state, frequently -- sorry.  Quote, "Frequent

16     cancellation would not affect the price because

17     traders would notice, adjust their trading

18     accordingly and ignore frequent cancellations,"

19     close quote.

20                 Did you analyze the trading data in any

21     way to determine whether frequent entry and

22     cancellation of large orders would affect the price

23     of the CBOT wheat futures?

24          A.    Well, I already explained that I didn't

1    see where the large orders moved the market.  The

2    market seemed to be orderly trading in one-quarter

3    tick minimum increments.

4              What I was referring to here is that

5    somebody who trades a given market, in this case the

6    wheat market, if he's watching the market and he

7    sees all of a sudden the bids increase dramatically

8    and then decrease and increase and decrease, he's

9    going to see they're frequent cancellations, and he

10   will realize -- if he's an experienced trader, he'll

11   realize what's happening, that somebody's, you know,

12   doing this.  It could be a high frequency trader or

13   not.

14        Q.    Did you analyze the data to determine

15   if, in fact, other traders were reacting to

16   Moncada's large orders and cancellations?

17        A.    No, I did not.

18              MR. ASCHE:  Well, other than --

19   BY MR. RIDENOUR:

20        Q.    Have you ever --

21              MR. ASCHE:  -- what he testified

22        before that he saw that the market didn't go up

23        or down more than one-quarter tick.

24              MR. McCRACKEN:  The testimony speaks

130

```
 1        for itself, Richard.  You don't need to start

 2        clarifying what he said.

 3               MR. ASCHE:  It wasn't a question of

 4        the testimony.  It was the question he hadn't

 5        said anything yet.

 6   BY MR. RIDENOUR:

 7        Q.    Did you --

 8               MR. McCRACKEN:  Let's let the witness

 9        answer.

10               MR. ASCHE:  Let Mr. Ridenour conduct

11        the examination.

12   BY MR. RIDENOUR:

13        Q.    Did you ever conduct a survey of other

14   traders to determine if, in fact, traders do adjust

15   their trading and ignore frequent cancellations?

16        A.    No.  I just know that my own experience

17   as a trader, if I see somebody doing that in a

18   market that I'm trading and following closely, I

19   realize what's happening and --

20        Q.    So, this is based on your trading

21   experience?

22        A.    Just my trading experience and the fact

23   that my trading experience and my background would

24   tell me that any other experienced trader, if he
```

1    noticed that was going on, would know what's

2    happening, and it happens with high-frequency

3    trading and algorithm trading much more frequently

4    than it used to because these orders can go in and

5    out extremely quickly.

6         Q.    You stated earlier that you never used a

7    high-frequency trading algorithm?

8         A.    No, I never.  I never used it myself.

9         Q.    On page 6 of your report, marked as

10   Exhibit 2, in the paragraph under the header

11   "October 27th," about a little over halfway down --

12   I'm sorry.  Hold on one second.

13             On -- my apologies.

14             On the first full paragraph on page 6 of

15   your report, the third sentence, quote, "The large

16   buy orders had little or no effect," close quote.

17             What do you mean by "little effect"?

18             MS. DIAMOND:  Do you see where that is

19     in the report?

20             MR. ASCHE:  Do you see where they are?

21             THE WITNESS:  Mm-hmm.  Yes.

22             MS. DIAMOND:  Okay.

23             THE WITNESS:  Well, what I meant by

24     that is that if he's got a large buy order and

132

1       he's selling one or two ticks better than his

2       large buy order, if it was one tick better,

3       it's, basically, had no affect.  It's the offer

4       side of the market.  And little effect would be

5       if he was able to sell two ticks better; but,

6       you know, it wasn't like you put in what he's

7       referring to.  It's not like he's putting in

8       large orders and all of a sudden he's able to

9       sell four, five, six, seven ticks better.

10      He's, basically, selling on the offer side of

11      the market.

12  BY MR. RIDENOUR:

13          Q.    Or possibly one tick better?

14          A.    Possibly one tick better, but you have

15  to realize he was also taking market risk at that

16  point in time.

17          Q.    Over on page 8 of your report --

18          A.    Mm-hmm.

19          Q.    -- the first paragraph under

20  "October 12th," you state, quote, "Moncada may have

21  anticipated that the market was not going higher and

22  decided to liquidate a position -- a portion of his

23  long position," close quote.

24              Did Moncada tell you that he anticipated

133

1   the market was moving higher in this instance?

2          A.    No.

3                MR. ASCHE:  Off the record a second?

4                MR. RIDENOUR:  Sure.  Off the record

5      at 12:12.

6                     (Discussion held off record.)

7                MR. RIDENOUR:  Back on the record at

8      12:13.

9   BY MR. RIDENOUR:

10         Q.    Looking over at page 9 of your report,

11  marked as Exhibit 2, the top sentence, it says,

12  quote, "Time and sales for the relevant dates does

13  not indicate any increased volatility during the

14  period of his large canceled orders to the time of

15  the executed smaller trades," close quote?

16         A.    Mm-hmm.

17         Q.    The time and sales you reference here,

18  that's the same time and sales data that you got

19  from the CME, correct?

20         A.    Correct.

21         Q.    You stated earlier that you did not

22  perform any statistical analysis of any of the trade

23  data, correct?

24         A.    Correct.

Wollack, Steven

134

1        Q.    So, you did not determine what average

2    volatility is in the CBOT wheat futures market,

3    correct?

4        A.    Correct.

5        Q.    And you did not perform any statistical

6    analysis to determine volatility in the CBOT wheat

7    futures market following Mr. Moncada's large lot

8    orders, correct?

9        A.    Correct.

10            MR. RIDENOUR:  Can we take a

11       five-minute break so we can talk to Ken and try

12       to --

13            MR. ASCHE:  Do you want us to leave

14       the room?

15            MR. RIDENOUR:  Yes, if you can,

16       please.

17            Off the record at 12:14 p.m.

18                (Recess taken.)

19            MR. RIDENOUR:  Back on the record at

20       12:30.

21            MS. DIAMOND:  During the testimony, we

22       discussed obtaining documents from you,

23       Mr. Wollack.

24            THE WITNESS:  Yes.